UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br>    501 Front St.<br>    Norfolk, VA 23510,<br><br>ANIMAL LEGAL DEFENSE FUND,<br>    170 East Cotati Ave.<br>    Cotati, CA 94931,<br><br>HOWARD GARRETT, and ORCA NETWORK,<br>    485 Labella Vista Way<br>    Freeland, WA 98249,<br><br>            Plaintiffs,<br><br>            v.<br><br>MIAMI SEAQUARIUM,<br>    4400 Rickenbacker Cswy.<br>    Miami, FL 33149,<br><br>FESTIVAL FUN PARKS, LLC, D/B/A PALACE ENTERTAINMENT,<br>    4590 MacArthur Blvd., Ste. 400<br>    Newport Beach, CA 92660,<br><br>            Defendants. | Civ. No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This is a citizen suit, brought pursuant to Section 11(g)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(A), to address ongoing violations of the ESA and its implementing regulations arising out of the operation of the Miami Seaquarium ("Seaquarium"), a marine animal display facility located in Miami-Dade County, on Virginia Key, Florida. Plaintiffs bring this lawsuit against Defendants for "taking" the endangered orca Lolita in violation of the ESA and its implementing

1

regulations. Specifically, the Seaquarium confines Lolita – a highly intelligent, social, and complex individual – to a small, shallow, and barren concrete tank, without adequate protection from the sun, and without a single orca companion. For more than forty years, Lolita has been unable to swim any meaningful distance, dive, forage, or carry out virtually any natural behaviors, and has been forced to spend the majority of her life at, or just below, the surface of the water, with only animals of other species with which she is not compatible. These inhumane conditions "harm" and "harass" Lolita in continuing violation of the "take" prohibition of the ESA. Plaintiffs seek declaratory and injunctive relief to end these violations.

## Jurisdiction and Venue

2.   This Court has subject matter jurisdiction pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331.

3.   Plaintiffs have complied with the pre-suit notice provisions of the ESA. Pursuant to Section 11(g)(2)(A)(i), 16 U.S.C. § 1540(g)(2)(A)(i), on May 11, 2015, Plaintiffs mailed to Defendants, the Secretary of the Department of Commerce ("DOC"), and the Assistant Administrator for the National Marine Fisheries Service ("NMFS"). A notice of violation and intent to file suit ("Notice of Intent"), attached hereto as Exhibit A. More than sixty days have passed since the Notice of Intent was served on Defendants and these agencies.

4.   Neither the Secretary nor the United States has commenced or is diligently prosecuting any action to redress the violations set forth in the Notice of Intent. *Id.* § 1540(g)(2)(A)(ii)–(iii).

5. Venue is appropriate in the Southern District of Florida, pursuant to Section 11(g)(3)(A) of the ESA, *id.* § 1540(g)(3)(A), because the violations of the ESA set forth herein occurred, and continue to occur, within this judicial district.

## Parties

6. Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") is a Virginia non-stock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code, with its headquarters located in Norfolk, Virginia. PETA is dedicated to protecting animals from abuse, neglect, and cruelty. It undertakes these efforts through public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, administrative petitions and comments, and lawsuits to enforce laws enacted to protect animals. It brings this case on its own behalf to protect its organizational interests and resources.

7. As part of its organizational activities, PETA has been and will continue to be required to expend resources educating the public about the unlawful and inhumane conditions in which Lolita has been kept for decades at Seaquarium. Seaquarium misrepresents to the public, including children, that the manner in which Lolita is held and exhibited is both lawful and humane and "Lolita is healthy and thriving." However, these conditions cause Lolita much harm and harassment. Accordingly, PETA has been and will continue to be required to spend resources informing the public that, in fact, the conditions under which Lolita is held cause her to suffer greatly. PETA has also been and will continue to be required to spend resources to urge Seaquarium to release Lolita from these harmful conditions. PETA has been and will continue to be

required to expend these resources as a direct result of the unlawful and inhumane conditions in which Seaquarium holds Lolita.

8. PETA's injuries are likely to be redressed if Lolita is removed from these unlawful conditions and placed in a more natural setting where she could live in an appropriate environment and be treated humanely. PETA will no longer have to expend resources educating the public about or seeking to improve the unlawful and inhumane conditions in which Lolita is kept because Seaquarium would only be able to maintain Lolita by providing her with a larger living space, shelter from the sun, and a companion of her own species, or, if unable to provide her with these basic necessities in compliance with the ESA, by ensuring that Lolita is transferred to a different location, such as a sea pen or seaside sanctuary in her home waters of Washington State, where she can experience conditions that are consistent with her biological and other needs.

9. The resources PETA spends educating the public that the conditions under which Lolita is presently kept are unlawful and inhumane, and urging Seaquarium to release Lolita from these conditions, could then be directed to other PETA projects, including efforts to protect other marine mammals and other animal species, in furtherance of its overall mission.

10. Plaintiff Animal Legal Defense Fund ("ALDF") is a non-profit corporation and charity pursuant to Section 501(c)(3) of the Internal Revenue Code, based in Cotati, California. For more than three decades, ALDF has fought to protect the lives and advance the interests of animals.

11. ALDF spends substantial resources each year advocating on behalf of animals used for exhibition and entertainment. ALDF files lawsuits and administrative

petitions, including filings directly related to Seaquarium and Lolita, and also spends resources educating the public regarding the unlawful and inhumane conditions in which Lolita is kept. Like PETA, ALDF has been and will continue to be required to spend these resources on trying to correct the public misimpression fostered by Seaquarium that Lolita is healthy, happy, and living in lawful and humane conditions, and urging Seaquarium to improve her conditions or release her, as long as the Seaquarium continues to maintain Lolita in these conditions. ALDF has been and will continue to be required to expend its resources as a direct result of Seaquarium's failure to comply with the ESA by maintaining Lolita in unlawful and inhumane conditions.

12. This drain on ALDF's resources is likely to be redressed if Lolita is removed from these unlawful conditions and placed in a more natural setting. ALDF would no longer have to expend resources educating the public about the unlawful and inhumane conditions in which Lolita is kept, nor would it have to continue urging Seaquarium to improve her conditions or release her.

13. Those resources could then be directed to other ALDF projects, including efforts to protect and conserve orcas and other animals, in furtherance of its overall mission.

14. Plaintiff Orca Network is a non-profit organization based in Freeland, Washington, and dedicated to raising awareness of the killer whales of the Pacific Northwest and the importance of providing them healthy and safe habitats.

15. Orca Network's activities include tracking and documenting the activities of the L pod of the Southern Resident Killer Whale ("SRKW") population—the pod from which Lolita was captured—and educating the public online and by presentations locally

and worldwide about the natural history of the SRKWs, Lolita's capture, the conditions in which she is held at Seaquarium, the misperception perpetrated by Seaquarium that she is being treated humanely, and a proposal for her to be returned to her natural habitat.

16.    Orca Network is injured by having to spend resources to educate the public that Seaquarium's practices create the false impression that Lolita is being treated in a lawful and humane manner, when in fact the conditions under which she is maintained are extremely inhumane and unlawful, and by urging Seaquarium to improve her conditions or release her.

17.    Orca Network's injuries are likely to be redressed if Lolita is removed from these unlawful conditions and placed in a more natural setting because Orca Network will no longer have to expend resources educating the public about the unlawful and inhumane conditions in which Lolita is kept because Seaquarium would only be able to maintain Lolita by providing her with improved living conditions or ensure that she is sent somewhere else that can humanely and lawfully care for her.

18.    These resources could be spent on the organization's other projects to protect and conserve the still-wild members of the SRKW population and other orcas.

19.    Plaintiff Howard Garrett lives in Freeland, Washington, and is the director of Orca Network. For many years he has derived significant aesthetic pleasure from studying and observing the SRKWs.

20.    Mr. Garrett has followed Lolita's plight for decades. Since 1993, when he developed a personal bond with Lolita upon first seeing her in person, he has visited her at Seaquarium on several occasions. Each time, he has suffered great aesthetic harm

from seeing her held in inhumane and unlawful conditions—i.e., in an extremely small and shallow tank without protection from the sun or any companions of her own species. Mr. Garrett is forced to make the choice of having to visit Lolita at Seaquarium and suffering additional aesthetic harm from seeing her held in these conditions, as well as contributing monetarily to the very facility that is causing her suffering, or refraining from visiting her to avoid that harm—both of which cause him additional aesthetic injury. Because of Mr. Garrett's well-known dedication and commitment to Lolita, members of the public who visit Lolita also regularly contact him with reports, photographs, and video of her conditions.

21. For years, Mr. Garrett has submitted materials both to Seaquarium's owners and the federal government in an effort to obtain lawful and more humane treatment for Lolita, and he regularly contributes to social media discussions regarding Lolita's plight and efforts to rescue her.

22. Mr. Garrett's aesthetic injuries are likely to be redressed if Lolita is removed from these unlawful conditions and placed in a more natural setting where she can be humanely and lawfully cared for. If Lolita were placed in lawful and humane conditions or sent to a coastal sanctuary in her native waters, Mr. Garrett would visit her often to study, photograph, and observe her, and do everything possible to assist in her transition.

23. Defendant Festival Fun Parks, LLC, d/b/a Palace Entertainment ("Palace"), is a limited liability company organized under the laws of Delaware with its corporate headquarters in Newport Beach, California. Defendant owns and operates

Seaquarium and is ultimately responsible for the unlawful acts described in this Complaint.

24. Defendant Miami Seaquarium is the entity under which Palace operates the marine animal facility, and is responsible for the unlawful acts described in this Complaint.

## Statutory Background

25. The ESA defines an "endangered species" as "any species which is in danger of extinction." 16 U.S.C. § 1532(6).

26. Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of any endangered species.

27. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" includes an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

28. Section 9(a)(1)(D) of the ESA, 16 U.S.C. § 1538(a)(1)(D), also makes it unlawful to "possess, sell, deliver, carry, transport, or ship" any endangered species that has been unlawfully taken in violation of Section 9(a)(1)(B).

29. Section 11(e)(4)(a) of the ESA, *id,* § 1540(e)(4)(a), provides that all wildlife taken, possessed, transported, delivered, or received contrary to the provisions of the ESA "shall be subject to forfeiture to the United States."

30. These prohibitions apply to endangered animals held in captivity as well as those in the wild. *See, e.g.,* 80 Fed. Reg. 7380, 7385 (Feb. 10, 2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status."); *id.* ("captive members of a listed species are also subject to the relevant provisions of section 9 of the ESA as warranted").

**General Allegations**

31. Seaquarium is a marine animal park located at 4400 Rickenbacker Causeway on Virginia Key in Miami-Dade County, Florida. Seaquarium confines and exhibits marine animals and charges the public a fee to view, feed, and interact with the animals.

32. Among the animals confined at Seaquarium is the orca known as Lolita, the lone surviving captive member of the endangered SRKW Distinct Population Segment ("DPS"), and the only orca at Seaquarium.

33. Lolita was captured from the "L" pod of the SRKW population on August 8, 1970, in Penn Cove off the coast of Washington State. She was approximately 3 to 6 years old at the time of her capture. Lolita was then purchased by Seaquarium, where she has been held since September 24, 1970.

34. The SRKW DPS is listed as endangered under the ESA, 50 C.F.R. § 224.101; 70 Fed. Reg. 69903 (Nov. 18, 2005), and, following a petition submitted by

Plaintiffs, Lolita is specifically included in the listed SRKW DPS, *see* 80 Fed. Reg.7380 (Feb. 10, 2015) (amending the regulatory language of the ESA listing to remove the exclusion for captive orcas); *id.* at 7388 ("[T]he ESA does not support the exclusion of captive members from a listing based solely on their captive status.").

35. As of December 31, 2014, the SKRW population totaled only 79, making it one of the most endangered populations on the planet. The SRKWs became endangered, in large part, due to captures in the 1960s and 1970s for marine parks such as Seaquarium. More than a dozen orcas were reportedly killed and more than 40 others were captured and delivered to marine parks around the world, including Seaquarium.

36. The brief page of Seaquarium's website in which Lolita's species, *Orcinus orca*, is discussed, lists the "Status" of the species as "Healthy Populations."

37. Seaquarium does not possess a permit from NMFS to "take" Lolita.

38. In their natural habitat, members of the SRKW DPS are far-ranging and deep-diving, and they exhibit strong and long-lasting social bonds in complex societies with unique genetic and acoustic characteristics.

39. Orcas are also extremely intelligent mammals whose brains are highly developed—in some respects even more than humans—in areas related to complex cognitive functions such as self-awareness, intuition, judgment, social and emotional cognition, culture, and language.

40. At Seaquarium, Lolita—who is approximately 20 feet long and weighs 7,500 pounds—is confined to a small, shallow, and barren concrete tank, without adequate protection from the sun, without a single orca companion, and with animals of

other species that are not biologically or socially compatible with her. For more than forty years, Lolita has been unable to swim any meaningful distance, dive, forage, or carry out virtually any natural behaviors, and she is forced to spend the majority of her life at, or just below, the surface of the water.

41. Seaquarium confines Lolita to an inadequate tank.

42. Orcas are among the fastest animals in the ocean. In the wild, they may swim nearly 100 miles per day, and regularly dive many hundreds of feet beneath the ocean's surface. At Seaquarium, Lolita is kept in an oblong tank that measures just 80 feet by 60 feet. Lolita does not even have free range of this tiny area because the tank has a large concrete obstruction measuring approximately 45 feet long by 5 feet wide in the center that is used as a stage by Lolita's trainers during public performances. The tank therefore has an unobstructed space of only 80 feet by 35 feet. Lolita's tank is only twenty feet deep at its deepest point.

43. Even assuming the gates on either side of the concrete platform were open to allow her to swim the entire circumference of the tank, she would have to do so more than 2,300 times in a single day to approximate the distance an orca may swim in a single day in the wild.

44. The dimensions of the tank and concrete platform prevent Lolita from turning about or swimming freely. Instead, Lolita must make continual and substantial corrective adjustments to her normal movements and behaviors in order to avoid colliding with the tank's platform and walls.

45. The tank in which Lolita is held does not even meet the "minimum" size required for orcas under the Animal Welfare Act ("AWA") standards. 9 C.F.R. § 3.104.

46. Lolita regularly exhibits repetitive abnormal behaviors such as bobbing and listlessly floating at the surface of her tank. These are physical manifestations of psychological stress caused by her small enclosure and being deprived of the ability to engage in her natural behaviors, such as swimming long distances, diving in deep waters, searching or hunting for food, and engaging in social interaction with other members of her species.

47. Seaquarium fails to provide Lolita with adequate protection from the sun.

48. All cetaceans have extremely delicate skin that is susceptible to sunburn and other damage.

49. In the wild, orcas spend the majority (up to 95 percent) of their lives submerged at depths where potential damage from ultraviolet radiation is minimized due to refraction and filtration. At Seaquarium, the small, shallow, and barren enclosure in which Lolita is kept causes her to spend extended periods of time at the surface of the tank.

50. There are no natural or artificial shade structures positioned over any portion of Lolita's tank. Instead, the tank is completely exposed and provides no opportunity for Lolita to shield herself from direct sunlight during the most intense heat of the day, when the sun is highest and strongest and no shadows are cast in the tank.

51. Because the tank is only 20 feet deep at its deepest point, Lolita is unable to dive to protect herself from ultraviolet rays. Moreover, because the water in the tank is relatively clear, even if Lolita were able to rest at the bottom of the small and shallow tank, the lack of turbidity from dissolved organic matter means that she remains exposed to ultraviolet radiation from the sun.

52. A former caretaker of Lolita has reported that Lolita often suffered sunburn at Seaquarium, causing her skin to crack and bleed.

53. Lolita is routinely exposed to intense ultraviolet radiation as she floats around the surface of her tank.

54. Lolita's tank is surrounded by stadium seating that is shaded for the comfort of Seaquarium's customers. The stadium shading does not extend over the tank.

55. In addition to sunburn and potential adverse impacts from the application of sunscreen to a wild marine animal, exposure to ultraviolet radiation is a factor in the development of cataracts and retinal damage in cetaceans and may also act as an immunosuppressant.

56. Seaquarium's failure to provide adequate protection from the sun also violates the minimum standards required for shelter under the AWA. 9 C.F.R. § 3.103(b).

57. Seaquarium isolates Lolita from any other member of her species.

58. The SRKW population is highly social in the wild. Population members live in highly stable social groups with strong long-term associations.

59. Some individuals, such as mothers and sons, stay together for life. These close relationships are so crucial that even adult offspring of a post-reproductive orca mother have been shown to have a significantly increased mortality risk in the year after their mother's death.

60. The SRKWs also have a distinctive set of call types—a unique dialect that is passed down through vocal learning from mothers and pod members to calves.

Indeed, in one well-studied population, family-specific call types dramatically increase in the days following a birth, which indicates that the calls are "family badges" that are actively taught more rapidly because they are important for recognizing and maintaining contact with the family.

61.  These pod-specific dialects are maintained notwithstanding extensive interactions between pods. In addition, certain calls are shared between pods, which is further evidence of a complex population structure and the importance of communication and culture to their sophisticated society.

62.  Lolita is a member of a highly-social, endangered population.

63.  Lolita has been confined without another orca since 1980, when her tankmate Hugo—a SRKW captured in 1968 in the waters of Washington State—died.

64.  Lolita's isolation deprives her of the interaction and stimulation fundamental to her physical, social, and psychological well-being. This social isolation deprives Lolita of her fundamental need to engage in social contact with other members of her species, which is crucial to ensuring her psychological welfare and providing her a humane environment.

65.  Seaquarium holds Lolita with numerous Pacific white-sided dolphins, a species with which Lolita is not compatible and would not interact in the wild. Upon information and belief, Seaquarium's forced pairing of Lolita and these dolphins causes additional stress and physical harm to Lolita.

66.  These conditions violate the minimum standards for social housing required by the AWA. 9 C.F.R. § 3.109.

67. Seaquarium promotes the public misimpression that it provides Lolita with an appropriate environment and that she is healthy and thriving at Seaquarium, when in fact, Lolita is being maintained in harmful, inhumane, and unlawful conditions.

68. Seaquarium has made millions of dollars from exhibiting Lolita, who is their "star" attraction, from members of the public who were misled by Seaquarium's misimpressions.

69. Despite the prohibitions of the ESA, Defendants confine Lolita to a small, shallow, and barren concrete tank, without adequate protection from the sun, without an orca companion, and with incompatible animals, and force her to perform multiple times daily.

70. The conditions in which Lolita is held inflict physical and psychological injury on her.

71. The conditions in which Lolita is held significantly disrupt and impair her normal behavioral patterns, including her ability to engage in normal movement and postural adjustments, sheltering, and social relationships with other orcas.

72. Cetacean experts state that Lolita would thrive if transferred to a protected sea pen in her native waters, where the more natural conditions would allow her to swim without constant adjustments to her movement and posture, dive to avoid the heat and radiation of the sun, interact with other members of her species, and generally provide her with physical and psychological enrichment crucial to her well-being.

## Claims for Relief

### Count One:  Unlawful Take of a Southern Resident Killer Whale

73. The allegations set forth in the preceding paragraphs are hereby realleged and incorporated by reference herein.

74. Seaquarium's ongoing practice of keeping Lolita in a small, barren, and unprotected tank, deprived of interaction with a member of her own species, and with incompatible animals violates the "take" prohibition of Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B).

### Count Two:  Unlawful Possession of a Taken Southern Resident Killer Whale

75. The allegations set forth in the preceding paragraphs are hereby realleged and incorporated by referefce herein.

76. Seaquarium's ongoing practice of keeping Lolita in a small, barren, and unprotected tank, deprived of interaction with a member of her own species, and with incompatible animals violates the ESA's prohibition against the possession of an endangered species that has been unlawfully taken, 16 U.S.C. § 1538(a)(1)(D).

### Relief Requested

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

a. Enter a declaratory judgment that Seaquarium's treatment of Lolita violates the ESA's prohibition on the "take" of an endangered species set forth in 16 U.S.C. § 1538(a)(1)(B);

b. Enter a declaratory judgment that Seaquarium has violated and continues to violate 16 U.S.C. § 1538(a)(1)(D) by possessing Lolita, who has been unlawfully taken by Seaquarium;

c. Enjoin Seaquarium from continuing to violate the ESA and its implementing regulations with respect to Lolita, including the prohibition on "taking" an endangered species;

d. Enjoin Seaquarium from continuing to violate the ESA and its implementing regulations with respect to possessing Lolita, whom the Seaquarium has unlawfully "taken;"

e. Order Seaquarium to forfeit possession of Lolita and order her transferred to a sea pen, in accordance with an established rehabilitation and retirement plan, where she would have the opportunity to behave naturally in an environmentally stimulating setting that prevents her from being further "taken;"

f. Award Plaintiffs their reasonable attorneys' and expert fees and costs for this action; and

g. Grant such other and further relief as the Court deems just and proper.

Date: July 20, 2015            Respectfully submitted,

/s/ Paul J. Schwiep_____
Paul J. Schwiep, Fla. Bar No. 823244
Coffey Burlington, P.L.
2601 South Bayshore Dr., PH!
Miami, FL 33133
Telephone:   (305) 858-2900
Facsimile:    (305) 858-5261
pschwiep@coffeyburlington.com

/s/ Jared Goodman_____
Jared Goodman (*pro hac vice* application forthcoming)
PETA Foundation
1536 16th St. NW
Washington, DC 20036
Telephone: (202) 540-2204
Facsimile: (202) 540-2208
JaredG@petaf.org

/s/ Matthew Strugar_____
Matthew Strugar (*pro hac vice* application forthcoming)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Telephone: (323) 210-2263
Facsimile: (202) 540-2208
Matthew-S@petaf.org

/s/ Matthew Liebman_____
Matthew Liebman (*pro hac vice* application forthcoming)
Animal Legal Defense Fund
170 E. Cotati Ave.
Cotati, CA 94931
Telephone: (707) 795-2533
Facsimile: (707) 795-7280
MLiebman@aldf.org

*Attorneys for Plaintiffs*