**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 15-cv-22692-Ungaro/Otazo-Reyes

**PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,
ANIMAL LEGAL DEFENSE FUND,
HOWARD GARRETT, and ORCA
NETWORK,**

    **Plaintiffs,**

v.

**MIAMI SEAQUARIUM and
FESTIVAL FUN PARKS, LLC, d/b/a
PALACE ENTERTAINMENT,**

    **Defendants.**

**PLAINTIFFS' MOTION TO EXCLUDE IMPROPER OPINION TESTIMONY BY
CLINTON THAD LACINAK**

   Defendant's proffered expert, Clinton Thad Lacinak, is not a veterinarian; he is not a marine biologist; and he has never meaningfully studied wild orca behavior. He admitted these facts under oath. The *only* topic on which Mr. Lacinak could conceivably be qualified to testify is the training of captive marine mammals. As to that subject, however, Mr. Lacinak has failed to conduct an analysis of the facts of this case using any reliable methodology. By his own admission, he failed to review the behavioral records for Lolita, the orca at issue in this matter, prior to preparing his opening expert report—records which Defendant itself deems to be among *the most critical* primary source documents in this litigation. When Mr. Lacinak finally did look at those documents, which span a period of nearly fifteen years and comprise many hundred pages of handwritten notes that use a detailed coding system, he conducted only a cursory review. Accordingly, Mr. Lacinak's proposed testimony simply cannot satisfy the 11th Circuit's stringent standard for expert witnesses: He lacks the necessary expertise in all but one of the

1

topics on which he seeks to opine; he failed to employ any reliable methodology in analyzing documents relating to Lolita's training (the sole topic on which he could arguably be qualified to offer an opinion); and these facts, coupled with improper legal conclusions in Mr. Lacinak's report, mean that his testimony would in no way be helpful to the Court as the fact finder in this matter. For these reasons, Plaintiffs People for the Ethical Treatment of Animals, Inc., Animal Legal Defense Fund, Howard Garrett, and Orca Network (collectively, "Plaintiffs") hereby respectfully request that Mr. Lacinak be barred from testifying at trial.[1] Plaintiffs incorporate the below memorandum of law in support of this motion.

I.     FACTUAL BACKGROUND

This lawsuit seeks to enjoin Defendant's ongoing "take" under the ESA of the endangered orca named "Lolita."[2] Lolita was captured in 1970 from waters off the coast of Washington State and has been held at Miami Seaquarium since that time. She is a member of the Southern Resident Killer Whale ("SRKW") Distinct Population Segment ("DPS"), a group of animals whose numbers were drastically reduced during the 1960s and 70s due, in large part, to captures for marine parks such as Miami Seaquarium. (Compl., ECF No. 1, ¶ 35.) The SRKW pod was listed as endangered on November 18, 2005. 50 C.F.R. § 224.101; 70 Fed. Reg. 69903 (Nov. 18, 2005). Lolita was specifically added to the SRKW DPS listing in 2015, following a lawsuit and petition filed by Plaintiffs challenging the National Marine Fisheries Service's prior unlawful exclusion of her from her pod's listing. *See* 80 Fed. Reg.7380 (Feb. 10, 2015).

Conduct impacting endangered animals such as Lolita is subject to statutory and regulatory restrictions under the ESA. Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of any endangered animal. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" includes an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns

---

[1] In the event that Mr. Lacinak's cursory review of Lolita's behavioral logs is deemed an acceptable "methodology," Plaintiffs respectfully request that his testimony be limited to issues relating to orca training.
[2] Defendant and its employees refer to Lolita by numerous alternate names, including "Tokitae," "Toki," "Tik," and "Gypsy."

2

which include, but are not limited to, breeding, feeding, or sheltering." *Id.*[3] Plaintiffs allege that Defendant harms and harasses Lolita, in violation of the various provisions of the ESA, by confining her to a small, shallow, barren concrete tank, without adequate protection from the sun, and without a single orca companion. (Complaint, ECF No. 1, ¶¶ 1-72.)

### A.     Mr. Lacinak's Background

Defendant has retained Clinton Thad Lacinak as a purported expert in this matter. Mr. Lacinak is a former marine mammal trainer for SeaWorld and Busch Gardens. (Letter from Clinton Thad Lacinak to James Lister, dated February 6, 2016 and served on February 8, 2016 ("Lacinak Report"), attached hereto as Exhibit A at 1.) Per his February 8, 2016 expert disclosure, he was responsible in that role for "overs[eeing] and coordinat[ing] the efforts of over 450 animal trainers and keepers at these parks" and for "the world's largest animal training staff as well as the world's largest collection of trained animals." (*Id.*) Currently, Mr. Lacinak is the owner of "behavioral consulting firm, Precision Behavior," which provides services to "zoos, aquariums and other animal facilities worldwide." (Lacinak Report at 2.)

Mr. Lacinak does not have a degree in marine biology, veterinary medicine, or law. (Lacinak Report at Appendix P.5 (summary of Mr. Lacinak's education).) By his own admission, Mr. Lacinak's knowledge, skill, training, and experience, insofar as they pertain to the issues in this matter, are very narrowly focused. (*See* Transcript of Deposition of Clinton Thad Lacinak ("Lacinak Tr.") at 32:15-33:20, attached hereto as Exhibit B.) As Mr. Lacinak himself explained, he contends only that he is an expert in "[t]raining animals in captivity and training animals to do shows and to live comfortably in the marine environments that we provide." (Lacinak Tr. at 33:18-20.)

---

[3] 50 C.F.R. § 17.3 is a regulation adopted by the United States Fish and Wildlife Service ("FWS"). The NMFS, the entity charged with regulating endangered marine mammals such as Lolita, has cited this regulation, but has not adopted an official definition of the term "harass". *See, e.g.*, Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Section 7(a)(2) "Not Likely to Adversely Affect" Determination, *available at* http://www.westcoast.fisheries.noaa.gov/publications/protected_species/marine_mammals/final_groundfish_biop_12-7-12.pdf (applying a definition of "harass" that is "consistent with the [FWS]'s interpretation of the term"); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 366 (D. Mass. 2012) (noting that definition of harassment used by NMFS is similar to the FWS regulatory definition); *but cf. Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1066-67 (D. Alaska 2013) ("NMFS maintains it did not rely on FWS's definition of the term.").

### B. Mr. Lacinak Opines on Veterinary Medical Issues Despite Admitting that He Is Not an Expert on these Topics

Mr. Lacinak is not a veterinarian. (Lacinak Tr. at 40:12-13 ("Q. Are you a veterinarian? A. No."); Lacinak Report at Appendix P.5 (summary of Mr. Lacinak's education).) Indeed, when asked whether he had occasion to review the transcript for the deposition of Dr. Maya Rodriguez, Defendant's staff veterinarian, Mr. Lacinak replied, "No. I don't feel like I need to look at that because I am -- as far as the animal's heath is concerned, I'm not a veterinarian. That doesn't stop me from giving an opinion on what [Lolita] looks like. But I'm not a veterinarian, so I'm not going to get into that. I don't think a trainer that doesn't have the expertise or the training in that field should necessarily comment on that." (Lacinak Tr. at 99:13-22.) Likewise, when asked whether he had reviewed Lolita's medical records, Mr. Lacinak replied, "No, I did not. Like I said before, I'm not a veterinarian, so I didn't think it was necessary." (Lacinak Tr. at 124:10-12.)

Despite this, Mr. Lacinak's two reports offer *extensive* opinions regarding veterinary issues. For example, in his February 8, 2016 expert report, Mr. Lacinak concludes that:

> . . . Lolita looks fantastic! Her body and skin condition appear great. There are no scrapes, rub marks or lesions visible except a slight discoloration approximately 4-5 inches long on her chin. Most killer whales, and dolphin for that matter, will have this. Her weight looks appropriate for an animal of her length and age. Her dorsal fin is erect and there is no curvature on her tail flukes. Her teeth are in excellent shape! They are better, in my opinion, than most other orcas in captivity. The only teeth with any issues were stated by the veterinarian in front of everyone present for the inspection on January 20th.

(Lacinak Report at 2.)[4] Mr. Lacinak goes on to opine on veterinary dermatological issues, stating "I saw no indication of Lolita having any concerns with her skin on her head or melon area. On the contrary, her skin looks great on her entire body." (Lacinak at 6.)

---

[4] To the extent that Mr. Lacinak intends to imply that fin curvature is a negative health effect of captivity in female orcas, he is mistaken. Fin curvature arises in *male* captive orcas.

As to the veterinary health risks posed by the lack of shade over Lolita's tank, Mr. Lacinak opines:

> If shade structures were required, they would need to be designed in a way that prevents pathogens from entering the pool. Shade structures can have health problems for marine mammals. Molds and bacteria from bird feces can collect on the structures and can then be funneled to the whale's pool.

(Lacinak Report at 5.) In rendering this opinion, Mr. Lacinak offers no evidence that would support a conclusion that he is an expert in disease transmission, aquarium sanitation, or that he is otherwise qualified to opine upon this issue of veterinary health.

Continuing his series of veterinary medical conclusions, Mr. Lacinak purports to assess Lolita's physiological need for activity, concluding that her training sessions and repetitive laps in her tank "more than meet[ ] the physical needs of this animal and [are] likely the catalyst for her terrific body condition." (Lacinak Report at 5.)

      C.      **Mr. Lacinak Opines on Wild Orcas Despite Admitting that He Is Not an Expert on this Topic**

By his own admission, Mr. Lacinak is "not an expert" on the behavior of orcas in the wild. (Lacinak Tr. at 38:10-12; *see also* 38:24-39:2 ("Q. You're not an expert in cetacean behavior in the wild, are you? A. I have some knowledge of it. I'm not – I wouldn't consider myself an expert.").) Indeed, Mr. Lacinak has never made an effort to undertake *any* course of study relating to this topic. (Lacinak Tr. at 58:2-5 ("Q. [ ] Have you had occasion to engage in any study of orca behavior in the wild? A. No."); 39:25-40:5 (testifying that he has not engaged in academic research regarding and does not have a degree relating to wild cetacean behavior).) Likewise, Mr. Lacinak has no experience in reintroducing an orca to a pod from which the animal was captured. (Lacinak Tr. at 85:17-86:25.) In fact, he has only even *seen* wild orcas on three occasions, no fewer than 16 years ago. (Lacinak Tr. at 58:6-12 ("I don't have the exact years, but I saw them in the Puget Sound area, J, K, and L pods. I observed them for four days. I don't remember the date but it was -- we were filming footage for a show at SeaWorld. It was in the '90s."), 59:14-21 (testifying that he viewed two wild orcas in the early 90s in Patagonia); Lacinak Report at 2 (referencing trip to Alaska in the 1990s).)

Despite this, Mr. Lacinak addresses, at length, behaviors that he claims are normal for orcas *in the wild*. His February 8, 2016 report provides:

> PETA states that killer whales swim nearly 100 miles per day in the wild. Some whales may travel that distance in one day, but it is not the norm. Like most animals, they will only travel that far for food and breeding needs. If an area supplies them with what they need to survive, they will stay in that area.

(Lacinak Report at 5.)[5] Likewise, Mr. Lacinak states that "[Lolita] has already lived longer than most of her counterparts in captivity *and in the wild*." (Lacinak at 6.)

Mr. Lacinak's rebuttal "report" similarly oversteps.[6] (Email from Jennifer Moore to counsel for Plaintiffs, dated February 14, 2016, forwarding email from Mr. Lacinak ("Rebuttal Report"), attached hereto as Exhibit C.) In that document, he states that Plaintiffs' experts (including Dr. Ingrid Visser, a marine biologist specializing in wild orca behavior for more than 20 years) "demonstrate a lack of understanding and experience regarding cetacean behavior . . . in the wild." (Rebuttal Report at 1-2.)

Likewise, with regard to the significance of rake marks in wild orca populations, Mr. Lacinak states:

> Wild dolphins, including killer whales, have rake marks and have been observed chasing each other. I have personally observed such rake marks and chasing behavior in connection with orcas in the Pacific Northwest, including some of the Southern Resident Killer Whale pods. The rake marks I have observed in the wild were inflicted by one orca on another and were far more significant than any that a 200-300 pound dolphin could inflict on Lolita. Rake marks have also been used in studies as a means of identifying orcas in the wild, suggesting that these are a common occurrence.

(Rebuttal Report at 1-2.) Again, Mr. Lacinak offers this opinion despite the fact that he has only observed orcas in the wild on *three* occasions in the 1990s. (Lacinak Tr. at 58:6-12, 59:14-21; Lacinak Report at 2.)[7]

---

[5] It is unclear what Mr. Lacinak refers to when he discusses "PETA" in this statement. *Plaintiffs* in this matter will rely on the testimony of their experts in veterinary medicine and in wild and captive orca behavior to provide analysis relating to the physiological needs of these animals.

[6] This document is actually just an email forwarded to Plaintiffs by Defendant's counsel.

[7] To the extent that Defendant intends to elicit testimony from Mr. Lacinak on the severity of rake marks in wild or captive orcas, this again improperly strays into the area of veterinary medicine, a topic on which Mr. Lacinak admits he is not qualified to testify. *See* above, Section I(B).

### D. Mr. Lacinak Opines on Aquarium Design, Maintenance, and Water Quality Despite Offering No Evidence that He Is an Expert on these Topics

Regarding the tank in which Lolita is kept, Mr. Lacinak opines that "[a]lthough the pool is older, it appears in good condition. The paint in and surrounding the pool is intact without visible cracking or peeling. The quality and clarity of her water appears good." (Lacinak Report at 3.) Mr. Lacinak offers no support, in his reports or in his deposition testimony, for a conclusion that he is an expert in aquarium design or maintenance, or in water quality. Further, by his own admission Mr. Lacinak "did not talk to [Defendant] about their water quality." (Lacinak Tr. at 111:5-6.) Likewise, his reports do not indicate that he reviewed any of the many hundreds of pages of water quality reports produced by Defendant in this matter.

### E. Mr. Lacinak's Expert Report Contains Improper Legal Conclusions

Mr. Lacinak is not a lawyer (Lacinak Report at Appendix P.5), and he is not an expert in the ESA (Lacinak Tr. at 40:14-16). In fact, Defendant's counsel Jennifer Moore herself objected to Mr. Lacinak testifying in deposition as to any legal conclusions, noting that he is not qualified to do so. (Lacinak Tr. at 41:4-12 (objecting to the extent that the deposition question called for a legal conclusion, and stating "He's not an attorney. He doesn't study the Endangered Species Act.").) Nevertheless, Mr. Lacinak attempts to offer legal opinions beyond the scope of his qualifications. In his opening report, he states

> I have considered the U.S. Fish and Wildlife Regulations definition of "Harass" – the definition of the term "Harass" which appears in the definition of the term "Take" in the Endangered Species Act (50 C.F.R. § 17.3) in coming to my conclusions. In my opinion, based on my experience, the care for Lolita, including her facilities, training personnel, and training, is in compliance with the generally accepted husbandry care for killer whales.

(Lacinak Report at 6-7.) To the extent that the Defendant intends to elicit testimony from Mr. Lacinak regarding the application of the cited statutory provisions regarding "take", this constitutes a legal conclusion and is, by defense counsel's own admission, improper.[8]

---

[8] Mr. Lacinak's reference to "generally accepted husbandry care" for killer whales may be intended to echo a provision of the FWS's regulations under the ESA, which reference a separate statutory scheme, the Animal Welfare Act ("AWA"). That provision exempts from the definition

7

### F. Mr. Lacinak Failed to Review Lolita's Behavioral Records Prior to Preparing His Expert Report

As set forth above, Mr. Lacinak does indeed have experience related to captive marine mammal training and behavior. However, Mr. Lacinak testified at his deposition that he did not review Lolita's behavioral records, which cover the period between 2001 and 2015, until February 12, 2016, four days *after* his initial expert report was served. (Lacinak Tr. at 15:17-16:6.) Prior to that date, Mr. Lacinak had only laid eyes upon "a month's worth" of records and, as to those, admitted, "I really didn't look at them that extensively. I just looked to see what type of record form they used. That's what I mainly looked at." (Lacinak Tr. at 17:17-23.) When he finally did look at those documents, he spent only a few hours reviewing them (Lacinak Tr. at 18:25-19:11), despite the fact that they span a period of nearly fifteen years, comprise many hundred pages of handwritten notes, and use a detailed coding system. By Defendant's own admission, these records are *the most relevant* primary source documents in which Lolita's behavioral issues are recorded. (December 23, 2015 letter from Stephanie Mitchell to Caitlin Hawks at 3 ("Mitchell Letter"), attached hereto as Exhibit D.)

## II. ARGUMENT

The admission of expert evidence is governed by Federal Rule of Evidence 702, which provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

of harass "generally accepted . . . husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act." 50 C.F.R. § 17.3. However, the fact that Lolita is the *sole* endangered orca in captivity in the United States and held in conditions unlike any other captive orca in the country means that Defendant's practices cannot possibly be "generally accepted" and, accordingly, the AWA standards are not relevant to this action.

District Courts "act as gatekeepers, excluding evidence unless it is reliable and relevant." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)), *cert. denied*, 135 S.Ct. 1423 (2015). Whether an expert's testimony is reliable depends on "the particular facts and circumstances of the particular case." *Hughes*, 766 F.3d at 1329 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999)).

The Court of Appeals for the Eleventh Circuit has set out three requirements that an expert must meet before his opinions may be admitted. *Hughes*, 766 F.3d at 1329. First, the expert must be qualified on the matter about which he intends to testify. *Id.* (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Second, he must employ a reliable methodology. *Id.* Third, the expert's testimony must be able to assist the trier of fact through the application of expertise to understand the evidence or fact in issue. *Id.*

With respect to whether an expert's methodology is reliable, the Eleventh Circuit looks to a number of factors, including (1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted. *Id.* (citing *Daubert*, 509 U.S. at 593-94). This list of factors is not meant to be exhaustive, nor must each factor be present in a given case. *Id.* The proponent of the expert opinion must carry the burden of establishing qualification, reliability, and helpfulness. *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

### A.  Mr. Lacinak Should Not be Permitted to Provide Opinion Testimony Regarding Veterinary Issues

Defendant seeks to introduce Mr. Lacinak's testimony about a wide variety of veterinary issues. In his reports, Mr. Lacinak opines on (1) Lolita's body and skin condition (Lacinak Report at 2, 6); (2) the health risks posed by the lack of shade in Lolita's tank and the purported concerns associated with providing shade cover (*id.* at 5); and (3) the exercise requirements for an orca of Lolita's size (*id.*). But a veterinary degree requires *doctoral-level* expertise, and Mr. Lacinak is certainly not a veterinarian. (Lacinak Tr. at 40:12-13; Lacinak Report at Appendix P.5.) To the contrary, Mr. Lacinak does not hold any degree at all—in veterinary medicine or otherwise—and has no comparable experience. (Lacinak Report at Appendix P.5.) Accordingly, under the first factor articulated in *Hughes*, Mr. Lacinak is not qualified as an expert in

veterinary medicine, and any opinion testimony by Mr. Lacinak going to such issues should therefore be barred a trial. *See Hughes*, 766 F.3d at 1329.

### B. Mr. Lacinak Should Not Be Permitted to Provide Opinion Testimony Regarding Wild Orcas

Defendant seeks to introduce testimony by Mr. Lacinak regarding the behavior of orcas in the wild. (*See* Lacinak Report at 5 (opining on the average distance traveled by orcas in the wild), 6 (opining on wild orca longevity), and 1-2 (opining on the severity of rake marks in wild orca populations). Defendant also apparently intends to rely on Mr. Lacinak to rebut the testimony of *Plaintiffs'* wild orca expert Dr. Ingrid Visser. (Lacinak Rebuttal at 1-2 (stating that Plaintiffs' experts "demonstrate a lack of understanding and experience regarding cetacean behavior . . . in the wild.".)

Leaving aside that such testimony is strikingly bold given that Mr. Lacinak has not so much as *seen* a wild orca since the 1990s, it should be dispositive of this issue that Mr. Lacinak is not, according to his own sworn testimony, an expert in wild orca behavior. (Lacinak Tr. at 38:10-12; 38:24-39:2 ("Q. You're not an expert in cetacean behavior in the wild, are you? A. I have some knowledge of it. I'm not – I wouldn't consider myself an expert."); 58:2-5 ("Q. [ ] Have you had occasion to engage in any study of orca behavior in the wild? A. No."); 39:25-40:5 (testifying that he has not engaged in academic research regarding and does not have a degree relating to wild cetacean behavior).) Opinion testimony about issues on which the proffered witness *admits* that he has no expertise should not be allowed. *See In re Trasylol Products Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *11 (S.D. Fla. Feb. 24, 2010) (excluding expert opinion where expert admitted he was not an expert in the topics discussed); *see also Hughes*, 766 F.3d at 1329. For this reason, Mr. Lacinak should be barred from testifying at trial on any issues relating to the behavior of orca in the wild.

### C. Mr. Lacinak Should Not Be Permitted to Testify Regarding Aquarium Design, Maintenance, or Water Quality

As Mr. Lacinak himself explained, he is, at most, an expert in "[t]raining animals in captivity and training animals to do shows and to live comfortably in the marine environments that we provide." (Lacinak Tr. at 33:18-20.) He is not an expert in aquarium design or

10

maintenance, and he has no disclosed knowledge, skills, training, experience, or education that would allow him to render an opinion regarding issues of water quality. Under the first *Hughes* factor, he should thus be barred from testifying regarding his opinions that Lolita's tank "appears in good condition" and that "the quality and clarity of her water appears good." (Lacinak Report at 3.)

Moreover, even if Mr. Lacinak were somehow qualified as an expert on these issues, he failed to use a reliable methodology to analyze them. *Hughes*, 766 F.3d at 1329. Mr. Lacinak admitted that he "did not talk to [Defendant] about their water quality." (Lacinak Tr. at 111:5-6.) Likewise, his reports do not indicate that he reviewed any of the many hundreds of pages of water quality reports produced by Defendant in this matter. Mr. Lacinak's opinions on aquarium design and maintenance, and on water quality thus cannot possibly be based upon any "generally accepted methodology." *Hughes*, 766 F.3d at 1329. Mr. Lacinak should therefore be precluded from testifying at trial regarding these topics.

### D. Mr. Lacinak Did Not Employ a Reliable Methodology Because He Failed to Review Lolita's Behavioral Records Prior to Preparing His Expert Report

Although Mr. Lacinak has experience as a trainer of captive orcas, the Defendant's ability to elicit his opinion testimony on that issue requires that he employ a reliable methodology in analyzing the animal training-related facts of this particular case. *See Hughes*, 766 F.3d at 1329. By his own admission, Mr. Lacinak did not review Lolita's behavioral records, which cover the period between 2001 and 2015, until February 12, 2016, four days *after* his initial expert report was served. (Lacinak Tr. at 15:17-16:6.) Even at that point, Mr. Lacinak conducted only a cursory review of the documents, spending only a few hours examining many hundreds of pages of handwritten notes that use a detailed coding system. (Lacinak Tr. at 18:25-19:11.)

Any expert report on orca training and behavior that fails to consider these documents in adequate detail cannot possibly be deemed to have used a reliable methodology. As Defendant

itself has explained, Lolita's behavioral records are *the best primary source documents* regarding her behavior in that they are "created contemporaneously with care being provided each day." (Mitchell Letter at 3.) Accordingly, Mr. Lacinak's testimony regarding Lolita's behavior and training cannot be deemed reliable under the 11th Circuit requirements for expert testimony and should therefore be excluded. *Hughes*, 766 F.3d at 1329.

### E. Mr. Lacinak's Improper Legal Conclusions Are Not Helpful to the Trier of Fact

Under the third *Hughes* factor, an expert's opinions regarding ultimate legal conclusions in a matter are inadmissible as they are not helpful to the trier of fact. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (holding that trial court acted well within its discretion in excluding testimony constituting pure legal conclusion); *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) (expert's declaration that a purported service dog "meets the statutory and regulatory criterion that he is individually trained to do work or perform tasks for an individual with disabilities" was "rife with impermissible legal conclusions" and therefore excluded); *Legg v. Voice Media Grp., Inc.*, No. 13-62044-CIV-COHN, 2014 WL 1767097, at *4 (S.D. Fla. May 2, 2014) ("Where an expert offers an opinion as to the legal implications of the facts, that testimony also encroaches on the responsibilities of the judge and jury, and is inadmissible").

Mr. Lacinak's February 8, 2016 expert report states:

> I have considered the U.S. Fish and Wildlife Regulations definition of "Harass" – the definition of the term "Harass" which appears in the definition of the term "Take" in the Endangered Species Act (50 C.F.R. § 17.3) in coming to my conclusions. In my opinion, based on my experience, the care for Lolita, including her facilities, training personnel, and training, is in compliance with the generally accepted husbandry care for killer whales.

(Lacinak Report at 6-7.) To the extent that the Defendant intends to elicit testimony from Mr. Lacinak regarding the application of the cited statutory provisions regarding "take" to the facts of this case, such testimony constitutes a legal conclusion and should therefore be barred.[9]

---

[9] Even if testimony regarding legal conclusions were proper, Mr. Lacinak is not qualified as an expert on the subject of the ESA. Indeed, by his own admission, he had no experience with that statute prior to his involvement in this litigation. (Lacinak Tr. at 40:20-25.)

12

**III.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that their Motion to Exclude Improper Opinion Testimony by Clinton Thad Lacinak be granted and that Mr. Lacinak's opinion testimony be excluded, or in the alternative, that his testimony be limited to the narrow issue of training of orcas in captivity.

Date:   March 11, 2016                    Respectfully submitted,

/s/ Paul J. Schwiep_____
Paul J. Schwiep, Fla. Bar No. 823244
Coffey Burlington, P.L.
2601 South Bayshore Dr., PH
Miami, FL 33133
Phone: 305-858-2900
Fax: 305-858-5261
pschwiep@coffeyburlington.com

/s/ Jared Goodman_____
Jared Goodman (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2266
Fax: 213-484-1648
JaredG@petaf.org

/s/ Matthew Strugar_____
Matthew Strugar (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 213-484-1648
Matthew-S@petaf.org

/s/ Caitlin K. Hawks
Caitlin K. Hawks (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 206-858-8518
Fax: 213-484-1648
CaitlinH@petaf.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE AND CONFERENCE

I HEREBY CERTIFY that on March 11, 2106 the foregoing document was served by Electronic Mail upon the parties identified in the Service List.  I further certify that I have conferred with all parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

 /s/ Paul J. Schwiep

**Service List**

| | |
|---|---|
| **Jennifer B. Moore, Esq.**<br>moorej@gtlaw.com<br>   *(admitted pro hac vice)*<br>GREENBERG TRAURIG, P.A.<br>Terminus 200<br>3333 Piedmont Road NE<br>Atlanta, Georgia  30305<br>Telephone:     (678) 553-2100<br><br>*Counsel for Defendants* | **James H. Lister, Esq.**<br>jlister@dc.bhb.com<br>   *(admitted pro hac vice)*<br>**Melinda L. Meade Meyers, Esq.**<br>mmeademeyers@dc.bhb.com<br>   *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>   CHEROT, PC<br>Suite 1020<br>1156 Fifteenth Street, NW<br>Washington, D.C.  20005<br>Telephone:     (202) 659-5800<br><br>*Counsel for Defendants* |
| **William A. Earnhart, Esq.**<br>wearnhart@bhb.com<br>   *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>   CHEROT, PC<br>1127 West 7th Avenue<br>Anchorage, Alaska  99501<br>Telephone:     (907) 263-7285<br><br>*Counsel for Defendants* | **Evelyn A. Cobos, Esq.**<br>cobose@gtlaw.com<br>**Mark S. Salky, Esq.**<br>Salkym@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 Southeast 2nd Avenue, Suite 4400<br>Miami, Florida  33131<br>Telephone:     (305) 579-0500<br><br>*Counsel for Defendants* |
| **Stefanie Wilson, Esq.**<br>swilson@aldf.org<br>   *(admitted pro hac vice)*<br>170 E. Cotati Avenue<br>Cotati, California  94931<br>Telephone:     (707) 795-2533<br><br>*Counsel for Animal Legal Defense Fund* | |