IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-cv-22692-Ungaro/Otazo-Reyes

**PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., ANIMAL LEGAL DEFENSE FUND, HOWARD GARRETT, and ORCA NETWORK,**

        **Plaintiffs,**

**v.**

**MIAMI SEAQUARIUM and FESTIVAL FUN PARKS, LLC, d/b/a PALACE ENTERTAINMENT,**

        **Defendants.**

**PLAINTIFFS' MOTION TO EXCLUDE IMPROPER OPINION TESTIMONY BY FORMER SEAQUARIUM VETERINARIAN MICHAEL S. RENNER, DVM**

    Dr. Michael S. Renner, by his own sworn admission, is not expert in animal behavior, has never studied wild orcas, and has no experience with the retirement or release of captive orcas. Likewise, Dr. Renner is not a lawyer and has no expertise in the Endangered Species Act ("ESA"), the sole statute at issue in this litigation. Despite this, Defendant seeks to rely on the testimony of Dr. Renner to address precisely these topics. On February 8, 2016, Defendant served on Plaintiffs Dr. Renner's opening expert report which consisted, almost exclusively, of a series of improper legal conclusions relating both to the ESA, which governs this litigation, and to another statutory scheme (the Animal Welfare Act ("AWA")) that is not even at issue in this case. Then, on February 19, 2016, the last day of discovery in this matter and three days *after* Dr. Renner had been deposed, Defendant's counsel forwarded to Plaintiffs an email that they characterized as Dr. Renner's rebuttal "report" to Plaintiffs' various experts. That "report" included yet more improper legal conclusions and, in addition, set forth numerous opinions

1

relating to the behavior of Lolita (the orca at issue in this case), and to the desirability of releasing her to a sea pen in her native waters.

Dr. Renner's testimony on these subjects simply cannot meet the 11th Circuit's stringent standard for expert testimony. That standard requires (1) that the expert be qualified on the matter about which he intends to testify, (2) that he employ reliable methodology in analyzing the facts of the case, and (3) that his testimony be helpful to the trier of fact. Dr. Renner's proposed testimony meets *none* of these requirements. He *admits* that he is not qualified as an expert in the topics about which he opines and, even if he were, it is well established that the statements in his reports regarding the ESA and AWA are improper legal conclusions that, by their very nature, are not helpful to the fact finder in this case and should be excluded. Further, Dr. Renner has failed to employ any reliable methodology to analyze the behavior-related issues discussed in his reports, neglecting to review *the most critical records* regarding Lolita's behavior during her time in Defendant's care. For these reasons, Plaintiffs' hereby move this Court for an order barring Dr. Renner from testifying regarding ESA or AWA compliance, animal behavior, wild orca health or behavior, or the desirability of transferring Lolita to a sea pen. Plaintiffs incorporate the below memorandum of law in support of this motion.

## I.   FACTUAL BACKGROUND

This lawsuit seeks to enjoin Defendant's ongoing "take" under the ESA of the endangered orca named "Lolita."[1] Lolita was captured in 1970 from waters off the coast of Washington State and has been held at Miami Seaquarium since that time. She is a member of the Southern Resident Killer Whale ("SRKW") Distinct Population Segment ("DPS"), a group of animals whose numbers were drastically reduced during the 1960s and 70s due, in large part, to captures for marine parks such as Miami Seaquarium. (Compl., ECF No. 1, ¶ 35.) The SRKW pod was listed as endangered on November 18, 2005. 50 C.F.R. § 224.101; 70 Fed. Reg. 69903 (Nov. 18, 2005). Lolita was specifically added to the SRKW DPS listing in 2015, following a lawsuit and petition filed by Plaintiffs challenging the National Marine Fisheries Service's ("NMFS") prior unlawful exclusion of her from her pod's listing. *See* 80 Fed. Reg.7380 (Feb. 10, 2015).

---

[1] Defendant and its employees refer to Lolita by numerous alternate names, including "Tokitae," "Toki," "Tik," and "Gypsy."

Conduct impacting endangered animals such as Lolita is subject to statutory and regulatory restrictions under the ESA. Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of any endangered animal. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" includes an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*[2]

Plaintiffs allege that Defendant harms and harasses Lolita, in violation of the various provisions of the ESA, by confining her to a small, shallow, barren concrete tank, without adequate protection from the sun, and without a single orca companion. (Complaint, ECF No. 1, ¶¶ 1-72.) The interpretation and application of the ESA's legal framework remains, as it always does, exclusively within the province of this Court.

### A.   Dr. Renner's Expert Reports Contain Numerous Improper Legal Conclusions

Defendant has retained its own former employee, Dr. Michael Renner, as a purported expert in this matter. Dr. Renner, who previously served as one of Miami Seaquarium's staff veterinarians for Lolita, *admits* that he has no expertise in the ESA. (Transcript of Deposition of Michael S. Renner ("Renner Tr.") at 27:4-6 ("Q: Are you an expert in the Endangered Species Act? A: No."), attached hereto as <u>Exhibit A</u>.) Yet inexplicably, both Dr. Renner's opening expert report and his emailed rebuttal "report" contain numerous legal conclusions regarding

---

[2] 50 C.F.R. § 17.3 is a regulation adopted by the United States Fish and Wildlife Service ("FWS"). The NMFS, the entity charged with regulating endangered marine mammals such as Lolita, has cited this regulation, but has not adopted an official definition of the term "harass". *See, e.g.*, Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Section 7(a)(2) "Not Likely to Adversely Affect" Determination, *available at* http://www.westcoast.fisheries.noaa.gov/publications/protected_species/marine_mammals/final_groundfish_biop_12-7-12.pdf (applying a definition of "harass" that is "consistent with the [FWS]'s interpretation of the term"); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 366 (D. Mass. 2012) (noting that definition of harassment used by NMFS is similar to the FWS regulatory definition); *but cf. Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1066-67 (D. Alaska 2013) ("NMFS maintains it did not rely on FWS's definition of the term.").

3

Defendant's purported compliance with that statute and with the AWA, a separate statute that is not at issue in this litigation.

### 1. Dr. Renner's Opening Expert Report

Dr. Renner's February 8, 2016 expert report focuses almost exclusively on whether Defendant's conduct with regard to Lolita constitutes an unlawful "take" under the ESA and the regulations promulgated thereunder. (Letter from Michael S. Renner, DVM, to James Lister, dated February 7, 2016 and served on February 8, 2016 ("Renner Report"), attached hereto as Exhibit B.) Specifically, Dr. Renner states:

> I strongly disagree there has been any "take". The ESA defines the term "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or to attempt to engage in any such conduct". Lolita first came to the Miami Seaquarium prior to the ESA of 1973; therefore, the legality of her acquisition by Miami Seaquarium in 1970 should not be in question. Clearly she is not being pursued, hunted, shot, wounded, killed, or trapped. Therefore, it appears to me that "harm" and "harass" (both further defined by the ESA regulations with reference to injury or likelihood of injury) are the ESA terms in question. Based on my twenty-four years of experience as a marine mammal veterinarian and my knowledge of Lolita and her care at Miami Seaquarium, it is my professional opinion that Lolita is not being injured and is not likely to be injured as a result of the care provided for her by Miami Seaquarium and therefore I don't believe she is being "harmed" or '"harassed" in any way.

(Renner Report at 1.)

Dr. Renner conceded in his deposition that this "expert" opinion was based upon his own "interpretation of the definition of 'take'" under the ESA. (Renner Tr. at 86:21-25.) What is more, Dr. Renner testified that he unilaterally, and without legal basis, elected to *narrow* that definition in order to reach the conclusion that Lolita is not being harmed or harassed by the conditions in which Defendant maintains her. (*See* Renner Tr. at 87:5-10; 87:17-88:24.) Indeed, Dr. Renner acknowledged that the rakes on Lolita's skin documented in her veterinary records *do* constitute an injury, but stated that he nevertheless concluded that such injuries "are minor and insignificant, and they don't constitute take and harm." (Renner Tr. at 88:16-18.) When asked whether he found any basis in the applicable statute or regulations to narrow the definition of "take" in this way, Dr. Renner merely stated that "I have to call [rakes] injury because they are injuries, but again, scratches and scrapes minor, I don't think that is what the endangered species

4

[act] is getting at." (Renner Tr. at 88:1-5; *see also* Renner Tr. at 89:7-22.) But Defendant offers no evidence that Dr. Renner is somehow qualified as an expert in legislative intent, i.e. there is no basis for concluding that he should be aware of what Congress or any federal agencies were "getting at" in enacting the applicable provisions of the ESA. Further, Dr. Renner is not a lawyer and has offered no evidence that he is familiar, even on a general level, with principles of statutory construction. (*See* Renner Tr. at 28:19-21 ("Q. Are you an attorney? A. No. Do I sound like one?").)

Dr. Renner nevertheless further opines that the legality of Defendant's conduct under the ESA is demonstrated by Lolita's longevity, stating that:

> Lolita's longevity and paucity of health issues during forty-six years at Miami Seaquarium are testimony to her level of care and well being. *I find no evidence of any violation of the ESA based on past history, medical records, and recent observation.*

(Renner Report at 2 (emphasis added).)

Dr. Renner offers yet more legal conclusions regarding the application of the ESA to Plaintiffs' requested relief, stating, "I believe any radical changes to her current environment, as suggested by the citizen suit (including transport and relocation to a natural sea pen) are much more likely to 'harm' and 'harass' Lolita, as well as the population of endangered wild killer whales that she will encounter." (*Id.* at 1.)

In addition to improperly opining on the legality of Defendant's conduct under the ESA, which is the sole statute at issue in this litigation, Dr. Renner also offers legal conclusions regarding Defendant's purported compliance with an entirely separate statutory scheme, the AWA, stating "I do not believe Lolita is living under unlawful conditions." (*Id.* at 2.)[3] Dr. Renner further states, "APHIS rules and regulations are in place to enforce the AWA and protect

---

[3] The AWA, 7 U.S.C. § 2131—which is not at issue in this case—authorizes the Secretary of Agriculture to set "minimum" requirements for the treatment of all animals used in exhibition and research, regardless of whether such animals are listed as either "endangered" or "threatened" under the ESA. 7 U.S.C. § 2143(a)(2). Although regulations promulgated under the ESA address the AWA in that they exempt from the definition of harass "generally accepted . . . husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act", 50 C.F.R. § 17.3, the fact that Lolita is the *sole* endangered orca in captivity and held in conditions unlike any other captive orca in the country means that Defendant's practices cannot possibly be "generally accepted" and, accordingly, the AWA standards are not relevant to this action.

5

marine mammals like Lolita at educational facilities such as the Miami Seaquarium. Miami Seaquarium complies with APHIS regulations pertaining to killer whales." (*Id.*) As with his legal conclusions regarding ESA compliance, however, Dr. Renner admits that he lacks expertise regarding the AWA. (Renner Tr. at 172:1-17 ("I don't need to be an expert because the rules are already written."); *see also* 195:9-14 (discussing reliance on Defendant's purported expert (and longtime SeaWorld employee) Thad Lacinak's findings).)

Dr. Renner's report is so full of legal conclusions that, if his statements regarding the Defendant's purported compliance with the ESA and AWA are disregarded, only *one substantive paragraph* remains. That paragraph, which appears at page 2 of his report, lists the types of evidence that Dr. Renner reviewed ("clinical notes, blood results, and various laboratory sample results including cytology and culture of skin, teeth, tongue, eye, blowhole, stomach, feces, vagina, and urine" and "physical examinations and review of medical records, as well as my own personal examinations"), and makes the conclusory statement that "Lolita is very well cared for and continues to thrive in her environment". (Renner Report at 2.) Despite the fact this paragraph does not contain legal analysis, however, Dr. Renner fails to demonstrate how this bald conclusion and recitation of evidence types would be in any way helpful to the fact finder in this litigation. The only potentially helpful information in the entire report is thus Dr. Renner's discussion, in the latter half of the paragraph, of the dental problems from which Lolita continues to suffer. (*Id.*)

      **2.**     **Dr. Renner's Rebuttal "Report"**

At 8:28 p.m. on the final day of the discovery period in this matter (and three days after Dr. Renner was deposed), Defendant's counsel Jim Lister forwarded to Plaintiffs' counsel an email from Dr. Renner purporting to be an "Expert Rebuttal" addressing the opinions of Plaintiffs' experts Dr. Maddalena Bearzi, Dr. Ingrid Visser, Dr. Pierre Gallego, and John Hargrove. (Email from James Lister to counsel for Plaintiffs, dated February 18, 2016, forwarding email from Dr. Renner ("Rebuttal Report"), Exhibit C.) Yet again, Dr. Renner's rebuttal "report" is replete with legal conclusions regarding a statutory scheme not applicable to this action.[4] Dr. Renner states that Lolita's "pool size meets Animal Welfare Act (AWA)

---

[4] Dr. Renner's rebuttal "report" also includes unsworn factual statements regarding incidents that he claims to have witnessed during his time as the veterinarian of record for Defendant. (*See,*

minimum space requirements as regulated by the United States Department of Agriculture, Animal Plant Health Inspection Services (USDA, APHIS)." (*Id*. at 1.) He further states that "Although APHIS regulations require companions for Lolita (ie. (*sic*) it is against APHIS regulations for her to live alone) APHIS does not require the companions to be of the same species (conspecific)." (*Id*. at 2.) Finally, Dr. Renner states "[n]umerous APHIS reports are on file confirming adequate shade as required by AWA."[5] (*Id*. at 1.)

### B. Dr. Renner Opines on Orca Behavior and Training Despite Admitting That He Is Not Qualified as an Expert on those Topics

By his own sworn admission, Dr. Renner is not an expert qualified to provide opinions on orca behavior. (Renner Tr. at 20:13-20; 217:22-218:3.) Indeed, Dr. Renner stated, in no uncertain terms, "I am not an expert in behavior. I'm an expert of veterinary medicine in orcas." (Renner Tr. at 20:13-20.) Despite this, Dr. Renner's rebuttal "report" purports to offer expert analysis regarding a multitude of behavioral issues. For example, Dr. Renner concludes that Pacific white-sided dolphins ("PWDs") are "good companions for Lolita" because "[r]aking and sexual posturing [by the dolphins toward Lolita] are natural cetacean behaviors and natural and common forms of cetacean interaction." (Rebuttal Report at 2.)

Dr. Renner also states that "[c]hasing appears to be play behavior and provides Lolita exercise that keeps her in shape" and that he "do[es]n't believe that the PWDs harass Lolita." (*Id*. at 2.) When asked in deposition about the basis for this conclusion, Dr. Renner explained that his "expert" opinion was in fact based upon the findings of Defendant's *other* purported experts, stating "That is my own feeling from observing it, and, you know, I look to a guy like Thad Lacinak who knows killer whales and cetacean behavior way better than I do." (Renner Tr. 187:3-5.)

---

*e.g.*, Rebuttal Report at 1 ("I have personally witnessed Lolita fully breach and turn around completely in the pool on many occasions.") and 1-2 ("In my experience as Lolita's veterinarian, as well as observations during the January 20 2016 inspection, I saw no sign of significant negative effects from the sun on Lolita's skin.").) Dr. Renner's former role as a veterinarian responsible for Lolita's care makes it extremely likely that his testimony is biased since any misconduct on the part of the Defendant could potentially be connected to his own actions or omissions.

[5] These documents, although not in any way relevant to this action, also speak for themselves. No expert testimony is required to understand the plain language of these APHIS reports.

Regarding Lolita's public performances, Dr. Renner states, "If Lolita did not want to perform, she would not perform." (Rebuttal Report at 2.) Again, Dr. Renner offers no foundational evidence that would support a finding that he possesses any unique knowledge, skill, experience, or education regarding orca performances, training, or behavior. In fact, as to orca training expertise, Dr. Renner testified precisely to the contrary, stating "I am not an expert in training orcas other than the fact that I worked with them for 25 years. So no, I'm not a trainer." (Renner Tr. at 224:6-15.)

Dr. Renner also purports to render an expert opinion regarding stereotypic (i.e. repetitive, abnormal) behavior in his rebuttal "report" despite having earlier admitted—*in the context of a discussion regarding stereotypies*—that he is "not a behavioral expert." (*Id.* at 219:19-220:4 ("Stereotypical behavior to me more often is—again, I'm not a behavioral expert, but just from my knowledge and what I've seen as an aquarium vet and zoo vet over the years its more obvious and more repetitive.").) Three days after making this admission under oath, Dr. Renner stated in his rebuttal "report" that "[t]he behaviors described by the plaintiffs are very subtle and in my opinion are not stereotypical or indicative of boredom." (Rebuttal Report at 2.)

Finally, even if Dr. Renner had not explicitly (and repeatedly) acknowledged that he is not qualified to render opinions regarding orca training or behavior, his analysis is grossly incomplete. Dr. Renner admitted at deposition that he wholly failed to review Lolita's behavioral records in preparing his expert reports:

> Q. In preparing your opinions, did you review any of the animal behavior records regarding Toki?
>
> A. I did not.

(Renner Tr. at 137:15-17). By Defendant's own admission, these records are *the most relevant* primary source documents in which Lolita's behavioral issues are recorded.[6] (December 23, 2015 letter from Stephanie Mitchell to Caitlin Hawks at 3 ("Mitchell Letter"), attached hereto as

---

[6] Likewise, Dr. Renner admitted at his deposition that, if Lolita had injured a PWD (also called a "lag", a shortened version of the scientific name Lagenorhynchus), it would be recorded in the *dolphin's* veterinary records, not in Lolita's, and that he had also failed to review those documents. (Renner Tr. at 99:11-21.) This is particularly significant given that a dolphin in Lolita's tank died in 2015 as a result of an injury that could have been related to trauma caused by Lolita. (Renner Tr. at 100:11-101:5.)

Exhibit D.) Accordingly, any behavioral analysis that fails to take them into account cannot possibly be complete and should therefore be deemed unreliable.

>    **C.    Dr. Renner Opines on Wild Orcas and Orca Retirement and Release Despite Admitting that He Is Not Qualified as an Expert on Those Topics**

Dr. Renner also offers extensive opinions regarding the desirability of transferring Lolita to a sea pen in her native waters in Washington State. (Rebuttal Report at 4.) In his opening expert report, Dr. Renner states that "any radical changes to [Lolita's] current environment, as suggested by the citizen suit (including transport and relocation to a natural sea pen) are much more likely to 'harm' and 'harass' Lolita, as well as the population of endangered wild killer whales that she will encounter." (Renner Report at 1; *see also* Sections I(A) and II(C) discussing the impropriety of Dr. Renner's legal conclusions regarding ESA compliance.)

In his rebuttal "report", Dr. Renner states that he "strongly disagree[s] with the notion of moving Lolita to a sea pen and strongly oppose[s] the idea of releasing her to the wild." (Rebuttal Report at 4.) In an attempt to support this statement, Dr. Renner cites two publications regarding "[t]wo high profile cases of attempted reintroduction of killer whales to the wild."[7] (*Id*.) But Dr. Renner does not explain how simply reading two documents, when he has not even so much as *seen* an orca in the wild since he was 14 years of age (Renner Tr. at 54:5-16), qualifies him to render an expert opinion on the subject of sea pens and orca release. In fact, at his deposition on February 16, 2016, Dr. Renner explicitly *admitted* that he is not qualified as an expert in wild orca behavior (*Id.* at 20:13-20), and that he does not have *any* experience with releasing orcas into the wild.[8] (*Id.* at 77:2-4.)

---

[7] Dr. Renner initially indicated in his deposition that his conclusion that releasing Lolita is not safe was based upon his reading of a single paper regarding an orca by the name of Keiko. (Renner Tr. at 74:12-75:13.) Not only does Dr. Renner have no firsthand knowledge of that release, but he could not even recall with certainty the name of the author on whose conclusions he based his "expert" deposition testimony. (*Id.* at 74:25-75:13.) And Dr. Renner's conclusions are not only unsupported by foundational expert qualifications, but are factually without merit. Indeed, Keiko's release is regarded by many experts to have been largely successful, given that he survived several years following his relocation from his original tank in Mexico, and given that he successfully learned to hunt and swim free in the wild.

[8] In fact, in his deposition, Dr. Renner admitted that he works "pretty much" exclusively for captive marine mammal parks in his capacity as a consulting veterinarian. (Renner Tr. at 13:6-18.) This goes not only to his qualifications for purposes of this motion, but should also be considered as a source of potential bias should he be permitted to testify at trial.

9

Likewise, Dr. Renner failed to identify (in his reports or at deposition) any knowledge, skill, experience, training, or education regarding wild orcas that would qualify him to render an expert opinion on potential disease risks to the SRKW DPS that could result from releasing Lolita into her native waters. (*See* Renner Rebuttal at 4.) Indeed, by his own admission, Dr. Renner has only worked with *captive* orcas, and has no experience with diseases afflicting wild orca populations such as Lolita's pod. (Renner Tr. at 20:11-12 (acknowledging that he has never treated an orca in the wild); 54:5-16 (acknowledging that he has not even *seen* an orca in the wild since he was 14 years old). Dr. Renner likewise admits that he has never otherwise studied disease transmission among wild orcas in the open ocean (*Id.* at 112:4-9), and yet concludes (without explanation) that his experience working with captive orcas housed in close proximity in concrete swimming pools is sufficient basis to understand it.

## II.   ARGUMENT

The admission of expert evidence is governed by Federal Rule of Evidence 702, which provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

District Courts "act as gatekeepers, excluding evidence unless it is reliable and relevant." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)), *cert. denied*, 135 S.Ct. 1423 (2015). Whether an expert's testimony is reliable depends on "the particular facts and circumstances of the particular case." *Hughes*, 766 F.3d at 1329 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999)).

The Court of Appeals for the Eleventh Circuit has set out three requirements that an expert must meet before his opinions may be admitted. *Hughes*, 766 F.3d at 1329. First, the

10

expert must be qualified on the matter about which he intends to testify. *Id.* (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Second, he must employ reliable methodology. *Id.* Third, the expert's testimony must be able to assist the trier of fact through the application of expertise to understand the evidence or fact in issue. *Id.*

With respect to whether an expert's methodology is reliable, the Eleventh Circuit looks to a number of factors, including (1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted. *Id.* (citing *Daubert*, 509 U.S. at 593-94). This list of factors is not meant to be exhaustive, nor must each factor be present in a given case. *Id.* The proponent of the expert opinion must carry the burden of establishing qualification, reliability, and helpfulness. *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

### A.   Dr. Renner Should Not Be Permitted to Testify Regarding Lolita's Behavior or Training

Dr. Renner's conclusions regarding animal behavior address: (1) the harassment that Lolita suffers as a result of raking and chasing behavior by the dolphins in her tank, (2) the Defendant's ability to force Lolita to perform for the public, and (3) Lolita's stereotypical behavior. (Rebuttal Report at 2.) Under the first *Hughes* requirement, Dr. Renner admits that he is not qualified—by knowledge, skill, training, experience, education, or otherwise—to testify on these topics. *Hughes*, 766 F.3d at 1329; *see also* Fed. R. Evid. 702. At his deposition, Dr. Renner stated, unambiguously, "I am not an expert in animal behavior" and explained that, rather than relying solely on his own qualifications for his conclusions relating to this issue, he had to turn to the findings of Defendant's purported animal training expert, Thad Lacinak. (Renner Tr. at 217:22-218:3.) Because Dr. Renner admits that he is not qualified to opine on these issues, any testimony regarding them should be barred at trial. *See In re Trasylol Products Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *11 (S.D. Fla. Feb. 24, 2010) (excluding expert opinion where expert admitted he was not an expert in the topics discussed).

Moreover, even if Dr. Renner were somehow qualified to testify regarding issues related to animal behavior and training, his failure to employ a reliable methodology to analyze the facts in this matter must necessarily bar his testimony under the second *Hughes* requirement. *Hughes*, 766 F.3d at 1329. By his own admission, Dr. Renner failed to review *any* of Lolita's extensive

11

behavioral records, documents that Defendant itself has characterized as among "the most relevant set of records related to Lolita." (Renner Tr. at 137:15-17; Mitchell Letter at 3.) Lolita's behavioral records are the best primary source documents regarding her behavior in that they are "created contemporaneously with care being provided each day." (Mitchell Letter at 3.) Dr. Renner's conclusions thus cannot possibly be based upon any "generally accepted methodology" for analyzing animal behavior, given that they wholly fail to take into account the most critical documents on the subject they purport to address. *See Hughes*, 766 F.3d at 1329. Dr. Renner should therefore be precluded from testifying at trial regarding any issues relating to animal behavior generally, or to Lolita's behavior in particular.

### B. Dr. Renner is Not Qualified to Provide Expert Testimony Regarding Wild Orcas or Orca Release

Defendant seeks to introduce Dr. Renner's opinion testimony regarding the alleged risks to Lolita associated with transferring her to a sea pen in her native waters. (*See* Renner Report at 1 (concluding that "any radical changes to [Lolita's] current environment, as suggested by the citizen suit (including transport and relocation to a natural sea pen) are much more likely to 'harm' and 'harass' Lolita, as well as the population of endangered wild killer whales that she will encounter."); Rebuttal Report at 4 (stating that Dr. Renner "strongly disagree[s] with the notion of moving Lolita to a sea pen and strongly oppose[s] the idea of releasing her to the wild.").) When Dr. Renner was asked at deposition whether he is an expert in the behavior of orcas in the wild and whether he had any experience in releasing captive orcas, however, he stated, quite plainly, "No." (Renner Tr. at 20:13-20; 77:2-4.) Given these admissions, Dr. Renner cannot possibly be qualified under the first *Hughes* factor to testify regarding the impact of transferring Lolita back to her home. *Hughes*, 766 F.3d at 1329; *see also In re Trasylol Products Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *11 (S.D. Fla. Feb. 24, 2010).

Dr. Renner also opines in his rebuttal "report" that moving Lolita to Washington State would risk transferring disease to other members of her pod. (Rebuttal Report at 4.) But again, Dr. Renner has no relevant knowledge, skill, experience, training, or education that would qualify him to testify on this issue. By his own admission, he has only worked with *captive* orcas, and has never treated diseases in wild orca populations such as the SRKW DPS. (Renner Tr. at 20:11-12 (acknowledging that he has never treated an orca in the wild); 54:5-16 (acknowledging that he has not even *seen* an orca in the wild since he was 14 years old).) Dr.

12

Renner attempts to base his conclusion that Lolita's release to a sea pen would present a health risk to her pod on his experience with orcas in captive marine mammal parks—facilities that hold orcas in close proximity to one another, in chlorinated concrete tanks filled with water not taken from any orca's native habitat. (*See* Renner Tr. at 112:4-9.) Dr. Renner's extrapolation is baseless and not methodologically sound. *Hughes*, 766 F.3d at 1329. He fails to offer any evidence establishing that his experience at SeaWorld and Miami Seaquarium qualify him to testify on a *wild* orca population that he has neither seen nor otherwise studied.

Further, Dr. Renner's purported expertise regarding sea pens is entirely without support. Dr. Renner admits that he has never been involved in the release of an orca and instead bases his opinion that a sea pen is not a viable option for Lolita on two papers, the subjects of which he has never studied himself. (Rebuttal Report at 4.). This contention is absurd: the reading of two documents cannot possibly satisfy the expert qualification and methodological soundness requirements of *Hughes*. *Hughes*, 766 F.3d at 1329. Dr. Renner must therefore be barred from testifying regarding the release of Lolita to a sea pen in her native waters in Washington State.

      **C.**    **Dr. Renner's Improper Legal Conclusions Are Not Helpful to the Trier of Fact**

Under the third *Hughes* factor, an expert's opinions regarding ultimate legal conclusions in a matter are inadmissible as they are not helpful to the trier of fact. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (holding that trial court acted well within its discretion in excluding testimony constituting pure legal conclusion); *Legg v. Voice Media Grp., Inc.*, No. 13-62044-CIV-COHN, 2014 WL 1767097, at *4 (S.D. Fla. May 2, 2014) ("Where an expert offers an opinion as to the legal implications of the facts, that testimony also encroaches on the responsibilities of the judge and jury, and is inadmissible"). For example, in *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015), the plaintiff brought suit for disability discrimination and sought to introduce a declaration from a purported expert regarding the plaintiff's dog's legal status as a service animal. The expert's declaration stated that the dog "meets the statutory and regulatory criterion that he is individually trained to do work or perform tasks for an individual with disabilities, and is thus a service dog." *Id.* The court held that the declaration was "rife with impermissible legal conclusions," and that it was therefore not helpful to the jury and should be excluded. *Id.*

Here, as in *Cordoves*, Dr. Renner's opening expert report consists almost *entirely* of impermissible legal conclusions. Indeed, the report contains no factual analysis that could be construed as any discernible "methodology" under *Hughes* and its progeny. *See Hughes*, 766 F.3d at 1329 (requiring experts to employ reliable methodology and for their testimony to assist the trier of fact through the application of expertise to understand the evidence or fact in issue). Instead, the report is merely a laundry list of legal conclusions preceded by a basic summary of Dr. Renner's credentials: First, Dr. Renner recites the ESA's statutory definition of "take," which includes harm to and harassment of endangered animals, and states, without explanation, that "it is my professional opinion that Lolita is not being injured and is not likely to be injured as a result of the care provided for her by Miami Seaquarium and therefore I don't believe she is being 'harmed' or 'harassed' in any way." (Renner Report at 1.) Dr. Renner does not identify what about Lolita's condition or circumstances lead him to this conclusion and, in fact, expressly admitted that he failed to review any of Lolita's behavioral records, records that are among the most critical documents relating to Lolita's care. (Renner Tr. at 137:15-17 (stating that he did not review Lolita's behavioral records).) Second, Dr. Renner purports to analyze the Defendant's compliance with the AWA, a statute not at issue in this litigation. He references government inspection reports, and concludes that the conditions in which Lolita is kept are adequate under this statute.

What is more, Dr. Renner also admitted in deposition that Lolita is actually sustaining regular injuries in Defendant's care. Rather than concluding that such conduct violated the plain language of the ESA, he used his report and deposition to advocate a unilateral *narrowing* of the applicable statutory provisions such that they do not prohibit Defendant's conduct in allowing Lolita to be raked by the dolphins in her tank. (Renner Tr. at 88:1-5; *see also* Renner Tr. at 89:7-22 (stating that the rake marks that Lolita has sustained are not what the ESA is "getting at".) Allowing a veterinarian with no legal expertise or experience with the ESA to testify regarding issues of statutory construction would undermine the very integrity of the legal process. For this reason, Dr. Renner's testimony regarding the ESA- and AWA-related subject matter in his expert reports should be excluded.[9]

---

[9] If legal conclusions are removed from Dr. Renner's opening expert report, the only remaining substantive discussion is a single statement regarding the health of Lolita's teeth. (Renner Report

**III.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that their Motion to Exclude Improper Opinion Testimony by Former Seaquarium Veterinarian Dr. Michael S. Renner be granted, and that Dr. Renner be barred from testifying regarding (1) Defendant's compliance with the ESA or AWA, (2) orca behavior, or (3) the viability of a sea pen as a remedy for Defendant's "take" of Lolita.

Date:   March 11, 2016                            Respectfully submitted,

/s/ Paul J. Schwiep_____
Paul J. Schwiep, Fla. Bar No. 823244
Coffey Burlington, P.L.
2601 South Bayshore Dr., PH
Miami, FL 33133
Phone: 305-858-2900
Fax: 305-858-5261
pschwiep@coffeyburlington.com

/s/ Jared Goodman_____
Jared Goodman (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2266
Fax: 213-484-1648
JaredG@petaf.org

/s/ Matthew Strugar_____
Matthew Strugar (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 213-484-1648
Matthew-S@petaf.org

---

at 2.) If Dr. Renner is permitted to testify in this matter regarding the issues in his opening expert report, his testimony should be limited to this topic.

/s/ Caitlin K. Hawks
Caitlin K. Hawks (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 206-858-8518
Fax: 213-484-1648
CaitlinH@petaf.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE AND CONFERENCE

I HEREBY CERTIFY that on March 11, 2106 the foregoing document was served by Electronic Mail upon the parties identified in the Service List.  I further certify that I have conferred with all parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

 /s/ Paul J. Schwiep

**Service List**

| | |
|---|---|
| **Jennifer B. Moore, Esq.**<br>moorej@gtlaw.com<br>   *(admitted pro hac vice)*<br>GREENBERG TRAURIG, P.A.<br>Terminus 200<br>3333 Piedmont Road NE<br>Atlanta, Georgia  30305<br>Telephone:     (678) 553-2100<br><br>*Counsel for Defendants* | **James H. Lister, Esq.**<br>jlister@dc.bhb.com<br>   *(admitted pro hac vice)*<br>**Melinda L. Meade Meyers, Esq.**<br>mmeademeyers@dc.bhb.com<br>   *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>   CHEROT, PC<br>Suite 1020<br>1156 Fifteenth Street, NW<br>Washington, D.C.  20005<br>Telephone:     (202) 659-5800<br><br>*Counsel for Defendants* |
| **William A. Earnhart, Esq.**<br>wearnhart@bhb.com<br>   *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>   CHEROT, PC<br>1127 West 7th Avenue<br>Anchorage, Alaska  99501<br>Telephone:     (907) 263-7285<br><br>*Counsel for Defendants* | **Evelyn A. Cobos, Esq.**<br>cobose@gtlaw.com<br>**Mark S. Salky, Esq.**<br>Salkym@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 Southeast 2nd Avenue, Suite 4400<br>Miami, Florida  33131<br>Telephone:     (305) 579-0500<br><br>*Counsel for Defendants* |
| **Stefanie Wilson, Esq.**<br>swilson@aldf.org<br>   *(admitted pro hac vice)*<br>170 E. Cotati Avenue<br>Cotati, California  94931<br>Telephone:     (707) 795-2533<br><br>*Counsel for Animal Legal Defense Fund* | |