## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 15-cv-22692-Ungaro/Otazo-Reyes

**PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., ANIMAL LEGAL DEFENSE FUND, HOWARD GARRETT, and ORCA NETWORK,**

**Plaintiffs,**

**v.**

**MIAMI SEAQUARIUM and FESTIVAL FUN PARKS, LLC, d/b/a PALACE ENTERTAINMENT,**

**Defendants.**

## PLAINTIFFS' MOTION TO EXCLUDE IMPROPER OPINION TESTIMONY BY DR. GREY STAFFORD

Dr. Grey Stafford, by his own sworn admission, is not a veterinarian, has no formal education relating to orcas, and has undertaken no study relating to orcas. Likewise, Dr. Stafford is not a lawyer and has no expertise in the Endangered Species Act ("ESA"), the sole statute at issue in this litigation. Despite this, Defendant seeks to rely on the testimony of Dr. Stafford to address precisely these topics. On February 8, 2016, Defendant served on Plaintiffs Dr. Stafford's opening expert report which consisted, almost exclusively, of a series of improper legal conclusions relating to the Animal Welfare Act ("AWA"), a statute that is not even at issue in this case.

Dr. Stafford's testimony on these subjects simply cannot meet the 11th Circuit's stringent standard for expert testimony. That standard requires (1) that the expert be qualified on the matter about which he intends to testify, (2) that he employ reliable methodology in analyzing the facts of the case, and (3) that his testimony be helpful to the trier of fact. Dr. Stafford's

1

proposed testimony meets *none* of these requirements. He *admits* that he is not qualified as an expert in the topics about which he opines and, even if he were, it is well established that the statements in his reports regarding the AWA are improper legal conclusions that, by their very nature, are not helpful to the fact finder in this case and should be excluded. Further, Dr. Stafford has failed to employ any reliable methodology to analyze the space, shade, and compatibility issues discussed in his reports, neglecting to review *the most critical records* regarding Lolita's behavior during her time in Defendant's care. For these reasons, Plaintiffs hereby move this Court for an order barring Dr. Stafford from testifying in this matter regarding ESA or AWA compliance, whether Defendant's enclosure for Lolita is of adequate size, whether Defendant's enclosure for Lolita provides adequate shade, whether Defendant is housing Lolita with compatible animals, and wild orca health or behavior. Plaintiffs incorporate the below memorandum of law in support of this motion.

## I.    FACTUAL BACKGROUND

This lawsuit seeks to enjoin Defendant's ongoing "take" under the ESA of the endangered orca named "Lolita."[1] Lolita was captured in 1970 from waters off the coast of Washington State and has been held at Miami Seaquarium ("Seaquarium" or "MSQ") since that time. She is a member of the Southern Resident Killer Whale ("SRKW") Distinct Population Segment ("DPS"), a group of animals whose numbers were drastically reduced during the 1960s and 70s due, in large part, to captures for marine parks such as the Seaquarium. Compl., ECF No. 1, ¶ 35. The SRKW pod was listed as endangered on November 18, 2005. 50 C.F.R. § 224.101; 70 Fed. Reg. 69903 (Nov. 18, 2005). Lolita was specifically added to the SRKW DPS listing in 2015, following a lawsuit and petition filed by Plaintiffs challenging the National Marine Fisheries Service's prior unlawful exclusion of her from her pod's listing. *See* 80 Fed. Reg.7380 (Feb. 10, 2015).

Conduct impacting endangered animals such as Lolita is subject to statutory and regulatory restrictions under the ESA. Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of any endangered animal. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" includes an act which "kills or

---

[1] Defendant and its employees refer to Lolita by numerous alternate names, including "Tokitae," "Toki," "Tik," and "Gypsy."

injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*[2]

Plaintiffs allege that Defendant harms and harasses Lolita, in violation of the various provisions of the ESA, by confining her to a small, shallow, barren concrete tank, without adequate protection from the sun, and without a single orca companion. Complaint, ECF No. 1, ¶¶ 1-72. The interpretation and application of the ESA's legal framework remains, as it always does, exclusively within the province of this Court.

### A.    Dr. Stafford's Expert Report Contains Numerous Improper Legal Conclusions

Defendant has retained Dr. Grey Stafford, as a purported expert in this matter. Dr. Stafford's expert report focuses, nearly exclusively, upon Defendant's purported compliance with the AWA and the regulations promulgated thereunder. Indeed, at deposition, Dr. Stafford testified that he understood his role in this case is "to look at the regulations, the requirements under the animal welfare act [sic] and compare them to the various measurement we have available of Lolita's pool and to either confirm or deny whether or not … that pool meets the minimum required standards as set forth under the Animal Welfare Act." Transcript of Deposition of Grey Stafford ("Stafford Tr.") at 21:4–10, attached hereto as Exhibit B. But the AWA is not at issue in this case. That statute authorizes the Secretary of Agriculture to set "minimum" requirements for the treatment of all animals used in exhibition and research, regardless of whether such animals are listed as either "endangered" or "threatened" under the

---

[2] 50 C.F.R. § 17.3 is a regulation adopted by the United States Fish and Wildlife Service ("FWS"). The NMFS, the entity charged with regulating endangered marine mammals such as Lolita, has cited this regulation, but has not adopted an official definition of the term "harass". *See, e.g.*, Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Section 7(a)(2) "Not Likely to Adversely Affect" Determination, *available at* http://www.westcoast.fisheries.noaa.gov/publications/protected_species/marine_mammals/final_groundfish_biop_12-7-12.pdf (applying a definition of "harass" that is "consistent with the [FWS]'s interpretation of the term"); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 366 (D. Mass. 2012) (noting that definition of harassment used by NMFS is similar to the FWS regulatory definition); *but cf. Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1066-67 (D. Alaska 2013) ("NMFS maintains it did not rely on FWS's definition of the term").

ESA. 7 U.S.C. § 2143(a)(2). Although an FWS[3] regulation promulgated under the ESA addresses the AWA in that it exempts from the definition of harass "generally accepted . . . husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act," 50 C.F.R. § 17.3, the fact that Lolita is the *sole* endangered orca in captivity and held in conditions unlike any other captive orca in the country means that Defendant's practices cannot possibly be "generally accepted" and, accordingly, the AWA standards are not relevant to this action.

Moreover, even if this case arose under that statute, Dr. Stafford is not an attorney, he has never worked for the USDA, and has no academic or educational training in regulatory compliance with the AWA. Yet Dr. Stafford's expert report contains numerous legal conclusions regarding Defendant's purported compliance with regulations promulgated under that statute. *See generally* Letter from Dr. Grey Stafford to James Lister, served on February 8, 2016 ("Stafford Report"), attached hereto as Exhibit A.

Nevertheless, Dr. Stafford offers the following legal conclusions in his report:

- "The complaint alleging the MSQ [Miami Seaquarium] pool is noncompliant with the AWA in terms of minimum space requirements to house up to 2 orcas with 2 companion animals is incorrect." Stafford Report at 3.
- "In every measure, the MSQ pool for Lolita exceeds the minimum standards set forth by AWA regulations." *Id.* at 3.
- "Lolita's pool is significantly larger than the required space minimums in terms of all four factors used by APHIS to determine pool compliance with rules under the AWA." *Id.* at 4.
- "The APHIS conclusion stated in several documents cited above that the requirements for Minimum Horizontal Dimension in Section 3.104 do not preclude a partial obstruction is sound." *Id.* at 5.
- "Furthermore, CFR Section 3.104(a) requires that primary enclosures must make it possible for animals '…to be able to make normal postural and social adjustments with adequate freedom of movement, in or out of the water' as the MSQ pool certainly provides for Lolita with significant horizontal space and at greater than minimum depth (i.e., 12 to 20 ft)." *Id.*
- "The legal complaint erroneously implies the AWA rules require that a cetacean must be housed with a member of its own species in order for a facility to be compliant with AWA regulations, and incorrectly asserts MSQ is not housing Lolita with compatible individuals from a biologically related species." *Id.*
- "The AWA Rule does not preclude housing two different species of cetacean together, nor does it require that animals must be housed with members of their

---

[3] The FWS is not the agency responsible for regulating endangered marine mammals. Rather, Lolita is subject to regulation by the NMFS, a separate entity.

own species. . . .The main requirement under the AWA is that a marine mammal 'known to be primarily social in the wild' has at least 1 companion animal from a 'biologically related species,' and that the two animals are 'compatible' per CFR section 3.109. The Act even permits the housing of cetaceans singly in some circumstances provided the well-being of the animal calls for such housing, and provided there is a coordinated and periodically reviewed management plan from the veterinary and training staff. As a result, MSQ's housing of Lolita with two individuals from another species of dolphin with whom she shares so many behavioral, biological, environmental, and ecological characteristics as the Pacific white-sided dolphin *is not a violation of the AWA*." *Id.* at 6 (emphasis added).

- "The legal complaint incorrectly asserts that MSQ does not provide Lolita shade or protection from weather." *Id.*
- "[T]he legal complaint asserting that the MSQ is non-compliant with the AWA in terms of: providing minimum required pool space, providing compatible companion animals from a biologically related species, and providing species appropriate shade and shelter is not supported according to requirements as set forth under the AWA." *Id.* at 7.

Dr. Stafford conceded in his deposition that this opinions were based upon his own "reading of the rules" under the AWA. Stafford Tr. at 54:6 (stating that his opinion that the obstruction in Lolita's pool does not count against the minimum horizontal dimension is based on his own reading of the regulations); *id.* at 76:23 (stating that his opinion of what shade is appropriate for the species is based on his own reading of the regulations).

Dr. Stafford's report also essentially parrots the USDA Animal and Plant Health Inspection Service (APHIS) letters, memoranda, and site evaluation that were attached to Defendant's Amended Answer. Stafford Report at 2–3, 6. At deposition, he admitted that he based his conclusion that the shade for Lolita's tank is adequate only on the statements of the veterinarians who authored these documents, without conducting any analysis or observation himself. Stafford Tr. at 89:20–24 ("I concluded that it's adequate because trained veterinarians indicated that her eyes and skin condition appeared fine, that the stadium area provided adequate shade and that the pool depth enabled Lolita to dive to a depth of 20 feet.").

### B.    Dr. Stafford Is Not an Expert on Orca Behavior or Housing, And His Analysis Is Incomplete

By his own sworn admission, Dr. Stafford has had no formal education and has undertaken no course of study related to the orca species. Stafford Tr. at 22:10–12. He has had no academic or educational training in regulatory compliance with the AWA, and is "not aware that there is one for zoology professionals." *Id.* at 22:18–20. The entire sum of his professional

5

experience at a facility housing orcas was four years as an animal trainer at SeaWorld of Ohio, two decades ago. Stafford Resume at 2 (attached to Stafford Report). None of the other facilities where he has worked have housed orcas. Stafford Tr. at 30:10–14; 33:14–15. He has only been to Miami Seaquarium and seen Lolita once, 14 years ago in 2002. *Id.* at 15:15–17. This was during a "courtesy visit" among zoology professionals, *id.* at 16:9, and they spent one hour by her tank observing her and the one male Pacific white-sided dolphin she was housed with at the time, *id.* at 17:23. He does not remember anything else about Lolita's companion at that time. *Id.* at 17:9–13.

Finally, even if Dr. was qualified to render opinions regarding orca behavior or housing, his analysis is grossly incomplete, and therefore must be deemed unreliable. As to his opinions on Seaquarium's compliance with the AWA space requirements, Dr. Stafford did nothing more than plug in the dimensions of Lolita's pool that were provided to him by counsel for Defendant to the formulas provided in the AWA regulations. Stafford Report at 4–5; Stafford Tr. at 42:10–22. At deposition Dr. Stafford could not explain any special expertise used in performing the calculations that are the basis of his conclusion that Lolita's tank exceeds minimum space requirements under the AWA:

> Q. . . .[E]xplain to me the special expertise that was involved to input these values and to compute the calculations to arrive at the final numbers that you compared against each other.
> A. I have been somewhat familiar with the rules under the Animal Welfare Act, specifically as they related to marine mammals, given my role in building and launching the sea lion facility.
> The space measures for marine mammals are fairly uniform. They just vary by the type of taxon. . . . So what I did was to look at the exhibits and try to calculate, based on those documents, what those calculations that the [A]ct provides, what was the result. And then compared them to the minimum standards, which are in the [A]ct or under the rule under the [A]ct.

Stafford Tr. at 42:23–25; 43:2–19. He further admits that he did not substantively review the Seaquarium's animal behavior records for Lolita, although he acknowledges that they would impact whether the standards for space were met: "I briefly perused just to see that they, in fact, keep records which is a requirement. But not in any detail. I did not have the time to draw any conclusions from them as far as how their training might somehow influence or impact the welfare standards of space." *Id.* at 72:22–25 73:1–2.

As to his opinion that the Seaquarium complies with the AWA minimum requirements for shade, Dr. Stafford identified a number of features that would provide shade for a marine mammal housing facility, such as the materials by which the pool was constructed," "the shading of the pool itself or the color of the pool, whether or not the materials used and the coloration of the pool is reflective or not," *id.* at 77:20 –23, "water quality," "naturally occurring algae in a pool," *id.* at 78:2–4, "living creatures and so forth that utilize the light or scatter like," *id.* at 80:14–15. But he admitted that he did not take any of these things into account in drawing his conclusion that shade is adequate in Lolita's pool. *See id.* 82:13–14 ("I did not take into account water quality of the pool."); *id.* 83:4–5 ("I did not consider the reflective nature of the pool."). When asked what, if not these facts, his conclusion that the shade in Lolita's tank is adequate is based on, he admitted that it was only on the statements of other individuals, without conducting any analysis or methodology himself: "I concluded that it's adequate because trained veterinarians indicated that her eyes and skin condition appeared fine, that the stadium area provided adequate shade and that the pool depth enabled Lolita to dive to a depth of 20 feet." *Id.* at 89:20–24.

As to his opinions on housing with "compatible" companion animals, Dr. Stafford admits that he is not able to conclusively evaluate compatibility, but rather "the training staff at [Seaquarium] in conjunction with the veterinarian staff are probably in the best position to evaluate that because they spend the most time with those animals." *Id.* at 107:2–6.

Further, he also admits he failed to review important information to assess whether Lolita and her tankmates are compatible. For example, he testified that one of the factors relevant for assessing the compatibility of animals housed together is what the animals are doing "when they are not aware they are being observed . . . what are they doing? Are they spending . . . as much time as possible away from each other or are they interacting? And how are they interacting?" *Id.* at 106:17–21. But he admits he has never done this with regard to Lolita. *Id.* at 106:10–12; *see also id.* at 110:19–23 (admitting that he had not "reviewed the records in detail" or "observed the animals in detail over an extended period of time, both with their attention and with them not knowing they were being observed").

He further admitted that he did not look at and was not provided complete behavior records in order to conduct a proper assessment of compatibility:

Q. In preparing your assessment about compatibility of Lolita with her companion in her tank, were you provided any information about their interactions?

A. As we discussed several minutes ago, there was some documents provided that included some behavioral records, but I did not look at them in that context. And I believe again, my review was brief because of the time and the priority for our other documents to look through. And I also think that the documents only really pertain to Lolita herself, not the other dolphin. So I think to evaluate that, you'd probably want to look at both sets of records. If you are talking about compatibility between two different animals, you'd probably want behavioral records that represent both individuals that you're talking about. So I did not factor those into my report.

*Id.* at 104:18–25; 105:1–10.

By his own admission, the personal knowledge that Dr. Stafford largely relied upon when making his report is fourteen years old: "A lot of it really was based upon my visit to the [Seaquarium] back in 2002." (Stafford Tr. at 105:16–17.) What is more, Dr. Stafford's 2002 personal observations are not reflective of Lolita's current circumstances: at that time of his visit, Dr. Stafford testifies that Lolita was only housed with one Pacific white-sided dolphin (*id.* 17:4–8), and she is currently housed with two. Moreover, Dr. Stafford does not remember anything about that dolphin (*id.* 9–13), and thus cannot say whether it is the same one she is housed with now. Therefore, his observations about the compatibility between Lolita and that unnamed dolphin (Stafford Report at 6), are unreliable and unhelpful as expert opinion testimony about the compatibility of Lolita with the dolphins she is housed with today.

### C.   Dr. Stafford Is Presented as an Expert on AWA Compliance, Yet He Is the Director of Conservation and Communications for a Facility that Has Been Repeatedly Cited for Non-Compliance by the USDA

The purpose of Dr. Stafford's testimony is to provide opinion testimony on Seaquarium's compliance with AWA regulations. Dr. Stafford contends that he is qualified to opine on this issue because his "work history has been focused on maintaining Animal Welfare Act Compliance, and in particular, with respect to the rules governing the Humane Handling, Care, Treatment, and Transportation of marine mammals." (Stafford Report at 1.) But Dr. Stafford's professional associations belie this assertion.

Dr. Stafford is the Director of Conservation at Wildlife World Zoo & Aquarium ("WWZ"). Stafford Resume at 1 (attached to Stafford Report). WWZ has been *repeatedly* cited for non-compliance with AWA regulations by USDA inspectors. Since just 2012, WWZ has

been cited for no fewer than 28 violations of AWA regulations, 14 of those related to housing facilities/enclosures alone. *See* USDA Inspection Reports (attached hereto as <u>Exhibits C–J</u>). These repeated violations demonstrate institutional disregard for the well-being of animals in this facility at which Dr. Stafford, a purported "expert" in AWA compliance, has been a member of the senior management team for 12 years. For example:

- In December of 2012, WWZ was cited for failure to maintain structurally sound facilities to protect the animals from injury and contain the animals after "a Defassa Waterbuck jumped over a wall of its enclosure, escaping into the public walkway, after introduction of a new animal to the enclosure by staff." The animal died after being having to be restrained and placed into a vehicle by staff. USDA APHIS Inspection Report, 1–2 (Jan. 16, 2013) (Ex. C).

- On Feb. 28, 2013, WWZ was cited when a handler brought a 3 month old tiger cub to a local television studio, and allowed it to run around the studio unrestrained. "This animal was seen biting the clothes of the off stage handler. . . The host of the television show was also seen pulling at the tail of the young tiger." USDA APHIS Inspection Report, 1 (Mar. 21, 2013) (Ex. D).

- On September 5, 2013, an inspection of WWZ found numerous enclosures for non-human primates that had wires with sharp ends and other dangerous items protruding "posing a risk of injury to the animals." USDA APHIS Inspection Report, 1 (Sept. 6, 2013) (Ex. G).

- On May 4, 2015, WWZ was cited for a repeat violation for allowing "excessive accumulation of feces" in two separate enclosures. One housed 19 goats where the inspector found that "the animals could not lie in their enclosure without becoming contaminated by the waste material." The other was an enclosure housing three warthog piglets where the inspector found "blankets that contained an excessive amount of feces." USDA APHIS Inspection Report, 3 (May 12, 2015) (Ex. I).

- On January 14, 2016, WWZ was cited for seven separate violations. One of these was because WWZ "is not providing heat to non-human primates housed outdoors to maintain temperatures above 45 degrees Fahrenheit." WWZ told the inspector that they had no policy on temperature guidelines. The inspector noted that the outdoor facilities housed 59 non-human primates of various species, and at the time of the inspection, the

overnight lows for the area was 36 degrees Fahrenheit. The inspector observed the primates grouped together, and trembling. USDA APHIS Inspection Report, 2 (Jan. 21, 2016) (Ex. J).

## II.  ARGUMENT

The admission of expert evidence is governed by Federal Rule of Evidence 702, which provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

District Courts "act as gatekeepers, excluding evidence unless it is reliable and relevant." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)), *cert. denied*, 135 S.Ct. 1423 (2015). Whether an expert's testimony is reliable depends on "the particular facts and circumstances of the particular case." *Hughes*, 766 F.3d at 1329 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999)).

The Court of Appeals for the Eleventh Circuit has set out three requirements that an expert must meet before his opinions may be admitted. *Hughes*, 766 F.3d at 1329. First, the expert must be qualified on the matter about which he intends to testify. *Id.* (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Second, he must employ reliable methodology. *Id.* Third, the expert's testimony must be able to assist the trier of fact through the application of expertise to understand the evidence or fact in issue. *Id.*

With respect to whether an expert's methodology is reliable, the Eleventh Circuit looks to a number of factors, including (1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally

accepted. *Id.* (citing *Daubert*, 509 U.S. at 593-94). This list of factors is not meant to be exhaustive, nor must each factor be present in a given case. *Id.* The proponent of the expert opinion must carry the burden of establishing qualification, reliability, and helpfulness. *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

### A.    Dr. Stafford Should Not Be Permitted to Testify Regarding Defendant's AWA Compliance With Regard To Lolita's Housing

Under the first *Hughes* requirement, Dr. Stafford is not qualified—by knowledge, skill, training, experience, education, or otherwise—to testify on Lolita's housing and the requirements of the AWA with respect to captive orcas. *Hughes*, 766 F.3d at 1329; *see also* Fed. R. Evid. 702. At his deposition, Dr. Stafford admitted that he has had no formal education or study related to orcas. Stafford Tr. at 22:10–12. The entire sum of his professional experience at a facility housing orcas was four years as an animal trainer at SeaWorld of Ohio, two decades ago. Stafford Resume at 2 (attached to Stafford Report). None of the other facilities where he has worked with exotic animals housed orcas. Stafford Tr. at 30:10–14; 33:14–15. He has had no academic or educational training in regulatory compliance with the AWA, and is "not aware that there is one for zoology professionals." *Id.* at 22:18–20.

Even if Dr. Stafford were somehow qualified to testify regarding issues related to AWA compliance for orca housing, his testimony does not rely on any "specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In reaching his conclusion that Lolita's tank exceeds the minimum space requirements under the AWA, he simply used dimensions given to him by counsel for Defendant and plugged them into the formulas provided in the AWA regulations. Stafford Report 4–5; Stafford Tr. at 42:10–22. He could not identify what special expertise was used, other than being "somewhat familiar with the rules under the Animal Welfare Act," to perform these calculations. Stafford at Tr. at 43:2–3. In coming to his opinions on compliance with shade requirements, Dr. Stafford again admitted that he did not use any of his own specialized knowledge; rather, his opinion simply echoed the conclusions of veterinarians provided to him by counsel for Defendant. *See* Stafford Tr. at 89:20–24. Other than general descriptions of the species, *see* Stafford Report at 5–6, Dr. Stafford did not rely on any specialized knowledge in coming to his conclusion that Lolita is compatible with her tankmates, two Pacific white-sided dolphins. He said that someone else

besides him – the training and veterinary staff of the Seaquarium – would be in the best position to evaluate compatibility. Stafford Tr. at 107:2–6.

Further, Dr. Stafford's failure to employ a reliable methodology to analyze the facts relating to the conditions in which Defendant keeps Lolita must necessarily bar his testimony under the second *Hughes* requirement. *Hughes*, 766 F.3d at 1329. By his own admission, Dr. Stafford failed to review Lolita's extensive behavioral records, documents that Defendant itself has characterized as among "the most relevant set of records related to Lolita." December 23, 2015 letter from Stephanie Mitchell to Caitlin Hawks at 3 ("Mitchell Letter"), attached hereto as Exhibit K. Dr. Stafford concedes that behavioral records are relevant to whether the Seaquarium is compliant with regard to Lolita's tank size, but he "did not have the time to draw any conclusions from them as far as how their training might somehow influence or impact the welfare standards of space." Stafford Tr. at 72:22–25; 73:1–2.

Likewise, as to his opinions that the Seaquarium complies with AWA minimum requirements for shade, Dr. Stafford did not even consider whether Lolita's tank has any of the features that he himself identified would provide shade in a marine mammal housing facility. *See* Stafford Tr. at 77–78; 82–83. As noted above, he relied exclusively on the statements of veterinarians provided to him by counsel for Defendant in coming to that conclusion. Thus, Dr. Stafford's analysis is incomplete and cannot possibly be reliable.

Dr. Stafford also did not reliably apply the facts of this case to any methodology in coming to his conclusion that Lolita is housed with compatible animals. *See* Fed. R. Evid. 702(d). As Defendant notes, Lolita's behavioral records are the best primary source documents regarding her behavior in that they are "created contemporaneously with care being provided each day." Mitchell Letter at 3. Dr. Stafford himself describes the behavioral records of all of the animals in the tank as being relevant facts and evidence to assess compatibility among individuals housed together, but admits that he did not look at them. Stafford Tr. at 104:18–25; 105:1–10. By his own admission, the main thing he did rely on was his one-hour visit to the Seaquarium 14 years ago. *Id.* at 105:16–17. According to Dr. Stafford, in order to assess compatibility, it is important to be able to observe how the animals behave when they are unaware of the presence of humans, *id.* at 106:17–21, but he did not do this prior to preparing his expert report, *id.* at 106:10–12; 110:19–23.

For these reasons, Dr. Stafford's testimony cannot possibly meet this Circuit's stringent standard for admissible expert testimony.

**B.      Dr. Stafford's Improper Legal Conclusions Are Not Helpful to the Trier of Fact**

Dr. Stafford's conclusions regarding AWA compliance address: (1) the size and water volume in Lolita's tank, (2) the shade provided by the stadium facility where Lolita is housed, and (3) whether Lolita is housed with biologically similar and compatible species. Under the third *Hughes* factor, an expert's opinions regarding ultimate legal conclusions in a matter are inadmissible as they are not helpful to the trier of fact. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (holding that trial court acted well within its discretion in excluding testimony constituting pure legal conclusion); *Legg v. Voice Media Grp., Inc.*, No. 13-62044-CIV-COHN, 2014 WL 1767097, at *4 (S.D. Fla. May 2, 2014) ("Where an expert offers an opinion as to the legal implications of the facts, that testimony also encroaches on the responsibilities of the judge and jury, and is inadmissible"). For example, in *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015), the plaintiff brought suit for disability discrimination and sought to introduce a declaration from a purported expert regarding the plaintiff's dog's legal status as a service animal. The expert's declaration stated that the dog "meets the statutory and regulatory criterion that he is individually trained to do work or perform tasks for an individual with disabilities, and is thus a service dog." *Id.* The court held that the declaration was "rife with impermissible legal conclusions," and that it was therefore not helpful to the jury and should be excluded. *Id.*

Here, as in *Cordoves*, Dr. Stafford's expert report consists almost *entirely* of impermissible legal conclusions. Indeed, the report contains no factual analysis that could be construed as any discernible "methodology" under *Hughes* and its progeny. *See Hughes*, 766 F.3d at 1329 (requiring experts to employ reliable methodology and for their testimony to assist the trier of fact through the application of expertise to understand the evidence or fact in issue). Instead, the report is merely a laundry list of legal conclusions and Dr. Stafford's readings of what the AWA and its regulations mean. *See, e.g.*, Stafford Report at 3 ("the MSQ pool for Lolita exceeds the minimum standards set forth by AWA regulations."); *id.* at 6 ("The main requirement under the AWA is that a marine mammal "known to be primarily social in the wild" has at least 1 companion animal from a "biologically related species," and that the two animals

13

are "compatible" per CFR section 3.109."). Dr. Stafford also offers his opinion that legal assertions in Plaintiffs' complaint are incorrect. Stafford Report at 4, 5. At deposition, Dr. Stafford admitted that his opinions were based upon his own "reading of the rules" under the AWA. Stafford Tr. at 54:6; *id.* at 76:23.

Allowing a witness with no legal expertise to testify regarding issues of statutory construction would undermine the very integrity of the legal process. For this reason, Dr. Stafford's testimony regarding the AWA-related subject matter in his expert reports should be excluded.[4]

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion to Exclude Improper Opinion Testimony by Dr. Grey Stafford be granted, and that Dr. Stafford be barred from testifying regarding Defendant's compliance with the AWA.

Date:   March 11, 2016                    Respectfully submitted,

                                          /s/ Paul J. Schwiep
                                          Paul J. Schwiep, Fla. Bar No. 823244
                                          Coffey Burlington, P.L.
                                          2601 South Bayshore Dr., PH
                                          Miami, FL 33133
                                          Phone: 305-858-2900
                                          Fax: 305-858-5261
                                          pschwiep@coffeyburlington.com

---

[4] If legal conclusions are removed from Dr. Stafford's expert report, the only remaining substantive discussion is a general background on orcas, discussion that Seaquarium has housed Lolita in mixed species groups for many years, and a general description of Pacific white-sided dolphin and Southern Resident Killer Whale characteristics. Stafford Report at 5, 6, 7. However, Dr. Stafford is not qualified as an expert on orca behavior, *see supra* II.B; if Dr. Stafford is permitted to testify in this matter regarding the issues in his expert report, his testimony should be limited to discussion of the fact that Seaquarium has housed Lolita in mixed species groups for many years, and a general description of Pacific white-sided dolphin characteristics.

/s/ Jared Goodman
Jared Goodman (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2266
Fax: 213-484-1648
JaredG@petaf.org

/s/ Matthew Strugar
Matthew Strugar (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 213-484-1648
Matthew-S@petaf.org

/s/ Caitlin K. Hawks
Caitlin K. Hawks (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 206-858-8518
Fax: 213-484-1648
CaitlinH@petaf.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE AND CONFERENCE

I HEREBY CERTIFY that on March 11, 2106 the foregoing document was served by Electronic Mail upon the parties identified in the Service List. I further certify that I have conferred with all parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

/s/ Paul J. Schwiep

15

## Service List

| | |
|---|---|
| **Jennifer B. Moore, Esq.**<br>moorej@gtlaw.com<br>  *(admitted pro hac vice)*<br>GREENBERG TRAURIG, P.A.<br>Terminus 200<br>3333 Piedmont Road NE<br>Atlanta, Georgia  30305<br>Telephone:    (678) 553-2100<br><br>*Counsel for Defendants* | **James H. Lister, Esq.**<br>jlister@dc.bhb.com<br>  *(admitted pro hac vice)*<br>**Melinda L. Meade Meyers, Esq.**<br>mmeademeyers@dc.bhb.com<br>  *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>  CHEROT, PC<br>Suite 1020<br>1156 Fifteenth Street, NW<br>Washington, D.C.  20005<br>Telephone:    (202) 659-5800<br><br>*Counsel for Defendants* |
| **William A. Earnhart, Esq.**<br>wearnhart@bhb.com<br>  *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>  CHEROT, PC<br>1127 West 7th Avenue<br>Anchorage, Alaska  99501<br>Telephone:    (907) 263-7285<br><br>*Counsel for Defendants* | **Evelyn A. Cobos, Esq.**<br>cobose@gtlaw.com<br>**Mark S. Salky, Esq.**<br>Salkym@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 Southeast 2nd Avenue, Suite 4400<br>Miami, Florida  33131<br>Telephone:    (305) 579-0500<br><br>*Counsel for Defendants* |
| **Stefanie Wilson, Esq.**<br>swilson@aldf.org<br>  *(admitted pro hac vice)*<br>170 E. Cotati Avenue<br>Cotati, California  94931<br>Telephone:    (707) 795-2533<br><br>*Counsel for Animal Legal Defense Fund* | |