# Exhibit B

**to**

**Plaintiffs' Motion to Exclude Improper Opinion Testimony by Dr. Grey Stafford**


CERTIFIED
COPY

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF FLORIDA

3              MIAMI DIVISION

4      Case No. 15-cv-22692-Ungaro/Otazo-Reyes

5                  - - - -

6
       PEOPLE FOR THE ETHICAL     )
7      TREATMENT OF ANIMALS, INC.,)
       ANIMAL LEGAL DEFENSE FUND, )
8      HOWARD GARRETT, and ORCA    )
       NETWORK,                   )
9                                 )
                      Plaintiffs, )
10                                )
             vs.                  )
11                                )
       MIAMI SEAQUARIUM and       )
12     FESTIVAL FUN PARKS, LLC.   )
       d/b/a PALACE ENTERTAINMENT,)
13                                )
                      Defendants. )
14     _____)

15

16

17

18                  - - - -

19      DEPOSITION OF S. GREY STAFFORD, Ph.D.

20       Held at Animal Legal Defense Fund

21            170 E. Cotati Avenue

22            Cotati, California

23      Sunday, February 14, 2016, 8:59 a.m.

24                  - - - -

25

1    APPEARANCES

2

3    For the Plaintiffs:

4         Animal Legal Defense Fund
           170 E. Cotati Avenue
5         Cotati, California 94931
           BY:   STEFANIE WILSON, ESQ.
6         and   MATTHEW LIEBMAN, ESQ.

7

8    For the Plaintiffs:

9         Coffey Burlington, L.L.
           2601 South Bayshore Drive., PH
10       Miami, Florida 33133
           BY:   PAUL J. SCHWIEP, ESQ.
11           (Did not appear)

12

13    For the Plaintiffs:

14       PETA Foundation
           1536 16th Street, NW
           Washington, D.C. 20036
15       BY:   JARED GOODMAN, ESQ.
           (Did not appear)

16

17    For the Plaintiffs:

18       PETA Foundation
           2154 W. Sunset Boulevard
19       Los Angeles, California 90026
           BY:   MATTHEW STRUGAR, ESQ.
20           (Did not appear)

21

22    For the Defendants:

23       Birch Horton Bittner & Cherot, PC
           1156 Fifteenth Street, NW
24       Washington, D.C. 20005
           BY:   JAMES H. LISTER ESQ.
25



1    APPEARANCE CONTINUED

2

3    For the Defendants:

4            Birch Horton Bittner & Cherot, PC
             1127 West 7th Avenue
             Anchorage, Alaska 99501
5            BY:   WILLIAM A. EARNHART, ESQ.
                   (Did not appear)
6

7    For the Defendants:

8            Greenberg Traurig, P.A.
             Terminus 200
9            3333 Piedmont Road, NE
             Atlanta, Georgia 30305
10           BY:  JENNIFER B. MOORE, ESQ.
                  (Did not appear)
11

12   For the Defendants:

13           Greenberg Traurig, P.A.
             450 South Orange Avenue
14           Suite 650
             Orlando, Florida 32801
15           BY:  MICHAEL G. MURPHY, ESQ.
                  (Did not appear)
16

17   For the Defendants:

18           Greenberg Traurig, P.A.
             333 Southeast 2nd. Street
19           Suite 4400
             Miami, Florida 33131
20           BY:  EVELYN A. COBOS, ESQ.
             and  MARK S. SALKY, ESQ.
21                (Did Not appear)

22

23   Reported by:

24           Emily Husary, CSR
             License No. 12148

25



A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

3

```
 1                    INDEX OF EXAMINATION

 2                                                   Page

 3   Examination By:  MS. WILSON                       5

 4   Examination By:  MR. LISTER                      144

 5

 6

 7                    INDEX OF EXHIBITS

 8   Plaintiff's

 9   Exhibit No.          Description               Page

10

11   3001   Three-page Amended Notice of             41

12          Taking Deposition

13   3002   Fifteen-page Report                      41

14   3003   Two-page USDA Inspection Report         134

15   3004   Two-page USDA Inspection Report         134

16   3005   One-page USDA Inspection Report         139

17   3006   One-page USDA Inspection Report         139

18   3007   One-page USDA Inspection Report         140

19   3008   One-page USDA Inspection Report         141

20   3009   Two-page USDA Inspection Report         142

21

22

23

24

25
```



1          S. GREY STAFFORD, Ph.D.,                    16:00

2    called as a witness by the Plaintiffs, herein, being

3    first duly sworn by the Certified Shorthand Reporter,

4    was thereupon examined and interrogated as is

5    hereinafter set forth.

6                          EXAMINATION

7    BY MS. WILSON:

8          Q.   Hi, Dr. Stafford.  I'm Stefanie Wilson.  I'm

9    one of the attorneys for the plaintiff, Animal Legal

10   Defense Fund in this case.  So I just first want to

11   make sure that I'm speaking clearly enough for you.  So

12   right now and at any time, if I'm going too fast or I

13   am mumbling, just let me know.  Okay?

14         A.   Okay.

15         Q.   We'll start by having you state your name for  08:59

16   the record, please.

17         A.   Sure.  It's Dr. Steven Grey Stafford.

18         Q.   And have you ever been deposed before?

19         A.   No.

20         Q.   So in that case, there is just a couple of

21   guidelines I wanted to run through fairly quickly off

22   the bat so that we're on the same page.

23              So first is I would ask you to answer

24   verbally to my questions, as you've already been doing.

25   Not just nodding or shaking your head or saying

1 huh-uh.  08:59

2  A. Yes. Might take me a few repetitions.

3  Q. No problem. And also, I'd ask you to provide

4 complete answers and any information you can think of

5 that responds to my question. Do you agree to do that?

6  A. Sure. Yes.

7  Q. And if you don't understand any of my

8 questions, will you please ask me to rephrase it?

9  A. I will.

10  Q. If you need a break at any time, please feel

11 free to say so. But if there is a question pending,

12 just please answer it first before taking the break.

13 Okay?

14  A. Yes.

15  Q. And if you remember any additional  09:00

16 information during the course of our discussion, even

17 if we've moved on to a different topic, that might be

18 responsive to a question that was already asked, will

19 you please raise it?

20  A. Yes.

21  Q. And if you think of a document that might

22 help your testimony while we're talking today, will you

23 please mention it?

24  A. Yes.

25  Q. And as I ask questions, Mr. Lister may make



1    objections just to preserve them for the record.   But     **09:00**

2    unless he tells you specifically not to answer a

3    question, you're required to go ahead and answer.   Do

4    you understand that?

5         A.   Yes.

6         Q.   Is there anything such as illness or

7    medication that might prevent you from giving accurate

8    testimony today?

9         A.   No.   I just have allergies so I may rub my

10   eyes quite a bit.

11        Q.   Okay.   Anything else besides allergies that I

12   should know about that might prevent --

13        A.   No.

14        Q.   And I actually have to finish my question

15   first also before you answer.                            **09:01**

16        A.   Okay.

17        Q.   Did you bring any documents with you today?

18        A.   I did.

19        Q.   Okay.   Tell me what you brought.

20        A.   I have a copy of the Animal Welfare Act, Part

21   E, which pertains to marin mammals.

22             I have a statutory regulatory text.   These

23   are just definitions of terms.   And I have what appears

24   to be a press release from NOAA Fisheries on Lolita,

25   their decision to list her.



1       I have a publication of the proposed rule,    09:02
2   originally, which examined whether or not to list her
3   under the ESA.
4       I have exhibit -- The Defendant's Amended
5   Answers to Plaintiff's First Set of Interrogatories.
6   With that comes several exhibits.
7       Do you need me to list those out by letter,
8   Exhibit A, C?
9       Q.   Sure.  Just for completeness.
10      A.   Exhibit A is a detailed diagram of the whale
11  and dolphin stadium.
12          MR. LISTER:  And I think you may be switching
13  over to exhibits to our amended answer as opposed to
14  exhibits to our interrogatory answers.
15          THE WITNESS:  Oh, yes, yes.                09:02
16          MR. LISTER:  You've got there the diagram
17  that's Exhibit A to defendant's answers to
18  interrogatories.  And then you have some exhibits that
19  are exhibits to defendant's answer to the plaintiff's
20  complaint.
21          THE WITNESS:  Exhibit C.  Exhibit D, a letter
22  from Dr. ckGoldentyer from APHIS.
23          Exhibit E, Dr. Moore of APHIS, inneroffice
24  memo.
25          I have Exhibit F, a declaration by Patricia



**Verbatim**

1    ckSykes.                                                        09:03

2              Exhibit G, prepared by Dr. Laurie ckGates

3    from APHIS, their marine mammal expert.

4              I have the sea aquarium's motion to dismiss.

5              I have a document that has a number,

6    REV0021497.

7              MR. LISTER:  And I can help the plaintiffs

8    there.  That now has a Bates stamp number.  It was a

9    document that was produced and the Bates stamp number

10   is MSQ0010539.

11   BY MS. WILSON:

12        Q.   Okay.  Could you just briefly describe the

13   document?

14        A.   It appears to be a letter from APHIS to a --

15   a generic letter to a concerned citizen.                        09:04

16        Q.   Okay.

17        A.   Listing APHIS's evaluation of Lolita's

18   housing and addressing the concern by some unknown

19   concerned citizen.

20             It has a detailed diagram with some linear

21   dimensions of the pool.

22             It has a chart with calculations of the

23   minimum that APHIS looks at.

24        Q.   For space?

25        A.   For space, yes.

1       And it compares it to the minimum required      09:05

2   under the act versus values that APHIS came up with.

3       I have Plaintiff's Request for Admonitions

4   document, which includes several of their exhibits,

5   which they describe as A, B and C; diagrams of the pool

6   of varying years.

7       And I have the defendant's answers and

8   objections to the plaintiff's request.

9       I also have the report that I provided to the

10  plaintiff's attorney.

11      Q.   Thank you.

12      MR. LIEBMAN:   Is there anything there that we

13  don't have, do you know?   I can run a photocopy of

14  it.

15      MR. LISTER:   I think you've got everything.      09:06

16  The REV document is the same as this MSQ document that

17  I just read to you before.   If you want to get a copy

18  as an MSQ so you can match it up, you can take this

19  copy of it.

20      MR. LIEBMAN:   Okay.   I'll do that.

21  BY MS. WILSON:

22      Q.   Who provided you the documents that you

23  brought today?

24      A.   Plaintiff's attorney, Mr. Lister and his

25  office.

**Verbatim**

1    Q.   Did you look at anything else when you were          09:06

2    preparing your report that you wrote for Plaintiff?

3    A.   I would have to review the report because I

4    have citations, to be -- I don't believe so.  But in

5    the interest of completeness, I would like to review

6    that.

7    Q.   Sure.

8    A.   Did you use any other documents or

9    information?

10   Q.   That's correct.

11   A.   I used my personal experience having visited

12   Miami Seaquarium back in 2002.  And seeing Lolita at

13   that time in a professional visit unrelated to this

14   matter, obviously.

15       I also refer to mathematical calculations,          09:08

16   going back to calculate like the volume of a cylinder.

17   Those type of...

18   Q.   Like the formulas?

19   A.   Like the formulas, yes.

20   Q.   Okay.

21   A.   That's all I can think of, to my knowledge.

22   Q.   Thank you.  I'm going to show you a document.

23   It's called Plaintiff's Amended Notice of Deposition of

24   Grey Stafford.  Just take a look at it.  Take your time

25   and let me know if it's familiar to you.

**Verbatim**

1        MR. LISTER:  I'll jump in and say that with    09:09

2   the scheduling of the depositions, which was so

3   difficult to arrange because there was so many of them,

4   I actually did not get this amended notice of

5   deposition to him.  But instead what we did is I read

6   it and I've worked to make sure that the documents that

7   you asked be provided are with us today.  That's how I

8   dealt with it rather than going over it with him.  So

9   I'm not sure he's seen it.

10        THE WITNESS:  I have not seen it.

11        MR. LISTER:  I didn't think so.

12        THE WITNESS:  I didn't see it.

13        MS. WILSON:  So I guess, then, Dr. Stafford

14   can't authenticate it, but would you object to moving

15   it in?                                                 09:11

16        MR. LISTER:  Not at all.

17   BY MS. WILSON:

18     Q.   So I'm just looking at this to confirm you

19   did do a diligent search for all -- actually, let me

20   back up a bit.

21        I am going to point you to the second page of

22   Exhibit A where it says "Documents requested from each

23   expert."  Part 4.

24     A.   Oh, Exhibit A.  Part 4?

25        MR. LISTER:  He's looking at the definitions

1    and instructions.                                          09:11

2    BY MS. WILSON:

3        Q.   I'm sorry.  The second page of Exhibit A.

4        A.   "All documents provided to each expert"?

5        Q.   "Documents requested from each expert."

6        A.   Okay.  I'm in the right section now.

7        Q.   Number 4, all documents provided each expert

8    by defendant's attorneys and each of the subparts

9    there.  Are you aware of any documents or did you look

10   at any documents that might be responsive to each of

11   these subpoints?

12            MR. LISTER:  Documents provided by

13   defendant's attorney that reflect any of the following.

14   And there is three categories.

15   BY MS. WILSON:                                             09:12

16       Q.   "Compensation for expert study or testimony.

17   Facts or data that the expert considered in forming the

18   opinion to be expressed.  And assumptions that

19   defendant's attorney provided and that the expert

20   relied on in forming opinions to be expressed."

21       A.   Well, first one, compensation, for my study

22   or testimony, that has been laid out in my report.  So

23   that has been provided.  I am asking almost as a

24   question.  If I am answering your question.  So yes,

25   I've provided the compensation rate.

1      Q.   Are there any documents, additional documents 09:12

2  that might reflect it?  Such as a contract or a

3  retention letter.

4           MR. LISTER:   There is a retention letter.   If

5  you guys want to see that, I have it.   I can bring it

6  up.  The basics of his hourly rate is all set forth in

7  his report.

8           MS. WILSON:   Sure.   Thank you.

9           THE WITNESS:   To the best of my ability, the

10  documents that I considered for my report, I have

11  already presented to you.   They're here in this

12  binder.

13  BY MS. WILSON:

14      Q.   Okay.  Thank you.  Moving on.  Have you ever

15  testified as an expert witness before?                09:13

16      A.   No.

17      Q.   In addition to reviewing the documents, did

18  you talk to anyone in preparation for your testimony

19  today?

20      A.   I talked with Mr. Lister, of course.  And he

21  is the only person from his firm that I've spoken to on

22  these matters.

23      Q.   Was anyone else present when you talked to

24  Mr. Lister?

25      A.   No.  Those were via e-mail or telephone

1      calls.                                                    09:14

2             Q.   Have you talked to anyone at Miami

3      Seaquarium?

4             A.   I have not.

5             Q.   You mentioned that you visited the Miami

6      Seaquarium in 2002?

7             A.   Yes.

8             Q.   I wanted to ask you a few questions about

9      that.  Is that the only time you've been?

10            A.   I may have gone as a child long before I can

11     remember.

12            Q.   So what's your best estimate of how many

13     times you've visited the Miami Seaquarium?

14            A.   One.

15            Q.   And so I'm correct that the last time was in   09:14

16     2002?

17            A.   That's correct.

18            Q.   Do you remember the month or around --

19            A.   I do not.  It was late in the year.  It was

20     part of a conference trip to Florida and we were

21     conducting tours of various marine mammal facilities in

22     the Central and Southern Florida area.

23            Q.   Could you tell me a little bit more about the

24     conference.

25            A.   Sure.  The conference was for the

1    International Marine Mammals Trainer's Association.   I    09:15

2    believe it was in Orlando.

3         Q.   And you said "we were conducting tours."

4    What do you mean by that?

5         A.   My coworkers that I was traveling with.

6         Q.   Coworkers where?

7         A.   At that time I worked for Dolphin Quest.

8    This was not an official visit.   It was a professional

9    courtesy visit.

10        Q.   That was arranged with Miami Seaquarium?

11        A.   Yes.

12        Q.   And tell me a little bit more about the tour

13   that you took.

14        A.   Well, we visited the park and then we were

15   able to go to the stadium, Lolita's housing.   And we    09:15

16   spent time with -- and I don't recall the person that

17   showed us around.   But we were there in nonshowtimes.

18   So nonpublic access times to that area, which gave us a

19   close view of her and the pool and her companion at

20   that time.

21        Q.   Okay.

22        A.   In other words, we were right up next to the

23   pool.

24        Q.   And just for clarity in the record, when you

25   say "her," you're referring to Lolita?

**Verbatim**

1      A.   That's correct.                          09:16

2      Q.   Also Toki?

3      A.   Yes.

4      Q.   And who was her companion?

5      A.   At that time she had a male Pacific

6 white-sided dolphin.

7      Q.   Any others?

8      A.   No.  Not at that time.

9      Q.   Do you remember any information about the

10 dolphin?  His name or --

11     A.   I do not.

12     Q.   -- anything like that?

13     A.   No.  I do not.  I just remember they both

14 where beautiful specimens for their species.

15     Q.   You said you were right up to next to her    09:16

16 pool.  Like, looking in or how --

17     A.   Yes.  Correct.  Like looking in at the --

18     Q.   So you're holding your hands about like a

19 foot away from your chest.

20     A.   Yeah.  Being zoo people, we like to lean over

21 and take a closer look.

22     Q.   How long did you spend at the tank?

23     A.   We were probably there, I guess an hour.

24 There again, it's been almost 14 years, 13 and a half

25 years.

1     Q.   Tell me what you remember about what things     09:17
2     you observed while you were there.
3     A.   Well, at that time I had already worked with
4     killer whales at my former facility.  So I was familiar
5     with the species.  I was familiar with lagalankus
6     (phonetic) as well; Pacific white-sided dolphin.  And I
7     was struck by how absolutely beautiful Lolita was in
8     terms of skin tone, her body condition, her teeth;
9     incredibly sharp.  And I was even more struck once I
10    learned how old she was.  She was probably in her
11    mid-30s by then.  And I didn't know that prior to going
12    to visit her.  I didn't know her history prior to going
13    to visit her.  So I was absolutely floored by how great
14    she looked.

15         I also was taken by the fact that both     09:18
16    animals were calm.  They were engaged with these people
17    by the side of the pool, but they were not asked to
18    come to stimulus control which is basically asking
19    animals for their attention.  That was not part of our
20    visit.  But yet they were still engaged, curious as to
21    what we were doing there and investigating us as much
22    as we were observing them.
23    Q.   And how do you assess when an animal is calm?
24    A.   Well, it varies by species, of course.  Some
25    behaviors are species-specific.  But in general, when

1  you're talking about mammals now, not reptiles, you   09:19

2  look at things like respiratory rate.

3       Q.   I'm sorry.  I don't mean to interrupt you.  I

4  realize my question was phrased very broadly.  And just

5  in the interest of time, what I was getting at was how

6  did you know that Lolita and her companion were calm

7  when you said that you observed them being calm?

8       A.   Oh, they were spy hopping.  They were

9  basically presenting themselves vertically in the water

10 so that they could see above the surface of the water,

11 observing us as much as we were observing them.  And

12 they were in fairly close proximity to each other.

13 There may have been some tactile contact, gentle

14 tactile between the two animals.  All of those indicate

15 to me that these were companions and they were curious   09:19

16 about their environment, curious about these visitors,

17 myself included.  There is no agnostic or other types

18 of behavior that would not indicate calm animals.

19      Q.   Any other behaviors that you observed while

20 you were there?

21      A.   No, because we weren't there as part of any

22 show or performance or husbandry training session.  So

23 we didn't see a full display of behaviors other than

24 swimming.

25      Q.   I think you mentioned earlier you were at the



1    tank for an hour; is that --

2         A.   Approximately an hour.  It was not a -- we

3    were not there to spend days on days.  We weren't there

4    to inspect or -- we were there as a courtesy visit to

5    see the facility.

6         Q.   Did the staff that was bringing you around,

7    did they give you any other information about Lolita or

8    her care or about the tank itself?

9         A.   No.  Not that I recall.  Obviously I was

10   there in the stadium.  I could see the seating and the

11   wall.  It's a kind of a colliseum-type design.

12        Q.   Okay.  Did you take any notes that day?

13        A.   No.

14        Q.   Are you planning to go to the Miami

15   Seaquarium to observe her again?

16        A.   Very likely.  That is part of our plan,

17   especially if we go to trial.  I will make my way to

18   Miami and refine any conclusions that I've already

19   arrived at.

20        Q.   When you say "our," who are you referring to?

21        A.   Mr. Lister.

22        Q.   And yourself?

23        A.   Yes.  Just myself.

24        Q.   Okay.  So taking a step back.  We understand

25   you've been retained as an expert in this case to talk

1    about AWA compliance.  Tell me what you perceive as          09:21

2    your role in this case.

3         A.   I think that my role, in some ways, is pretty

4    straightforward.  In that I am asked to look at the

5    regulations, the requirements under the Animal Welfare

6    Act and compare them to the various measurements we

7    have available of Lolita's pool and to either confirm

8    or deny whether or not those pools, that pool meets the

9    minimum required standards as set forth under the

10   Animal Welfare Act.

11        Q.   Okay.  So I wanted to now get into a little

12   bit of your educational and professional background.

13   So tell me about your education.

14        A.   I have a bachelor's degree in physics.  I

15   have a doctorate from the Department of Biology of          09:22

16   Science at Kent State University.  My interest there

17   was primarily mammalian physiology, specifically

18   reproductive and environmental physiology.

19             At that time, the department had two primary

20   focuses:  reproductive physiology and aquatic ecology.

21   I was on the reproductive side of the department.  My

22   interests for my dissertation was to examine

23   environmental reproductive parameters of small new

24   world primates.  Specifically, the use of energy and

25   the relation of their body size, their small body size

**Verbatim**

1   to their energy requirement as a species.  So this was   09:23
2   largely an environmental physiology-type of project.
3        Q.   Do you have any college or graduate school
4   academic research or study that specifically relates to
5   orca?
6        A.   I have paid work experience as a animal
7   caregiver, trainer at Sea World.
8        Q.   I understand.  I do want to get into that.
9   Just for organization sake --
10       A.   In terms of specific to orcas?  I do not
11   recall any coursework, specifically for marine mammals
12   orcas.
13       Q.   Do you have any academic or educational
14   training in regulatory compliance in the Animal Welfare
15   Act?                                                        09:24
16            MR. LISTER:  Objection.
17            You can answer.
18            THE WITNESS:  I have not taken a course in
19   interpreting the Animal Welfare Act rules.  I'm not
20   aware that there is one for zoology professionals.
21   BY MS. WILSON:
22       Q.   So you started getting into your professional
23   experience.  Can you walk me through, chronologically,
24   your work history in zoological abilities?
25       A.   Sure.  I was hired in January 1990 at what



**Verbatim**

1   was then called Sea World of Ohio.  That park no longer  09:25

2   exists.  At that time, I started at what was the whale

3   and dolphin stadium at that facility.  It was rather

4   unique at that time, in that it housed killer whales

5   and dolphins.  Originally, it held -- when I first

6   started, it held bottlenosed dolphin.  And after a few

7   years those animals were relocated to other facilities

8   for breeding and other animal management.  Reasons that

9   I was not privy to.  And we moved in a trio of Pacific

10  white-sided dolphin.

11       Q.   And how long were you there at Sea World of

12  Ohio?

13       A.   I was at Sea World of Ohio from January of

14  '90 until -- well, I was there in several stages.  I

15  was there until May of '92.  I returned the spring of   09:26

16  '93 and continued there on a half-year basis until '95.

17       Q.   Okay.  What happened in the gap?

18       A.   I taught math and physics in high school.

19       Q.   Tell me a little bit more about your

20  responsibilities --

21       A.   Oh, I apologize.  I also began graduate

22  school.

23       Q.   Oh, okay.  In that gap?

24       A.   Yes.  I started graduate school in '94.  So

25  part of that gap was graduate school.

1    Q.   Okay.  Then tell me a little bit about your          09:26

2    responsibilities at Sea World of Ohio.

3    A.   Sure.  As with most entry-level positions at

4    the beginning, you're there doing husbandry, learning

5    about the species, learning about animal management,

6    animal training, enrichment.  And I was promoted on a

7    few occasions at the earliest window of opportunity.

8    At that time, the company had minimum time requirement,

9    in addition to being able to demonstrate some skills

10   and knowledge about your job.  So I was promoted on or

11   about the minimum amount of time required, which I

12   think spoke to my progression in terms of skills.

13        And in practical terms, what that meant is I

14   went from being able to observe and assist with

15   training sessions to leading my own sessions with the     09:27

16   whales, with the dolphins, with the sea lions, walrus,

17   and other species.  And took on greater responsibility

18   including public demonstrations, educational shows and

19   so on.

20        I also, at that time, was the animal training

21   department's research coordinator.  Basically, any data

22   we collected on something like seasonal body weight on

23   male California sea lions and compared to intake.

24   Those sorts of things.  So I helped to write poster

25   presentations, formal presentations for professional

1    conferences.                                                     09:28

2         Q.   Was this based on animals that you had in

3    house?

4         A.   Correct.

5         Q.   Just backing up.  So what was your title when

6    you started?

7         A.   I think at that time it was entry level or

8    apprentice trainer.

9         Q.   And then when you were promoted?

10        A.   Then associate trainer, then trainer level.

11        Q.   Could you elaborate a little bit on how your

12   responsibilities there as a trainer provided you with

13   expertise related to orca housing and care?

14        A.   Well, obviously we were responsible for

15   maintaining the health and husbandry of the animals,        09:29

16   which includes how they're fed, how they're cared for,

17   the condition of their exhibit.  So in preparation for

18   random APHIS inspections, that's the normal part of any

19   keeper of trainer's job, I suppose.

20             I also recall on more than one occasion

21   measuring diameters of pools and depths of pools.  And

22   that information was then handed to a curator to, no

23   doubt, calculate space requirements.

24        Q.   What sorts of things did you look at when

25   you're -- you mentioned the condition of the exhibit.

**Verbatim**

1    A.   Oh, you know, things like sanitizing food    09:30

2 buckets, work space areas, handles on gates, handles on

3 refrigerators, handles on scales.  Things that --

4 supplies and tools that are used to interact with the

5 animals on a daily basis.  Writing behavioral records,

6 making behavioral observations.  Cleaning.  A lot of

7 cleaning.  Those sorts of things.

8    Q.   Okay.  So what came next in your work

9 history?

10    A.   In my work history?  Following grad school, I

11 defended in May of '99.  And then I took a position a

12 few months later as curator of education at Wildlife

13 World Zoo.  At that time it was just a zoo.  There I

14 managed a collection of media and education animals

15 onsite programs, offsite programs.  Worked with the    09:31

16 public quite a bit, worked with the media quite a bit.

17         Accompanied, from time to time, APHIS

18 inspectors during their visits to the zoo.

19         Following a three-year stent as education

20 curator, I took a position as director of animal

21 management at Dolphin Quest of Oahu.

22    Q.   Sorry.  Let's back up a little bit.  So

23 curator of education world wild life --

24    A.   Wildlife World.  It happens all the time.

25    Q.   Wildlife World.  Kind of like ADLF.  Okay.



**Verbatim**

1    Tell me what you mean when you said "media,    09:31
2    educational animals."
3         A.   We had a population of animals housed in a --
4    together in terms of the total area of the zoo so that
5    they could transport to schools, to community events,
6    to television stations.  These were animals kept
7    basically separate from the general population of zoo
8    animals.
9         Q.   What kind of animals?
10        A.   Mammals, birds, reptiles.
11        Q.   Terrestrial animals mostly?
12        A.   Yes.
13        Q.   What --
14        A.   But animals that were trained.  Much like we
15   trained the orcas.  So there was a continuity in terms    09:32
16   of how the animals were managed using operant
17   conditioning.  The same sort of principles that we
18   would use with orcas and dolphins and sea lions.
19        Q.   Were they trained to interact with the
20   public?
21        A.   To the extent that they were a part of public
22   demonstrations, free-flight demonstrations.  In some
23   cases, perhaps even public contact like helping to hold
24   a big snake or -- given the proximity of the public, I
25   would say, yes there was an interaction there.  They

**Verbatim**

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

27

1    weren't exhibit animals, for example.                    09:33

2         Q.   Okay.  So this was May '99 to when?

3         A.   No.  It was August '99 when I started.  I

4    defended and graduated in May '99.  The curator of

5    education position was roughly August of '99 to August

6    of 2002.

7         Q.   Okay.  And tell me about your

8    responsibilities or walk me through what would you do

9    when you accompany APHIS on its visits.

10        A.   Well, as you know, APHIS makes a minimum of

11   about one visit per year.  So these weren't a lot of --

12   necessarily a lot of visits.  But I would answer

13   questions.  I would accompany the curator, the general

14   curator or the zoo director.  And we would walk or

15   drive through the zoo and address whatever questions    09:34

16   the inspector might have.

17        Q.   What are the nature of the questions that

18   they usually had?

19        A.   It depends on the nature of the visit.  If

20   it's just a random inspection, they just come to visit,

21   then it could be anywhere.  Sometimes they might come

22   because of a specific public complaint and want to see

23   a specific exhibit or animal or animals.  So it varies.

24   It's really up to the inspector's control how that

25   inspection is conducted.

1   Q.   Did your job responsibilities at that time   **09:34**

2   include anything related to compliance, aside from

3   accompanying APHIS?

4   A.   Well, certainly, to the extent that the

5   mammals in the education collection were subject to

6   Animal Welfare Act standards, I was responsible for

7   maintaining that husbandry and exhibitory, to meet

8   those minimum standards or exceed them.

9        And occasionally I would be involved in

10  crafting a response.  As you know, the inspection

11  process works as follows:  The inspectors issue a

12  report.  If they find a noncompliant item, you have the

13  opportunity to respond to that.  We usually do it in

14  writing.  Saying that it's either been addressed or we

15  have questions.                                        **09:35**

16       So I was, from time to time, asked to help

17  edit or write the response to an APHIS inspection.

18  Q.   Okay.  Anything else as far as compliance or

19  bringing the facility into compliance?

20       MR. LISTER:  Objections.  A little more

21  clear.

22       You can answer.

23       THE WITNESS:  Not that I can think of.

24  BY MS. WILSON:

25  Q.   How did your responsibilities as curator of

1    education at a world -- Wildlife World Zoo or WWZ, if    09:36
2    we can do that.
3         A.   There we go.  That will work.
4         Q.   -- provide you with expertise related to orca
5    housing and care?
6         A.   Other than being more familiar with the
7    Animal Welfare Act regulations themselves and the
8    process by which APHIS conducts itself in these,
9    nothing directly to orca.
10        Q.   Does WWZ -- did they have any orcas at the
11   time?
12        A.   No.
13        Q.   Have they ever had any orcas?
14        A.   No.
15        Q.   Okay.  What came next in your job history?    09:37
16        A.   In, I believe, September of 2002 I took a
17   position, director of animal management for Dolphin
18   Quest of Oahu.
19        Q.   So 2002...
20        A.   To 2004.  Approximately a two-year stent.
21        Q.   Okay.  And please tell me about your
22   responsibilities as director of animal management.
23        A.   I was responsible for coaching and managing a
24   team of trainers, interns as well as a population of
25   bottlenose dolphin.  We had some other species like sea

1  turtles and fish and rays.  But primarily the          09:37
2  responsibility was over the dolphin.  This was an
3  interactive swim facility.  So a lot of guest contact,
4  as you might imagine under controlled conditions.
5      Q.  I kind of wanted to drill down a little, you
6  managed a team of trainers?
7      A.  Yes.
8      Q.  What kind of -- what would that involve on
9  your part?
10     A.  Well, it involved everything from scheduling
11  staffing to providing them coaching, training -- on
12  training.  Making sure that they were involved in
13  professional organizations and additional learning
14  opportunities.  We were involved in a variety of
15  research-related projects.  Things like neonatal       09:38
16  development, ultrasound use in tracking and monitoring
17  dolphin pregnancies.
18     Q.  So was this the breeding facility as well?
19     A.  Well, when I arrived we had pregnant females
20  on loan to us.  But when I left, those animals had
21  moved back to their facilities that basically they came
22  from and we had all males.  So a mixture of both
23  situations.
24     Q.  So did your responsibilities include anything
25  about maintaining the facility or direct animal care?



1     A.   Absolutely.  All of the above.  The care of    09:39

2   the animals from food prep, to the condition of their

3   habitat, to how they were maintained and trained and

4   managed, how they were transported in a few cases, all

5   of that responsibility rested with me.

6     Q.   Did your responsibilities include anything

7   related to APHIS visits or AWA compliance there too?

8     A.   Absolutely.  I would be the responsible party

9   as the animal manager to address any concerns that

10   APHIS might have had.

11     Q.   Did they conduct any visits during your time

12   there?

13     A.   I believe they did conduct one.

14     Q.   When was that?

15     A.   I do not recall.                       09:40

16     Q.   Can you tell me little bit more about the

17   nature of the visit?

18     A.   Not really.  It's been so long, I can't.  It

19   may not have been a formal visit.  It may have been a

20   courtesy visit.  APHIS can do that where they drop in

21   and say hello, essentially.  But not conduct a formal

22   visit or issue a formal inspection.

23     Q.   Okay.  The courtesy visits, are those the

24   same as the random inspections you mentioned before?

25     A.   No.  Well, they're often unannounced.  So in

1   that sense they might be considered random.  But they          09:40
2   aren't necessarily to inspect a facility.  It could be
3   here are some changes in how we interpret rules.  Here
4   are some additional findings from the service.  Here
5   are some new requirements that we might want to see.
6   Any of those things might be a reason for a courtesy
7   visit.
8        Q.   But you don't recall if it was actually a
9   courtesy visit?
10        A.   I don't.  I really don't.
11        Q.   So how did your responsibilities at Dolphin
12   Quest provide you with expertise related to orca
13   housing care?
14             Orca's housing and care, we did not house
15   orcas for Dolphin Quest.  But of course we retained          09:41
16   related -- biologically related species, bottlenose
17   dolphins.  So from that standpoint, that experience
18   reinforced the basic requirements of the Animal Welfare
19   Act with respect to cetacean in general.
20        Q.   What came next?
21        A.   Let's see.  September 2004 I returned to
22   Wildlife World Zoo, which soon became Wildlife World
23   Zoo and Aquarium through a major expansion.  In that
24   time frame, I was the director of conservation and
25   communications.  So my role changed from my previous

**Verbatim**

1  role there.  Just as the facility itself had changed as **09:42**

2  well.

3      Q.   Okay.  So tell me about your job

4  responsibilities as director of conservation and

5  communication.

6      A.   I would evaluate potential recipients for

7  conservation awards.  These is small cash awards to

8  conservation-minded organizations such as the Marine

9  Mammal Center in Sausalito.  Facilities like that.  And

10  we would, then, of course try to promote those efforts.

11  Usually those organizations we supported had some

12  connection to our collection.  So for example, we had a

13  lot of hoofed animals from sub-Sahara Africa.  So we

14  would very often help support organizations that

15  support those animals in the wild or those species.    **09:43**

16          I also dealt almost exclusively for the zoo

17  in terms of news media and messaging and providing

18  education materials for onsite information and

19  eventually online.  Still kind of the early days of the

20  Internet.  I don't think social media had been

21  discovered quite yet in 2004.

22      Q.   It was a very different Internet.

23      A.   It was, yes, yes.

24          And then in more recent years, over the last

25  five or six years with the installation of our aquarium



1   and the phase rollout of the aquarium and complex, part 09:44

2   of our master plan included adding marine mammals.  In

3   this case, California sea lions.  And given my marine

4   mammal background, I led that project from design of

5   the facility, including its minimum standard

6   requirements or meeting those; collection, transport.

7   And by "collection," I mean from other facilities.  Not

8   from the wild.  I guess, a better word would be

9   acquisition of animal from other facilities,

10   transporting them safely.  Building a staff, training

11   and coaching a staff, maintaining life support systems,

12   developing public education programs.  And coordinating

13   a team of trainers that provide the day-to-day care of

14   the sea lions, including my own participation of that.

15   My own participation in daily care and training of the 09:45

16   animals.  It was very much hands on and has been a very

17   much hands on role.

18          In that capacity, I absolutely have dealt

19   with APHIS as well as NOAA Fisheries because of the

20   involvement of marine animals.

21          Q.   Please give me a little bit more detail about

22   your dealings with APHIS related to this position right

23   now.

24          A.   Sure.  Well, prior to building the facility

25   or in early stages of building the facility, I was then

1    meeting with representatives of organizations, major    09:45

2    agencies, USDA., NOAA Fisheries, U.S Fish and Wildlife.

3    But they're not really part of that.  They don't

4    oversee California sea lions.  And I consulted with

5    them as far as our intention to bring marine mammals to

6    our facility, asking their input on design and other

7    specifications prior to building the facility.

8    Obviously, as we progressed in the construction phase

9    and the acquisition of animals phase, there are certain

10   notifications that are required.  You have to notify

11   NOAA Fisheries if you're going to move marine mammals.

12   There is a certain time period that's required prior to

13   moving them, under normal circumstances.

14        We also, during -- at least on one occasion

15   I'm aware of and more like two or three others, we    09:46

16   invited our APHIS inspector to see the job site and to

17   offer feedback, input on the development of our site

18   plan for the sea lions.  And I was part of these

19   conversations.

20        Once the animals arrived, of course, they are

21   subject to APHIS inspection.  And as you might imagine,

22   APHIS came to see how the sea lions were doing.  Many

23   conversations over the course of the last several years

24   we have had on sea lions.

25        Q.   Now, are you the point person when APHIS



1   comes to inspect or are you primarily --                09:47

2        A.   I am one of them.   It sort of depends.   As

3   you know, APHIS they have better hours than lawyers.

4   They work Monday through Friday, 9:00 to 5:00.   So my

5   hours, I tend to work a lot of weekends.   So if I am

6   not there during the week, then obviously the general

7   curator would handle it.   And they are generally the

8   point person.   But in their absence, I would be the

9   point person.   And certainly with respect to questions

10  that may arise with the sea lions at our facility, I am

11  the point person.   And I conduct those conversations

12  with the APHIS inspector.

13       Q.   Do your responsibilities include the other

14  animals that you keep --

15       A.   At the institution?                            09:48

16       Q.   Yeah.

17       A.   Sorry.

18       Q.   That's okay.

19       A.   Insofar as if I were the only senior manager

20  on site that day in some rare instance that the

21  director was off grounds, the general curator was off

22  grounds and there was an inspector visiting, then yes,

23  I would have the responsibility to escort them, answer

24  their questions along with the veterinarian that was

25  there, daily.

1    Q.   So --                                              09:48

2        A.   But in terms of day-to-day management of the

3    animals, that is not part of my current responsibility.

4        Q.   But if you were there that day, would you be

5    involved if, say, APHIS does a site visit, looks at the

6    aquarium, also goes around to the other exhibits that

7    you have --

8        A.   It's possible I would be involved in that.

9    Again, it depends on whether or not the other senior

10   management is there or not.  If they're called away and

11   I'm the -- I don't mean this in the wrong way --

12   ranking person, manager that day, then yeah, I would

13   take responsibility for that and through the duration

14   of their visit.

15       Q.   Okay.  And how does that work at WWZ?  Is      09:49

16   there a senior person for each type of exhibit or how

17   does that work?

18       A.   It's a -- I think it's a fairly standard zoo

19   setup where you have a zoo director with several direct

20   reports.  More on the operational side of things,

21   nonanimal side.  Of course, you have a veterinarian

22   team, vet techs, comm staff.  And then you have a

23   general curator or W director.  Excuse me.  Generally

24   speaking, anything related to APHIS outside of the sea

25   lion facility would be handled by the W director of

1    general curator and the veterinarian.                    09:50

2            But if there are any questions or if some day

3    a noncompliant item would come up in our sea lion

4    facility, that would fall to me to address that.  We've

5    had sea lions for three years.  We have not had a

6    noncompliant item.

7        Q.   Who is the general curator deputy director --

8        A.   At my zoo is a gentleman named Jack Ewert,

9    E-w-e-r-t.

10       Q.   And are you involved in any way in

11   noncompliance or response in any of the other

12   facilities together with Mr. Ewert?

13       A.   Yes.  I have been called upon to help craft

14   written responses to APHIS inspection reports.

15       Q.   Okay.  And you mentioned also another          09:51

16   responsibility of yours is dealing with media and

17   offsite.

18       A.   Offsite programs.

19       Q.   Yes.

20       A.   Like educational programs.

21       Q.   Is that correct?

22       A.   The offsite programs like an educational,

23   like an outreach to a children's school, that was back

24   when I was education curator.  I don't really engage in

25   those too often at this point.  More so, it would be

1    like a, you know, presentation at a chamber of commerce 09:51

2    meeting.  And then of course I worked extensively with

3    print, radio and television news media.

4         Q.   Does anyone else do print, radio or

5    television appearances at the zoo?

6         A.   Yes.  We do so much that -- yes, I do have a

7    few on our training staff that assist me with covering

8    some of them.

9         Q.   Are you the person who usually --

10        A.   I'm it.  And even if they are assisting me,

11   they're taking their direction from me as far as what

12   message we have, so on.

13        Q.   Okay.  So are we current now on your work

14   history, complete?

15        A.   Yes.                                        09:52

16        Q.   Okay.  So I have a few questions about the

17   opinions that you included in your report.  Would it be

18   helpful to you to have -- or you do have a copy of the

19   report there with you.

20        A.   Of my report?  Yes.  And I have, I believe, I

21   have copies of all the reports I cited in my report.

22        Q.   Perfect.  Okay.  I'm going to show you

23   another copy that I have.  I'm going to go ahead and

24   ask you to take a look at this just to make sure my

25   copy is true and accurate and it's the same as yours.

## Verbatim

1          MR. LISTER:  Counsel, this is the report that **09:53**

2    was served by Defendants on Plaintiff on February 8th,

3    right?  That's how you got it?

4          MS. WILSON:  Yes.

5          MR. LISTER:  I just notice that it doesn't

6    have a date on the report.  So dated by the cover

7    document that was served on you.

8          MS. WILSON:  Right.  And I didn't print the

9    cover as well.  Trying to save paper.

10         THE WITNESS:  Okay.

11   BY MS. WILSON:

12     Q.   Okay.  Just a housekeeping thing.  I don't

13   think we actually moved and marked the first one, the

14   deposition notice.  Do you still have that laying

15   around somewhere?                                **09:54**

16     A.   This?

17     Q.   Yes.

18         (Whereupon, Plaintiff's Exhibit 3001 was

19   marked for identification.)

20   BY MS. WILSON:

21     Q.   And the copy I just handed you will be 3002.

22         (Whereupon, Plaintiff's Exhibit 3002 was

23   marked for identification.)

24   BY MS. WILSON:

25     Q.   Let's start with space.  Please tell me how

**Verbatim**

1   you came to your expert conclusion in the report that        09:55

2   the pool size for Lolita exceeds the minimum space

3   requirement under the AWA.

4       A.   I utilized exhibits that were provided and

5   that have been mentioned previously this morning to

6   calculate, using formulas under the Animal Welfare Act

7   rules, to calculate those values for myself and

8   compared them to the minimum standards that are listed

9   in the act itself -- or under the rules on the act.

10      Q.   Okay.  And so just to clarify your testimony.

11  The dimensions of the pool that you got were from the

12  exhibits mentioned provided to you by your attorney or

13  by Mr. Lister, correct?

14      A.   They were -- yes.  All the exhibits were

15  provided through Mr. Lister's office.                        09:56

16      Q.   And the formula to calculate the minimum

17  horizontal dimension, the minimum pool depth, minimum

18  water volume and minimum surface area, those were all

19  taken from the AWA regulations that are in the code of

20  federal regulations; is that correct?

21      A.   Yes.

22      Q.   Okay.  So I guess -- what other than --

23  explain to me the special expertise that was involved

24  to input these values and to compute the calculations

25  to arrive at the final numbers that you compared

1    against each other.                                    09:57

2         A.    Well, I have, I have been somewhat familiar

3    with the rules under the Animal Welfare Act,

4    specifically as they related to marine mammals, given

5    my role in building and launching the sea lion

6    facility.

7         The space measures for marine mammals are

8    fairly uniform.  They just vary by the type of taxon.

9    When we're talking about cetacean or pinniped, it's the

10   same factors APHIS uses.  Minimum horizontal dimension,

11   depth, so forth.  Those are fairly uniform across

12   taxon.  Obviously some species use land and others

13   don't.  So there are some adjustments there.

14        So what I did was to look at the exhibits and

15   try to calculate, based on those documents, what those   09:58

16   calculations that the act provides, what was the

17   result.  And then compared them to the minimum

18   standards, which are in the act or under the rule under

19   the act.

20        Q.   How did you use -- how was your experience

21   with the sea lion exhibit helpful to you in that or

22   relevant for doing the calculations?

23        A.    When it comes to sea lions, you have to

24   calculate the same sorts of dimensions.  The MHD.

25   Again, these are based upon the species and the taxon,

1    the type of species.                                    09:58

2            Pinnipeds need pool space, but they also need

3    dry space, land, where cetaceans are not required to

4    have land.  And that's not prohibited, but they're not

5    required to have it.  So while the input values might

6    change, like the length of the species we're talking.

7    At least the length that the service, APHIS requires or

8    deems an average for that species.  Those might change.

9    The calculations are rather similar, whether you're

10   talking about sea lions or orcas or dolphins or other

11   cetaceans.

12       Q.   And how did you take into account the island

13   or the obstruction that's inside the tank?

14       A.   Well, I was able to estimate the volume of

15   the water displaced by the island, which I would refer   09:59

16   to as a "partial obstruction," and subtract it from the

17   volume and surface area calculations for that imaginary

18   cylinder of water, if you will, that APHIS uses, that

19   model, that construct, to kind of visualize how all

20   these dimensions, the MHD, the volume, the pool surface

21   area and the minimum depth requirement form, basically,

22   a cylinder, an imaginary cylinder of water in the pool.

23       Q.   What do you mean by "partial obstruction"?

24       A.   Well, the island itself has passageways on

25   either end of it.  So it's not an obstruction.  It's a

**Verbatim**

1    partial obstruction.  The animals can freely swim                    **10:00**

2    normally around it.

3         Q.   How do you know that, in Lolita's case?

4         A.   Well, I visited that facility so -- back in

5    2002, but I also believe in the APHIS reports cited in

6    my report, that was a conclusion of the APHIS

7    inspectors, that there are gates, but she can freely

8    swim on either side of it.

9         Q.   How often are the gates in Lolita's tank

10   open?

11        A.   Again, using the letter from Dr. Goldentyer

12   from APHIS and Dr. Guage from APHIS, and -- I have

13   trouble with her name.  Dr. -- begins with a P.

14             MR. LISTER:  Petervery (phonetic).

15             THE WITNESS:  Thank you.  Petervery.  They       **10:01**

16   all address the presence of the island and the fact

17   that she can pass around the island on either side.

18        Q.   And these letters, what are the dates of the

19   letters, do you recall?

20        A.   I would have to refer --

21        Q.   I don't have them in front of me.

22        A.   I would have to refer to the exhibits

23   themselves.

24        Q.   Do you know if they were based on their own

25   personal visits to the facility?



1    A.   I think definitely in the case of Dr. Guage,   **10:02**

2    that was based on her inspection because she is the

3    APHIS expert on marine mammals, as well as big cats.

4    But marine mammals.  She's the go-to person.  So she

5    was there and evaluated Lolita in her exhibit.

6        Q.   Do you know how long she was there in

7    evaluating Lolita?

8        A.   I'd have look at her report.  I don't recall

9    off the top of my head.

10       Q.   Do you want to take the time to take a look

11   and see if it's there?

12       A.   Sure.  The only time reference I see in

13   Dr. Guage's report, which is -- was her visit on

14   December 21 of 2004.

15       Q.   So it doesn't indicate how long she was there   **10:03**

16   or anything like that?

17       A.   Not that I can see.  It does not.

18       Q.   Do you have personal knowledge about how

19   often the gates are open or closed in the tank?

20       A.   Well, my personal knowledge is based upon the

21   exhibits that have been provided and discussed this

22   morning.  So I don't know if that qualifies as personal

23   knowledge.  It came from these exhibits that the gate

24   is not closed very often.

25       Q.   Anything else that you relied on in sort of



1    basing that assumption in coming to your conclusion?    10:04

2         A.   No.

3         Q.   Does AWA compliance, when calculating these

4    measures that you did, does it take into consideration

5    whether obstructions are partial or permanent or --

6    I'll stop there.  That's the end of my question.

7              MR. LISTER:  Objection.  The question didn't

8    finish.

9    BY MS. WILSON:

10        Q.   Let me rephrase.  When you have a partial

11   obstruction like the gates can be opened or closed

12   sometimes, does the AWA compliance take into account

13   how often that obstruction is present?

14        A.   It does in the sense as follows:  The act

15   absolutely allows for temporarily housing marine    10:05

16   mammals in spaces that do not meet the minimum

17   requirements.  Now what is "temporarily"?  Anything

18   beyond two weeks requires the oversight and the written

19   authorization and detailed plan by an attending

20   veterinarian.  Short of that two weeks, there is a

21   great deal of latitude in the regulations to allow for

22   that temporary housing in areas that do not meet the

23   minimum requirements for things like breeding,

24   temporarily holding them in preparation for transport,

25   and obviously medical training, but also nonmedical

1   training purposes.  The key emphasis there is it's          10:06
2   temporary.
3        Q.   Okay.  Is that your own reading of the
4   regulation or is that derived from any other source?
5        A.   That is my reading of the regulation.
6        Q.   If it were the case that the gates were often
7   or usually closed, would it change your conclusion that
8   the minimum space requirements are met?
9             MR. LISTER:  Objection.  Assumes fact not in
10  the record.
11            Witness may answer to the extent he knows.
12            THE WITNESS:  That's an interesting question
13  from the standpoint that I have no knowledge of those
14  gates being closed more often than that, and I
15  certainly don't have knowledge of the gates being       10:06
16  closed longer than the two-week period, in which
17  additional requirements come into play under the act.
18            But what is interesting is even with the
19  gates closed, there is -- and if I may refer to the
20  regs themselves.
21  BY MS. WILSON:
22        Q.   Okay.  Just for the record, if you can give
23  the citation and where you're looking at.
24        A.   I will.  If for example, you look under
25  Section 3.104 Space Requirements and you look under

1  paragraph B, which pertain to cetaceans, which is what  10:07
2  we're talking about today and below that you look at
3  paragraph 1-I, it defines the MHD, the minimum
4  horizontal dimension.

5         And in most cases, I think yourselves, APHIS,
6  my collogues and I, we focus on MHD and we visualize a
7  circle.  But if you look at the second half of that
8  paragraph, it allows subtracting 20 percent.  I think
9  it would help to imagine a globe, north, south, east,
10 west when you look at the top the Lolita's pool.  If
11 you look at the second half of that paragraph, it
12 allows you to remove or subtract 20 percent of the
13 required MHD, which in the case of the killer whales,
14 48 feet.  That's APHIS's rules, their guidelines, not
15 mine.  And you can add it to the linear dimension,     10:08
16 east, west.  Again, thinking about our globe, now
17 instead of a circle, it's now more of a kidney bean.
18 You can add that 20 percent length in your
19 determination of whether or not you satisfy the mean
20 horizontal dimension.

21         Well, 20 percent off of 48 feet is
22 approximately 10 feet.  So you're down to 38 feet.
23 This north, south dimension, according to regulations
24 for orcas -- now, these are orca values; you can drop
25 that north, south down to by 10 feet.  So provided that

1  you can add that 20 percent on a linear dimension  10:09

2  that's 90 degrees to the direction that you're

3  subtracting that 20 percent from and still satisfy the

4  APHIS rules for mean horizontal dimension.

5          So bringing us back, if those gates are

6  closed, you are very close to that kidney-bean shaped

7  size pool.  Because, of course Lolita's pool is 80 feet

8  long east, west measure.  And most of that is at or

9  below the minimum required -- or greater I should say

10 than the minimum 12-feet depth for orcas.

11         So even if gates are closed, the pool fits

12 the spirit and perhaps, of that definition for mean

13 horizontal dimension.

14    Q.   Okay.  So with that explanation, your answer

15 to my hypothetical question of whether if you knew that  10:10

16 the gates were closed, you would still say that the

17 space is adequate is a yes?

18    A.   Yes.  Provided that anything beyond two weeks

19 is explained and documented by an attending

20 veterinarian.  I have not done the calculations for the

21 kidney-bean shape that I just described to you.  But

22 based on a brief perusal and mental calculation,

23 evoking the second half of that paragraph where you can

24 subtract that 20 percent in one dimension and add it to

25 90 degrees in the linear dimension.



1    MR. LISTER:  I'm going to object in that I
2  think the hypothetical question was about a long-term
3  closure.  Something more than the two weeks.  That's
4  what I understand the answer to relate to.
5    MS. WILSON:  Or often.
6    MR. LISTER:  You're asking the question.  I
7  just heard the question as a hypothetical, long-term
8  type gate closure.
9  BY MS. WILSON:
10   Q.   Are you aware that the Miami Seaquarium
11  records reveal that the gates were often closed
12  overnight or all day?
13   MR. LISTER:  Objection to facts not in the
14  record.
15   The witness can answer.
16  BY MS. WILSON:
17   Q.   I'm asking if you're aware of that.
18   A.   I'm not aware of that.
19   Q.   Are you aware that in 2015, the gates, when
20  you total all the time together, were closed for almost
21  a month out of the year?
22   MR. LISTER:  Objection.  Assumes facts not in
23  the record.
24   THE WITNESS:  I have no data.
25  BY MS. WILSON:

**Verbatim**

10:10

10:11

1     Q.   So you're not aware?                          10:11

2     A.   I'm not aware.

3     Q.   What's your basis for concluding that the

4  island in the tank provides Lolita and her companion

5  animal opportunities for tactile enrichment?

6     A.   Well, it's a -- as has been described in the

7  exhibits that we've talked about this morning, it's

8  described as a freestanding wall, essentially.  Which

9  means, as the animals freely move about either end of

10 it from the front pool to what's been deemed the annex

11 on the other side of the island, there is opportunities

12 to rub and to scratch and receive tactile reinforcement

13 from that.

14    Q.   Have you ever personally observed Lolita or

15 her companions doing that?                             10:12

16    A.   I have not observed her and her companion

17 doing it.  I've observed other cetaceans, including

18 orcas rub on the gate channel, if you will, the spaces

19 between one part of the pool to the next similar to the

20 space, the free space formed at the end of the island.

21    Q.   In other facilities?

22    A.   Yes.

23    Q.   Okay.  Have you ever read any staff reports

24 or observations relating to Lolita about her or her

25 companion using the island or the gate for tactile

**Verbatim**

1    enrichment?                                                    10:13

2         A.   I have not read anything to that effect.

3         Q.   I admit that we might have touched on this in

4    your explanation.  But I just want to clarify my

5    understanding.  You have a conclusion or you have a

6    statement in your report that the obstruction, such as

7    the island don't count against the minimum horizontal

8    dimension requirements.  Can you explain that to me a

9    little bit more.

10             MR. LISTER:  Objection to the concept of

11   partial versus full obstruction.

12             Go ahead.  The witness can answer.

13             THE WITNESS:  Well, given that she can pass

14   freely on either end of the island, I would not deem it

15   as an obstruction.  I would refer to it as a partial     10:13

16   obstruction.

17   BY MS. WILSON:

18        Q.   Okay.  So why doesn't it -- explain to me why

19   it doesn't count against the minimum horizontal

20   dimension.

21        A.   Because it doesn't -- it doesn't impact or

22   impeded her ability to swim normally and to make

23   postural changes, as defined under the welfare act

24   rules.  She can swim around it.

25        Q.   Okay.  And that's based on your own reading



1   of the regulation or is that derived from some other       10:14
2   source?

3       A.   It is based on two sources -- well, two
4   general sources.  One are the exhibits that I cited in
5   my report from several APHIS veterinarians and
6   inspectors.  But also my reading of the rules as well.

7       Q.   How would you define -- what would you
8   include as normal postural and social adjustments with
9   adequate freedom of movement for an orca?

10      A.   The ability to move their peduncle up and
11  down freely, be able to turn and verse course, to swim
12  fast or slow.

13      Q.   Anything else?

14      A.   I don't know.  Nothing comes to mind at the
15  moment.                                                     10:15

16      Q.   Could you explain what a peduncle is?

17      A.   It's the portion of the body, basically from
18  the dorsal fin to where the tail flukes meet the body
19  itself.  So that's the peduncle, that region.  It's the
20  power source for a cetacean.  It's where they get their
21  locomotion from, essentially.

22      Q.   You said the ability to move their peduncle,
23  is that correct?

24      A.   Yes.

25      Q.   And explain how they do that, what that



1    means.                                                          10:16

2          A.   Well, cetaceans move their peduncle, their

3    tail flukes up and down when they're swimming.  If you

4    see flukes vertical, worry it's a shark.  If you don't

5    see the flukes, you're okay.  It's a whale.  But that

6    normal fluid motion, moving their peduncle up and down

7    would certainly be an indicator that they're able to

8    freely move about their exhibit.

9          Q.   Okay.  Would freedom of movement for an orca

10   include the opportunity or ability to swim long

11   distances?

12         A.   Well, given that she has the ability to swim

13   around the island, I think she has that ability to swim

14   long distances.

15         Q.   What about just in a straight line?          10:16

16         A.   Well, if you look at the exhibit, the

17   east/west dimension of the pool is 80 feet.  So that's

18   kind of a long straight line.

19         Q.   So that's as far as she can swim in a

20   straight line before she has to turn around and go

21   back; is that correct?

22         A.   Well, she, she -- it's a three-dimensional

23   exhibit.  These are very much three-dimensional animals

24   in terms of their movement.  So she can move in all

25   sorts of directions three dimensionally, including

1    above the water.  And there is no stipulation that I'm    10:17

2    aware of in the welfare act rules that look at straight

3    line motion, I guess.

4         Q.    Okay.  Would freedom of movement for an orca

5    include diving?

6         A.    Sure.

7         Q.    How deep?

8         A.    Well, are you asking me about wild orcas

9    or --

10        Q.    I am asking you what you would consider to be

11   adequate for species in your expert opinion.

12        A.    Well, orcas, like other dolphins, they breach

13   frequently compared to, say, much larger baleen-type

14   whales, much bigger bodied whales that can dive for 30

15   minutes to an hour on one breath.                        10:18

16             Orcas can certainly dive deeply for five

17   minutes, eight minutes.  But nowhere near the depths or

18   the duration of much larger species of whale, baleen

19   whale, not a tooth dolphin or a tooth whale.

20        Q.    But would you still consider diving part of

21   their normal range of movement in the wild?

22        A.    Sure.  But the point I was getting to was

23   that because of their smaller body size, even with

24   their ability to dive, they are, they are tied to the

25   surface much more than, say, a much larger species of

1    whale, blue whale or other type of baleen whale.  And    10:19
2    even if they do dive for extended periods of time, like
3    maximum dive, they're going to have to kind of stay
4    near the surface for a while after that to recover.
5    Much like an athlete might recover after a race or
6    something like that.  There is a metabolic deficit
7    there that has to be recovered.  And the only way to do
8    that is to breathe.  And the only way orcas can breathe
9    is at surface.
10       Q.   When you say "surface," I guess talk to me
11   about your understanding of this, because some people
12   will imagine a surface just immediately at the top, the
13   very top line of the ocean, the surface of the ocean.
14   But some people also envision surface being sort of
15   like a column not, a like a column.  Like a row of      10:19
16   water.  Is there a range of depth that you would still
17   consider to be at the surface where the whales are
18   spending their time, in your understanding of, you
19   know, orca?
20       A.   I think, as per the nature of my report, I
21   tend to review things like a physicist, conservatively.
22   To me, the surface means at the water surface.  At the
23   very top.  At the boundary layer between water and air.
24   In my mind, that's how I define it.
25       Q.   So normal range of presence in the ocean for



1    orcas would be at the surface of the water?                    10:20

2         A.   Certainly relative to larger bodied

3    cetaceans.

4         Q.   Like the baleen whales that you were talking

5    about earlier?

6         A.   Yes.

7         Q.   And about how much of their --

8    percentagewise, how much of their time would they be

9    spending there versus diving deep?

10        A.   I don't have that data.

11        Q.   Would freedom of movement for an orca include

12   breaching?

13        A.   Sure.

14        Q.   And how deep would an orca have to dive in

15   order to be able to breach her entire body out of the     10:21

16   water?

17        A.   Well, orcas are incredibly strong animals.

18   And based on my experience at my facility, not looking

19   at sea aquariums, at my facility, our whales routinely

20   were able to breach well out of the water, their entire

21   body at depths very similar to what you see at sea

22   aquarium.

23        Q.   What do you mean when your say your facility?

24        A.   When I worked at Sea World of Ohio.

25        Q.   How deep was the pool?

1    A.   In the back -- we had multiple pools.   The     **10:21**

2    back pool, I believe, at that time, it was 10 to 12

3    feet, and the whales could breach out of that water.

4    The front pool, the largest pool, I think had a depth

5    of 26 feet and they absolutely could dive and breach

6    completely out of the water.

7         Q.   Are you aware that in the literature that

8    orcas in the wild will swim in a straight line up to

9    100 miles per day?

10              MR. LISTER:   Objection.

11              Witness may answer.

12              THE WITNESS:   I've heard that.   I suspect

13   that there are a lot of caveats to that.   It's a great

14   popular thing to say.   But my experience with all types

15   of species is that animals will do what they have to do  **10:22**

16   to find and forage for food.   So if it requires 100

17   miles a day, then they'll do it.   But if they only have

18   to swim a half mile today because the fish are here,

19   they're not going to swim away from that.   So to me,

20   that is driven more so by the resources available to

21   the animal, prey, as opposed to they must or required

22   to swim that far.

23   BY MS. WILSON:

24        Q.   Would normal or adequate freedom of movement

25   for an orca include the ability and opportunity to

1    forage?                                                    10:23

2         A.   For a while, orca certainly.   For an animal

3    that's provided all its nutrition by human care, it

4    could be -- that foraging can be provided in other

5    ways:   through enrichment, through play times, through

6    a variety in regular training sessions, if I understand

7    your question.

8         Q.   What, in your opinion, would the AWA require

9    if the minimum space requirements set forth under

10   Section 3.104b, which are the measurements that you

11   discussed, don't satisfy the requirements of space that

12   would require, quote "normal, postural and social

13   adjustments with adequate freedom of movement," which

14   are set forth under Part A?   In other words, what do

15   you think the AWA would require if there is a tension    10:24

16   between those two?

17        MR. LISTER:   Objection.   The questioning

18   attorney is making an interpretation of law and asking

19   a question based on interpretation of law.   I think

20   it's a highly improper question.

21        The witness is being asked about a possible

22   change in law, apparently.   The witness can answer to

23   the best of his ability.

24        But I think it's a very misleading question.

25   BY MS. WILSON:

1    Q.    I'm not asking you about a change in the law. **10:24**

2    I'm asking if there is a scenario where the minimum

3    amount of space did not afford an animal adequate

4    freedom of movement, what would the AWA require, in

5    your expert opinion?  Which is on the AWA compliance.

6            MR. LISTER:   Objection.   Are you asking about

7    a hypothetical in any situation or are you asking about

8    something at Miami Seaquarium?

9            MS. WILSON:   A hypothetical situation

10   involving a marine mammal.

11           THE WITNESS:   I think the answer to that is

12   detail, as we've already described today.   Because

13   first of all, the factors that the service uses to

14   determine those minimum requirement, minimum space

15   requirement are designed so that any pool that's    **10:25**

16   built -- let's talk cetaceans -- any pool that's built,

17   will allow the freedom of movement.   That is the

18   purpose of having the cylinder of water and so forth

19   construct.

20           But of course, as we've mentioned this

21   morning, there are situations, normal, routine

22   situations, whether it's husbandry training, holding

23   the animal temporarily, getting the animal ready for

24   transport, that are allowed or permit situations where

25   the animal might be in spaces that do not meet the

1  minimum standards, up to that two-week period that we            10:26

2  discussed earlier.  And even beyond there, it requires

3  the supervision and documentation of an attending

4  veterinarian.  So I don't -- I think the rules were

5  written to precisely avoid tension between normal

6  postural changes and the minimum requirements.

7  BY MS. WILSON:

8      Q.   Thank you.  Does your opinion that the water

9  volume in Lolita's pool satisfies the minimum

10  requirements under the AWA, account for water drop in

11  the tank or the level of the water reduced?

12      A.   I was not asked to consider that.  I think it

13  would fall under the heading of routine maintenance.

14  Adjusting water levels to service the pool itself or

15  occasionally for veterinary purposes.  You might drop   10:27

16  the water because of getting safer access to the animal

17  itself in a veterinary situation.  I'm not aware of

18  those situations.  But I could see where dropping of

19  water is done.  It's done at other facilities.  But

20  there is usually purpose, as far as veterinary need or

21  a maintenance need.  Both of which are permitted under

22  the rules.

23      Q.   If you were made aware of facts that

24  indicated that the water level was consistently dropped

25  by several feet without explanation or purpose, would

1   that change your conclusion that the water volume is   10:27

2   adequate under the AWA?

3          MR. LISTER:  Objection.

4          Witness may answer.

5          THE WITNESS:  I think it depends on several

6   things.  I think certainly it might affect my opinion.

7   It depends on the depth of the water drop.  It depends

8   on the duration of the water drop.

9          Again, a water drop might be viewed as a

10  smaller-than-minimum space, which is permitted under

11  the welfare rules for certain purposes, training

12  purposes, veterinary medicine and so on, that we

13  discussed previously.

14         I think the key factor is temporary.  And

15  once you are housing an animal for whatever reason   10:28

16  permitted under the rules, it has to be temporary and

17  in that two-week time frame.  Assuming it's a

18  veterinary issue, then you need additional documenting

19  as to why that's necessary, by the attending

20  veterinarian.

21  BY MS. WILSON:

22     Q.  Is there any duration for frequency of

23  unexplained water dropping that would cause you

24  concern, say, if it was in your own facility?

25     A.  In my facility, we drop water to service the

1   pools, to clean the pools; we actually vary the water a   10:29
2   little bit for enrichment purposes because of the shape
3   of our pool.  Some of the shallow areas basically
4   create a little slip and slide for the sea lions.  So
5   it's not unusual to see varying water depth.
6        Q.   Okay.  Thank you, Dr. Stafford.  I don't
7   think you answered my question so I'm going to ask it
8   again.
9            Is there any duration or frequency of
10  unexplained water dropping in a marine mammal facility
11  that would cause you concern?
12       A.   Certainly if there was a significant drop of
13  water that led the animal to be housed in a space that
14  doesn't meet minimum requirements.  And if the duration
15  of that exceeded two weeks, without any sort of          10:30
16  documentation by a veterinarian, then yes, that would
17  certainly be a concern.
18            I'm requesting a rest room break.
19            MR. LISTER:  That's fine.
20            (Whereupon, a short recess was taken.)
21            MR. LISTER:  Counsel had asked some questions
22  about what documents the witness relied on and
23  there may have also been some questions about what
24  documents the witness was given.  And so to be careful,
25  we've gone back through e-mail logs and there is some



**Verbatim**

1    more documents that the witness can describe and we        **10:42**

2    have copies of.

3              MS. WILSON:  Okay.  Great.  Thank you.

4              THE WITNESS:  I think when I answered earlier

5    this morning, I was thinking documents that I used

6    specifically for my report.  So I have here -- this is

7    a document that I -- what would this be called?  These

8    are vet records for Lolita.  I did not review them.

9    I'm not a clinician; I'm not a licensed clinician.  I'm

10   not qualified to comment on veterinary issues to the

11   extent that this document writes.  So I did not review

12   it in any great detail.

13             MR. LISTER:  That was just a document that

14   was sent to him with the vet records.

15             MS. WILSON:  Are they ones that were produced  **10:43**

16   in my previous document production?

17             MR. LISTER:  Yes.  We will go one by one.  Be

18   careful.  But yes, that one was produced.

19             THE WITNESS:  I have here an e-mail; this was

20   a video, a brief video of Lolita swimming in her pool.

21   As I recall, I had trouble with viewing it in realtime.

22   I think it was more a broadband issue.  So I saw like,

23   an image or two of her swimming, making white water.

24   But --

25             MR. LISTER:  This one also had a cover e-mail



1    from me, which said that she was swimming laps.  So I    10:44

2    guess that counts as sort of a fact supplied by the

3    lawyer to the expert.  So we have that covered in the

4    e-mail.  You can see it.  The video was produced.  And

5    it's a video of Lolita swimming laps around the island

6    in her pool.

7                MS. WILSON:  Okay.

8                THE WITNESS:  I have some sample behavioral

9    records from Lolita from 2015.  I may have scanned

10   these and looked at some of the types of information in

11   recorded records, but I did not review them for

12   purposes of my report.

13   BY MS. WILSON:

14        Q.   The behavioral records, like when you just

15   glanced at them, were they familiar to you?  Are they    10:45

16   similar to the type of behavior records that you have

17   used at other facilities?

18        A.   Yes.  They have a rating system for each

19   interaction with the animals.  They use a five-point

20   scale, I use a three-point scale.  They note things

21   that are required like food amounts eaten per day, per

22   session, who the trainers were involved that were

23   caring for her and training her at that point in time.

24   The type of interaction.  It was nice to see -- I did

25   notice that the types of interactions that Lolita

**Verbatim**

1   receives vary.  It's not all show.  It's not all          10:45

2   training.  It's play time.  It's veterinary.  It's

3   relationship-type sessions.  And that's pretty

4   universal in the marine mammal training field.  So what

5   I would say is that the records seem very detailed in

6   the amount of information that they condensed in a

7   single record per day.

8       Q.   Okay.

9       A.   This is the letter from Catherine Meyer that

10  precipitated the response by Dr. Goldentyer of APHIS

11  that I did use.  I used Dr. Goldentyer's response.  I

12  don't recall reading it.  It looks like it did go to my

13  e-mail address.  But I don't recall actually reading

14  the original letter to Dr. Goldentyer.  She actually

15  restated the concerns expressed in this letter as part    10:46

16  of her response.

17          This is links from Orca Network.  Looks like

18  objections to Miami Seaquarium.

19          MR. LISTER:  Those are Howard Garrett of Orca

20  Network's response to Miami Seaquarium's

21  interrogatories.  What they have in them is links to

22  the seapen plan and the sea plan proposal.  So I sent

23  that to the witness.  You know, he's not been talking

24  about seapens, but we wanted to be complete.

25  Everything, you know, the facts that were given to the

1    witness.  So that's what we're going through now.  And

2    this is one of them.

3              MS. WILSON:  Okay.  Thank you.

4              THE WITNESS:  I did not really consider that

5    as part of my report, the NOAA recording of the press

6    conference on the final rule.

7              MR. LISTER:  The press conference recording

8    was produced in Miami Seaquarium's document production.

9              MS. WILSON:  Okay.

10             THE WITNESS:  And this looks like animal

11   training documents.

12             MR. LISTER:  The Animal Training Manual.

13             THE WITNESS:  Oh, it's the Animal Training

14   Manual.

15             MS. WILSON:  For Miami Seaquarium?              10:48

16             MR. LISTER:  Yes.  That was also produced.

17             THE WITNESS:  I perused it, but I did not use

18   any data from here as far as the space calculations.

19   BY MS. WILSON:

20        Q.   What about for any other part of your report?

21        A.   To the best of my memory, no.  I think that's

22   it.

23        Q.   Are those the copies that we can look at?

24             MR. LISTER:  Yes.  You're welcome to look at

25   this.  They have my cover notes to them as well.

1          MS. WILSON:  Do you mind if I just take a few  **10:48**

2  minutes?

3          MR. LISTER:  That's fine.

4          MS. WILSON:  We can do another three- to

5  five-minute break.

6          MR. LISTER:  That's fine.  You'll see titles

7  of e-mails like eight of X, seven of X, and what that

8  means, it's just the sequence of e-mails that went to

9  him forwarding the case documents.  And I think the

10  ones that aren't in that stack are the ones that you

11  already went over in your questioning at the very

12  beginning of the deposition.  Also, I did send him the

13  complaint, the lawsuit.

14          Do you have the answer?

15          THE WITNESS:  I do.                    **10:50**

16  MS. WILSON:

17     Q.  Did you use it or rely on it in formulating

18  your report?

19     A.  Only as far as to understand what the

20  question was, as far as the minimum standards, the

21  minimum required space standards and how that pertained

22  to what I was being asked to look at in terms of

23  exhibits to calculate the minimum space requirement.

24     Q.  So based on your looking at the complaint,

25  what did you -- how did you formulate what the

1    questions were that you were being asked to answer in     10:51

2    your request for the report?

3         A.   In part, through conversations with

4    Mr. Lister, that was the area of my expertise that they

5    were hoping that I could comment on after evaluating

6    the linear dimensions that were available through those

7    various documents.

8         Q.   So you're referring to space?

9         A.   Space.

10        Q.   Did they ask you about anything else?

11        A.   Space, companion animal and shade.

12        Q.   Did they ask you about anything else?

13        A.   Not at that time.  I have, since, looked at

14   some of the behavioral records in greater detail after

15   my report was submitted.  But there just hasn't been     10:52

16   enough time to look at some of the things in front of

17   you as well.

18        Q.   Dr. Stafford, when you said just now that you

19   have since reviewed some of the animal behavior

20   records, are these the ones that you looked at or

21   different ones?

22        A.   May I look at that?  Yeah.  I think -- well,

23   I looked at them when they were presented to me this

24   morning.  I have records from 2015 that I've scanned

25   that are more inclusive than yours were.  But those

1   were not provided to me until yesterday.                    10:54

2        Q.   Okay.  And they're from the document

3   production?

4            MR. LISTER:  Yeah.  After you'all began to

5   focus on those, we figured we ought to provide them.

6   So we provided a few pages just so we could see them

7   early on while he was preparing his report.  And then

8   defense began focusing on them, so we provided Dr.

9   Stafford, yesterday, with a whole set of 2015 that we

10  had.

11  BY MS. WILSON:

12       Q.   Dr. Stafford, did you look at plaintiff's

13  expert reports?

14       A.   I don't believe so.  No, no.

15           MS. WILSON:  Were they provided to          10:55

16  Dr. Stafford?

17           MR. LISTER:  Not yet.

18           MS. WILSON:  Not yet.  Will they be?

19           MR. LISTER:  I think that's certainly the

20  plan.  I think the plan served them one week ago.

21           I will just add that the documents you're

22  looking at now, the veterinary records and behavior

23  logs are confidential under the case protective order.

24  Animal Training Manual I think is confidential, as well

25  also.

1      MS. WILSON:  Do you mind if we go off the        11:00
2  record for a second?  I did want to confer with
3  cocounsel.
4      MR. LISTER:  Sure.
5      (Whereupon, a short recess was taken.)
6  BY MS. WILSON:
7      Q.  So we just discussed that you have, since you
8  prepared your report, reviewed animal behavior records
9  as well as other documents relating to Lolita and her
10  facility; is that correct?
11     A.  I think "reviewed" is probably a strong
12  characterization of that.  I apparently received some
13  of these documents, but some of them, in my estimation,
14  didn't immediately pertain to the space and other
15  issues that I was asked to focus on.  And in the        11:05
16  interest of time, there just wasn't enough time to
17  review things like plans for a seapen.  I certainly can
18  comment as far as animal welfare implications of a
19  seapen, but I'm not a seapen expert.
20     Q.  No.  I was asking about the animal behavior
21  record.
22     A.  Those I briefly perused just to see that
23  they, in fact, keep records which is a requirement.
24  But not in any detail.  I did not have the time to draw
25  any conclusions from them as far as how their training

1    might somehow influence or impact the welfare standards **11:06**

2    of space.

3         Q.   Okay.

4         A.   If I may, unless, you have another question,

5    I did want to add a few thoughts on the water drop

6    question that we ended with prior to our break several

7    minutes ago.

8         Q.   Okay.

9         A.   One important thing that animal managers,

10   behavior managers do particularly in the marine mammal

11   field, which has kind of led the way as far as using

12   operant condition in a zoological setting, is we

13   attempt to anticipate the unpredictable situation so

14   that the animals are better prepared when something

15   unforeseen might occur.  That's called desensitization. **11:07**

16   It's a very frequently used thing involving any

17   behavioral, husbandry or veterinary otherwise that an

18   animal might learn.

19            For example, before you can have a

20   veterinarian come step up to a pool and draw blood

21   voluntarily, you have to desensitize the animal to the

22   presence of a, quote, unquote "stranger," the

23   veterinarian.  And it's similar with any equipment that

24   they might use.  The sensation of an alcohol swab on

25   their skin and so on.

1          I can see where dropping water levels in a    11:07

2  pool could be a useful tool in that same

3  desensitization goal in the event that you had an

4  emergency.  If you had a medical emergency,

5  particularly where you needed to access an animal

6  quickly and immediately in a way that's safe for staff

7  and the animal as well.

8          One way that that's done in the case of

9  cetacean is dropping the water level.  So if dropping

10  the water level is done and paired with positive

11  reinforcement and other forms of enrichment, which as

12  far as I know are used extensively at aquariums, that

13  could be a very useful scenario to practice in the

14  event it's ever needed in more of an emergency

15  unpredictable situation.                       11:08

16     Q.   Okay.  Anything else?

17     A.   That is it.

18     Q.   What do you mean when you say "operant

19  conditioning"?

20     A.   "Operant conditioning" is the use of

21  consequences.  Consequences could be toys or a back

22  scratch or a hose or food or any other thing that an

23  animal finds interesting or desirable.  And those

24  consequences are provided to shape desirable behavior,

25  useful behavior, cooperative behavior like the

1    aforementioned drawing blood from a cetacean or any          11:09

2    animal.  So the process by which that is conducted is

3    called operant conditioning.

4         Q.   And the explanation that you just gave, would

5    it be correct to say that that was from your experience

6    as a behaviorist?

7         A.   That is absolutely based on my experience as

8    a behaviorist, as an applied behavior animal manager,

9    yes.

10        Q.   Okay.  And in your experience as a -- in your

11   experience with marine mammal facilities, when you were

12   purposely dropping the water in order to do

13   desensitization, would you reflect that in the records,

14   that the water dropping was on purpose or...

15        A.   We -- in my experience with cetaceans, now,     11:10

16   this is dolphins, Pacific whited-sided dolphins and

17   orcas, we did not drop the water to any appreciable

18   amount.  Now, it might have fluctuated because of life

19   support requirements, you know; it might vary -- much

20   like a tied; there is going to be some variations from

21   day to day in water level, by a few inches, perhaps,

22   when you're talking about such large volumes of water.

23        Our facility had slide-out areas where we

24   could ask the animal to come forward.  Our facility

25   had -- a lot of times you'll see a med pool, which

1   might be kind of a square-looking thing, clearly well   11:11

2   below the minimum standards but designed to have a

3   false bottom that the animal could lift up.  So there's

4   two ways to do it.  You drop the water or you could

5   lift them up.  So it varies by facilities' equipment

6   and capability.

7        Q.   Are you aware of any instance where the water

8   was dropped in Lolita's tank in order to desensitize

9   her?

10       A.   I'm not aware of that level of detail, no.

11       Q.   Okay.  Thank you.  Unless there is anything

12  else on space, I wanted to move on to shade.

13       A.   Okay.

14       Q.   Okay.  What's -- just generally speaking,

15  what's your understanding of shade that is appropriate   11:11

16  for the species concerned that is required by the AWA

17  regulations?  What does that mean?

18       A.   To me, what it means is the form of shade

19  that human beings might enjoy is not necessarily a form

20  of shade that other wild species might experience in

21  their normal habitat.  In other words, shade can take

22  many forms, I guess is my point.

23            And in my reading of the rules, it does not

24  specify what that shade must be constructed of or

25  consist of.  Nor does it preclude the use of



1    combinations of shade.  And by "shade," what we are        11:12

2    really talking about is absorbing sunlight or

3    reflecting sunlight or deflecting sunlight.

4        Q.   And what --

5        A.   Some shades are opaque, some aren't.  Some

6    are transparent, right?

7        Q.   I suppose.  Okay.  And that's your reading of

8    the regulations or is that derived from another source?

9        A.   That's my interpretation of the regulations

10   and my experience as a physicist studying things like

11   light.

12       Q.   What would you characterize as natural or

13   artificial shelter that is appropriate for orca?

14       A.   Could you repeat that question?

15       Q.   How -- maybe I'll put this as a hypothetical.  11:13

16   If you were designing a facility to house a killer

17   whale, what would you input as natural or artificial

18   shade that you think would be appropriate for that

19   species?

20       A.   I would look at the materials by which the

21   pool was constructed.  I would look at things like

22   the -- I'm going to use it in a different context, the

23   shading of the pool itself or the color of the pool,

24   whether or not the materials used and the coloration of

25   the pool is reflective or not.  Or to what degree it



1   might be reflective.                                        11:14

2           I also would look at things like water

3   quality.  And I think an argument can be made that a

4   certain degree of naturally occurring algae in a pool

5   is a good thing, from a shading standpoint.

6           Obviously, these are cetaceans that we are

7   talking about today.  They live in the open ocean.

8   There are no giant oak trees out -- extending branches

9   out over the open ocean to provide them the shade that

10  terrestrial animals might enjoy.

11          And so I don't think anyone has actually

12  examined what sort of differences these species might

13  have living in the open ocean compared to, say,

14  terrestrial animals in terms of their physical

15  abilities to live in open-ocean conditions with access   11:15

16  to sunlight except when they're below the surface.

17      Q.   Okay.

18      A.   Or at night.

19      Q.   Just so I understand your last sentence, you

20  were saying you don't think that there is anyone that

21  has compared, for an orca species, their ability

22  to live -- or -- can you just restate that more

23  specifically?

24      A.   I guess what I am saying is I don't know of

25  any research that someone has conducted that looks at

1    what may be unique abilities of orcas and other          11:16

2    cetaceans that again, spend a lot of their time at the

3    surface, in dealing with sunlight.

4         Q.   Okay.  And comparing --

5         A.   Comparing to other species that might utilize

6    access to direct shade like terrestrial animals often

7    do.  There are plenty of species, even on land, that

8    have access to shade and there are plenty of species

9    like Arabian horses that have access to almost no shade

10   and live in full sun.

11        Are there unique differences in their

12   physiology that might help them adapt to those

13   conditions?  I suspect there are.  I'm not sure anyone

14   has ever been able to do that kind of research.

15        Q.   Other than trees or shade, because you         11:16

16   started out saying that there are many different kinds

17   of shade, what kind of elements in an open ocean might

18   provide shade or reflect light or absorb light?

19        A.   Certainly, if the animal is in a coastal

20   situation, there may be shade cast by the landscape, by

21   the topography of the land, the rocks, so forth.

22   That's certainly possible.

23        Q.   Anything else?

24        A.   More so in-shore situations.  Except for any

25   kind of underwater feature or just below the surface

1    feature, no, I'm not aware of any.                    11:17

2         Q.   What about like any natural substrate or

3    organic matter that might be in the ocean?

4         A.   Certainly that's true.  Light comes in

5    different wavelengths, right?  And certain forms of

6    those light -- certain wavelengths of light are

7    transmitted further in the water column than other

8    forms.  And the higher energy wavelengths of light that

9    you have, the shorter -- the shorter wave length, the

10   higher the energy.  Those photons tend to get absorbed

11   rather quickly.  They don't go very far in the water,

12   compared to maybe some visible form of light.  But

13   certainly, if there are articulates, if there are

14   things in the water, living creatures and so forth that

15   utilize that light or scatter light, that would        11:18

16   provide, certainly, a form of shade.

17        Q.   Okay.

18        A.   Especially for creatures that, again, spend

19   much of their life at the surface.

20        Q.   Sure.  What's your source for the factual

21   assertion that orcas spend much of their life at the

22   surface?

23        A.   Some of it is based on personal experience

24   working with orcas.

25        Q.   In the wild or in captivity?



1      A.   In human care, yes.                          11:18

2      Q.   Okay.

3      A.   And some of it is just, you know, incidental

4  reading and study of comparing different cetaceans.  As

5  we discussed earlier, large bodied, really large-bodied

6  whales can dive for extended periods of time that

7  really no orca could ever match.  So just by their

8  smaller size.  As big as an orca is, they're still

9  relatively small, compared to a blue whale.  Their

10  physiology, their size, limits their life to being

11  closer to the surface more of the time, relatively

12  speaking, to a large blue whale, for example.

13      Q.   And when you say "reading and study," could

14  you just be a little bit more specific about what

15  materials?                                            11:19

16      A.   No, I really can't.  I've been doing this for

17  26 years.  An article here or a textbook there.  It's

18  knowledge accrued through career, I guess.

19      Q.   Are there any differences among resident

20  versus transient orca populations in terms of how much

21  time they spend at the surface or their behavior in

22  that way?

23      A.   Well, they generally are the same basic size

24  and shape, so their energy requirements are going to be

25  the same, roughly.  Therefore, their need for oxygen is

1    going to be roughly the same.  I am not aware of any        11:20

2    differences, but that doesn't mean there aren't some

3    differences.  Certainly, they make use of different

4    parts of the ocean habitat.  Some are more in-shore

5    coastal.  Some are offshore.  Some tend to be more

6    localized where they spend their time and others hence,

7    the name resident and transient, I guess.

8         Q.   Okay.  Did you consider these features, such

9    as the color of the pool, the reflectiveness of the

10   materials in the pool, the water quality when you were

11   coming to your conclusion about the appropriate shade

12   in Lolita's tank in preparing your report?

13        A.   I did not take into account water quality of

14   the pool.  It's certainly something I would look at

15   when I visit the facility prior to trial.             11:21

16        Q.   I do want to ask you about the other things.

17   Would you say is it just because you didn't have the

18   information in front of you?

19        A.   Yes, yes.  I don't have any detailed water

20   quality measures in front of me.  And my last visit to

21   the sea aquarium was 2002.  So I did not observe the

22   pool clarity, if you will, for the purposes of this

23   report.

24        Q.   Okay.  What about the other two aspects?

25        A.   Could you repeat what they were?

1    Q.   Sure.  You said the color of the pool and the **11:22**

2    materials that were used, whether or not they were

3    reflective.

4    A.   I did not consider the reflective nature of

5    the pool.  However, I did notice in that one that the

6    pool is a darker blue.  That's just knowledge that I've

7    had since 2002 visiting there.

8         I think anecdotally, if you look at marine

9    mammal facilities over the past few years, they have

10   transitioned to darker surfaces, like what you see at

11   sea aquarium.  That was not really mentioned in my

12   report.  I don't think it really was a part of it.

13   What I used was the documentation from APHIS inspectors

14   and their conclusions based upon the shade provided by

15   the stadium structure, seating and so forth.          **11:23**

16   Q.   So your conclusion relied exclusively on the

17   conclusions made in the APHIS documents?

18        MR. LISTER:  Objection.  That's inconsistent

19   with the testimony.  The question's inconsistent with

20   the testimony.

21        Witness may answer.

22        The word "exclusive" is particularly.

23        THE WITNESS:  With reference to shade, I

24   cited the -- I wanted to highlight in the rules that

25   the type or amount of shade shelter required is not

1   mentioned under the rules.  And also that much of the        11:24
2   UV light is filtered out or scattered within the water
3   column given the fact that the pool is a depth of 20
4   feet, maximum 20 feet.  So in that sense, I supported
5   what was written by the APHIS inspectors in those
6   documents that we discussed all morning.
7   BY MS. WILSON:
8       Q.   Are you aware of whether or not the APHIS
9   inspectors also looked at that measure that you just
10  mentioned, the depth of the pool?
11      A.   Yes.  In fact, I think one of the exhibits
12  was, I think, I was specifically looking at Exhibit E,
13  a letter or memorandum from Dr. More to Dr. Guage of
14  APHIS, both of APHIS, in which, I believe, she states,
15  "The majority of the pool is 20 feet deep.  More than   11:26
16  adequate to provide protection by submerging."  In
17  addition, "There was no evidence of solar damage to the
18  skin or active issues with the eyes."  She goes on to
19  say that "All animals in the west stadium are fed from
20  the island side, according to the position of the sun."
21          So the staff -- I took that to mean the staff
22  is aware of where the sun is each day during feeding
23  sessions so that the sun is always to the back of the
24  animal.  In other words, they're not asked to look up
25  into the sunlight.

**Verbatim**

1    Q.   If you were aware of sun damage to her skin    11:26

2    and to her eyes, would that change your conclusion that

3    the shade in her tank is adequate?

4             MR. LISTER:   Objection.

5             Witness may answer.

6             THE WITNESS:   When it comes to a

7    physiological response to something like sunlight, I'm

8    not a veterinarian; I'm not licensed in that area.   So

9    I really don't see how I can factor that into my

10   report.   Because that's not my training as a

11   veterinarian.

12   BY MS. WILSON:

13   Q.   So you don't think that any damage to the

14   skin or eyes would be indicative that there is no

15   adequate shade?                                       11:27

16   A.   Well, animals, including humans, have the

17   ability to adapt to sunlight.   We tan.   So there are

18   normal physiological responses that allow organisms to

19   adapt to their environment.   That's how we maintain

20   homeostasis.

21        I suppose if you exceed those mechanisms,

22   someone more qualified than myself, like a

23   veterinarian, can say this is, quote, unquote, "damage"

24   versus this is a "normal physiological response" to a

25   change in environmental condition.   In this case,

1    light.                                                          11:28

2         Q.   What is an individual orca's -- on the

3    individual level as opposed to species level, what are

4    the ability of an orca, a southern resident killer

5    whale to adapt to exposure to sunlight?

6         A.   I don't know the answer to that question.

7         Q.   What's the level of turbidity in Lolita's

8    case?

9         A.   I don't know the answer to that question.

10        Q.   What's the level of turbidity in the national

11   environment of a southern resident killer whale?

12        A.   I don't have specific data.  I suspect it

13   varies quite a bit based on the season, the

14   temperature, the currents and so forth.  But I'm not an

15   oceanographer.                                                  11:29

16        Q.   Okay.  Are you aware that Lolita's records

17   indicate that she has blisters, wrinkles and sunburn on

18   her skin?

19             MR. LISTER:  Objection.

20             Witness may answer.

21             THE WITNESS:  I did not extensively review

22   her veterinary records.  So no.  I'm not aware of that.

23   Doesn't mean they're not in there.  But I didn't note

24   those because I didn't really review them in any

25   detail.

BY MS. WILSON:                                              11:29

    Q.   Are you aware that her records reflect that

she suffers from eye issues, long term?

        MR. LISTER:   Objection.

        Witness may answer.

        THE WITNESS:   I'm not aware of that.   And

that actually runs contrary to my observation back in

2002, as well as several documents provided by APHIS

veterinarians, which were cited in my report.

BY MS. WILSON:

    Q.   If you had known those facts, would they have

impacted your opinion in your report?

    A.   Well, since I can't verify whether those

facts are true and since I'm not a veterinarian, I

don't know that I would be qualified to comment on that   11:30

in my report or otherwise.

    Q.   So your answer is you don't know if it would

impact your opinion?

    A.   I guess what I'm saying is I would have to

rely on the statements of qualified professionals to

evaluate whether or not there is physical damage to an

animal and in what way and what is the presumed cause

of that.   In other words, I'm not a veterinarian so I

can't diagnose that animal's condition with any kind of

expertise much like yourself.   I mean, you're not a

1    veterinarian, as far as I know.  So I would have to                11:31

2    rely, as I did, in my report on statements made by

3    qualified licensed veterinarians who also happen to be

4    APHIS inspectors.

5         And in their reports, she suffered from no

6    eye issues and her skin had no issues relative to sun.

7    And that was my layperson, if you will, observations

8    when I saw Lolita for the first time in 2002.

9         Q.   Okay.  So you base your report on the

10   information as it was known to you, that she had no

11   skin or eye issues whatsoever?

12              MR. LISTER:   Objection.

13              Witness may answer.

14              THE WITNESS:   Yes.  I believe that is the

15   case.                                                              11:32

16   BY MS. WILSON:

17        Q.   In humans, you said earlier, you know, we

18   adapt to sunlight; we tan.  Burns and wrinkles in

19   humans, are those caused by sun damage or can those be

20   caused by sun damage?

21        A.   Yes, they can be.

22        Q.   Is there any reason why there would be any

23   difference in an orca?

24        A.   Conceivably, yes.  They evolved from land

25   animals back to the sea.  And I would imagine that

1    given their lives at the surface of the water, that        11:32
2    there very well could be special adaptations in those
3    species and other cetaceans that enable them to survive
4    in that environment.  That's what organisms do to adapt
5    to their environment.
6          So for example, I'll give you a different
7    example.  There are certain types of hoofed animals
8    that because they live in snow much of the year, they
9    will change the proteins in their cells to adapt to the
10   changing environment.  Perhaps something like that.
11        Q.   Are you talking about an individual or a
12   species level?
13        A.   A species level.
14        Q.   So just to kind of wrap up, it would be fair
15   to characterize your conclusion that the shade,            11:33
16   sheltered use of Perma regulations that's provided in
17   Lolita's tank is adequate because orcas are known to
18   spend the majority of their time at or near the surface
19   of the water?
20        A.   I concluded that it's adequate because
21   trained veterinarians indicated that her eyes and skin
22   condition appeared fine, that the stadium area provided
23   adequate shade and that the pool depth enabled Lolita
24   to dive to a depth of 20 feet.
25        Q.   Thank you.  Okay.  Let's talk about



1  companionship now.  What's your understanding of the      11:34
2  term "biologically related species"?
3      A.  I think, you know, at a minimum, animals that
4  are found in the same general family of species.
5  Despite their name killer whale, orcas are dolphins.
6  The largest number of Delphinidae.  The family known as
7  dolphins that most people think of.  And therefore, any
8  other cetacean that has been classified under
9  Delphinidae, a lot of biologically relevant
10  characteristics.
11      Q.  Any other -- you said "at minimum."  So is
12  there anything beyond that that you would think is
13  biologically related required?
14      A.  Sure.  Well, I think that dolphins are
15  related biologically to porpoises, but they're in a      11:35
16  separate family.  But there are enough physical and
17  morphological differences to warrant them their own
18  family designation.  But still, they are tooth whales.
19  They fall under a larger umbrella, if you will, of
20  tooth cetaceans versus those that use baleen.  So the
21  answer to your question, I think, depends a little bit
22  on how close do you want to zoom in that lens.
23      Q.  Yes.  I guess what I am getting at, how close
24  of a zoom does the AWA regulations require, in your
25  view?



1    A.  It's a pretty broad definition.  Biologically **11:36**

2    related or similar.  There aren't a lot of

3    specifications to that.  But the fact that you're

4    considering a family of species means there is that

5    inherent similarity across a species in a family.

6    Q.  Does biologically related under the AWA

7    require anything deeper than just being in the same

8    family, taxonomically?

9    A.  There is no reference to taxon.  I am just

10   referring to the specific code.  I'll grant you, it's a

11   rather broad definition.  It does not specify what

12   those characteristics must be.

13   Q.  Okay.  You did bring a copy of it.  Let's

14   just read the reg into the record so we're all talking

15   about the same thing, if that is agreeable with   **11:38**

16   Mr. Lister.

17        MR. LISTER:  That's fine.

18   BY MS. WILSON:

19   Q.  So Section 3.109 says --

20        MR. LISTER:  If I could just open that back

21   up before you start to read.

22        MS. WILSON:  Let me know when you have it.

23        MR. LISTER:  I'm ready.

24   BY MS. WILSON:

25   Q.  It says, "Marine mammals, whenever known to



1   be primarily social in the wild, must be housed in          11:38

2   their primary enclosure with at least one compatible

3   animal of the same or biologically related species,

4   except when the attending veterinarian in consultation

5   with the husbandry/training staff determines that such

6   housing is not in the best interest of the marine

7   mammal's health or well-being."

8          So working off that definition or that reg,

9   tell me about your conclusion that Lolita's

10  companionship is adequate and respond to the

11  regulation.

12       A.   Well, as you read, first and foremost, the

13  rules do not require it must be the same species that

14  she's housed with as a companion.  That is not a

15  requirement.  It's a related species.  My conclusion on 11:39

16  it is based upon documents provided by APHIS

17  individuals we've mentioned previously, as well as my

18  own experience working with orcas and Pacific

19  white-sided dolphins in the same facility, not Miami

20  Seaquarium.  And given that orcas and lags are of the

21  same family of dolphin, they are inherently, to use the

22  term, biologically related species by virtue of being

23  classified in the same family.

24       Q.   So under that definition, would it be

25  appropriate under the regulations to house a wolf with

```
 1    a cocker spaniel?                                      11:40
 2              MR. LISTER:  Objection.
 3              Witness may answer if he knows.
 4    BY MS. WILSON:
 5         Q.   They're in the same family, Canidae?
 6         A.   My answer to that would be how was the wolf
 7    raised?  How was the cocker spaniel raised?  If the
 8    cocker spaniel was a feral cocker spaniel raised on the
 9    streets of the city, paired with a hand-reared wolf
10    that was bonded to people or to other animals, I might
11    have concerns about the cocker spaniel.
12         Q.   So it depends on the individual personality
13    of the animals and how they interact with each other?
14         A.   If you're asking me about compatibility, it
15    certainly depends upon the biologically relatedness of  11:41
16    the species, as well as how they are behaviorally
17    managed and trained on exhibit together.
18              It is not unusual in the zoological world to
19    house species that are similar, biologically related,
20    as well as species that are dissimilar, but maybe share
21    the same types of habitat, just different parts of it.
22    This is not an unusual thing in zoos, aquariums.
23         Q.   And I should -- I am asking about
24    compatibility.  I'll go on and read the reg.  I am back
25    at Section 3.109.  It says, "However, marine mammals
```

1   that are not compatible must not be housed in the same   **11:42**

2   enclosure.  Marine mammals must not be housed near

3   others animals that cause them unreasonable stress or

4   discomfort or interfere with their good health."

5          MR. LISTER:  I'm going to just object.  This

6   is similar to the objection counsel made yesterday in

7   the LDF deposition.  Just to preserve the record, our

8   point that the issue of compatibility with dolphins was

9   never raised in the notice of intent to sue, which

10  forms the scope, the maximum scope of this lawsuit.

11         The witness, of course, may answer subject to

12  that objection.

13         THE WITNESS:  I would like to request you

14  repeat the question.

15  BY MS. WILSON:                                        **11:42**

16    Q.  Sure.  I was just clarifying.  That is a good

17  point.  It wasn't a question.  I was just clarifying

18  that I am asking about compatibility between Lolita and

19  her companion because that's part of your assessment,

20  that her companionship is adequate or satisfies the

21  minimum requirements under the AWA.  So just clarifying

22  what I am asking about.

23         So what's the basis for your statement in

24  your report on page 6 that "The AWA rule does not

25  preclude housing two different species of cetaceans

1    together, nor does it require that animals must be          11:43
2    housed with members of their own species"?  Is that
3    your own reading of the regulation or is that derived
4    from a different source?
5         A.   That's the reading of the regulation you just
6    read into the record, 3.109.
7         Q.   Okay.  And your opinion in this report is
8    based, at least in part on your statement that orcas
9    and lags, the Pacific white-sided dolphin have
10   behavioral, biological, environmental, and ecological
11   characteristics in common.  So could you just expand on
12   what those characteristics are?
13        A.   Sure.  Pacific white-sided dolphins and the
14   southern resident killer whale population, since that's
15   what we're discussing here, they both feed on fish.     11:44
16        Q.   What's your source for that assertion?
17        A.   It was a Website search of the American
18   Cetacean Society.  They're a fact sheet.  That is the
19   most recent.  I've known that from my own experience of
20   feeding both types of animals, both species fish.  But
21   most recently I did a basic search online and read a
22   few fact sheets about them just to update my memories.
23        Q.   Just so I'm not going to continue to
24   interrupt you, my intent is to have you answer that
25   question.  And I would want to know the source for each

1    of those things.  So if you could just go ahead and          11:45

2    provide that.  So I'll repeat the question.

3         A.   Please.

4         Q.   So I asked you to tell me a little bit more

5    about what you meant when you say that orcas, southern

6    resident killer whales and lags have behavioral,

7    biological, environmental and ecological

8    characteristics in common.  I asked you to tell me a

9    little bit more about what each of those

10   characteristics are that they have in common.  And I

11   would also ask you to please, to the extent that you

12   recall, indicate what your source is.

13        A.   Okay.

14        Q.   For each of those.

15        A.   Perhaps one of the most obvious is that these    11:46

16   are social beings.  They are members of the same

17   scientific family.  So that right there tells me that

18   other scientists, through peer review process, not my

19   saying so, but other scientists have deemed these

20   animals to be biologically related.  And that is well

21   documented in things like Walkers Mammals of the World,

22   which is a huge textbook -- I probably have it here

23   somewhere -- where it discusses the taxonomy and the

24   rationale for why these species belong in the same

25   family.

## Verbatim

1        Their appearance is similar.  In the case of      11:46

2   Pacific white-sided dolphins and orcas, specifically

3   the southern resident population, they feed on fish.

4   Some orca species feed on other types of food, sharks

5   birds and so on.  They echo locate.  They, particularly

6   in the case of lags and killer whales, they share

7   similar coloration.  I refer to it as disruptive

8   coloration.  Basically, they're dark on their back side

9   and they're lighter on their underside.

10        That is a predatory adaptation.  Because what

11   that means is they can slide underneath prey.  And if

12   prey were to look down, their dark backside would blend

13   in with the sea bottom or the bottom of the pool, in

14   this case.  As opposed to if prey is underneath them,

15   looking upwards towards the sky, their lighter in color    11:47

16   underbelly is going to blend in with the brightness of

17   the surface.  So that is -- that sort of coloration

18   enables them to be predators or assist in that, I

19   guess.

20        Obviously, they have teeth.  And the shape of

21   their teeth is such that they are more related to one

22   another than, say, a species from, that's a porpoise,

23   which has a different shape type of tooth.

24        Obviously, as mammals, they give live birth;

25   they have hair; they produce milk; they nurse their

1   young; they breathe air.  So there are those kind of      11:48
2   broader comparisons that make them biologically
3   related.
4        Q.  And the source for all of that?
5        A.  I am sorry.  Some of that is my own graduate
6   studies in mammalian physiology.  Some of that has been
7   through work experience with both species, feeding
8   them, caring for them, observing them, measuring them,
9   watching them interact with each other, individuals
10  from each species.
11       And I think as I convey in my report, in our
12  case, it wasn't that the animals were not compatible,
13  they often were too compatible.  So it made it
14  challenging to ask them to separate from one another at
15  different times of the day in the training process.      11:49
16  Because the animals shared so much characteristics
17  together and they were managed together through that
18  operant conditioning to cooperate with one another, to
19  engage in behaviors with one another and to thrive
20  together.
21       Q.  And this was at Sea World?
22       A.  This was at Sea World, yes, of Ohio.
23       The only thing I would add about that, is Sea
24  World of Ohio -- remember, this was almost 25 years
25  ago, was unique in that its killer whale stadium housed

1    dolphins.                                                    11:50

2              If you go to a killer whale facility now,

3    they only have killer whales there.  Our situation in

4    Ohio was different than what you might find at Sea

5    World today with the orca population.

6         Q.   Sorry.  I was trying to listen and write at

7    the same time.  Sea World does not house orcas and

8    dolphins together anymore?

9         A.   Not at present.  They housed -- they've

10   chosen to house more orcas together and have ongoing

11   breeding programs.

12        Q.   Okay.  Do you know why they no longer do

13   that, house orcas and dolphins together?

14        A.   Well, my -- I don't know, per se.  But my

15   sense is that they're a much larger facility.  They've    11:51

16   had a conservative effort in orca reproduction.  And

17   they have created separate pool facilities for the

18   other dolphin species that they have in their

19   collection, like bottlenose dolphin or Pacific

20   white-sided dolphins.

21        Q.   You said that Pacific white-sided dolphins

22   are orca species.  Could you tell me a little bit more

23   what you mean by that.

24        A.   Well, what I mean is that they are typically

25   found with other cetaceans, often of their own species.

1    But occasionally they can intermix.  Dolphins will       11:51

2    intermix.  Different types of dolphins will intermix

3    with each other.  If not permanently, certainly if the

4    feeding is good.  You will see sea lions feeding next

5    to killer whales if the fish is in Monterey Bay.  So

6    those, you know, they share the same ocean.  So the

7    fact that you will find different species of dolphin

8    foraging or just existing in the same general vicinity,

9    that is not particularly unusual to me.

10        Q.   Okay.  Would this species of dolphin, Pacific

11    white-sided dolphin and Lolita's species, the killer

12    whale, southern resident killer whale ever intermix in

13    the wild?

14        A.   Well, both species prefer cooler

15    temperatures.  Both species are found along the          11:52

16    California coastline.  Perhaps not when the southern

17    resident population is in-shore for half the year when

18    most of the observations of that population is being

19    conducted.  But as they migrate down the coastline of

20    California, if they head that far south or if they head

21    out to sea for months a time when no one knows really

22    what they're doing, absolutely.  Those ranges could

23    overlap.

24        And that is also, in the back of my mind, one

25    reason why I believe they are so compatible.  Because



1    their water temperatures are similar.  Except                    11:53

2    particularly for the southern resident population,

3    which is in the Arctic or Antarctic temperatures.  You

4    swim in this ocean.  You know how cold this water is.

5         Q.   I am from Oregon.  I've not been out there.

6              Has that ever -- to your knowledge, has that

7    ever been documented in the literature on these species

8    in the wild that they intermix or could potentially?

9         A.   Again, it depends on what you mean by

10   "intermix."  If it's documented that there are ranges,

11   potential ranges, regions of the Pacific north overlap,

12   yes, that's been documented.  I think if you pick up

13   any guidebook on cetaceans, you'll see if they list

14   ranges, you can see those ranges will overlap at least

15   for part of the year.                                            11:54

16        Q.   Okay.  To your knowledge, have they ever been

17   documented feeding -- have these species ever been

18   documented feeding or foraging together in the wild?

19        A.   That, I don't know.

20        Q.   How do the social structures within each of

21   these species, how would they differ or how might they

22   be the same?

23        A.   Well, cetaceans, in general, and dolphins, to

24   be sure, are, what I have found in my career, they're

25   very tactile oriented.  They don't have fingers like we

1    do.  And yet they are very tactile oriented.  So they    11:54

2    often will swim alongside one another.  And if you're

3    not observant of it, you'll miss it.  But they might

4    rub pecks.  Or they might, you know, feather touch a

5    peck to a side of their body or dorsal fin to the

6    ventral side of another animal.  They are

7    tactile-oriented animals.  Orcas and Pacific

8    white-sided dolphin, in general.

9         And I think they share that, both orcas and

10   lags share that.  I don't know if it's a desire.  If

11   it's something adaptive to that trait.  But it's

12   certainly something that I have seen in my career.

13   That these animals are -- very often will, you know,

14   touch one another.  And I am sure it has a lot to do

15   with sexual reproductive behavior as well.              11:56

16        Q.   Tell me a little bit more about that.

17        A.   Well, all animals have one purpose in life,

18   and that is to reproduce, to put their genes forward

19   into future generations.  Dolphins are no different

20   from that.  And certainly, tactile contact could be

21   construed at times as play behavior as part of their

22   normal repertoire of behaviors.  And both lags and

23   orcas share that, in my experience in observing and

24   caring for them.

25        MR. LISTER:  Can I take a quick break, just

1    one minute?                                                    11:56

2              MS. WILSON:  Absolutely.

3              (Whereupon, a short recess was taken.)

4    BY MS. WILSON:

5         Q.   Before we went off the record, we were

6    talking about tactile interactions in the two species

7    that are housed together at Miami Seaquarium.  And we

8    talked about tactile interactions can be play; they

9    might be sexual in nature.  Are there any other

10   circumstance or aspect of tactile interaction between

11   these species?

12        A.   Well, I guess I would just, you know, augment

13   my previous response with the fact that despite the

14   fact they don't have toes and fingers, they are

15   incredibly tactile.  Both species are tactile.           12:05

16   Dolphins in general are tactile oriented.  So it's just

17   another attribute that those species share, which I

18   think goes to their compatibility.  And the fact that

19   they're related biologically in that trait, that

20   behavior, if you will.

21        Q.   Do tactile interactions also go to

22   compatibility, aside from just simply relatedness?

23        A.   Well, I think so.  I mean, I think that there

24   are examples in nature where certain forms of tactile

25   contact help facilitate compatibility and maintain it.

1    Bonobos are highly sexual animals.                      12:05

2              The prevailing thought is they breed as

3    opposed to their cousins, the chimpanzees, which fight.

4    And part of the reason they breed so much perhaps

5    speaks to their compatibility as a social breed, in the

6    case of bonobos.

7              MR. LISTER:  The witness is testifying a

8    little bit with his hands.  Try.

9              THE WITNESS:  They're getting cold.

10   BY MS. WILSON:

11       Q.   I know there was a long list.  Any other sort

12   of characteristic that you can think of between Pacific

13   white-sided dolphins and orcas that make them

14   biologically related?

15       A.   I think their natural behaviors are very      12:06

16   similar.  they jump; they bow; they breach; they swim;

17   they float.

18       Q.   In preparing your assessment about

19   compatibility of Lolita with her companion in her

20   tank, were you provided any information about their

21   interactions?

22       A.   As we discussed several minutes ago, there

23   were some documents provided that included some

24   behavioral records, but I did not look at them in that

25   context.  And I believe again, my review of that was

**Verbatim**

1    brief because of the time and the priority for our          12:07
2    other documents to look through.  And I also think that
3    the documents only really pertain to Lolita herself,
4    not the other dolphin.  So I think to evaluate that,
5    you'd probably want to look at both sets of records.
6    If you are talking about compatibility between two
7    different animals, you'd probably want behavioral
8    records that represent both individuals that you're
9    talking about.  So I did not factor those into my
10   report.
11        Q.   Okay.
12        A.   I think that was your question.
13        Q.   Yeah.  Well, any other information about
14   their interaction that you relied upon, specifically,
15   when you were making your report?                           12:08
16        A.   A lot of it really was based upon my visit to
17   sea aquarium back in 2002.  And just seeing the comfort
18   level.  I mean, it's a striking contrast to see a lag
19   sitting next to a killer whale closer than you and I
20   are sitting right now, five or six feet away.  And the
21   calm demeanor of both.
22             And, in fact, the, you know, I think it's
23   very easy when you talk about compatibility; it's very
24   easy for all of us to start becoming a bit too
25   anthropomorphic.  And interjecting anthropomorphic

1   ideas that are not necessarily substantiated in          12:08

2   observables.  Like restoration rate, proximity, whether

3   or not there is tactile contact between the animals,

4   whether or not they're able to just spend time

5   together, whether under stimulus control of a trainer

6   or just on their own time.  And nothing in my

7   experience precludes me or makes me think otherwise

8   that these are not compatible species.

9        Q.   When you went to observe Lolita and her

10  companion, did you have any opportunity to observe them

11  at a time where they weren't aware of your presence?

12       A.   Not that I recall.

13       Q.   What might you look at when considering the

14  ability of the animals to spend time together?  I think

15  you just mentioned that when you were talking about     12:10

16  compatibility.

17       A.   Well, I might look at things like when they

18  are not aware that they're being observed, the animals

19  that is, what are they doing?  Are they spending as

20  far -- as much time as possible away from each other or

21  are they interacting?  And how are they interacting?

22  Is it calm?  Is it playful?  Is it by touch?  Is it,

23  you know, play behavior?  So those sorts of things can

24  supplement our observations when they are on stimulus

25  control or when their attention is focused on us

1   because we're standing poolside.                    12:10

2           And I would just say, I think the training

3   staff at sea aquarium in conjunction with the

4   veterinarian staff are probably in the best position to

5   evaluate that because they spend the most time with

6   those animals, again, under direct stimulus control,

7   but at other times as well.

8       Q.   Are you aware that according to Miami

9   Seaquarium's records, Lolita was raked 52 times by the

10  lags in 2015?

11      A.   Did you say raped?

12      Q.   Raked, r-a-k-e-d.

13      A.   Okay.

14           MR. LISTER:  Objection.

15           Witness may answer.                         12:11

16           THE WITNESS:  I'm not aware of the count.  I

17  am not surprised by the fact that biologically related

18  cetaceans, dolphin in this case, rake one another.

19  Raking is a normal part of dolphin behavior.  In that,

20  I include orcas as dolphin.  I think that raking is a

21  form of communication; it's a form of play.  It's even

22  occasionally a form of sexual behavior.  And it's, in

23  addition to using other body parts, use of one's mouth

24  is also involved in tactile stimulation.  They don't

25  have fingertips to explore the world, so they use pecks

1    and dorsal fins and mouth and tongue.                    12:12

2    BY MS. WILSON:

3        Q.   Can it ever be a form of aggression?

4        A.   Certainly, absolutely.

5        Q.   Okay.  I guess, how would you know if it's

6    play or sexual or aggression?

7        A.   Well, I think you have to, as with any

8    behavior, you have to put it in the context of what's

9    going on that day.  Are there other precursors?  Are

10   there other behaviors?  Are there other situations that

11   might shed some light in the trainer's mind and the

12   veterinarian's mind that socially today they are more

13   sexual, more playful, higher energy, lower energy?  And

14   that's why the records that I have perused so far are

15   helpful in the sense that they happen to be very         12:13

16   detailed.  The forms that they use at sea aquarium have

17   a lot of data in them in a very confined, very

18   condensed way, that I think summarizes nicely -- the

19   format of it summarizes nicely for animal managers as

20   they look for how the animals are doing by day, by

21   week, by month, by year.

22       Q.   And you only looked at records from 2015; is

23   that correct?

24       A.   Yes.

25       Q.   That's what you're talking about when you say

1   they're really detailed, 2015 only?              12:13

2       A.   Yes.  And I assume that they used the same

3   form for a while.  I haven't gone beyond 2015.  And

4   even my examination of 2015 records is cursory at this

5   point.  But if it is something that is important to the

6   plaintiff's, then that is something I can certainly

7   spend more time going forward and examining in greater

8   detail.

9       Q.  Would information about the tactile

10  interaction between Lolita and her companion, the

11  raking, r-a-k-i-n-g, whether it was play or sexual or

12  aggression, if you had more information about that,

13  would that change your conclusion as to compatibility?

14      A.  I don't believe so.  I certainly -- there may

15  be information in the records that point to trends or   12:14

16  habits or likes and dislikes of the individuals in

17  question.  But I think overall, the compatibility lies

18  with the behavioral biological traits that these two

19  species share as members of the dolphin family.

20        And also, my sense of sea aquarium's training

21  program, which is that operant conditioning, using

22  positive reinforcement to build cooperative behaviors

23  between human beings and animals and among the animals

24  themselves.  To me, that's what marine mammal training

25  has done so well for so long, is that working together.

**Verbatim**

1    When "together" means one trainer, one animal or one        12:15

2    trainer and three animals, that compatibility, that

3    cooperation, that trust, that's why I became a marine

4    mammal trainer.  That's why the work that they have

5    done over the last 25 years has benefited many, many

6    other animals including petting animals, farm animals,

7    other zoological species.  We've learned an awful lot

8    in precisely these kind of situations.  In not only

9    building on compatibility that is there biologically

10   and ecologically, but also through operant

11   conditioning.

12        Q.   Hypothetically, if you had information of

13   repeated aggression against Lolita by one of the

14   dolphins or vice versa, would that change your opinion

15   as to compatibility?                                        12:16

16             MR. LISTER:  Objection.

17             The witness may answer.

18             Assumes facts not in evidence.

19             THE WITNESS:  Again, not having reviewed the

20   records in detail, not having observed the animals in

21   detail over an extended period of time, both with their

22   attention and with them not knowing they were being

23   observed, it's difficult to answer that question.

24             I also think that it's important to

25   understand that aggression is not simply a bite.

1    Aggression comes in different forms.  An aggression in    12:17

2    nature is actually an adaptive set of behaviors.  So I

3    think when we hear the word "aggression," we

4    immediately assume, oh, bad.  There is something wrong

5    here.  And aggression is a normal part of an animal's

6    repertoire, whether they are a prey animal or a

7    predictor.  So I'm not overly concerned by the premise

8    of your question, I guess.

9    BY MS. WILSON:

10       Q.   My question was about repeated acts of

11   aggression over time.  That wouldn't concern you at

12   all?

13       A.   Well, it depends on -- the devil always in

14   the details, right?  How many acts of aggression over

15   time?  What is the time frame?  And what sort of        12:17

16   context is there that we can learn from?  That may be

17   it has nothing to do with their compatibility.  It has

18   to do with an F16 flew over because there was an air

19   show in town or something random like that.  It goes

20   back to a point I made earlier about the importance of

21   desensitization training when we were discussing water

22   level drops.  Desensitization training with positive

23   reinforcement is fundamental to housing any animal in a

24   licensed facility, a USDA-licensed facility like the

25   sea aquarium; like my own facility.

1       Because the more we prepare animals to        12:18

2   understand, you didn't need to worry about that, it's

3   okay, the calmer they're going to be, the more prepared

4   they will be when those situations occur down the line

5   sometime.  It may be similar or -- to the jet or

6   something like that.  That's part of my job, to prepare

7   them for whatever they might experience while living in

8   human care.

9       So I can't answer your question as you framed

10  it, because the root causes of that may have nothing to

11  do with the compatibility of the animal.  It may have

12  something to do with other things in the environment

13  both external to the animals and internal.

14      Q.   But setting aside compatibility, I guess, for

15  a second, if that was happening, would you still think   12:19

16  it would be appropriate to house the animals together?

17      A.   I think you'd have to look at the learning

18  history of the animals prior to putting them together.

19      Q.   The learning history?

20      A.   Their learning history.

21      Q.   What's that?

22      A.   Learning history is all living organisms

23  learn.  To me, that's a fundamental truth.  And through

24  that experience, interacting with their environment,

25  interacting with their companions, interacting with



1    their, in this case, trainers, that leads to knowledge 12:19

2    or behaviors.  We don't know what they're thinking; we

3    don't know what they're feeling.  But through their

4    behavior, we can infer how they're doing.  Are they

5    engaging with us?  Are they avoiding us?  Are they

6    avoiding each other?  So there is a lot to be learned

7    from just observing their behavior that can shed some

8    light on how they're doing.  So I lost my train of

9    thought.

10        Q.   It's my fault.  I interrupted you and I

11   didn't give you the opportunity to finish your answer

12   to my question.  So I'd like you to do it now.  Maybe

13   the question can be read back if it would be helpful

14   for Dr. Stafford.

15        A.   That would be helpful.                       12:20

16             (Whereupon, the record was read as follows:

17             *But setting aside compatibility, I guess, for*

18   *a second, if that was happening, would you still think*

19   *it would be appropriate to house the animals together?)*

20             THE WITNESS:  Again, my answer would depend

21   upon the level of desensitization.  I would look to

22   other sources before I would immediately assume that

23   the animals are not compatible shouldn't be housed

24   together.  I would look at other things in the

25   environment, other things in our practices in terms of

## Verbatim

1 management that maybe we haven't addressed or we need   12:21

2 to address or modify over time.  So I think the answer

3 is a little more detailed than simply saying, well,

4 they're not compatible.  They shouldn't be together.

5 Especially since it may have nothing to do with their

6 relatedness as biologically related species.

7 BY MS. WILSON:

8    Q. Generally speaking, in your work and in your

9 experience, how have you -- how would you assess

10 whether in an animal's environment, including companion

11 species, may or may not be causing that animal stress?

12    A. Well, every animal has a baseline set of

13 behaviors.  A baseline -- how do they react?  Do they

14 come and check you out when you walk by the pool or are

15 they, for some strange reason today, staying away.  Is   12:22

16 there something else going on?  So as experienced

17 trainers and healthcare providers, in the case

18 veterinarians, you get to know your animals.  You get

19 to know their preferences.  You get to know how they

20 like to spend their time, both when you're there and

21 when you're not there.  And when you detect differences

22 in that norm for them, and that is individually based,

23 not across species, then, you know, that is a clue for

24 us as caregivers and trainers, something might be up.

25    Now, it could be nothing.  It could be



1    something, you know, just a random new reaction to          12:23

2    something.  Or it may point to, hey, socially there is

3    something going on.  Physically there is something

4    going on.  It doesn't necessarily have to be a bad

5    thing.  It just could mean that there is something

6    different.  And as caregivers, we need to pay attention

7    to that.  And one reason -- and one way we do that is

8    by keeping good records.  So that we can track.

9          That's probably one of reasons why Lolita

10   looks good at 50 years or mid-30s, when I saw her in

11   person, is because of the detailed recordkeeping on the

12   veterinary side and on the trainer's side.

13        Q.   What are some indicators of stress in an

14   orca, behavioral or otherwise?

15        A.   There are a lot of universal responses.          12:24

16   Again, I'm not going to get into the physiological

17   parameters like blood result.  I'm not a clinician.  I

18   would be responding more as a layperson at that point.

19        But certainly behaviorally, animals that are

20   avoiding contact with us or with their exhibit, animals

21   that -- you know, there are forms of frustration that

22   you can witness.  Orcas are -- orcas have -- have you

23   ever seen an orca up close?  I mean, like up close,

24   like right here.

25        Q.   I can't say I have.

1      A.   They have -- not a lot of people know this       12:24

2 because you have to be up close to see them, but they

3 have lateral lines that run through their skin.  It

4 almost looks like -- I am going to date myself, but I

5 think they're still popular.  Remember the old vinyl

6 albums?

7      Q.   Yes.

8      A.   There is grooves in them, right?  That's how

9 sound is reproduced.  Their skin does that laterally.

10 And you can feel it.  It almost feels like little speed

11 bumps lined up right next to each other.  It's kind of

12 like you took your skin and crinkled it up.  They have

13 that.  It's probably to reduce surface area to help

14 them with reducing their restrictions and friction in

15 the water.  I'm sure there's a physical fluid dynamics       12:25

16 purpose for it.

17      Well, long story short, when that disappears,

18 the animal is probably not in a great frame of mind as

19 far as frustration.  By "disappear," what I mean is

20 suddenly it's like the tightest skin you've ever seen

21 on someone coming out of a surgeon's office having just

22 had their face lift.  It goes from ridges to -- that is

23 a physical indicator that, you know, we need to see

24 what is going on here.  Maybe she's frustrated.  Maybe

25 something is going on in the environment that is a

1    change in her internal emotions, thoughts, whatever.    12:26

2    But there are physical changes that you can detect like

3    that.

4         Q.   How would you instruct your, when you were

5    dealing with orca and dolphins, how did you instruct

6    your trainers or how were you instructed to note that

7    physical change with the skin grooves in behavior

8    records or other records?

9         A.   It's not limited to just that.  You know,

10   first of all --

11        Q.   Sorry.  If you had observed that on an orca,

12   one, would you note that in a behavioral record or

13   other record?

14        A.   Perhaps not that specific observation.  I

15   mean, that is kind of an experienced person looking at    12:26

16   that animal, you know, posture, demeanor.

17        Q.   Okay.

18        A.   They don't use profanity.  They use other

19   things to indicate their state of mind.  But you might

20   see it in other things like they decide to swim off and

21   they don't want to engage.  Those sorts of things would

22   be noted in behavior records very often.  And

23   reflected, if the system uses a point scale like I

24   think sea aquarium does, you might note that.  Again,

25   it depends on how your point scale is set up.  If it's

1   you know, she didn't do X number of behaviors or she   12:27
2   swam away four or five times, it might correspond to
3   certain numbers on their scale.  One, two, three,
4   whatever.  So you would record it that way.  Perhaps
5   maybe not a comment, but maybe numerically.
6        Q.   What would it mean to you if the records said
7   that an animal seemed tense?
8        A.   Again, I think it -- we as trainers, as
9   animal professionals, we have to be careful about using
10   terms that can also be used antimorphically.  Like
11   "tense."  What does that mean?  As a physiologist, when
12   I hear the word "tense," I think of muscle contraction.
13   But I think if you ask most people, maybe even some
14   trainers, you use the word "tense," they're going to
15   immediately go to some emotional state, that may have   12:28
16   no basis and fact or realty.
17        Q.   Okay.  So any other kind of behavioral
18   indicators in orca that you would look for to assess
19   whether an animal in your care is stressed?
20        A.   Again, "stress," is one of those words that I
21   think is overused and subject to antimorphic
22   interpretation.
23        Q.   It's in the regulation, isn't it?
24        A.   It may very well be, but, you know, there
25   needs to be with it actual measures that are -- whether

1   the behavioral or physiological in the case of like a    12:29

2   blood panel or something like that, then we can talk

3   about what the impact might be on the animal, if that

4   is quote, unquote "stressed." Well, you can see it in

5   their blood panel. There is some changes there. Now,

6   whether or not those changes are harmful, a lot of

7   physiological behavioral changes are adaptations for

8   survival. They're beneficial to the animal, in other

9   words.

10          Just because an animal is stressed and

11  behaves a certain way, doesn't make it bad. Again, you

12  have to be careful for making those value judgments and

13  using words that again, lend themselves antimorphic use

14  as opposed to scientific use. So observable things

15  like their posture, the nature of their skin. Is it    12:30

16  taut or is it normal relaxed posture? Is their

17  breathing rate normal? Is their breathing -- how

18  they're breathing normal? By "normal," I mean baseline

19  calm, not it's abnormal. For example, a whale will --

20  you know, a normal breath on a whale is (breathing

21  noise) as opposed to (breathing noise). It's very

22  different behavior that might reflect very different

23  internal thought process or emotions.

24          Q.   I don't know how we're going to do that on

25  the record.



1          You just did sort of a big free exhale and          12:30
2     your second example was a restrained --
3          A.   More like, imagine if a whale had lips like
4     humans and you pursed your lips, purse your lips in a
5     very controlled, slow, deliberate exhale.  That is a
6     very different whale in that instance than a whale just
7     (breathing noise) breathing normal.
8          Q.   What would the latter indicate to you?
9          A.   Well, it might indicate nothing.  They might
10    be whistling.  They might be vocalizing.  Or in the
11    context of what has preceded it, again, in the session
12    and the interaction as revealed in the records or
13    first-hand experience because you're a trainer, it
14    might indicate that they're frustrated.
15         Q.   Okay.  Are you familiar with stereotypic          12:31
16    behaviors?
17         A.   I am.
18         Q.   What is the definition of stereotypic
19    behavior that you use?
20         A.   It is a -- again, this is not out of a
21    textbook, but in my experience, stereotypic refers to a
22    repetitive-type of behavior that is not necessarily
23    helpful to the animal.  It doesn't necessarily have to
24    be harmful, but it's not necessarily helpful to the
25    animal.  It's essentially a very repetitive behavior.

1    Q.   Are they indicative of anything as far as        **12:32**

2  mental or psychological state of the animal?

3    A.   It certainly can be.  It doesn't have to be.

4  And stereotypic doesn't have to suggest or doesn't

5  always indicate there is a problem.

6    Q.   Are stereotypic behaviors in the literature

7  related to stress in an animal?

8    A.   Certainly there can be a correlation between

9  an animal's quote, unquote "stress level" and

10  stereotypy.  And there are examples where stereotypy is

11  harmful, like excessive licking on a house cat or

12  something.  They lick their paw and they continue to do

13  it.

14    And part of the reason that may occur is

15  because there are, they're stimulated to do it.  It's    **12:33**

16  reinforcing.  It's pleasurable in a way.

17  Unfortunately, that behavior persists or is repeated so

18  often that it can cause a physiological injury.  In

19  that case, of an overgrooming cat or something.

20    Q.   What are some stereotypic behaviors that

21  might be observed exhibited by orca?

22    A.   I suppose you might have an animal that has a

23  favorite enrichment item, a toy, and it just refuses to

24  give it back.  It just, you know, it swims with it in

25  its mouth, on its back and it's not about to relinquish

1    that object.  That could certainly, I suppose be a type  12:34

2    of stereotypy.

3              Again, any excessively repetitive behavior

4    might suggest that a stereotypy is developed or that

5    there is something in the environment in the situation

6    that is causing that behavior.

7         Q.   Are you aware of anything else other than

8    literature or in your own experience?

9         A.   Specific to orcas or just in general?

10        Q.   Yes.  Orca.

11        A.   Not really in a sense of a chronic repetitive

12   behavior, no.  None come to mind.

13        Q.   What are -- well, let me ask you another

14   question.  In your training, both that you have

15   received and have given in facilities that care for      12:35

16   orca and dolphin, that family of animals, do you give

17   any training to observe any particular stereotypic

18   behaviors?

19        A.   Do I give training to the staff?

20        Q.   Yes.  Do you instruct your staff to look out

21   for any?

22        A.   That is an interesting question.  I instruct

23   my staff to observe everything because I want to know

24   and I want them to want to know any time there is a

25   change in an animal's behavior that is not easily

1    explained.  Because if there is a change, there could        12:36

2    be something going on.

3         Now, it could be completely harmless or it

4    could be more serious and require more investigation on

5    our part to know the difference.  So I use behavior

6    much like a doctor uses a blood test, to diagnose or at

7    least, begin to diagnose behaviorally what is going on

8    in the animal's learning environment that is helpful or

9    something that is not helpful to the animal or to the

10   situation that we're talking about whether it's a

11   social situation or a single animal on exhibit or

12   whatever.  It's a very powerful tool.

13        Q.   What behaviors that an orca might exhibit are

14   known to you to be aggression or precursors to

15   aggression?                                                   12:37

16        A.   Some of these are specific to animals that

17   swim, I suppose, and some of these are just shared by

18   other high-order animals.  There's a general -- before

19   I give a list -- I didn't prepare a list.  But again,

20   after 25 years, I have a mental list.

21        If you can kind of imagine a step ladder.  At

22   the bottom rung being kind of minor clues and cues from

23   the animal to more overt clues.  So it could be things

24   like prolonged eye contact.  Or avoiding eye contact.

25   It could be close proximity or avoidance.  Sometimes

1    you get into these things where you've got opposing      12:38
2    things could mean same thing is brewing.  It could be
3    the way in which the animal responds to a behavior
4    request or a cue, if you will.
5         If they're slow and lethargic when normally
6    they're right on it and they respond fairly quickly
7    within -- again, within normal, for that animal, that
8    individual animal's time frame.  If they respond really
9    slowly or they respond really fast, that is a
10   difference from what's usual.  All of those things can
11   be used as potential clues of aggression.  It doesn't
12   have to be any more serious or energetic or overt than
13   that.  It can be, but it doesn't have to be.
14        Q.   Anything else you can think of, as you sit
15   here?                                                      12:39
16        A.   Dolphins love to jaw pop.
17        Q.   What do you mean by that?
18        A.   They will take their jaws -- and again,
19   remember, they communicate with their mouths.  They
20   communicate by producing sound through their blow hole,
21   blowing bubbles underwater, basically, or above the
22   water.  One the things they love to do is jaw pop.
23   They will basically open their mouth and close it
24   really fast.  And we've referred to that as a jaw pop.
25        Q.   When you said "dolphins," does that include



1    killer whales?                                              12:39

2         A.    Sure.

3         Q.    What about head bobbing?

4         A.    Yeah.  I suppose it could.

5         Q.    What does that sort of look like in an

6    animal?

7         A.    You told me not to gesture.

8         Q.    Can you describe it without, or no?

9         A.    It sounds very much like its name.  You know,

10   where the animal's forward half, maybe from its

11   pectoral flippers forward.

12        Q.    It kind of looks like nodding?

13        A.    Yeah.  If we were on our bellies in yoga

14   class and somebody started nodding, that might be a

15   head bob in a cetacean.                                     12:40

16        Q.    That's what my upward dog looks like.

17        A.    Namaste.

18        Q.    Is sexual contact between two different --

19   individuals of two different species appropriate?

20              MR. LISTER:  Objection.

21              Witness may answer.

22              THE WITNESS:  I'm not sure how to answer that

23   question because it sounds an awful lot like a moral

24   question, not a scientific biologically related

25   question.

1        Cetaceans engage in all sorts of sexual    12:41

2  behavior; they will engage in homosexual behavior, they

3  will engage in group sex behavior, they will engage in

4  what appears to be sexual behavior with no purpose

5  other than to engage in the behavior, not to procreate.

6  BY MS. WILSON:

7     Q.  Are they known to engage in sexual behavior

8  interspecies?

9     A.  Certainly species that are biologically

10  related, yes, they will perhaps interbreed.  Whether or

11  not something comes of that breeding, that is a

12  different story.  That can vary.

13     Q.  In the wild?

14     A.  Sure.  Probably does happen.

15     Q.  I'm sorry.  I'm asking if your statement was  12:41

16  based on knowledge --

17     A.  Animals, species -- sorry.  I didn't mean to

18  interrupt.

19     Q.  I was asking if your response was based on

20  knowledge of animals in the wild or in captivity?

21     A.  It's actually based on both.  Species

22  hybernize all the time.  It depends on the relatedness.

23  Of course, whether or not offspring are produced, but

24  species will engage in the behavior from time to time.

25        You could have different species of dolphin



1  swimming in a syncapod (phonetic) or something and have 12:42

2  sexual contact, absolutely.  That is not unique to

3  cetaceans.  Look at primates.  Primates will do that as

4  well.

5          That's one of the challenges, I have to say.

6  And I'm not a molecular biologist; I'm not expert in

7  taxonomy.  But it gets a little dicey trying to

8  delineate between a species and a subspecies and

9  related species when interbreeding can occur, and

10 particularly when offspring result.  Particularly, when

11 offspring is also able to then reproduce.  So some of

12 it is in the realm of science -- we don't know all the

13 answers.  There is no -- there are different ways to

14 delineate what a species is.  Some people prefer

15 molecular indicators.  Some prefer, you know, the       12:43

16 obvious; can they produce offspring; can they

17 interbreed?  There is a fair degree of haziness there

18 when you start getting down to the species and

19 subspecies level of detail, and not in every type of

20 animal, but certainly in enough that suggest to me that

21 we haven't, as a scientific community, figured out

22 exactly what a species is versus a different species.

23 That understanding is still in the realm of science and

24 being investigated.  So yes, they can engage in

25 behavior across species.



1    Q.   To your knowledge, what are some reasons they **12:44**

2    might engage in that behavior when it's

3    nonreproductive?

4    A.   It's fun.  I'm not trying to be flippant.

5    But assuming we share many of the characteristics of

6    other mammals, there are neurological signals

7    associated with that.  Dolphins are very gregarious

8    animals.  They can afford to be because they are apex

9    predators, right?  So they have a lot of free time.

10   And one of the ways that you maintain that social

11   cohesiveness is through sexual types of behavior,

12   community play, other things.  So it's quite normal.

13   It might shock a few people on Sunday at church, but

14   it's quite normal in the animal world.

15   Q.   Any other reason?  What about -- sorry.        **12:44**

16        The witness is shrugging.

17   A.   None come to mind.  I mean, I suppose there

18   could be other reasons.

19   Q.   What about dominance?

20   A.   You know, dominance is a -- speaking now as

21   behaviors, dominance is a really misused term in the

22   animal training world.  And a lot of our understanding

23   of it comes from dog training, which is completely

24   unsubstantiated.

25   Q.   May I?  I welcome your explanation, but may I

**Verbatim**

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

128

1   ask you to just answer the question first, whether or   12:45

2   not sexual activity may be done for the reasons of

3   maybe a dominance behavior?

4       A.   The reason I am having trouble answering your

5   question is because I don't know what your definition

6   of "dominance" is because of how the term is used in

7   society, in conversation.  Particularly with domestic

8   animals, dogs.  So I don't know how you use the term.

9       Q.   Why don't you put forth a definition of

10  dominance first and then use that to answer the

11  question, if you can.

12      A.   Well, I measure -- in this case, it might be

13  easier to explain how it is misused, the term is

14  misused than how it is -- should be correctly used.  In

15  any social group, you have leaders; you have middle of   12:47

16  the pack and you have followers.  But within that norm,

17  there are situations in which the leaders become

18  followers and the followers become leaders.  It can be

19  very situational.

20           And so I have seen what I think you and

21  others would characterize as the dominant male.  How do

22  we say that?  Well, they're successful breeders; they

23  have high testosterone levels; they produce sperm.  We

24  can see it on ultrasound.  And yet I've seen those same

25  animals behave submissively and allow other males, for

1    example, to breed them.  So I think that the whole        12:47
2    notion of dominance is -- I'm not sure how it's
3    relevant to the situation because I don't think the
4    term is understood or used correctly.
5         I look at behavior -- I look at an animal's
6    relationship to another animal or to a human being, a
7    trainer in terms of physical, observable behavior.  Not
8    some sort of purported mental state labeled
9    "dominance."  That we really don't know other than by
10   judging what their behavior is or is not.
11        What I can say is animals engage in sexual
12   behavior.  What those personal relationships are, one
13   is older, more mature; one is younger, less mature, it
14   doesn't necessarily impact the behavior that you see in
15   terms of sexual behavior.  One will breed one and at        12:48
16   times, one will breed the other.  And their
17   relationship in a society has no real bearing, in my
18   experience.
19        Q.  Can sexual contact between an individual of
20   one species and another be related to aggression?
21        A.  It certainly can in some species.  In my
22   experience, I don't recall experiencing that with
23   cetaceans.  And particularly, orcas in my experience.
24   But I did have -- I did not work with a collection that
25   involved males and females.

1    Q.   What about Pacific white-sided dolphins?    12:49

2    A.   There again, it was a single sex.  It was all

3  a female collection.  So not in my repertoire of

4  experience.

5    Q.   Are you aware that Miami Seaquarium's

6  documents reflect repeated sexual contact between the

7  lags and Toki, or Lolita?

8    A.   I am not sure that the records indicate that,

9  but I'm not surprised that biologically related

10  dolphins would engage in sexual contact.

11    Q.   If you had known that, how would it have been

12  taken into account in your assessment of compatibility

13  with Lolita's companion species?

14    A.   I would point to that as being another

15  indicator of just how compatible they are.    12:50

16    Q.   Why?

17    A.   Because I think that dolphins, like certain

18  higher-order mammals have the luxury as a species or a

19  set of species to engage in what other species might

20  consider frivolous behavior.  Sex with no outcome.  Or

21  sexual behavior with no offspring.  They have the

22  luxury of that because they sit at the top of the food

23  chain and they're relatively long-lived animals.  They

24  can afford to engage in play.

25       MS. WILSON:  So the last little bit I have,

1    Mr. Lister, is just a few documents that I wanted to          12:51

2    get into.  I am not going to get into them extensively.

3    You're welcome to take another quick break if you like.

4    Maybe that would be good so I can review my notes and

5    make sure there aren't any more questions.  And then we

6    can wrap up.

7             MR. LISTER:  Okay.

8             (Whereupon, a short recess was taken.)

9             MS. WILSON:  I didn't have anymore questions.

10   I just have a few more documents that I wanted to move

11   in.  So just for the sake of order, let me do that.

12            MR. LISTER:  Sure.

13   BY MS. WILSON:

14       Q.   So going back to at the beginning when we

15   talked about your experience and dealing with APHIS and   13:04

16   inspections and stuff like that.  Would it be fair to

17   say that you're familiar with the content and

18   appearance of an APHIS inspection report if one was

19   presented to you, you would recognize it as such; is

20   that correct?

21       A.   I believe so, yes.

22       Q.   Okay.  And specifically, ones that have --

23   reports that have been filed for Wildlife World Zoo,

24   correct?

25       A.   Yes.  I may not have read them all, but I



1    certainly would recognize my zoo's name.                    13:04

2         Q.   Okay.  I am going to show you a document that

3    is a routine inspection report dated December 14, 2012.

4    It's USDA.  It's for Wildlife World Zoo.  Then I have

5    an extra copy.

6              MR. LISTER:  Thank you.  Appreciate that.

7    BY MS. WILSON:

8         Q.   Just take a moment and look at it.  I guess,

9    I should clarify.  It looks like the date of the

10   inspection was December 14, 2012, but the date of the

11   report at the bottom of the page is January 16, 2013.

12   Just let me know when you're finished reviewing it.

13        A.   Okay.

14        Q.   Are you familiar with this report?

15        A.   I don't recall seeing this representation of   13:07

16   it.  I do recall some of the findings of the report.

17        Q.   To your knowledge, would this be a fair and

18   accurate copy of the inspection report that would be

19   filed by the USDA?

20             MR. LISTER:  Objection to "filed by."

21   BY MS. WILSON:

22        Q.   Or produced by the USDA?

23        A.   Yes.

24             MS. WILSON:  I would like to move it into

25   admission.

```
 1              MR. LISTER:  No objection.                    13:07
 2              (Whereupon, Plaintiff's Exhibit 3003 was
 3     marked for identification.)
 4     BY MS. WILSON:
 5         Q.   Now, I'm going to show you another report,
 6     another USDA inspection report.  This one also says
 7     that it's a routine inspection, Wildlife World Zoo.
 8     The date of the inspection is February 28, 2013.  And
 9     the date of the report at the bottom says March 21st,
10     2013.  Please take your time; take a look at it.
11         A.   Mm-hmm.
12         Q.   Okay.  Are you familiar with this report?
13         A.   I am familiar with some of the findings in
14     the report.
15         Q.   Okay.  To your knowledge, is this a fair and   13:10
16     accurate copy of an inspection report produced by the
17     USDA?
18         A.   Yes.
19              MS. WILSON:  And I'll go ahead and move that
20     in.
21              MR. LISTER:  Okay.
22              (Whereupon, Plaintiff's Exhibit 3004 was
23     marked for identification.)
24     BY MS. WILSON:
25         Q.   Dr. Stafford, I'm going to read a little bit
```

1    from the first page, under Handling of Animals.          13:10

2          A.   First page of which?

3          Q.   Of this inspection report, that is now 3004.

4    And under the heading Handling of Animal, I'm going to

5    skip the paragraph that starts C1, which I think is

6    just the regulation to the findings.  And I am just

7    going to read the findings there.  So basically the

8    middle of the page.  There is a bunch of dashes.

9          A.   Yes.

10              "This licensee was exhibiting a

11   three-month-old tiger cub at an offsite venue within a

12   local television studio.  During this event, this

13   animal was observed through the studio without any

14   barriers that would prevent it from coming into contact

15   with people, audio/video equipment and the electrical   13:11

16   wiring in the studio.  This animal was seen biting the

17   clothes of the offstage handler.  The lead handler on

18   stage with the program's host was seen to have scratch

19   and bite wounds on his arms.  The host of the

20   television show was also seen pulling at the tail of

21   the young tiger.  There were not sufficient distances

22   and/or barriers to ensure minimal risk of harm to the

23   animal and the public.  This young animal was not

24   confined to a designated area or under direct control

25   by an experienced handler.

1      "During public exhibition any animal must be    13:12

2  handled so there is minimal risk of harm to the animal

3  and to the public so as to assure the safety of animals

4  and the public."

5      Dr. Stafford, who was the lead handler that's

6  referred to in this inspection report?

7      A.   It was not myself.

8      Q.   Do you know who it is?

9      A.   I do.

10     Q.   Who was that, please?

11     A.   His name was Josh Jarnagon (phonetic).

12     Q.   And is he affiliated with Wildlife World Zoo?

13     A.   He has gone to another position in another

14  facility.  So he's no longer employed by our zoo.

15     Q.   But he was employed by your zoo at the time?    13:12

16     A.   Yes.

17     Q.   How long was he employed by your zoo?

18     A.   I do not recall.  I didn't manage him

19  directly, several years.

20          Do you recall --

21     A.   Approximately four.  Four or five.

22     Q.   Do you recall when he left?

23     A.   He left -- I believe he left in 2014.  I

24  don't recall the exact dates.

25     Q.   Okay.

1        A.   It's probably approaching two years.        13:13

2        Q.   Okay.  Do you recall the circumstances of his

3   departure?

4        A.   Yes.  He obtained another position at another

5   zoological facility.

6        Q.   Where is he now?

7        A.   I believe he's at New York Aquarium.

8        Q.   Okay.

9        A.   He went first to Georgia Aquarium.  But in

10   the last several months he's gone to New York Aquarium.

11        Q.   Okay.  Thank you.  This report also refers to

12   an offstage handler.  Do you know who that person is?

13        A.   I believe it's Justine.  At that time her

14   name was Reha, her maiden name, R-e-h-a.

15        Q.   Who is Justine?                             13:14

16        A.   She is a staff member at the zoo.

17        Q.   What's her title?

18        A.   At this time she was educational keeper at

19   that time.

20        Q.   What is her title now?

21        A.   Actually, I think she's -- I think her title

22   is marine mammal manager.

23        Q.   Does she work within the conservation and --

24   sorry, your department, the conservation education

25   department?

1      A.   At the time that this event is described, she **13:15**

2  was a member of the education department.  She and Josh

3  did not report to me.

4      Q.   Okay.  So education, is that separate from

5  conservation and communications at Wildlife World?

6      A.   Conservation communication is a department of

7  one and you're looking at him.  The education

8  department is who these two individuals that you

9  referenced, that's the department they were in at that

10  time.

11      Q.   Okay.  Thank you.  I am done with that report

12  now.  I am going to show you another report.  It's

13  another routine inspection report from USDA.  It's

14  dated at the top April 1st, 2013.  It looks like the

15  date of the report itself at the bottom is April 3rd,   **13:15**

16  2013.  Are you familiar with this report?

17      A.   I am familiar with the incident that it

18  references.

19      Q.   Okay.  Is this, to your knowledge, a true and

20  accurate copy of the inspection report produced by the

21  USDA?

22      A.   Yes.

23          MS. WILSON:  Okay.  I'm going to move that

24  in.

25          (Whereupon, Plaintiff's Exhibit 3005 was



# Verbatim

1    marked for identification.)                                    13:17
2    BY MS. WILSON:
3         Q.   I am going to show you another routine
4    inspection report produced by the USDA of Wildlife
5    World Zoo.  The date is June 17, 2013.
6         A.   Okay.
7         Q.   Are you familiar with this report?
8         A.   I'm familiar with one of the events in the
9    report.
10         Q.   To your knowledge, is this a true and
11    accurate copy of the USDA inspection report --
12         A.   Yes.
13         Q.   -- produced by the USDA?
14         A.   Yes.
15              MS. WILSON:  I'm going to move it in.      13:18
16              (Whereupon, Plaintiff's Exhibit 3006 was
17    marked for identification.)
18    BY MS. WILSON:
19         Q.   I'm going to show you another USDA inspection
20    report of the Wildlife World Zoo dated September 5,
21    2013.  I am sorry.  This is a prelicense inspection
22    report, number one, the title of the document.
23              Are you familiar with this report?
24         A.   I actually am not.  I'm not familiar with the
25    findings.  I am familiar with the fact that we had a --

1   there is a renewal on the exhibitor's license every          13:20

2   year and if APHIS doesn't get it on time, you have to

3   go through this process to get your license renewed, I

4   guess.  So that's what I think warranted this

5   preinspection report.  I am aware of that circumstance.

6   I'm not aware of these findings.

7        Q.   Okay.  Thank you.  To your knowledge, is this

8   a true and accurate copy of the prelicense inspection

9   report of Wildlife World Zoo produced by the USDA on

10   September 5th, 2013?

11        A.   It appears to be, yes.

12             MS. WILSON:  Okay.  Thank you.  I'm going to

13   move it in.

14             (Whereupon, Plaintiff's Exhibit 3007 was

15   marked for identification.)                                   13:20

16   BY MS. WILSON:

17        Q.   I'm going to show you another report.  It is

18   a USDA inspection report, routine inspection report of

19   Wildlife World Zoo.  The routine inspection is dated

20   July 7, 2014.  The date of the report is July 14th --

21   well, the prepared date is July 14th, 2014.  And the

22   received by date is July 15, 2014.  Are you familiar

23   with this report?

24        A.   No, I am not.  Those animals referenced were

25   not under my responsibility.  So I'm not familiar with

**Verbatim**

1   this report.  I would just note that you can see that   **13:22**

2   our USDA license number had changed from the earlier

3   reports that you provided just now, indicating that

4   your license had been renewed, but under a different

5   license number.  And that's evident in this report.

6       Q.  To your knowledge, is this a true and

7   accurate copy of the USDA's routine inspection report

8   of Wildlife World Zoo dated July 7th, 2014?

9       A.  Yes.

10       MS. WILSON:  Thank you.

11       I'm going to move it in.

12       (Whereupon, Plaintiff's Exhibit 3008 was

13   marked for identification.)

14   BY MS. WILSON:

15       Q.  I'm going to show you a USDA routine   **13:22**

16   inspection report of Wildlife World Zoo.  The routine

17   inspection is dated May 4, 2015.  The prepared by date

18   is May 8th, 2015.  And the received by date is May 12,

19   2015.  Are you familiar with this report?

20       A.  I am familiar with the findings of the

21   report, yes.

22       Q.  To your knowledge, is this a fair and

23   accurate copy of the USDA's inspection routine

24   inspection report of Wildlife World Zoo dated May 4,

25   2015?

1      A.   Yes.                                          13:24

2           MS. WILSON:   Okay.   I am going to move it in.

3           (Whereupon, Plaintiff's Exhibit 3009 was

4      marked for identification.)

5      BY MS. WILSON:

6      Q.   And like before, Dr. Stafford, with this one,

7      I am going to read a portion of it and I'll just ask

8      you to clarify, to the extent you can, a couple of

9      terms.

10     A.   Which report?

11     Q.   Sorry.   The last one that was just handed to

12     you.

13          MR. LISTER:   What's the date of that one?

14          MS. WILSON:   May 4, 2015.   This is 3009.

15     Q.   Okay.   I'm reading from 3009, first page,        13:25

16     first paragraph under access and inspection of records

17     and property; submission of itinerary.

18          "Animal care (AC) was informed of areas at

19     the facility which house animals used for regulated

20     activity, that were unknown to the VMO.   These include

21     breeding goats used to stock the petting zoo, which are

22     housed near the facility garbage dump and exhibit

23     mammals housed in the tropics (reptile) building.   The

24     facility failed to inform the inspecting VMO on this

25     and previous unannounced routine inspections of these

1  areas.  At the conclusion of previous inspections, the    13:26

2  VMO would ask the facility's deputy director if all

3  covered regulated animals had been inspected.  The

4  director's response was always yes.  During this and

5  previous inspections, the VMO inquired about the area

6  housing, the goat enclosure and the reptile building

7  and was told by the facility director that the areas

8  only contained the garbage dump, birds and/or reptiles.

9  These areas were not disclosed of containing regulated

10  animals until the VMO asked to see the areas.  During

11  today's inspection of these areas, several

12  noncompliances were identified."

13        So my only question is whether you know who

14  the facility's deputy director is that's referenced in

15  this?    13:26

16        A.    I do.

17        Q.    And who is that?

18        A.    His name is Jack Ewert.

19        Q.    And that's the same Mr. Ewert that we

20  discussed?

21        A.    Yes.

22        Q.    And do you know what VMO stands for in these

23  reports?

24        A.    Veterinary medical officer.  That was my

25  guess, but I wanted to see it in writing.



1        MS WILSON:  Okay.  I'm done.  Thank you.          13:27
2                       EXAMINATION
3    BY MR. LISTER:
4        Q.   Just some very brief redirect.  If you could
5    turn, Dr. Stafford, to the REV diagram of the pool that
6    you referenced in the earlier part of your testimony
7    today.
8             Counsel, this document is the MSK0010540
9    document.  That's the Bates stamp of the diagram in our
10   document production.  And I am just going to put a copy
11   here at the center so that we're all able to see it.
12            Dr. Stafford, when you calculated the volume
13   of the pool in your report, did you take into account
14   this perfect circle that goes -- that is inscribed
15   within the oblong of the pool?                          13:28
16       A.   Yes.
17       Q.   And does that perfect circle which appears on
18   the diagram, is it actually a physical structure in the
19   pool?
20       A.   It is not.
21       Q.   Is it simply an artificial construct of APHIS
22   that sets the boundaries of the cylinder of water that
23   is used in calculating the pool volume?
24       A.   Yes.  It is a concept to help with the
25   calculations for minimum space requirements.

1     Q.  So in your report, did you calculate volume  **13:29**

2  two ways:  One, actual volume including water outside

3  the cylinder, the imaginary cylinder and also volume of

4  water within the cylinder?

5     A.  Yes, I did.

6     Q.  Okay.  Is that because the APHIS regulations

7  look to measurement of volume of water within a

8  cylinder?

9     A.  Yes.  They use a cylindrical model to

10  visualize, conceptualize the minimum space requirement

11  using the four categories.

12     Q.  And so when APHIS measures water, they

13  exclude water outside the cylinder?

14     A.  That's correct.

15     Q.  In terms of calculating the volume of water  **13:30**

16  within the cylinder, did you make some simplifying

17  assumptions?

18     A.  Yes, I did.

19     Q.  And did you mention in your report that if

20  you were to dig a little deeper and do away with some

21  of the simplifying assumptions that you thought the

22  calculated volume might increase?

23     A.  Yes, it would.

24     Q.  Now, even with those simplifying assumptions,

25  was the calculated volume in compliance with the APHIS

1    standards?                                                13:30

2         A.   It was not only in compliance, it exceeded

3    APHIS standards.

4         Q.   So if you were to relax the simplifying

5    assumptions, would that mean that the calculated volume

6    is even -- is in compliance by even a greater margin?

7              MS. WILSON:   Objection.  Leading.

8              MR. LISTER:   I understand.

9         Q.   Was one of the simplifying assumptions that

10   the slope-down area of the pool was 10-foot wide?

11        A.   Yes.

12        Q.   Now, looking at the diagrams, the MSK0010540,

13   is the slope-down area of the pool, in fact, 10-foot

14   wide at the very front of the pool?

15        A.   Yes.                                            13:31

16        Q.   But does that 10-foot margin -- skip it.

17             At the very front of the pool, is there a

18   10-foot slope-down area within the imaginary circle

19   defined by the MHD and the lowest area, 20-foot deep

20   area of the pool?

21        A.   Yes.

22             MS. WILSON:   Sorry.  Can you just point out

23   where the front of the -- just tell me where you're

24   talking about.

25             THE WITNESS:   This is the front of the pool.

1          MS. WILSON:  So the witness is pointing to        13:32

2     the rounded side of the bottom of the diagram.

3          THE WITNESS:  It's the 6:00 position if

4     you're looking at it.

5     BY MR. LISTER:

6          Q.   So does the portion of the slope-down area

7     within the 60-foot diameter cylinder shrink from

8     10-foot wide at the 6:00 position to smaller values as

9     you move leftward from the very front of the pool?

10         A.   Yes.

11         Q.   Does it also shrink as you move rightward?

12         A.   Yes.

13         Q.   So does that mean that the area within the

14    cylinder that is at the full 20-foot depth -- I'll

15    start that question again.                              13:33

16         Does that mean that the subtraction from pool

17    volume to account for the slope-down towards the

18    deepest depth should be less as you move away from the

19    6:00 position and begin to rotate around the pool?

20         MS. WILSON:  Objection.  Leading.

21         THE WITNESS:  Yes.  My estimate overestimates

22    the contribution of the slope in subtracting water

23    volume from that cylinder.  In other words, the slope

24    is less of a factor as you move away from that 6:00

25    position, in decreasing the water volume, the actual

**Verbatim**

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

147

1    water volume in the cylinder.         13:33

2    BY MR. LISTER:

3        Q.  And does the influence of the slope begin to

4    build back up again as you reach the island as you move

5    further around the circle?

6        A.  Yes.

7        Q.  If you were to take into account the

8    information that the slope-down area within the 60-foot

9    diameter circle shrinks from ten feet to lower values

10    as you rotate around the pool, what would be the effect

11    on your volume calculation?

12        A.  It would increase the actual volume of water

13    in the area of the circle that is used by APHIS to

14    determine whether or not the pool meets minimum

15    standards.         13:34

16        Q.  And have you done that mathematical

17    calculation to account for the varying impact of the

18    slope within the circle as you rotate around the slope?

19        A.  I have not done that calculation.

20        Q.  Is that a calculation you may work on as we

21    get ready for trial?

22        A.  We certainly can work on it.

23        MR. LISTER:  That's all I have.

24        MS. WILSON:  All right.

25        MR. LISTER:  The purpose of this is to give

1    you guys some disclosure as to some of the refinements    13:34

2    to the math that might be done on the way to trial, to

3    show you a diagram and how it's done.  Not easy to ask

4    questions and I understand the leading objections.

5    It's difficult to frame those questions.

6    That's all.

7            We will offer that the witness will review

8    and correct by March 7th or else the transcript can

9    simply be used by any party without corrections, which

10   is how we stipulated on the other things.  And I

11   understand that was your stipulation yesterday.

12           MR. LIEBMAN:  So stipulated.

13           (Whereupon, the deposition concluded at 1:35

14   p.m.)

15                      - - - -

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF WITNESS

- - - -

1
2
3        I, S. GREY STAFFORD, Ph.D., hereby declare
4   under penalty of perjury that I have read the foregoing
5   deposition testimony; and that the same is a true and
6   correct transcription of my said testimony except as I
7   have corrected pursuant to my rights under Section
8   2025.520(a)(f) of the California Code of Civil
9   Procedure.
10
11
12
13
14
15
16        _____
17                  Signature
18
19
20        _____
21                    Date
22
23
24
25

**Verbatim**
A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

150

STATE OF CALIFORNIA     )

                        )    ss.

County of Sonoma        )


      I, Emily Husary, holding CSR License No. 12148, a

Certified Shorthand Reporter, licensed by the State of

California, hereby certify that, pursuant to Notice to

taking the foregoing deposition, said witness was by me

duly sworn to tell the truth, the whole truth and

nothing but the truth in the within-entitled cause;

that said deposition taken at the time and place stated

herein; that the testimony of the said witness was

recorded by me by stenotype, and that said deposition

was under my direction thereafter reduced to computer

transcript and, when completed, was available to said

witness for signature under penalty of perjury.

      I further certify that I am not of counsel or

attorney for either of the parties to said deposition,

nor in any way interested in the outcome of the cause

named in the caption.

      IN WITNESS WHEREOF, I have hereunto set my hand

this 22nd. day of February, 2016.

                        _____
                        Emily Husary
                        Certified Shorthand Reporter
                        California License No. 12148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DEPOSITION CORRECTION FORM

INSTRUCTIONS FOR CORRECTING TRANSCRIPT


Please make your corrections, if any, on this sheet.
Do not change any of the questions and do not make any
marks on the deposition transcript itself.  If
necessary, you may use more than one sheet of paper.

Page/Line                        Change/Add/Delete

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Date:_____      _____
                            Signature



**Verbatim**
A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

152

1                          February 22, 2016

2

3

4    S. GREY STAFFORD, Ph.D.
     c/o JAMES H. LISTER, ESQ.
5    1156 Fifteenth Street, NW
     Washington, D.C. 20005
6

7
           Re:   PETA vs. MIAMI SEAQUARIUM
8                DISTRICT COURT - MIAMI DIVISION
                 15-cv-22692-Ungaro/Otazo-Reyes
9

10   Dear Dr. Stafford,

11   The original transcript of your deposition taken on
     Sunday, February 14, 2016, in the above-referenced case
12   will be e-mailed to you, as requested by Mr. Lister,
     for your inspection and signing.
13
     Pursuant to Code of Civil Procedure 2025.520(a)(f), if
14   you do not read and sign your deposition by March 7,
     2016, as stipulated to by Counsel, it can used as if
15   you had done so.

16

17                          Sincerely,

18

19                          Karen L. Curzon
                            Office Manager
20

21   Copy:   All Counsel

22

23

24

25