IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-cv-22692-Ungaro/Otazo-Reyes

**PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., ANIMAL LEGAL DEFENSE FUND, HOWARD GARRETT, and ORCA NETWORK,**

   **Plaintiffs,**

v.

**MIAMI SEAQUARIUM and FESTIVAL FUN PARKS, LLC, d/b/a PALACE ENTERTAINMENT,**

   **Defendants.**

# PLAINTIFFS' MOTION TO EXCLUDE IMPROPER OPINION TESTIMONY BY DR. JEFFREY L. STOTT

  Defendant seeks to rely on the testimony of Dr. Jeffrey L. Stott regarding his opinion that "Lolita [the orca at issue in this case] would best benefit from minimal changes in [her] environment." But Dr. Stott is not qualified to make such an assessment. He is not a veterinarian, he is not a marine biologist, he is not an expert in animal behavior, and he, by his own admission, has no information or knowledge of the conditions of Lolita's captivity or her mental or physical health other than certain limited data derived from periodic blood samples taken from her (her "immunological profile").

  Dr. Stott's opinions thus cannot meet the Eleventh Circuit's stringent standard for expert testimony. That standard requires (1) that the expert be qualified on the matter about which he intends to testify, (2) that the testimony is based on sufficient facts and data, (3) that he employ reliable methodology in analyzing the facts of the case, and (4) that his testimony be helpful to

1

the trier of fact. Dr. Stott's testimony meets none of these requirements. As to the first and second factors, Dr. Stott admits that he has no knowledge of Lolita's health, stress level, or physical or psychological condition, or how any of these measures would impact her immune response to being transferred to a sea pen. Moreover, he admits he lacks any knowledge or facts about her current environment or the environment to which she will be moved, facts that Dr. Stott himself identified as necessary to conducting a risk assessment when transferring an animal. Further, Dr. Stott also opines regarding the impact of stress on immunological function, but he admits he has no formal training, education, or experience in assessing stress in an animal; that he does not know how stress would be measured in an animal; and that the impact of stress on immunological function in cetaceans is not discussed in peer-reviewed literature—in other words, that his opinion regarding the impacts of stress is pure speculation. As to the third factor, Dr. Stott admits that his laboratory's current longitudinal study of Lolita's immunological profile could not withstand the peer-review process. As to the final factor, Dr. Stott's testimony cannot possibly be helpful to the finder of fact given that he admits that he is not qualified as an expert, lacks necessary information, and that his methodologies are fatally flawed.

For these reasons, Plaintiffs People for the Ethical Treatment of Animals, Inc., Animal Legal Defense Fund, Howard Garrett, and Orca Network (collectively, "Plaintiffs") hereby move that Dr. Stott be barred from testifying at trial.[1] Plaintiffs incorporate the below memorandum of law in support of this motion.

## I.   FACTUAL BACKGROUND

This lawsuit seeks to enjoin Defendant's ongoing "take" under the ESA of the endangered orca named "Lolita."[2] Lolita was captured in 1970 from waters off the coast of Washington State and has been held at Miami Seaquarium since that time. She is a member of the Southern Resident Killer Whale ("SRKW") Distinct Population Segment ("DPS"), a group of animals whose numbers were drastically reduced during the 1960s and 70s due, in large part, to captures for marine parks such as Miami Seaquarium. (Compl., ECF No. 1, ¶ 35.) The SRKW pod was listed as endangered on November 18, 2005. 50 C.F.R. § 224.101; 70 Fed. Reg. 69903

---

[1] In the event that Plaintiffs' motion is denied, Plaintiffs respectfully request that Dr. Stott's testimony be limited to issues relating to authenticating records of Lolita's immunological profile, and explaining the data contained therein.
[2] Defendant and its employees refer to Lolita by numerous alternate names, including "Tokitae," "Toki," "Tik," and "Gypsy."

(Nov. 18, 2005). Lolita was specifically added to the SRKW DPS listing in 2015, following a lawsuit and petition filed by Plaintiffs challenging the National Marine Fisheries Service's prior unlawful exclusion of her from her pod's listing. *See* 80 Fed. Reg.7380 (Feb. 10, 2015).

Conduct impacting endangered animals such as Lolita is subject to statutory and regulatory restrictions under the ESA. Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of any endangered animal. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" includes an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent act or omission which creates the likelihood of injury [to an endangered animal] by annoying [her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*[3] Plaintiffs allege that Defendant harms and harasses Lolita, in violation of the various provisions of the ESA, by confining her to a small, shallow, barren concrete tank, without adequate protection from the sun, and without a single orca companion. (Complaint, ECF No. 1, ¶¶ 1-72.)

### A. The Laboratory for Marine Mammal Immunology's Longitudinal Study of Lolita

Dr. Stott is the Director of the Laboratory for Marine Mammal Immunology (the "Lab"). (Memorandum regarding "Lawsuit filed against the Miami Seaquarium by PETA, Animal Legal Defense Fund & Howard Garrett/Orca Network", dated February 5, 2016 and served on February 8, 2016 ("Stott Report"), attached hereto as Exhibit A.) For over a decade, his laboratory has "received blood samples from Lolita from the Miami Seaquarium . . . for the

---

[3] 50 C.F.R. § 17.3 is a regulation adopted by the United States Fish and Wildlife Service ("FWS"). The NMFS, the entity charged with regulating endangered marine mammals such as Lolita, has cited this regulation, but has not adopted an official definition of the term "harass". *See, e.g.*, Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Section 7(a)(2) "Not Likely to Adversely Affect" Determination, *available at* http://www.westcoast.fisheries.noaa.gov/publications/protected_species/marine_mammals/final_groundfish_biop_12-7-12.pdf (applying a definition of "harass" that is "consistent with the [FWS]'s interpretation of the term"); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 366 (D. Mass. 2012) (noting that definition of harassment used by NMFS is similar to the FWS regulatory definition); *but cf. Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1066-67 (D. Alaska 2013) ("NMFS maintains it did not rely on FWS's definition of the term.").

purpose of establishing a longitudinal immunologic monitoring program to assist veterinarians in health assessment." Stott Report at 1. The arrangement is informal, and arose from a "social conversation" at "one of the Aquatic Animal Medicine meetings." (Transcript of Deposition of Jeffrey L. Stott ("Stott Tr.") at 48:17–18, 20, attached hereto as Exhibit B.) The Lab was "recruiting participants" for "a research project" that would allow the Lab to "see how these reagents would pan out and me being able to follow the – set up a longitudinal study of the animal, or their immune system." (Stott Tr. at 49:1–5, 7, 15–16.) There is no formal engagement between the Lab and the Seaquarium regarding the study. (Stott Tr. at 49:20–22.) The schedule for sending the blood samples is set entirely by the Seaquarium: "They [Seaquarium] contact us [the Lab], and they say, 'Can we send a blood sample in?' I think that's about as – sometimes we get two or three times a year, sometimes we get one a year. It's just continual – but there's no set plan." (Stott Tr. at 92:12–16.)

By his own admission, the longitudinal study based on Lolita's immunological profile would not withstand peer review. (Stott Tr. at 96:23–25; 97:1–8 (explaining that neither he nor anyone in the Lab had published any work arising out of the Study because "N equals 1. You've got one animal."); *see also id.* at 98:9–12 ("When you – working with such a small number of animals, it's very difficult to get sufficient data to withstand a peer review.").) When asked to explain how he could be certain that there had been a decline in Lolita's ratio of memory to naïve lymphocyte cells, giving the fluctuations in the data, he admitted that "if you don't have a thousand killer whales to draw from, you're not going to have a population." (Stott Tr. 119:120–122.) In sum, the Study is an informal research project with data from a single orca. Accordingly, Dr. Stott's opinions are not based on reliable methodology.

> **B.     Dr. Stott Did Not Rely On Sufficient Facts or Data or Apply His Own Described Principles and Methods to the Facts of this Case in Offering His Opinion**

As explained by Dr. Stott, "[t]he immune system is extremely complex and can be compromised by a multitude of social, physical and microbiological insult." (Stott Report at 1.) In deposition, he elaborated that "there's a lot of things that can go wrong with it. . . . any kind of insult can perturb that balance." (Stott. Tr. at 63:25; 64:1, 10–11.) He also explained that "[o]nce

4

[the immune system is] taken out of context, it's very difficult to study," meaning that "you can't take pieces of the immune system out and study them very easily because sometimes some of those measures are functional, not phenotypic measures, meaning I can take a blood sample, and I can count the cells there. . . But going beyond that, it can become difficult." (Stott Tr. at 65:1, 11–19.) He further explained that "[t]he immune system [is] connected to everything." (Stott Tr. at 65:24–25.)

As described by Dr. Stott, "all you can do [to answer the question how an animal might react immunologically to a new environment] is what I would refer to probably as a risk assessment." (Stott Tr. 76:8–12.) When asked how to do a risk assessment, Dr. Stott stated that "I would have to know the environment or exactly what – the risk can only be associated with the [new] environment." (Stott Tr. 77:2–6.) Other factors relevant for conducting the risk assessment identified by Dr. Stott were whether the animal was "undergoing chemotherapy" (Stott Tr. at 77:22), the "[h]istory of their environment in which they've been living" (Stott Tr. at 78:21–22), including their "entire life history" (Stott Tr. at 78:25–79:1), and "their relative health," as measured by "how many times they'd gone to the doctor lately," "the age of the animal," and if the animal is on any medication. (Stott Tr. at 79:4–21.)

Yet, by his own admission, Dr. Stott has not reviewed any of this information to assist in conducting the risk assessment for transferring Lolita to a sea pen in her native waters of the Puget Sound – which is precisely what he was asked to opine on in this case. (*See* Stott Report at 1 (quoting, and then contesting, Plaintiffs' Complaint at ¶ 72, which "states that 'cetacean experts state that Lolita would thrive if transferred to a protected sea pen in her native waters . . . [sic] and would generally provide her with physical and psychological enrichment crucial to her well-being.'"); *see also* Stott Report at 4 (opining on "the issue of 'whether it makes sense to make a major change in Lolita's environment at this time in light of the above points'").) Dr. Stott has never conducted an independent investigation of the Seaquarium facility. (Stott Tr. at 36:10–14.) He has visited the Seaquarium, but only to "visit with the veterinary staff" about a variety of issues relating to a number of the animals kept at the facility (Stott. Tr. at 36:18–19, 23–25), and his "focus when [he's] there is to . . . discuss research projects, potential research projects." (Stott Tr. 39:12–19.) He has little recollection of seeing Lolita. (Stott Tr. 38:7–9 ("I've seen her. . . . That's about the extent of it.").)

When receiving the blood samples, Dr. Stott and his Lab receive no other information about Lolita or her health. The only thing they receive is "a white blood cell count." (Stott Tr. at 92:3.) When he speaks with Seaquarium veterinarians, he does not discuss her health with them. (Stott Tr. at 92:22–23.) Moreover, he has not talked to them about Lolita in "a long time." (*Id.* 92:17–18.) He does not have any information about Lolita's life history, other than the fact that she is wild-born; he does not know when she was captured, or the age she was when the was taken into captivity; he knows nothing about the conditions of her captivity; he does not look at her clinical reports; he "absolutely [does] not" know what kind of medication she is on at any given time (Stott. Tr. 125: 9–11); he does not know anything about the water quality of her tank; he has no knowledge about her exposure to the elements or about her environment, and he does not know anything about the water or environment in the Pacific Northwest where she is from. (Stott Tr. 124–125.) Accordingly, all Dr. Stott has done in this case is take the immune system "out of context" and "count the cells" – precisely what he identified as being insufficient to conduct a risk assessment of Lolita's transfer.

        **C.**        **Dr. Stott's Opinions Regarding the Impact of Stress on Lolita from a Change in Her Environment Is Pure Speculation, Outside of His Area of Expertise, and Not Based on Any Reliable Methodology**

In his report, Dr. Stott opined that "In addition to the concern of relocating an aged animal with a geriatric immune system, the additional negative impact of stress induced by a major alteration in Lolita's living environment is of concern." (Stott Report at 2.) At deposition, he clarified that the word "stress" in this sentence means Lolita's "psychological stress." (Stott Tr. at 144:18.) However, Dr. Stott has no formal training or experience in orca psychology or behavior. (Stott Tr. at 31:16–18.) He admits that the impact of stress on immune system functioning is not described in the literature on cetaceans. (Stott Tr. at 147:23–25.) He admits that he "would not be in a position to speak of what would induce stress in a marine mammal, and what wouldn't," (Stott Tr. at 140:6–8), yet this is precisely the focus of the opinions in his report.

In addition to lacking knowledge regarding the general concept (cetacean stress) about which he purports to opine, Dr. Stott also was not provided any particular facts or information about how Lolita would be transported if this Court were to order her relocation. (Stott Tr. 145:15–18.) Instead, he just "assumed that a transport would cause stress." (Stott Tr. at 149:3–9.)

6

Likewise, as to Lolita's *current* circumstances, he has no idea about whether the conditions to which she is exposed at Miami Seaquarium (e.g. boredom, anthropogenic noise, inability to exhibit natural behaviors) would cause stress. (*See* Stott Tr. 149–150.) He ultimately admits that he cannot predict what Lolita's immunological response would be to the transfer itself, or to her placement in a new environment. (Stott Tr. at 153:1–10.)

Dr. Stott's opinion is also based on the statement that "[o]ne should also consider the 'stress' associated with major changes in her environment. Both acute and chronic stress can negatively impact the immune system, and thus further compromise her ability to immunologically respond to microbial insults." (Stott Report at 4.) In addition to the lack of expert knowledge, training, experience, or application of methodology on the impact of stress on a cetacean's immune functioning like Lolita, however, Dr. Stott admits he has no idea how to measure stress or what stress Lolita is currently under or might be exposed to. (*See* Stott Tr. at 149.) Further, Dr. Stott's opinion is based on the unsupported assumption that her current environment is stable, i.e. that she is not currently subject to major changes in her environment. However, he admits that he does not "know enough about her environment to know how much in flux it is." (Stott Tr. at 157:2–4.)

### D. Dr. Stott's Testimony is Extremely Limited in Scope

Dr. Stott's report states: "My professional opinion would be that Lolita, given her elderly age and low numbers of circulating B lymphocytes and naïve T lymphocytes, would best benefit from minimal changes in the environment in which she has lived for the past many years." (Stott Report at 4.) He clarified that by "best benefit" he means only the odds of her maintaining "a nondiseased state." (Stott Tr. at 166:13–17.) He further clarified that this opinion did not include any benefit to her psychological state, her muscle development or body condition. (Stott Tr. at 167.)

## II. ARGUMENT

The admission of expert evidence is governed by Federal Rule of Evidence 702, which provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

7

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

District Courts "act as gatekeepers, excluding evidence unless it is reliable and relevant." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)), *cert. denied*, 135 S.Ct. 1423 (2015). Whether an expert's testimony is reliable depends on "the particular facts and circumstances of the particular case." *Hughes*, 766 F.3d at 1329 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999)).

The Court of Appeals for the Eleventh Circuit has set out three requirements that an expert must meet before his opinions may be admitted. *Hughes*, 766 F.3d at 1329. First, the expert must be qualified on the matter about which he intends to testify. *Id.* (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Second, he must employ reliable methodology. *Id.* Third, the expert's testimony must be able to assist the trier of fact through the application of expertise to understand the evidence or fact in issue. *Id.*

With respect to whether an expert's methodology is reliable, the Eleventh Circuit looks to a number of factors, including (1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted. *Id.* (citing *Daubert*, 509 U.S. at 593-94). This list of factors is not meant to be exhaustive, nor must each factor be present in a given case. *Id.* The proponent of the expert opinion must carry the burden of establishing qualification, reliability, and helpfulness. *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

A.   **Dr. Stott Should Not be Permitted to Provide Opinion Testimony Regarding Whether Lolita Should be Transferred to a Sea Pen**

Dr. Stott's proposed testimony should be barred because is not based on sufficient facts or data, and because Dr. Stott has not reliably applied the principal methods to the facts of the case. Fed. R. Civ. P. 702(b), (d). *Hughes*, 766 F.3d at 1329. The core issue that Dr. Stott was asked to opine about for this case was a risk assessment of moving Lolita to a sea pen, one of the remedies sought by Plaintiffs in this case. (*See* Stott Report at 1, 4.) When asked how he might do a risk assessment, Dr. Stott identified several important factors to be considered. These included knowing about the new environment that the animal will be moved to, whether the animal was undergoing chemotherapy, the history of the environment in which the animal was living, the entire life history of the animal, relative health, age, medical records (i.e., "how many times they'd gone to the doctor lately"), and if the animal is on any medication. (Stott Tr. 77–79). But by his own admission, the only factors that he knows as to Lolita are her age, and that she was born in the wild. He admits that he has no information about Lolita's current environment or the environment in the Pacific Northwest that she would be moved to. (*See, e.g.*, Stott Tr. 125: 22–24 ("Q. . . . What do you know about the water in the Pacific ocean? A. Probably no more than anyone else does.")). Therefore, Dr. Stott, by his own admission, lacks any of the necessary facts or data that he himself describes would be necessary to conduct a risk assessment of moving Lolita to a sea pen. Put differently, Dr. Stott has admitted, under oath, that he has failed to employ a reliable methodology as required by *Hughes*: he lacked the data necessary to reach the conclusion in his Report regarding moving Lolita to a sea pen.

B.   **Dr. Stott's Assessment of Lolita's Health Is Based On A Longitudinal Study Of Lolita's Immunological Profile That Dr. Stott Admits Would Not Withstand Peer Review**

"Experts may demonstrate the scientific validity of a theory or technique by showing that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (internal quotation marks omitted). By his own admission, however, the longitudinal study of Lolita's immunological profile, on which Dr. Stott's theory and opinion regarding the risks associated with transferring Lolita to a sea pen rests, would not withstand peer review—one of the explicit factors for reliability identified under *Daubert* and its

9

progeny—because the population for the study consists of one single animal. (Stott Tr. 96:8, 98:9–12.) Given this admission, Dr. Stott is left without any basis, other than his own statements, for relying upon Lolita's immunological profile as evidence to support a conclusion regarding her transfer. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). For this reason alone, this Court should find that the opinions in Dr. Stott's report are not based upon a reliable methodology, and that they should therefore be excluded.

Moreover, the longitudinal immunologic study of Lolita's blood samples received from the Miami Seaquarium, on which Dr. Stott's proffered opinion is based, also fails to use a reliable methodology because it is based upon admittedly inconsistent data. Indeed, it is the result of an informal agreement between the Lab and the Seaquarium. (Stott Tr. at 48–49.) The schedule for receiving Lolita's blood samples is largely set by the Seaquarium, "there's no set plan." (Stott Tr. at 92:16.) As a result, the frequency with which the lab receives samples is highly variable – sometimes it is two or three times a year, sometimes only once a year. (Stott Tr. at 92.) This erratic schedule could be problematic because "[i]n any animal you see, you're going to see daily fluctuations" in measures of immunological profile (e.g., the ratio of naïve to memory lymphocytes). (Stott Tr. at 1119:13–14.)

      **C.**      **Dr. Stott Should Not Be Permitted to Provide Opinion Testimony Regarding the Impact of Stress**

Dr. Stott's opinions also fail under the first *Hughes* factor: by his own admission, Dr. Stott lacks sufficient qualifications to support an expert opinion regarding the impact of stress on Lolita. Defendant seeks to introduce testimony by Dr. Stott regarding "the negative impact of stress induced by a major alteration in Lolita's living environment." (*See* Stott Report at 2.) Dr. Stott admitted, however, that he has no formal training or experience in orca psychology or behavior. (Stott Tr. at 31: 16–18.) He also admits that the impact of stress on immune system functioning is not described in the literature on cetaceans. (Stott Tr. at 147:23–25.) He further admits that he does not know how to measure stress, or predict what Lolita's immunological response would be to stress. (Stott Tr. at 140, 149–150.) Dr. Stott also apparently *assumed* that transport would cause stress (Stott Tr. 149: 3–9), but admits that he "would not be in a position

10

to speak of what would induce stress in a marine mammal, and what wouldn't." (Stott Tr. 140:6–8.) Opinion testimony about issues on which the proffered witness admits that he has no expertise should not be allowed. *See In re Trasylol Products Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *11 (S.D. Fla. Feb. 24, 2010) (excluding expert opinion where expert admitted he was not an expert in the topics discussed); *see also Hughes*, 766 F.3d at 1329. For this reason, Dr. Stott should be barred from testifying at trial on any issues relating to "the negative impact of stress induced by a major alteration in Lolita's living environment." Stott Report at 2.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion to Exclude Improper Opinion Testimony by Dr. Jeffrey Stott be granted.

Date:    March 11, 2016                              Respectfully submitted,

/s/ Paul J. Schwiep_____
Paul J. Schwiep, Fla. Bar No. 823244
Coffey Burlington, P.L.
2601 South Bayshore Dr., PH
Miami, FL 33133
Phone: 305-858-2900
Fax: 305-858-5261
pschwiep@coffeyburlington.com

/s/ Jared Goodman_____
Jared Goodman (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2266
Fax: 213-484-1648
JaredG@petaf.org

/s/ Matthew Strugar_____
Matthew Strugar (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 213-484-1648
Matthew-S@petaf.org

/s/ Caitlin K. Hawks_____
Caitlin K. Hawks (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 206-858-8518
Fax: 213-484-1648
CaitlinH@petaf.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE AND CONFERENCE**

I HEREBY CERTIFY that on March 11, 2106 the foregoing document was served by Electronic Mail upon the parties identified in the Service List. I further certify that I have conferred with all parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and have been unable to do so.

 /s/ Paul J. Schwiep_____

**Service List**

| | |
|---|---|
| **Jennifer B. Moore, Esq.**<br>moorej@gtlaw.com<br>   *(admitted pro hac vice)*<br>GREENBERG TRAURIG, P.A.<br>Terminus 200<br>3333 Piedmont Road NE<br>Atlanta, Georgia  30305<br>Telephone:    (678) 553-2100<br><br>*Counsel for Defendants* | **James H. Lister, Esq.**<br>jlister@dc.bhb.com<br>   *(admitted pro hac vice)*<br>**Melinda L. Meade Meyers, Esq.**<br>mmeademeyers@dc.bhb.com<br>   *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>   CHEROT, PC<br>Suite 1020<br>1156 Fifteenth Street, NW<br>Washington, D.C.  20005<br>Telephone:    (202) 659-5800<br><br>*Counsel for Defendants* |
| **William A. Earnhart, Esq.**<br>wearnhart@bhb.com<br>   *(admitted pro hac vice)*<br>BIRCH HORTON BITTNER &<br>   CHEROT, PC<br>1127 West 7th Avenue<br>Anchorage, Alaska  99501<br>Telephone:    (907) 263-7285<br><br>*Counsel for Defendants* | **Evelyn A. Cobos, Esq.**<br>cobose@gtlaw.com<br>**Mark S. Salky, Esq.**<br>Salkym@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 Southeast 2nd Avenue, Suite 4400<br>Miami, Florida  33131<br>Telephone:    (305) 579-0500<br><br>*Counsel for Defendants* |
| **Stefanie Wilson, Esq.**<br>swilson@aldf.org<br>   *(admitted pro hac vice)*<br>170 E. Cotati Avenue<br>Cotati, California  94931<br>Telephone:    (707) 795-2533<br><br>*Counsel for Animal Legal Defense Fund* | |