UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-CIV-22692-Ungaro/Otazo-Reyes

PEOPLE FOR THE ETHICAL TREATMENT OF
ANIMALS, INC., ANIMAL LEGAL DEFENSE
FUND, HOWARD GARRETT, and ORCA
NETWORK,

          Plaintiffs,

v.

MIAMI SEAQUARIUM and FESTIVAL FUN
PARKS, LLC, d/b/a PALACE
ENTERTAINMENT,

          Defendant.

DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
OF PLAINTIFFS' IDENTIFIED EXPERT JOHN J. HARGROVE
AND INCORPORATED MEMORANDUM OF LAW

Defendant Festival Fun Parks, LLC d/b/a Palace Entertainment d/b/a Miami Seaquarium

("Miami Seaquarium" or "Defendant"), by and through undersigned counsel and pursuant to

Rule 702 of the Federal Rules of Evidence, respectfully moves to exclude the opinions of

Plaintiffs' identified expert John J. Hargrove ("Hargrove"), on grounds that his opinions are

unreliable and inadmissible. As grounds therefore, Miami Seaquarium submits the following

Memorandum of Law:

## MEMORANDUM OF LAW

### I.    RULE 702 AND *DAUBERT* STANDARD FOR EXPERT EVIDENCE

Under Federal Rule of Evidence 702, the Court acts as a gatekeeper to evaluate the

admissibility of expert testimony.  Fed. R. Evid. 702; *U.S. v. Masferrer*, 367 F. Supp. 2d 1365,

1371 (S.D. Fla. 2005) ("The 'gatekeeping' function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702.") (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2001)).   "The district court's role is especially significant since the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."  *Id.*

> A trial court, in determining the admissibility of expert testimony under Rule 702, must conduct "a rigorous three-part inquiry," considering whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).[1]  "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).  In other words, Plaintiffs must prove that Hargrove is qualified to offer an expert opinion and that his opinions are reliable and helpful to the fact finder.  They can prove none of these things.

First, the party offering the expert must prove that he is qualified to render the opinion proffered.  Fed. R. Evid. 702; *City of Tuscaloosa,* 158 F.3d at 562 (requiring that "expert is qualified to testify competently regarding the matters he intends to address"); *see also Masferrer*, 367 F. Supp. 2d at 1372 ("The witness must be found qualified before [he will be] permitted to give opinion testimony.").

---

[1]   The same standard applies to all expert testimony, including scientific, non-scientific, technical, and other specialized matters.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Second, the reliability requirement demands that an "expert's conclusions must be based on sound scientific principles." *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002); *Masferrer*, 367 F. Supp. 2d at 1372-73 (noting that trial court "must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue"). Since *Daubert*, the Supreme Court has identified additional factors that may inform a district court's evaluation of proffered expert testimony, including whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion and whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Kumho Tire Co.*, 526 U.S. at 152.

Third, the helpfulness requirement ensures that the expert opinion stays outside the province of the fact finder and beyond the understanding of the average lay juror. *See* Fed. R. Evid. 704 advisory committee's note ("Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach[.]"); *City of Tuscaloosa*, 158 F.3d at 565 (holding that expert testimony is inadmissible if the "trier of fact is entirely capable of determining whether or not to draw [the expert's] conclusions without any technical assistance" from the expert); *U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result

to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.").[2]

The helpfulness/relevance requirement is more rigorous than Rules 401 and 402; it requires that there be a "fit" between the expert's testimony and an issue to be decided by the trier of fact. *Allison*, 184 F.3d at 1312 ("[T]he evidence must have a valid scientific connection to the disputed facts in the case. . . . This connection has been appropriately denominated as 'fit.'"); *Rider*, 295 F.3d at 1202 (holding that expert evidence must "'fit' the plaintiff's theory" and rejecting expert evidence that would have required Court "to make several scientifically unsupported 'leaps of faith'").

If the Court determines that the data, methodology, studies, or assumptions upon which the expert's opinion is based are inadequate to support the expert's conclusions, or not relevant to the issues in the case, then the Court must exclude the expert's testimony. *Id.* at 266; *see also Rick v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert opinions that are unsupported should be excluded because "nothing in . . . the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."). The proponent of the expert testimony has the burden of establishing each of these three requirements by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10; *Cook v. Sheriff of Monroe County*, 402 F.3d 1092 (11th Cir. 2005). The admissibility of

---

[2]  In addition, expert evidence, like all other evidence, may also be excluded under Federal Rule of Evidence 403 if it is confusing or misleading, or if its probative value would be substantially outweighed by the risk of unfair prejudice. *U.S. v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005). Misleading and confusing expert testimony is at odds with the very purpose of expert testimony contemplated by Rule 702. *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004); *Allison*, 184 F.3d at 1310 ("Rule 403, working in conjunction with Rules 702 and 703, militates against this general policy [of admissibility] by giving courts discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance.").

expert testimony is within the discretionary authority of the trial judge, whose decision will be overturned only if this discretion is abused. *Kumho Tire*, 526 U.S. at 150; *Allapath Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1264 (11th Cir. 2003).

Here, the Court should exercise its considerable discretion in expert evidentiary matters to exclude Hargrove's opinions and testimony because: (1) he is not qualified by training or experience to testify regarding the medical care or medication given to Lolita, or the behaviors of Lolita compared to wild orcas, and (2) even if his legal conclusions were not otherwise inadmissible, they rest on an insufficient factual basis and a flawed legal analysis.

## II.   HARGROVE IS NOT QUALIFIED TO RENDER THE OPINION PROFFERED

Hargrove is a former Seaworld trainer who was retained to opine on the standard of Lolita's current living conditions based, in large part, on her medical needs. For example, Hargrove makes the following conclusion in his expert report:[3]

> The objective of my participation in this matter is to determine whether Lolita is healthy and thriving or being harmed in her current living conditions. Overwhelming evidence documented in her official animal behavior records and supported by physically observing her clearly demonstrates that she is neither healthy nor thriving. Lolita is continuously medicated with numerous drugs, including multiple antibiotics and Tramadol, a narcotic painkiller used to treat moderate to severe pain. Both of Lolita's eyes show signs of damage, most likely due to the chlorine levels in her tank and the direct sunlight.

Hargrove Report at 12. As a former Seaworld trainer, Hargrove is certainly qualified to compare Lolita's conditions at Miami Seaquarium with those at the Seaworld locations with which he is familiar. However, Hargrove's expert report and opinions are primarily based on his comparison of Lolita with wild orcas, with which he is admittedly not familiar. Moreover, Hargrove's critique of Lolita's well-being is based on medical assumptions regarding the use of medications and the condition of her eyes, Hargrove Report at 8, for which he is not qualified to render.

---

[3]   A true and correct copy of the Expert Report of John Hargrove, dated February 8, 2016 ("Hargrove Report") is attached hereto as Exhibit "A".

In determining whether a witness is qualified to offer expert testimony, a court must consider whether the expert has the education, knowledge, background, training and experience to offer an opinion on a topic that is relevant to the outcome of a particular dispute.  If such qualifications are lacking, the Court may exclude the testimony.  *See, e.g., Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (noting that "many courts have excluded testimony when they determine that the witness is testifying to an area outside of - but related to - his expertise").  *See also Goodyear Tire & Rubber Co., Inc. v. Ross*, 660 So. 2d 1109, 1111(Fla. 4th DCA 1995) ("it is not enough that [an expert] be qualified to propound opinions on a general subject…rather, [the expert] must be qualified on the discrete subject on which he is asked to opine.")

In regard to John Hargrove, he has no medical or veterinary training.  *See* Transcript of February 16, 2016 Deposition of John Hargrove ("Hargrove Dep.") at 43:14-17.[4]  In fact Mr. Hargrove's formal education is limited to a semester of freshman courses, which does not even include biology or chemistry. Hargrove Dep. 42:3-43:17.  Additionally, Hargrove agrees that opinions regarding the use of medications should be left to veterinarians.  Hargrove Dep. 108:12-110:2.

For example, Hargrove tries to opine that Lolita has an injured eye as the result of living in a pool.  Hargrove Report at 12.  However, Hargrove readily admits that he does not know the nature or cause of the problem with Lolita's eye.  Hargrove Dep. 87:11-14.  Initially, Hargrove claimed during his deposition that Lolita has severe eye problems.  Hargrove Dep. 276:16-278:1.  However, after a long break off record and having been asked to actually review the training

---

[4] Relevant excerpts from the transcript of John Hargrove's deposition are attached hereto as Composite Exhibit "B".

records, Hargrove clarified.  Hargrove Dep. 278:18-280:1-6.  Hargrove then admitted that he is not qualified to speak to the issue of eye drop usage.  Hargrove Dep. 282:4-10.

When comparing Lolita's eyes with similar orcas within Hargrove's personal experience (in captivity at Seaworld), Hargrove conceded that Lolita's eyes are no worse, and perhaps even better.  Hargrove Dep. 85:5-22.

Moreover, Hargrove is certainly not qualified to compare Lolita's life at the Miami Seaquarium to what her life would be like with a return to the wild, Plaintiffs' proposed remedy in this case.    As he readily conceded during his deposition, Hargrove is not an expert in regard to orcas in the wild.  Hargrove Dep. 77:7-12; 108:1-8.  In fact, prior to two years ago, Hargrove had never even seen an orca in the wild.  Hargrove Dep. 58:9-13.

This line of testimony is a key example of why Hargrove's report is misleading and, consequently, unreliable.  Hargrove has never observed the teeth of an orca living in the wild. Hargrove Dep. 69:22-70:10.  Yet, despite not having the relevant knowledge or experience, Hargrove tries to attribute Lolita's broken teeth to living at the Miami Seaquarium.  Hargrove Dep.70:11-71:2.  Interestingly, when questioned whether the broken teeth would prevent re-introduction to the wild, Hargrove freely admits that Lolita's teeth are in better condition than most captive whales.  Hargrove Dep. 119:2-120:2.  Hargrove has never seen the teeth of a wild orca and is not an expert on wild orcas.  Hargrove Dep. 69:20-70:10  Consequently, Hargrove has no basis to opine that Lolita's captivity has caused damage to her teeth.

In regard to comparing Lolita to similar orcas in captivity, it turns out there is only one orca as old as Lolita, "Corky."  Hargrove Dep. 67:15-22.   Corky's teeth are in worse shape than Lolita's.  Hargrove Dep. 68:4-7.  Corky is the only whale over 40 years old that Hargrove is familiar with.  *Id*.

Hargrove also has a number of opinions regarding Lolita's interaction and compatibility with the Pacific white-sided dolphins in her pool. Hargrove Report at 5. Similarly, this is a subject on which Hargrove has no experience or knowledge to form the basis for his opinion. For example, Hargrove claims that the dolphins are somehow biting Lolita's tongue (and somehow surviving the experience). Hargrove Dep. 288:16-20. Because he has absolutely no experience working with an orca housed with a dolphin, Hargrove should be precluded from offering opinions regarding their interactions and compatibility.

For all of the reasons set forth above, Hargrove lacks the qualifications to offer expert testimony regarding the use of medication, Lolita's eye conditions and her teeth. Hargrove Dep. 43, 69, 77 and 87. Hargrove similarly lacks sufficient experience to opine as to the health or behavior of wild orcas when compared to orcas in captivity and as to Lolita's interactions and compatibility with the Pacific white-sided dolphins in her pool. Hargrove Dep. 77 and 108. Because Hargrove has no relevant education, experience, or training that makes him qualified to render these opinions, Hargrove's testimony is unreliable and thus should be excluded under *Daubert*.

WHEREFORE, for all of the foregoing reasons, the Miami Seaquarium respectfully requests that the Court preclude Plaintiffs from offering expert testimony from John Hargrove regarding: (a) the Miami Seaquarium's use of medication with Lolita; (b) Lolita's eye condition; (c) Lolita's teeth; (d) Lolita's health and behavior in comparison with the health and behaviors of orcas in the wild; and (e) Lolita's interactions and compatibility with the Pacific white-sided dolphins in her pool; and grant such other and further relief as the Court deems just and proper.

## <u>CERTIFICATION REGARDING PRE-FILING CONFERENCE</u>

Pursuant to Local Rule 7.1(a)(3), undersigned counsel for Miami Seaquarium certify that they have conferred with Plaintiffs in a good faith effort to resolve the issues raised in this Motion and can state that Plaintiffs oppose the relief requested herein.

Dated: March 11, 2016.

Respectfully submitted,

/s/ Mark A. Salky
Mark A. Salky, Esq.
Florida Bar No. 058221
salkym@gtlaw.com
Evelyn A. Cobos, Esq.
Florida Bar No. 92310
cobose@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue
Miami, Florida 33131
Telephone: (305) 579-0500

Jennifer B. Moore, Esq. (*Pro hac vice*)
moorej@gtlaw.com
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100

James H. Lister, Esq. (*Pro hac vice*)
jlister@dc.bhb.com
Melinda L. Meade Meyers, Esq. (*Pro hac vice*)
mmeademeyers@dc.bhb.com
Birch, Horton, Bittner & Cherot, P.C.
Suite 1020
1156 15th Street, NW
Washington, D.C.  20005
Telephone: (202) 659-5800

William A. Earnhart, Esq.
(*Pro hac vice*)
wearnhart@bhb.com
Birch, Horton, Bittner & Cherot, P.C.
1127 West 7th Avenue
Anchorage, AK  99501
Telephone: (907) 276-1550

*Attorneys for Defendant Festival Fun Parks, LLC d/b/a Palace Entertainment d/b/a Miami Seaquarium*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on March 11, 2016, I served the foregoing document by Registered E-mail on counsel for Plaintiffs as follows:  Paul J. Schwiep, Esq., Coffey Burlington, P.L.,  pschwiep@coffeyburlington.com;  Scott  Hiaasen,  Esq.,  Coffey  Burlington,  P.L., shiaasen@coffeyburlington.com; Jared Goodman, Esq., PETA Foundation, JaredG@petaf.org; Matthew Strugar, Esq., PETA Foundation, Matthew-S@petaf.org; Caitlin Hawks, Esq., PETA Foundation, CaitlinH@petaf.org; and Stefanie Wilson, Esq., ALDF, swilson@aldf.org, *Counsel for Plaintiffs.*

/s/ Mark A. Salky
MARK A. SALKY

**EXHIBIT "A"**
**to Motion to Exclude**
**John Hargrove Expert Report**

# EXPERT REPORT OF

# JOHN HARGROVE

## Former Senior 1 Killer Whale Trainer, SeaWorld

## and

## Supervisor of Killer Whale Training, Marineland, France

## February 8, 2016

## QUALIFICATIONS

I have 14 years animal training experience between three different killer whale (or "orca") facilities—SeaWorld of California in San Diego, SeaWorld of Texas in San Antonio, and Marineland in Antibes, in the South of France. I began at SeaWorld of Texas in 1993 and was ultimately promoted to Senior Trainer at Shamu Stadium at SeaWorld of California in 2001 which, at the time, was the highest ranking position under the management level. As a Senior Trainer, I performed with the orcas in their tanks ("waterwork") and in shallow water at the edges of the tanks and on dry land ("drywork").   Like myself, only the most experienced trainers are approved by SeaWorld management to work with orcas, and particularly to swim with orcas who have been determined to be high risk and the most dangerous because of their past aggressive histories with trainers. I was also part of the team of trainers that in 2000 performed the first successful artificial insemination of a killer whale in the world.

In 2001, I left SeaWorld to gain international killer whale experience as a Supervisor at Marineland in France where I co-supervised the entire killer whale program. This included conditioning and performing waterwork with killer whales that had never before had trainers in the water with them, and teaching the French team of trainers how to perform waterwork with killer whales. After getting Marineland's killer whale waterwork program established, I left the facility at the end of 2002.

When I returned to SeaWorld, in Texas in 2008, I was promoted to the Senior 1 level, which was a newly created position and became the highest ranking position just below management. I was promoted to this position because I was considered a specialist in my waterwork and behavioral abilities following my extensive experience with the most dangerous whales held by SeaWorld and with the whales at Marineland who had no prior histories of trainers in the water with them.  I continued to perform in shows with the killer whales and perform artificial insemination, and I assisted in acclimating several orcas for transport from all three killer whale facilities where I worked. In all, I have worked with 20 different killer whales throughout my career and have performed in the water with 17 of those 20.

Following my resignation from SeaWorld in August 2012, I was interviewed as a primary subject in the Sundance selected, BAFTA nominated, and Satellite Award winning documentary *Blackfish*, in which I discussed the destructive physical and emotional effects of captivity on orcas that I witnessed during my career. I promoted the film by participating in numerous film festivals both in the United States and abroad and was interviewed countless times by magazine, radio, and national and international television programs.

Following the success of *Blackfish*, I wrote a book, *Beneath the Surface*, about my life and career as an orca trainer over a span of 19 years.  The book was published by Palgrave Macmillan of St. Martin's Press and became a New York Times Bestseller. In addition, *Beneath the Surface* was named one of the best books of 2015 by the

editors of Amazon, and won the Goodreads Choice Award of 2015 in Science and Technology.  The book received rave reviews from People magazine, Scientific American, Smithsonian Magazine, and Psychology Today, which named the book to their list of the "Most Emotionally and Intellectually Intense Books of 2015."  As with *Blackfish*, I have been interviewed on national and international television programs as well as interviewed for magazines and on radio to discuss my book and experience as a trainer. I have also lectured at Georgetown University and presented at the Society for Marine Mammalogy's biennial conference on what would be needed, from a training perspective, for orcas in a sea sanctuary coming from a captive facility.

I have been involved with orca welfare legislative and regulatory issues at both the state and federal levels. In 2014, I was asked to co-sponsor and testify as an expert witness before the California State Assembly for the 'Orca Welfare and Safety Act,' a bill authored by Assembly member Richard Bloom (D-CA) that proposed to ban the public display of orcas for entertainment purposes and end their captive breeding. I was also asked to support New York State Senator Greg Ball's (R-NY) similar bill that sought to ban the captivity, breeding, and artificial insemination of orcas as well as ending the transportation of orcas and their genetic material across state lines.

The federal Occupational Safety and Health Administration (OSHA) hired me as their expert witness in their case regarding the Miami Seaquarium's appeal of citations issued for violating the Occupational Safety and Health Act with respect to trainer safety.  This is the only case in which, during the previous four years, I have testified as an expert at trial or by deposition. Shortly after, the California Department of Industrial Relations' Division of Occupational Safety and Health (Cal/OSHA) retained me as a chief witness in their case against SeaWorld of California, which similarly resulted in the park being cited for multiple safety violations related to trainer contact with orcas.

I also met with individual commissioners on the California Coastal Commission and testified the day of their vote in which SeaWorld sought permits to be allowed to build new killer whale tanks.  In a unanimous decision, the Commission approved SeaWorld's permit, with the condition that SeaWorld must end their breeding program and would not transfer any orcas into the state.

# OPINION

I have been hired as an expert witness by the Plaintiffs in this lawsuit to review the animal training records of Lolita and to conduct an on-site inspection to behaviorally assess the solitary orca at Miami Seaquarium.  I was asked to use my experience to ascertain if Lolita is thriving in her environment or if she is suffering any type of physical and/or emotional adverse effects from her current living conditions. In exchange for these services, I will be compensated at a rate of $90.00

Highly Confidential – Attorneys' Eyes Only

per hour, $650.00 per day for out-of-town services exceeding seven hours, and reimbursement for out-of-pocket expenses.

I meticulously analyzed the Miami Seaquarium's animal behavior records for the years 2001, 2002, 2003, 2004, 2009, 2010, 2011, 2012, 2013. It is my understanding that the Seaquarium has misplaced or destroyed the records for the years 2005, 2007, and 2008. The animal behavior records consist of Lolita's trainer's notations regarding, largely: noting each interaction they have with her, including "relationships," "husbandry," "plays," "shows," and "training" sessions; the amount of food given to Lolita broken down by session, day, and week; the behavioral rating of each session and average for each day and week;  the list of medications given to her; and shorthand notes reflecting on each session and anything of concern observed, such as Lolita being given a new medication, acting "tense," or suffering from fresh "rakes" on her body.  These records are limited and fail to record important information such as the duration of interactions with Lolita, and the number of behaviors she is required to perform during each session. They are, however, very similar to those I have extensive experience preparing at SeaWorld during my employment there. Accordingly, I formed my opinion in this matter based on my experience as a trainer, which provided me with the knowledge and background to analyze these animal behavior records and to assess Lolita's behavior during our on-site inspection on January 20, 2016.

**SITE INSPECTION**
On January 20, 2016, I participated in an on-site inspection of the Miami Seaquarium and Lolita's conditions. I observed Lolita in her tank for approximately nine continuous hours, from 4:20 a.m. to 1:12 p.m.

Walking into Lolita's stadium I was shocked by the size and shallow depth of her tank, and the absolute absence of any enrichment to her enclosure. As discussed in this report, I have worked with orcas at three leading facilities and observed the animals' poor welfare as a result of their too-small tanks and conditions of captivity. Yet Lolita's tank at Miami Seaquarium is without question the smallest and most barren I have ever seen an orca forced to live in. The tank measures only 20 feet deep at its deepest point, and according to Miami Seaquarium holds 580,496 gallons of water and its records indicate that the water level is often dropped (*See, e.g.,* MSQ0002594). Even when filled, the tank is only a fraction of the 4.5 to 6.2 million gallons, and 36 foot depth, of the facilities at which I have worked.  It is absolutely unthinkable that an orca measuring at least 20 feet long and weighing over 7,000 lbs. lives in this outdated and inadequate facility, and without any same-species social contact.  It is difficult to believe that this facility still exists in the Unites States, where even many dolphin facilities from decades past that were essentially this size have long since been closed.

My goal during the site inspection was to begin by documenting her respirations and activity level every 30 minutes in 5 minute intervals, and thereafter to document any additional noteworthy behavior, in which case I would record that

event and, if necessary, her respirations and activity level at that time. Respirations can be one of the first indicators that an animal is in trouble and may need veterinary care as quickly as possible if injured or sick.

In my experience, a calm and relaxed orca, floating motionless (an "A" activity level rating), breathes an average of zero to three times per five minutes. An orca engaged in high energy behaviors, such as elevated swimming speeds (a "C" or "D" activity level), breathes upwards of seven to 10 breaths in a five-minute period. When an orca breathes more than 10 times per five minutes, especially when engaged in an A activity level behavior like floating motionless, they should be closely monitored to try and determine what is causing this elevated breathing rate—if it was not the result of a high burst of energy, it may indicate injury or distress.

Before other people began to enter the stadium and it became daylight, Lolita consistently floated motionless at the surface or just under the surface at what is most likely an inflow valve from the filtration system, discussed in further detail below. The only times Lolita moved from this spot, which is located at the beginning of the fourth glass/acrylic panel from stage left, was when the two Pacific white-sided dolphins who are also held in the tank harassed her. Many times she did nothing, but eventually she was provoked, possibly raked by their teeth, and she retaliated and a chase ensued.

The Miami Seaquarium's decision to hold Lolita and these dolphins in the same tank not only fails to provide Lolita with the species-specific companionship required for her psychological well-being, but it also has proven to cause her a great deal of stress, harassment, and injury. Of the 20 different orcas I have worked with between three different facilities, not one was held without an orca companion or with a Pacific white-sided dolphin or other non-orca dolphin species.

Throughout the duration of the inspection, I observed absolutely no interaction between Lolita and the Pacific white-sided dolphins other than harassment and chasing. From 4:20am until 8:30am, I observed this harassment and chasing behavior 8 times. Each time it occurred and chasing ensued, her respiration rate naturally increased. However, even when Lolita was in a motionless state, but the dolphins came within close distance, her respirations still increased—indicating distress—and she exhibited upset vocalizations that were sharp and distinct in sound, and behavioral signs of a distressed animal such as a tight back, rocking behavior, and when sufficiently lit, she clearly exhibited large wide eyes. I observed chasing for up to 10-12 minutes on at least one occasion. I observed the Pacific white-sided dolphins clearly chasing, harassing, and attempting to bite and rake her as she tucked her pectoral flippers and tail flukes in attempt to avoid the bites, since she cannot out maneuver them due to their small size and agility. These confrontations have also apparently been documented by the public. (Johnny Tsunami, *Lolita Killer Whale in Captivity - Miami Seaquarium - Please SHARE to raise awareness*, YouTube (Jan. 8, 2015),

5

https://www.youtube.com/watch?v=kmFB3_MDvCA.) The small size of Lolita's enclosure makes it difficult for her to even turn around at times, which is potentially the cause of the many cuts on her tail flukes that are reflected in her behavioral records. This would explain why she often appears to turn around or change positions slowly and therefore is unable to escape the dolphins.

As a result of my experience of 14 years, I am able to identify different types of vocalizations, such as those related to sexual behavior, aggressive behavior, distress, or play.  There is also a wide spectrum within each of these types of vocalizations, which represents how intense their emotions are.  As an experienced trainer, we rely on the interpretation of these vocalizations to make strategic behavioral decisions with the whales; these decisions can also be life or death.  "Normal" vocalizations, which Lolita emitted during the site inspection, are those vocalizations that are not indicative of a specific emotional state such as play, sex, or aggression, but rather constitute a general communication and language, usually between other orcas in their social pairing.

When the dolphins were in the back pool, Lolita was in a more relaxed and calm state floating motionless at the inflow valve.  She once continued to vocalize for approximately ten minutes. Because the dolphins are not adequate social companions, they did not interact or communicate back to her following these vocalizations. I believe, based on my experience and what I observed, that Lolita is engaging in behavior similar to when an isolated or ignored person begins talking to him or herself.  Her ability to emit the type of vocalizations demonstrates that she likely still recalls the language and dialect of her pod.  Despite being in captivity for 45 years and being solitary since the death of the orca Hugo 36 years ago, she still emits vocalizations that are considered normal between orcas, which I have heard from all the whales I have worked with during my career.

From the time I was permitted into the stadium at 4:20am until I was told to leave at 1:12pm, the only enrichment in Lolita's tank that she appeared to have access to and show any interest in was sitting at what appeared to be the inflow valve.  She floated motionless at the surface or just under the surface at this spot for the entire duration of the inspection, except when chasing occurred, when the trainers and park employees began to enter the stadium to prepare for the park opening, and during interaction with the trainers.  Even after preparing for the show and interactions with her began, however, she would still often return and float motionless at the inflow valve. During my time at SeaWorld, I witnessed this abnormal behavior of an orca spending inordinate amounts of time at an inflow valve. This fixation is caused by an intense boredom and absence of enrichment in the captive environment. It is unsurprising that Lolita engages in this repetitive behavior, as she is exposed to even less enrichment than the orcas that I worked with at SeaWorld or Marineland in France.

An additional concern regarding this behavior is the location of the chlorine injectors for her pool.  If the chlorine to treat her water enters through this valve

6

then she he is getting the chlorine at a very strong potency before it has time to disperse in the rest of her pool.  We know from her records that she is already on eye drops for both eyes and even Prednisone drops. (*See, e.g.*, MSQ0013227.) Numerous times both eyes are documented as being cloudy and most often white is seen in her left eye.  (*See, e.g.*, MSQ0003268.) During the inspection, I personally saw distinct cloudy white in her left eye, which could be indicative of cataracts as was the case with the orca Corky, with whom I worked at SeaWorld of California.

As a primary playtime reinforcer, the training team gives Lolita a wetsuit every day. My experience at other facilities that take even more enrichment measures than Miami Seaquarium has—simply allowing her to play with a wetsuit, or spraying a hose, which is Lolita's only other enrichment documented in the animal behavioral records and witnessed during the site inspection—has clearly demonstrated to me that these type of activities are wholly inadequate. They unquestionably fail completely to even begin to compensate for the physical and psychological damage caused by being held in such an unnatural setting—in a small concrete tank and without another member of her pod, population, or even species.

The wetsuit is not only an inadequate enrichment measure, and a swallowing hazard for Lolita that can cause her death, but it is also clearly an unsafe decision to condition an orca to play with a wetsuit like the ones that trainers are wearing on their bodies.  I witnessed several times a trainer playing tug of war with the wetsuit with Lolita. (*See, e.g.,* Inspection Video 14, Camera A, at 4:00). Just because she has never become aggressive with this wetsuit does not mean she will not.  In fact, the Seaquarium's records reveal that Lolita has refused to give the wetsuit back to her trainer when asked.  This reflects a horrible misjudgment of what these apex predators are capable of, reflects the training team has been taught to take her for granted and underestimate her nature, and demonstrates a fundamental lack of understanding of orca behavior, especially in captivity.

Finally, Lolita's behavior during the show demonstrated that this is a very predictable routine for her, especially evident when she would anticipate the behavior before being given the signal.  Instead of the trainer asking for a different behavior in light of Lolita's anticipation, the trainer still gave her the signal for the same behavior she anticipated.  Not only do these decisions detract from her behavioral ratings in the animal behavior records, but also this level of predictability historically leads to aggression due to frustration from boredom.

## ANIMAL TRAINING RECORDS

Miami Seaquarium's own records reveal that Lolita is regularly and often heavily medicated. I recognize a number of the drugs that Lolita is regularly administered from those I have given to whales between the three killer whale parks at which I worked.

7

Highly Confidential - Attorneys' Eyes Only

In my experience at other facilities, antibiotics were commonly dispensed for rakes caused by other animals' teeth when they aggressively charge with an open mouth. If the rake is deep enough to bleed, most veterinarians will prescribe antibiotics because of risk of infection. Indeed, orcas have died in the past from infected rakes even though they were given antibiotics. Antibiotics were also commonly used when an orca's bloodwork showed an infection somewhere in the body, often believed to have been contracted through holes that had been drilled in their teeth.  We would also regularly medicate with prescription Tagamet to treat orcas' stomach ulcers.

As stated above, the Miami Seaquarium's animal behavior records reflect that Lolita is given eye drops in both eyes nearly every day and often she is given Prednisone eye drops.  Additionally, it's clear from these records and from the on-site inspection that she is physically scarred from being raked by the Pacific white-sided dolphins. The documents indicate that many times these rakes are deep enough that they bleed and become open wounds, which can lead to infection, because following this raking behavior Lolita is often put on Baytril (*See, e.g.,* MSQ0009500, MSQ0009493), Clavamox (*See, e.g.,* MSQ0009496, MSQ9498), Amoxicillin (*See, e.g.,* MSQ0003479), and Cephalexin (*See, e.g.,* MSQ0003499), which are antibiotics to either treat infection that has already begun or to prevent it.  I was alarmed to see that the documents reveal that Lolita is also commonly given the narcotic painkiller tramadol. (*See, e.g.,* MSQ0003470, MSQ0003498.) As Miami Seaquarium staff manipulates the public in to thinking that Lolita and these dolphins are the best of friends, in reality they harass and injure her, often to the point she needs antibiotics and painkillers for bleeding open wounds.

Among other drugs, Lolita is also given Ranitidine (*See, e.g.,* MSQ0009465) and Carafate (*See, e.g.,* MSQ0008975), which are used to treat ulcers caused by stress. Adding to just this sample of drugs given to her is Simplicef for skin infections (*See, e.g.,* MSQ0009490), and Fluconazole for fungal infections (*See, e.g.,* MSQ0009497). Also concerning is that she has been administered Regumate for months and in different years, at least in 2002 (*See, e.g.,* MSQ0009132, MSQ0009122) and 2009 (*See, e.g.,* MSQ0009497, MSQ0009525, MSQ0009523, MSQ0009521, MSQ0009517, MSQ0009509, MSQ0009511, MSQ9513, MSQ9515).  Regumate was used during a trial period at SeaWorld as a form of birth control but was ultimately stopped due its dangerous side effects.  In fact, the drug was so potent that only approved male trainers were allowed to handle and feed the drug to the female whale using protected latex gloves and bleach used to clean anything that came in contact with it.  There was risk of infertility to female trainers if handled.  Besides use as birth control, the drug is a hormone used to treat cancer, ovarian cysts, endometrial polyps, endometriosis, and polycystic ovary syndrome.

Based on my experience at other facilities, I looked for key elements in Lolita's animal behavior records that would give the most solid glimpse into her daily life. Behaviors including chasing and head bobbing, and anxious, agitated or tense behavior, indicate distress in the captive environment. I believe these are the most important factors when really trying to assess if this animal is well adjusted and

Highly Confidential - Attorneys' Eyes Only

healthy.  This information can be used to determine whether she is living an emotionally and physically healthy existence, and the information contained in these records clearly indicates that she is not.  Also, note that these terms are those used to describe Lolita's behavior in the Seaquarium's own documents.  I calculated how many times these documents used these words or terms to describe what is happening to her every day.  The nine years of records I reviewed represent only a 20% snapshot of her 45 years in captivity at Miami Seaquarium.

CHASING has been documented more than 150 times.  (*See, e.g.*, MSQ0009243, MSQ0009249, MSQ0009250, MSQ0009214.) This is not play, but aggressive behavior that leads to the rakes described above. Some of her scars from the rakes from the dolphins measure greater than a foot in length. (MSQ0009257.) Just in the limited records we were given, trainers documented that Lolita had been raked more than 300 times by the dolphins. (*See, e.g.*, MSQ0009209, MSQ0009181, MSQ0009192, MSQ0009205, MSQ0009206.) In my experience working with many orcas in varying environments, including dealing with different social structures, I became keenly aware of the distinction between play behavior and aggression. When the behaviors are related to play, the orcas will eventually work their issues out and begin to cooperate and play in a less aggressive manner.  However this was not observed with Lolita and the dolphins nor represented in the animal behavior records.  Rather, the records and site inspection reflect a constant state of being anxious, tense, chasing, or being raked.

Her own trainers described her behavior as ANXIOUS OR AGITATED more than 50 times.  (*See, e.g.*, MSQ0009305, MSQ0009202, MSQ0009210, MSQ0009219, MSQ0009246.) This means she is stressed in her environment, which causes stomach and intestinal issues. I have commonly seen elevated stress levels in captive orcas, and they are often administered medication to attempt to treat it. However, Lolita has been described as anxious or agitated more than any orca I have ever worked with in my career. She has been documented as becoming agitated even to just simply being touched by a trainer.

According to the documents, the Pacific white-sided dolphins have bitten Lolita *on her tongue* more than 70 times, an injury I have never seen on an orca.  (*See, e.g.*, MSQ0009304.) This type of aggression by the dolphins toward Lolita and her occasional retaliation could have led to the two documented but not fully explained deaths of Pacific white-sided dolphins in 2001 and 2015. The official record for the death in 2001 states that a diver found the dolphin deceased in the morning and that Lolita was "agitated" and "started on" ulcer treatment medications Ranitidine and Carafate, and antacid Mylanta. (MSQ0008975.)

Miami Seaquarium's behavior rating system is largely taken from the system I used while at SeaWorld, as are many of their other methods of record keeping.  The behavior ratings used on a 1-5 scale are as follows:

Highly Confidential - Attorneys' Eyes Only

1.  NO RESPONSE. The animal does not make contact with the trainer in any manner; will not look at trainer; will not respond to stimuli and will not eat. (Note: if this behavior occurs report it to your supervisor or manager)
2.  POOR.  The animal responds but is sluggish; has a low energy level or is constantly breaking control; frequently refusing [discriminative stimuli] and generally responds at a level well below acceptable criteria.
3.  AVERAGE.  The animal responds reliably and generally meets criteria; energy level is normal and, although errors occur, they are correctable and not severe enough to be disruptive.
4.  GOOD.  The animal responds with enthusiasm and takes [discriminative stimuli] without any hesitation; energy level is noticeably above average and behavior exceeds criteria on a majority of all interactions during the session.
5.  EXCELLENT. The animal responds with extraordinary vigor to all [discriminative stimuli]; criteria is exceeded by a wide margin on most behaviors; rapid progress is made in training; energy level is extremely high and the animal is extremely positive throughout.

(MSQ0009764.) The animal behavior records reveal that Lolita has a poorer behavior rating than any orca I have worked with in my career.  She was given a POOR behavior rating for her interaction (training or shows) incredibly more than 1300 times.  The significance of this is that when an animal, especially an orca, is failing that much, they become very frustrated and aggression becomes highly probable.  An orca can become easily frustrated and become aggressive if they fail by performing a behavior incorrectly because reinforcement is withheld.  Advances in animal training techniques include reinforcing a whale on a ratio even if they performed the behavior incorrectly, as long as they remain calm.  However even with this training, frustration and aggression is still commonly observed when a whale fails, as is documented many times in Lolita's records. This leads to the following behaviors that, based on my experience, are recognized as well-known pre-cursors to aggression.

Lolita was observed HEAD-BOBBING more than 250 times.  It is important to note in what context she was observed exhibiting this behavior.  She had a high number of head bobs when she would fail on a behavior during the delivery of a Least Reinforcing Scenario (LRS), which is simply a three-second pause with no reaction from the trainer. If the animal remains calm for this pause, they have been trained that sometimes, but not always, there is an opportunity for reinforcement. However, on many occasions, Lolita demonstrated frustration at failing and exhibited the aggressive precursor of head-bobbing. (*See, e.g.*, MSQ0009301, MSQ0009220, MSQ0009254, MSQ0009284.) She has also head-bobbed at trainers in multiple scenarios: when trainers were in the water with her; when trainers where getting out of her pool or leaving her environment; when "sloppy feeding" occurred, and when a trainer touched her face. Alarmingly, she has head-bobbed when her teeth were swabbed—something I witnessed the veterinarian do the day of our

10

inspection even though the veterinarian is not a trainer and does not have an adequate relationship with Lolita.

Also indicating that Lolita is stressed, which causes health issues as well as leading to aggression, her own trainers documented Lolita more than 300 times as being TENSE. (*See, e.g.*, MSQ0009202, MSQ0009210, MSQ0009219, MSQ0009246.) On numerous occasions trainers documented Lolita as "extremely tense." (*See, e.g.*, MSQ0009042, MSQ0003473, MSQ0003511, MSQ0009493.)

Lolita was recorded as having JAW-POPPED 8 times in the records to which I had access. (*See, e.g.*, MSQ0009550.) This number may seem small and insignificant but the behavior is anything but insignificant.  In fact, it is arguably the most severe precursor to aggression—and clear indicator of stress—an orca can exhibit.  Most experienced orca trainers have never even heard or seen this happen.  In my 14 years spread out over 19 years, I have seen it only twice between 20 whales.  She has also "pushed trainer in pool" (MSQ0009626), attempted to bite a trainer's leg (MSQ0009204), and lunged toward a visitor with an open mouth (PETA001686-1989).These behaviors all clearly demonstrate that Lolita becomes aggressive due to the stress and frustration caused by her living in an environment with inadequate space, enrichment, and companionship.

Captive orcas exhibit stereotypic bored behavior patterns in various ways, depending upon the individual personality of each orca as well as learned behavior. From my analysis and observation, Lolita appears to express her boredom by excessively rubbing parts of her body on the pool floor and walls.  Rubs on her various body parts were observed and documented more than 350 times in the animal behavior records, including on her pectoral flippers, tail flukes, blowhole, dorsal fin, eyes, eye patches, melon, jaw, ventral side, back, peduncle, and genital region.  Some of these rubs were documented as severe enough to be raised, and trainers recorded in their records no fewer than 5 times, "Rubs all over body." (*See, e.g.*, MSQ0009212, MSQ0009214.)

## CONCLUSION

The Animal Training staff at Miami Seaquarium describe in detail in their own animal behavior records how Lolita is suffering and not thriving in her current conditions.  In fact, the records reflect the enormous amount of drugs she is given on a daily basis.  Additional drugs are regularly and commonly added to her daily drugs. With my experience and having used many of these drugs on captive orcas, I can confidently state that they reflect that she has damage to both eyes, and suffers from moderate to severe pain requiring narcotics, various and frequent infections and dental problems.  She is treated with at least two different medications indicated for both stomach ulcers and stress ulcers, which have most likely been caused by extremely abnormal and elevated stress levels in the captive environment and are common with other captive orcas. She is also treated for skin and fungal infections.  The staff's long term and repeated use of the dangerous drug Regumate

in various years is troubling since the drug is not being given for birth control, which reflects there is a health issue going on and most likely a very serious one. Since 2001, two Pacific white-sided dolphins forced to live in confinement with her have died, and the causes of death submitted by the facility to the National Marine Fisheries Service indicate causes potentially related to trauma. Miami Seaquarium has not provided any other explanation as to how these deaths happened.

The Seaquarium has displayed on numerous occasions a complete disregard for Lolita's health and well-being by making her perform numerous times in shows after it was known that one of her eyes was completely shut.  They also forced her to perform when she was medicated for a dental abscess that caused bruising and swelling to her lower jaw.  The records document that it was common practice to make her perform in shows while injured, sick, and/or medicated.  In 2011, trainers drilled one or more of her teeth at least 16 times.  Despite this painful medical procedure—called a pulpotomy—and with her tooth or teeth actively bleeding, and while she was medicated, they still chose to have her perform in shows.  This led to Lolita head-bobbing at her trainer, who also documented her behavior as "tense," clearly demonstrating the distress Lolita was suffering at the time. The decision made by the Seaquarium to have Lolita perform under these circumstances is unfathomable to me.  Rarely in my career have I witnessed such a poor and clearly unsafe decision for both Lolita and the trainers.

This complete disregard for what is in Lolita's best interest is further documented when she is raked by the Pacific white-sided dolphins, which cuts her skin deep enough to cause bleeding and scarring and yet they do not pull her out of shows so she can heal properly. We documented during the site inspection evidence of the dolphins she is forced to live with actively harassing her as she attempts to elude them.   It is common sense that Lolita should not be held with animals that are causing her injuries that require medical attention.

The behavior observed on the date of the on-site inspection corroborated all of the information collected from her animal behavior records. The objective of my participation in this matter is to determine whether Lolita is healthy and thriving or being harmed in her current living conditions.  Overwhelming evidence documented in her official animal behavior records and supported by physically observing her clearly demonstrates that she is neither healthy nor thriving.  Lolita is continuously medicated with numerous drugs, including multiple antibiotics and Tramadol, a narcotic painkiller used to treat moderate to severe pain.  Both of Lolita's eyes show signs of damage, most likely due to the chlorine levels in her tank and the direct sunlight she is subjected to due to no shade protection.  She does not have the ability to avoid the sun when she would need or choose to do so. She also consistently exhibits signs of distress and frustration that manifest themselves as a variety of aggressive precursors toward the trainers.  She also exhibits stereotypic bored behavior patterns from living in such a small and sterile confined space, including floating motionless at the surface for hours at a time without any stimulation or enrichment from her habitat.  For all the above-mentioned reasons, it is my strong

Highly Confidential - Attorneys' Eyes Only

professional opinion, based on my extensive experience with captive killer whales, that Lolita is neither healthy nor thriving.  In fact, the evidence supports that this whale, despite the love her trainers undoubtedly have for her, has been suffering both physically and emotionally for years in an antiquated and inadequate facility that fosters both poor living conditions and poor care.

### Declaration

Pursuant to 28 U.S.C. § 1746, I, John J. Hargrove, hereby declare that under the penalty of perjury the contents of the foregoing report are true and correct to the best of my knowledge.

EXECUTED on this 8th day of February 2016

John J. Hargrove

13

**EXHIBIT "B"**
**to Motion to Exclude**
**John Hargrove Expert Report**

1

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
                 Miami Division
```

```
------------------------------:
PEOPLE FOR THE ETHICAL        :
TREATMENT OF ANIMALS, INC.,   :
et al.,                       :
                              :
          Plaintiffs,         :
                              :
       vs.                    : Case No.:
                              : 15-CIV-22692
MIAMI SEAQUARIUM and FESTIVAL :
FUN PARKS, LLC, d/b/a PALACE  :
ENTERTAINMENT,                :
                              :
          Defendant.          :
------------------------------:
```

Washington, D.C.

Tuesday, February 16, 2016

Deposition of:

JOHN HARGROVE

called for oral examination by counsel for

Defendant, pursuant to notice, at Birch Horton

Bittner and Cherot, P.C., 1156 15th Street,

Northwest, Suite 1020, Washington, D.C., before

Shari R. Broussard, RPR, CSR, of Capital Reporting

Company, a Notary Public in and for the District

of Columbia, beginning at 9:01 a.m., when were

present on behalf of the respective parties:

Capital Reporting Company
Hargrove, John  02-16-2016

**42**

1 me lose the credits that, you know, I was in for
2 because I left -- obviously I left early.
3     Q  You might have had a semester under your
4 belt, maybe a little bit more?
5     A  Correct. If I -- if I had anything
6 under my belt, it would have just been the one
7 semester.
8     Q  Do you recall what classes you took?
9 Like freshmen English?
10     A  It was just the required basics. The
11 goal was a psychology degree, so it was
12 whatever -- and, again, I'm 42 and this was when I
13 was 18 or 19, so I was -- I would have had to have
14 been 19, to be clear, at that point. So, yeah,
15 just whatever the -- whatever the basics were.
16 And I was enrolled full-time -- full-time but only
17 for the basics.
18     Q  Were any of those courses actually on
19 psychology or was it just the basic math, science,
20 English freshman course load?
21     A  Yeah, I -- I believe I didn't have the
22 option at that point. I had to get through those

**43**

1 other basic courses before I could get into the
2 psychology courses. But it's been so long ago
3 I -- I can't, you know -- it's tough to remember.
4     Q  Do you recall whether you had biology or
5 chemistry as a course in college?
6     A  I don't think so. I don't think that's
7 part of the basics.
8     Q  Okay.
9     A  But to be honest, I don't -- I don't
10 even know what they consider what are -- what are
11 your -- what are the basics before you can move on
12 and -- and -- and take the courses that are
13 specific to your degree choice.
14     Q  And I believe you've already answered
15 this, you're not a vet or a medical specialist by
16 any means?
17     A  No, sir, I'm not.
18     Q  Outside of that college work have you
19 taken any formal courses at all?
20     A  Formal courses. I mean, other than my
21 certifications that were required by SeaWorld for,
22 you know -- such as, you know, scuba diving

**44**

1 certification, advanced diver rescue,
2 adult/child/infant CPR, all those types of things,
3 but all related to my work as a killer whale
4 trainer.
5     Q  Let's go to your work history. Since
6 you left SeaWorld, have you held any other jobs
7 other than author and expert witness?
8     A  Yeah. Well, I left SeaWorld -- I've
9 left SeaWorld twice.
10     Q  Well, the last time.
11     A  You mean -- so since August of 2012?
12     Q  Yeah.
13     A  Well, I'm on medical disability for my
14 injuries from so many injuries that are very well
15 documented by killer whales either by accidents or
16 by aggression, and so I've -- I've been paid for
17 giving lectures. I've also been paid for being an
18 expert witness now on two cases, and -- and a, you
19 know, being a published author I've received
20 compensation.
21     Q  But no other like full-time work?
22     A  I can't. I'm not allowed to work

**45**

1 full-time, my doctor's orders.
2     Q  Could you work in an office setting?
3     A  I'm not allowed to work full-time
4 because of my injuries, the state of my injuries,
5 which I -- I, because of my medical privacy, I'm
6 not going to get into the specifics of -- of what
7 my injuries are.
8     Q  Well, let me ask you this:  Sitting here
9 today is there any reason you would not have your
10 full cognitive abilities?
11     A  Just so I'm -- I'm answering it clearly,
12 there's no reason sitting here today that I would
13 not have my full capacity to answer questions
14 clearly and correctly and accurately.
15     Q  Okay. And full recollection? There's
16 no medication, there's no pain, there's no
17 anything that impairs you from being a witness
18 here today?
19     A  Well, I do have pain, but that's not
20 going to impair me today from answering your
21 questions accurately.
22     Q  Okay. Understanding my questions, you

Capital Reporting Company
Hargrove, John  02-16-2016

58

1  highrises in -- for a company in one of the
2  highrises in Manhattan before returning to
3  SeaWorld.  So I worked continuously while I was in
4  New York City.
5       So the only time I did not work was the
6  year and four months that I was in Los Angeles
7  while I was still seeking out whether or not I was
8  going to do stuntman work.
9      Q   Okay.  One other question.  I saw a
10  quote somewhere from, I think it's April 2014, at
11  that point you had never seen a killer whale in
12  the wild?
13     A   That's right, never.
14     Q   Have you seen one yet in the wild?
15     A   Of course, yeah, last year, many times.
16  So that's when I went to San Juan Island and then
17  I went back to Whidbey Island.  So I saw -- I saw
18  13 wild killer whales my first day out.  The next
19  day I saw 45 or 46 killer whales in the wild that
20  formed a true super pod, and then just weeks
21  later, probably three weeks later, I went back and
22  saw transient orcas that came through.  So now

59

1  I've seen wild orcas two different trips -- two
2  different like flights to that destination but out
3  on a boat three different times and seen wild
4  orcas all three of those times.
5      Q   Who took you out on a boat?
6      A   I went out with -- each time it was a
7  different person.  Jeff -- Jeff Friedman was one
8  of the people that took me out and then -- and I
9  say "took me out," there was a captain of the
10  boat.  Jeff was not the captain.  I think he was
11  just the owner of the business.
12     Q   Okay.
13     A   So -- and I can't remember the name of
14  the captain of the boat.  And -- pardon me -- and
15  then the second and the third boat, again, the --
16  great -- great guys, but I don't remember their
17  names.
18     Q   On any of those visits did you see
19  Howard Garrett?
20     A   Yeah.  Yes, I did.  I -- I saw Howard --
21  well, I saw Howard on my visits to -- to -- for
22  those trips each of those times, but as far as

60

1  actually being on the boat, Howard was on the boat
2  -- not on my first boat but my second boat.
3  And -- and then the third time we actually viewed
4  the transients from shore instead of -- instead of
5  choosing to go out on a boat.  It was our choice.
6      Q   Was Howard there with you on the shore?
7      A   Yes, he was.
8      Q   Okay.  How about Ken Balcomb, did you
9  meet him on any of those visits?
10     A   Yes, I met him, but he was not with me
11  while I -- I -- I witnessed the orcas in the wild.
12     Q   Okay.  What was your specific assignment
13  in creating your expert report in this case?
14     A   Do you mind if I get water real quick?
15         MR. EARNHART:  Why don't we just go
16  ahead and take a short break.
17         THE WITNESS:  Is that okay?
18         MR. EARNHART:  We've been about an hour
19  on, so that's okay.
20         (Brief recess 10:05 a.m. to 10:13 a.m.)
21         (The reporter read the record
22         as requested.)

61

1         THE WITNESS:  Okay.  It was to analyze
2  her animal training records, also any other
3  records that were supplied, which I did not go
4  through all of them because of time.  So I don't
5  know even every single one that was sent because I
6  know there were some like -- for example, some
7  water quality records.  I did not go through the
8  water quality records.  I didn't have time.
9         So I focused strictly on her animal
10  training records and the onsite inspection of -- I
11  believe it was exactly nine hours that we observed
12  her continuously.  And then -- and then I based --
13  I used that information and then composed my
14  expert report.
15  BY MR. EARNHART:
16     Q   Okay.  And your expert report, and
17  correct me if I'm at all wrong here, was to
18  identify the physical and mental effects of the
19  Miami Seaquarium on the whale Lolita?
20     A   Yes, if she even had any.
21     Q   Okay.  And we'll get back to the details
22  here.  I'm just looking just kind of a starter --

Capital Reporting Company
Hargrove, John  02-16-2016

66

1   observation of her.
2     Q   Okay.  Now, was it a wet suit or wet
3   suit material?
4     A   They call it a wet suit.  From my
5   perspective from where we were sitting, I can't
6   make out if it used to be an entire wet suit and
7   now there's just parts of it and it's just wet
8   suit material, but the way they document it in the
9   records is a wet suit.  So whatever it is it's
10  torn up.
11    Q   In regard to Lolita's teeth, did you
12  measure her teeth or do a --
13    A   We -- we did not have -- I'm sorry to
14  interrupt you.  Were you done with your question?
15    Q   Well, just did you measure her teeth or
16  look inside her mouth?  I mean --
17    A   They -- we were allowed to be -- you
18  know, of course for our safety, and I agreed with
19  that, we needed to be a certain distance from her
20  while one of the trainers who was in control of
21  her asked Lolita to open her mouth and the
22  veterinarian, Dr. Gallego -- sorry, it's a

67

1   difficult name to -- Dr. -- Dr. Gallego took
2   pictures which I have not seen, and -- but it --
3   it was -- and I was trying, like my angle and
4   where I was, trying -- above the acrylic panels
5   or -- because I'm sure they're acrylic and not
6   glass.  I would imagine they are like at SeaWorld.
7   And then -- and then also under -- trying to get
8   the best perspective that I could because I know
9   from the records that she's had a pulpotomy.  I
10  could not visually see the pulpotomy, but I could
11  see fractured teeth.
12    Q   Okay.
13    A   So -- and that was -- that's also
14  documented and supported in the records.
15    Q   Okay.  What is your baseline on
16  comparing -- Lolita is what?  50 years old?
17    A   I know she's -- they claim that she's
18  the oldest in captivity, but her and Corky are,
19  yeah, right up there.  So they're -- anywhere from
20  48 to 50 is -- you know, because they were
21  captured from the wild it's not -- no one knows
22  precisely.  It's a -- it's a guess of the age when

68

1   they were collected.
2     Q   Okay.  Now --
3     A   Captured.
4     Q   How does Lolita's teeth compare with
5   Corky's teeth?
6     A   Corky does have worse teeth than Lolita
7   does.
8         I've seen -- I've seen animals -- I've
9   seen whales -- I've worked with 20 different
10  whales in my career, and I've seen whales that had
11  better teeth than Lolita and I've seen whales that
12  had worse teeth than Lolita.  So I would say --
13  yeah.
14    Q   How many of the whales you've worked
15  with have been over 40 years old?  Corky?
16    A   Only Corky.
17    Q   Okay.
18    A   Only Corky.
19    Q   And you've never seen Lolita other than
20  that one site visit; is that correct?
21    A   That's correct.
22    Q   When you saw the wild whales, any idea

69

1   the age of any of them?
2     A   Certainly the -- the -- the tour person
3   on the -- the boat, they're giving -- they're
4   giving facts and stuff like that.  Honestly I'm
5   not really paying that close attention to the --
6   the -- what they're giving because I'm just -- it
7   was my first time to ever see them in the wild and
8   I was just really captivated by watching it.  And
9   then, of course, then that floods my brain with
10  all my memories of -- that I've worked with
11  these -- and swam with these whales for so many
12  years and I've never seen them in their -- in
13  their natural environment.  So that was, you know,
14  overwhelming, of course, for me.  I didn't -- not
15  emotionally.  I didn't break down and cry or
16  anything like that, but -- but did I answer your
17  question?  I'm sorry.
18    Q   We were kind of getting there.
19    A   Okay.
20    Q   They are majestic animals and I've seen
21  them in the wild too.
22        Did you see the teeth on any of these

Capital Reporting Company
Hargrove, John  02-16-2016

---

70

1  wild animals?
2      A   Not from the distance where I -- where
3  I -- where I was, you know.
4      Q   No?
5      A   No.
6      Q   I'd be surprised if you had, but --
7      A   Yes.  I'd have really good vision,
8  but -- and be very fortunate that they would --
9  but I saw some cool breaches and bows and stuff
10  like that, but I never saw an open mouth.
11      Q   Okay.  The fractured teeth on Lolita,
12  why do you say that that's from her living at the
13  Seaquarium, that that's an effect of living at the
14  Seaquarium?
15      A   Obviously, I mean, these killer whales,
16  I mean, they're designed to -- I mean, as an apex
17  predator, I mean, those teeth don't break easily.
18  Our teeth don't break easily either, but
19  especially an animal who's designed to -- that's
20  their survival, is -- is the power in those jaws
21  and their -- and their teeth, so they're --
22  they're not going to break even under enormous

---

71

1  pressure.  You have to do something quite
2  remarkable to fracture an orca's tooth.
3      Q   Let me just stop you there.  Have you
4  done any testing or read materials on what it
5  takes to fracture an orca's tooth?
6      A   From my experience, I've seen what --
7  what has -- what has caused teeth to be fractured
8  and, you know, they were very serious situations
9  of -- of whales what appeared to be with all their
10  might, which, you know, they're always showing you
11  they can do more than what you think they can do,
12  slamming their faces into a -- you know, these
13  massive steel bar gates.  And even then sometimes
14  the teeth will not fracture, but it -- it has
15  happened in those circumstances.
16      Also, when whales -- I've seen a whale
17  fracture their tooth when -- out of frustration.
18  They were biting the -- the lip of the concrete
19  stage.  And then we witnessed the behavior and the
20  next session when we call him over, we notice he
21  had a new fractured tooth because that was not his
22  only tooth.

---

72

1      Q   And that was a whale at SeaWorld?
2      A   Correct.
3      Q   Did you witness Lolita slamming her head
4  against a gate or biting --
5      A   No, I did not.
6      Q   You didn't witness her biting the side
7  of the stage or anything like that?
8      A   No, sir, I did not.
9      Q   Okay.
10      (Hargrove Exhibit Number 4 was
11      marked for identification.)
12  BY MR. EARNHART:
13      Q   Have you seen Exhibit Number 4 before?
14      A   Yes.  Yes, sir, I have.  Without --
15  without reading it completely, yes.  And yes,
16  that's my signature at the end.
17      Q   Okay.  And just for the record, what is
18  Exhibit Number 4?
19      A   Number 4.  Let's see.  Oh, I'm sorry.  I
20  have the exhibit itself.
21      This is just my declaration to the
22  court.  Just essentially a basic overview of my

---

73

1  experience.  And can you give me just a second --
2  I'm sorry -- just to review it because --
3      Q   Well, you can probably just read the
4  title.
5      A   Yeah, it's the motion to -- okay.  Yeah,
6  why we need it.  Thank you.  That makes it a lot
7  easier.
8      Q   I wasn't looking for why you need it,
9  just what is it?
10      A   Thank you.  It's -- it was just the
11  reason why a behavioral -- an overnight behavioral
12  observation would be needed and -- and be -- and
13  helpful in being able to assess what's going on
14  with her fully behaviorally and physically.
15      Q   Okay.  Let me go back a step.  I'm just
16  going to go back to teeth for a minute.
17      Orcas don't have hands or anything to
18  manipulate things, they have to use their mouth to
19  manipulate and to a certain degree sense or feel
20  things other than, you know, what they can --
21      A   Yes, sir, that's right.
22      Q   Okay.  They're kind of like Labrador

---

Capital Reporting Company
Hargrove, John  02-16-2016

**74**

1 Retrievers, they use their mouth for a whole lot
2 of things other than biting?
3    A    Absolutely.  It's amazing.  They can
4 pick up a penny on the bottom of a pool.
5    Q    Do orcas convey information verbally at
6 all?  Do they use sounds to convey information?
7    A    Yes, absolutely.  There's a -- they
8 definitely have a language.  They communicate with
9 each other.  Obviously they're -- some -- some of
10 the vocalizations, you know, we can hear and some
11 of those vocalization are out of our hearing
12 range.  So sometimes just because you didn't hear
13 a vocalization does not necessarily mean that --
14 that they did not vocalize, but, you know, most
15 often they are within our hearing range.
16    Q    How does an orca's behavior change at
17 night?
18    A    The -- the major change is that they
19 realize that -- well, sorry to make -- the center
20 of their universe, because they're in captivity,
21 is the trainers.  And I'm going to say we in this
22 instance because, like, this is my life.  We are

**75**

1 the center of their universe.  We're the ones that
2 provide them with the food that they need to stay
3 alive, we are the ones that put them in -- in
4 certain pools, we are the ones that try, to the
5 best of our ability, to -- to give them enrichment
6 and play and things that they enjoy because we
7 acknowledge they're in a sterile environment.  So
8 that's our job as a trainer, is to try to, because
9 they're in -- in captivity, to make their life as
10 exciting as we possibly can.  So the -- the -- the
11 whales are very focused on the trainers.  In fact,
12 so much so that if you have -- when you have two
13 back pools, the pool -- the back pool that's
14 closest to the trainer office, that -- that pool,
15 just -- just because of that reason, that it
16 becomes a very highly reinforcing pool.  The pool
17 that is furthest away from the trainer office we
18 often -- in all three facilities where I've
19 worked -- you have to really condition and train
20 and work whales to go to that pool because a lot
21 of times they will refuse to go because it's not a
22 reinforcing pool because they can't even just

**76**

1 watch the trainers come and go even if we're not
2 interacting with them.
3    Q    So at night?
4    A    So at night the trainers are gone.  They
5 know that -- you know, obviously it's a very
6 predictable pattern, so they know they're not
7 going to get interacted with again until the next
8 morning.  So they're not -- they're in -- there
9 is -- there is no anticipation that at any moment
10 there's going to be a slap on the water and a
11 trainer is going to call them over and they're
12 going to do some type of interaction session,
13 whether it's play, husbandry, exercise, show,
14 whatever, or get food.  So -- and this is also a
15 period where they should have the -- the -- the
16 least amount of harassment that they have to --
17 and what I mean by harassment, I mean noises,
18 lights.
19    Q    In other words, they want a quiet time
20 to rest?
21    A    We -- we try to give them -- although
22 they don't rest as people do, they don't sleep

**77**

1 seven to eight hours a day, they rest one-half of
2 their brain at a time and in short intervals
3 throughout the day.  It's still, we feel,
4 important to give them a period -- a block of time
5 where there is no noise and no light just to give
6 them essentially a break.
7    Q    Now, do you know do orcas have the same
8 habits in the wild of resting at night?
9    A    Because I'm not a marine mammal
10 scientist or studied orcas in the wild, I don't
11 even want to venture an answer there because I
12 would -- I'm not certain.
13        I mean, certainly I've learned things in
14 the last three years from the people I've been
15 associated with, but I'm by no means an expert on
16 orca behavior in the wild.
17    Q    Okay.  In regard to orcas and their
18 communication, we haven't decoded their verbal
19 communication yet; is that correct?
20    A    You're correct.
21    Q    And even very experienced trainers like
22 yourself, like Dawn Brancheau --

Capital Reporting Company
Hargrove, John  02-16-2016

82

1  requirements on shade?
2      A   I'm not sure of the legal requirement.
3  It was just my belief.  But I'm not sure the --
4  the exact law on that.
5      Q   And you're not an engineer?  You haven't
6  measured the sunlight or anything else?
7      A   No, sir.
8      Q   You haven't done an extensive study of
9  when she can get behind the screen or anything
10  like that?
11      A   No, sir, I've not.
12      Q   Does SeaWorld have any shade on their
13  pools?
14      A   They do.  Well, which -- which SeaWorld?
15      Q   Well, let's start with San Diego.
16      A   Okay.
17      Q   I remember visiting.  I don't recall any
18  shade.
19      A   Yeah, exactly.  San Diego -- in fact,
20  you're correct, San Diego does not have any shade
21  structure.  Now, Texas and Florida do.  It's
22  minimal, but they do have shade structure.  But

83

1  the whales have to have access to that pool,
2  which, again, that's dependent upon the trainers.
3  So it's not -- it's not a free-will situation
4  where the whales can -- okay, I'm tired of being
5  in this blistering sun or I'm beginning to be
6  sunburned or whatever and I'm going to go to the
7  area of the pool of the shade structure.  Well, if
8  you're locked out of that pool, you're not going
9  to have access to it.
10      But in Florida there's E pool -- yes, E
11  pool has shade structure, and -- and then they can
12  put shade structure over the medical pool.  They
13  can also take it off.  This is Florida still.
14      And in Texas, same thing with the med
15  pool, you can put shade structure on it or you can
16  take it off, and it's most often always off.  And
17  then the -- and then the two back pools of -- at
18  SeaWorld of Texas there are these narrow strips
19  that from above look like they're shade structure
20  and they do provide a level of shade, but it does
21  permit some sunlight to come through.  But it
22  still -- it provides some level of shade, but it

84

1  doesn't cover the entire pool.
2      Q   Let me ask you because I don't know the
3  answer to this question, but the --
4      A   Oh, and -- I'm sorry.  I'm sorry.  And
5  also the front show pool at SeaWorld of Texas,
6  it's domed in so it's completely covered.
7      Q   The med pools, the E pool, the back
8  pool, how deep are those pools?
9      A   The medical pool is only 8 feet deep,
10  the back pools -- we tell the public that they're
11  20 feet, but they're not.  We've measured them and
12  they're 15 to 17 feet deep.  That's at SeaWorld of
13  Texas.
14      I personally have not measured SeaWorld
15  of Florida because I've never been in that park.
16      SeaWorld of California -- and you're --
17  and you're -- you're just asking specifically
18  about the back pools, correct?
19      Q   Yeah.  Yeah.
20      A   California, the Shamu Pool is 30 to
21  33 feet deep -- 33 -- 30 to 33 feet deep, the
22  medical pool is 8 feet deep, and the back pool,

85

1  again, is only 15 to 17 feet in depth.  But now
2  with the lifting floors, that cut out
3  approximately 3 feet of depth, but those are now
4  being ripped out.
5      Q   I think I saw in your report you said
6  you saw something in Lolita's eye you thought
7  might be a cataract?
8      A   Yes.
9      Q   Is that a medical opinion?
10      A   Yeah.  I base that opinion off of Corky,
11  my experience with Corky, who has the same type of
12  white in her eye and what the veterinarians had
13  always told us what was going on with her eyes.
14  So I based my opinion on Lolita's eye based off of
15  my experience with Corky.
16      Q   Okay.  Corky is another 50-year-old
17  whale?
18      A   Yeah.  She's very close in age with
19  Lolita.  They're -- they are the two oldest whales
20  in captivity in the world.
21      Q   And you're not a veterinarian?
22      A   No, I am not.

Capital Reporting Company
Hargrove, John  02-16-2016

86

1    Q   So you don't know if this -- well,
2    actually what's your understanding of what a
3    cataract is and where it is in the eye?
4    A   Well, just the way it was explained to
5    me, again, by the vets, you know, because we
6    wanted to know what it was, is that the vets would
7    call it a cataract.  And it's basically a -- and,
8    again, because I'm not -- I don't have any medical
9    training and I'm not, honestly, not that
10   interested in it to pursue too much of -- you know
11   I just want the surface meaning of what it is, is
12   that, you know, it is a film, a layer of something
13   that inhibits the -- the vision out of that eye.
14   So -- but is it -- is it going to kill the animal
15   in that regard, no; but is it going to affect
16   their vision, yes.  And so --
17   Q   And is this film on the outside of the
18   eye, on the cornea, or is it something inside of
19   the eye?
20   A   Again, without having the knowledge of,
21   you know, the medical knowledge of physiology
22   because, of course, the trainers don't do the

87

1    necropsies and things like that, but, you know,
2    we -- we always believe it's, you know, the lens
3    of the eye that is the cataract.  That -- that's
4    where the cataract forms, is on the lens of eye.
5        And so -- and we -- because I remember
6    we've also asked our vets in the past if, when we
7    were explained that it was essentially a cataract,
8    could we remove it and they -- they told us no.
9    So -- and I don't know why, but that was the vet's
10   decision.
11   Q   Okay.  You wouldn't know what causes
12   cataracts because you're not a vet?
13   A   I always just believe it was -- to
14   answer your question, no, I don't.  I'm just --
15   Q   Okay.
16   A   So I -- what my beliefs were and why I
17   believed what causes cataracts may be true, they
18   may not be true.  It's just my -- my guess.
19   Q   Okay.  In regard to the pool size, do
20   you know if the federal standards are met for
21   Lolita's pool?
22       MS. HAWKS:  Objection.  Calls for a

88

1    legal conclusion.
2        THE WITNESS:  I have been told that they
3    do not.  Not by my counsel, we've never had
4    that -- that discussion regarding the pool, but
5    I've just -- other people I guess you would say.
6    And even in the industry, even while I was at
7    SeaWorld of Texas and SeaWorld of California, that
8    it was always discussed that Lolita was in an
9    illegally-sized pool, that it was too small, that
10   it did not meet the legal standards.  And that
11   that was always an area of contention and legal
12   argument, but somehow it was never, you know,
13   resolved and I guess it's -- I guess it's still an
14   ongoing battle.
15   Q   Okay.
16   A   So --
17   Q   Let me ask you two questions.  You said
18   your counsel.  Is PETA's counsel your personal --
19   A   Yes.  I'm sorry.  I'm referring -- I'm
20   referring to PETA being -- but I've never --
21   these -- these two attorneys seated next to me,
22   I've -- I have not had a discussion with them

89

1    about whether or not her pool is an illegal size
2    or if it pertains to this case or anything like
3    that.
4    Q   Just my question is they represent PETA
5    in this litigation and other parties.
6        Do they represent you personally in --
7    A   Yes.  Well, I believe they do.  I
8    believe that the -- absolutely that they are my --
9    my -- my counsel.
10       MS. HAWKS:  We are representing
11   Mr. Hargrove for purposes of this deposition.
12   BY MR. EARNHART:
13   Q   Going back to that, the discussions as
14   to Lolita's pool.  I assume that's with other
15   trainers at SeaWorld.
16       Have you had any discussions with
17   attorneys or government people as to the size of
18   Lolita's pool?
19   A   Well, I mean, throughout my career,
20   again, I mean, occasionally, I mean, we would,
21   because it's the industry, we would talk about
22   other facilities.  And, you know, the common --

Capital Reporting Company
Hargrove, John  02-16-2016

106

1 summary area, but they wouldn't document it where
2 they're supposed to on the flip side at the end of
3 the week in the box where it says the medications
4 for the week.
5        So I would -- I would ask, you know,
6 like why -- to myself and make notes, but, you
7 know, why wasn't this put in its -- in -- in the
8 documented medication box.  And that could just
9 be, you know, an oversight by a trainer, you know.
10    Q    Let me ask are Lolita's records similar
11 to those used at SeaWorld for training records?
12    A    Yes, they're in -- they -- they very
13 much have copied SeaWorld's procedures and
14 recordkeeping and -- it's not exactly the same.
15 There are differences and it's not as complete as
16 SeaWorld's, but they definitely have modeled it
17 off of SeaWorld's system for sure.
18    Q    So going back, you're not sure whether
19 there were times when she should have gotten
20 antibiotics and didn't get them?
21        MS. HAWKS:  Objection.  Mischaracterizes
22 earlier testimony.

107

1        THE WITNESS:  Yeah.  I'm just a little
2 --
3 BY MR. EARNHART:
4    Q    Correct me if I'm mischaracterizing it.
5    A    Yeah.  There -- there were times in her
6 records that they discussed or they documented
7 that she had been raked and it was not clear in
8 the records if they put her on antibiotics or not.
9        And again, though, you can have a rake
10 and it be superficial, and if it's superficial
11 meaning not breaking the skin, and you would not
12 need to prescribe antibiotics for that because
13 there is no wound.  It's like a -- not even a
14 scratch.  I mean, it's less than a scratch, it's
15 just a mark.  But if it's a rake where it cuts
16 through the layers of skin and the blubber and
17 causes them to bleed, it is now an open wound and
18 I believe that animals should be on antibiotics,
19 absolutely.
20    Q    Rakes are fairly common in any of these
21 --
22    A    In captive orcas it is, yes.

108

1    Q    How about in wild orcas?  Do you have
2 any idea?
3    A    I've been told that it's not, but,
4 again, I'm not an expert on orcas in the wild.
5 But I've been told by leading marine mammal
6 scientists and orca researchers that that is
7 not -- that type of behavior is not observed in
8 the wild.
9    Q    Okay.  Have you ever seen pictures of
10 orcas in the wild with rake marks on them?
11    A    I have not, no.
12    Q    Back on track here.  In regard to the
13 use of antibiotics, do you recall any particular
14 entries that you saw in the training logs where
15 Lolita got antibiotics and shouldn't have gotten
16 them?
17    A    I saw a lot of cases -- a lot of
18 instances where it was unclear why she was on
19 antibiotics.  It just -- it wasn't -- it wasn't
20 indicated.  They -- they did not document that she
21 had been raked, but they didn't document any
22 other -- any other thing out of the norm what was

109

1 happening of why they were giving her this
2 medication.  So there was only just the
3 documentation that she was on the medication.
4        So, again, because I'm not a vet -- some
5 of the -- some of the drugs were drugs that I've
6 seen SeaWorld vets use, but a lot of the drugs
7 were drugs that, you know, I have not seen used
8 but I still knew what they were.  I knew what
9 their general purpose was.
10        But, again, why they specifically were
11 giving it to Lolita at that time was not clear
12 because their records were not clear.  They were
13 not thorough enough.
14    Q    So you would have to defer to her vets
15 or her trainers as to why she was getting those
16 antibiotics --
17    A    Correct.
18    Q    -- and whether it was correct to give
19 them?
20    A    Yeah, like why -- exactly.  Why was she
21 given this -- this particular drug -- and it
22 wasn't always antibiotics.  Sometimes it was other

Capital Reporting Company
Hargrove, John  02-16-2016

110

1  types of drugs -- why was she given this because
2  it was not clear in the records why.
3     Q    Just a few more questions and I think
4  we'll take a break.
5     A    Sure.
6     Q    From reading your book, Beneath the
7  Surface, I take it captive whales like Lolita
8  shouldn't be set free into the wild?
9     A    Well -- gosh. Okay. Are you ready for
10  this one? I believe that it -- I mean, this is --
11  we're talking about -- this is individual and
12  specific. You can't view every killer whale the
13  same.
14        I think that there are some whales that
15  are viable candidates to go to a sea sanctuary
16  and -- but must -- almost all of them, because of
17  the damage that captivity has caused, that they
18  could not be released back into the wild. A sea
19  sanctuary would be as far as you go. So they're
20  still -- still in the care of man, as SeaWorld
21  likes to say -- say it, but they're still, you
22  know, essentially still in captivity, but they're

112

1     Q    And they don't know how to hunt?
2     A    Well, they don't have to hunt -- they
3  don't know how to hunt in -- at SeaWorld, but I --
4  what my -- what I believe, without exactly knowing
5  where in the book, and I'm sure you will probably
6  point it out, but -- and, again, too I also had a
7  co-writer for my book, so -- but I -- this is the
8  way I believe on it. These whales, even the
9  whales that are born at SeaWorld, still have all
10  of their natural and wild instincts, you know,
11  genetically programmed into them from millions and
12  millions and millions of years.
13        So I believe that even animals that --
14  so to answer your question -- a whale that's been
15  born into captivity at SeaWorld who has never
16  hunted certainly right now today they don't know
17  how to hunt. But they could, I believe, based off
18  of their instincts and evolution and all these
19  millions of years, that they could absolutely --
20  those -- those instincts would kick back in and
21  they would learn how to be able to hunt on their
22  own, and especially if they're with -- in a social

111

1  in their natural habitat, it's larger. But you
2  still have the ability to give this animal medical
3  attention, drugs, you know, things like that that
4  they need because, for example, if their teeth
5  have been drilled out, those types of things, or
6  they've been historically unhealthy.
7        But I do believe that there is potential
8  for animals -- and again, it's individual
9  specific, whale specific. Based off of their --
10  their history of illness, if we know where they
11  were captured and if their family members are
12  still alive and exist, that, you know, could --
13  could potentially be a viable candidate to first
14  go to a sea sanctuary and then be acclimated for
15  an attempt at a full reintroduction back into the
16  wild. But I will say that that -- the number of
17  whales in captivity that I believe that that could
18  happen is extremely low.
19     Q    Okay. I think you said that captive
20  whales are socially dysfunctional; is that
21  correct?
22     A    Yeah. Yes.

113

1  group and they are watching other killer whales
2  because they're so intelligent and they can learn
3  very quickly by observational learning.
4     Q    Well, let me just ask you, this is from
5  your book at page 236, and you talk, most, if not
6  all of the 30 whales it owns, "because those
7  whales cannot be released into the wild"?
8     A    Yes.
9     Q    Is that what you wrote?
10     A    Yeah, and I believe that.
11     Q    "They have become so dysfunctional due
12  to years of captivity they would likely not
13  survive in nature."
14     A    I agree with that.
15     Q    Okay.
16     A    I agree with that because I said it.
17     Q    "It would be a difficult adjustment
18  because the orcas at SeaWorld don't know how to
19  hunt for their food."
20     A    Yeah, it would be a difficult adjustment
21  in the beginning, but they -- it is absolutely
22  possible to acclimate them and -- and get them to

Capital Reporting Company
Hargrove, John  02-16-2016

118

1  you're seeing.
2        But why -- why I believe that she has a
3  chance at that is because according to marine
4  mammal scientists and orca researchers, they
5  have -- they have located her family, that members
6  of her family are still alive, and that they
7  definitely have a language and a dialect that can
8  be recognizable.
9        My experience with these types of
10  animals is they -- they don't forget things.
11  They -- they won't -- years -- I've seen a whale
12  that five years goes by and they hadn't seen a
13  signal in five years and they were asked for it
14  and got it correct the very first time they hadn't
15  even seen it.  And this was something completely
16  insignificant to this animal's life, where
17  obviously their family structure and being taken
18  from their family and caught from the wild is
19  obviously hugely significant in an animal's life.
20  So I don't believe that they forget that -- that
21  that happened.
22      Q   Well, let me step back.

119

1      A   Sure.
2      Q   You said that animals who were damaged
3  from their captivity were not candidates to be
4  released to the wild.
5      A   Well, it depends on the level of damage
6  that they received by captivity.
7        So, for example, back to Lolita, she has
8  fractured teeth, unfortunately she has a
9  pulpotomy.  It's not clear in the records how many
10  pulpotomies that they've performed, if it's just
11  on one tooth or if it's on multiple teeth.  It's
12  not clear.  So that would be, honestly, the, to
13  me, the -- the most worrisome aspect of her, is
14  that -- if it is one tooth that there's been a
15  pulpotomy.
16        The fractured teeth, she certainly could
17  overcome that in -- in the wild because she has --
18  her teeth actually for a captive orca are in
19  pretty good condition.  They're not in -- they're
20  damaged, but they're in pretty good condition and
21  I believe they're in condition enough for her to
22  survive in the wild.  I would just be worried

120

1  about the risk of infection and the tooth that has
2  the pulpotomy.
3      Q   Well, let me ask you this:  You said
4  Lolita and Morgan are the two best candidates to
5  be released.
6      A   Right.
7      Q   What makes them different than the
8  SeaWorld orcas as far as their ability to be
9  released?
10      A   Well, again, it goes back to do we know
11  where their family is, you know, do they -- do
12  they exist, were they killed when they were
13  captured.  If they weren't killed when they were
14  captured, do we know where they are.  That's one.
15        The other thing is you certainly can't
16  reintroduce back into the wild animals now that
17  are being born at SeaWorld that are inbred and
18  crossbred because those animals do not exist in
19  the natural world.
20      Q   Okay.  Let's stop for a second.
21      A   Sure.
22      Q   At SeaWorld they do have orcas that have

121

1  been taken from the wild?
2      A   Yes.
3      Q   Correct?
4      A   Yes.
5      Q   And they know where they were taken,
6  what pod they were taken from?
7      A   No.
8      Q   In any cases?
9      A   Kasatka, Ulises and Corky, we were --
10  from everything that I was taught at SeaWorld, we
11  do not know.  And also from -- recently from
12  marine mammal scientists and orca researchers
13  we -- we don't know if Kasatka's mother even
14  survived let alone where her pod is.  And then
15  Corky --
16      Q   We know where she was captured though,
17  correct?
18      A   Well, Iceland.  So she's Icelandic.
19  But -- so -- but the exact coordinates of where
20  she was captured from in Iceland I don't believe
21  people have that information, no.
22        And -- and then you have Ulises.  And

Capital Reporting Company
Hargrove, John 02-16-2016

274

1 exam. The exam is directly above it. But that
2 was an entirely different interaction where she
3 got eye drops and an exam. And in the show -- so
4 in the show she closed mouth on trainer and it
5 says, "Mouth pres briefly." So that is -- that is
6 aggressive behavior.
7     And then here in Show 7 on the same day,
8 again I'm re-highlighting, it says, "Closed mouth
9 on" -- "Closed mouth on mouth present hula." So
10 honestly that reads to me as an aggressive
11 incident, but the way that they write it's
12 unclear. So I will circle that one as a question
13 mark because that -- that doesn't make sense the
14 way they wrote it, "Closed mouth on mouth present
15 hula."
16     Q   It could be she's supposed to present
17 her mouth to the --
18     A   Yeah.
19     Q   -- to the audience and she closed it
20 instead?
21     A   Yeah. So the reason why I'm going to
22 circle this too is because I don't see the word

275

1 "trainer" in here, where, unlike Show 3, it says,
2 "Closed mouth on T-R" -- that looks like T-R-I-N.
3     Q   What was that date again?
4     A   That was 11/21. So -- and then they
5 said, "Mouth pres briefly." So at first I thought
6 okay, could they, giving them the benefit of the
7 doubt, could this be on a behavior, closed mouth
8 on a throw. But then when they said that her
9 mouth pressed briefly, that is indicative that
10 they are aware of how -- how firmly she's pressing
11 her mouth. So that means it had to have been on a
12 body part. But I'm going to circle the 11/21 Show
13 7, "Closed mouth on mouth present hula," because
14 it does not say the word "trainer" in it. So it's
15 unclear.
16     Q   The one above that, Show 3, "Closed
17 mouth on" --
18     A   That's definitely a T-R and then that
19 could be an A-I-N.
20     Q   Mouth present briefly or pres briefly?
21     A   Again, it says mouth -- yeah, yeah,
22 exactly. "Mouth pres briefly." That could be

276

1 mouth present briefly, but that wouldn't make
2 sense if it's written that way. Mouth present
3 briefly. That doesn't make sense. And there
4 would be no reason to document if she -- if they
5 did a brief mouth present.
6     Q   Okay.
7     MR. EARNHART: Let's just take a short
8 break and let me decide if I've covered
9 everything.
10     MS. HAWKS: Okay.
11     (Brief recess 3:28 p.m. to 3:30 p.m.)
12 BY MR. EARNHART:
13     Q   I've been going back and forth because
14 it is tortuous.
15     A   It is.
16     Q   Here are the rest or close to the rest
17 of the 2015 records. I don't know. I haven't
18 done the records in this case.
19     Why don't we go with the same drill as
20 we did before, but so we don't have quite as much
21 blue, in regards to medications, you know, just
22 put in blue or circle it if it's something of

277

1 extreme concern, you known, mainlining heavy drugs
2 into her or something crazy like that.
3     MS. HAWKS: I actually would prefer
4 that, just for consistency sake, if we could --
5     THE WITNESS: Do the same thing.
6     MS. HAWKS: -- if we're going to do
7 this, do the same thing and -- go ahead.
8     THE WITNESS: And I -- to -- to agree
9 with you on that, the -- these things -- what I
10 did highlight in blue before, they do potentially
11 represent that because we don't -- for her to be
12 getting eye drops multiple times a day every
13 single day, that means there's something seriously
14 wrong with her eyes or there's something very
15 abrasive in her environment and they're trying to
16 protect her eyes from it. So even that that's
17 highlighted the most is indicative of something
18 very serious. And then all the other stuff that I
19 highlighted in blue was actual where they tubed
20 her by her stomach, a vaginoscopy, they -- they
21 vaginally scoped her, and she -- medications,
22 including Tramadol, on multiple times giving her

Capital Reporting Company
Hargrove, John  02-16-2016

278

1 narcotic painkillers, so --
2    Q   Okay.  We'll stay with the same method.
3 Let me get this marked though.  Let me give you a
4 marked copy.
5        MR. EARNHART:  Next exhibit in order.
6        (Hargrove Exhibit Number 10 was
7        marked for identification.)
8        MS. HAWKS:  Can we request the same
9 thing with this one?  Once he's done with the
10 markup, can we get a color copy?
11        MR. EARNHART:  Yeah.
12        THE WITNESS:  And, again, to you that --
13 those eye drops could be the sun related, so -- or
14 they may not be.  So I'll do it exactly the way I
15 did it before.
16        MS. HAWKS:  We'll go over that.
17        (Off the record.)
18        MR. EARNHART:  For the record, these are
19 Bates numbers MSQ0003672 through 3749.
20        THE WITNESS:  I just want to state that
21 in all the records that I examined prior the eye
22 drops that they give consistently every day,

279

1 separate from the occasional Prednisone eye drops
2 that they give, but here they finally classify
3 what those eye drops are.  They're Artificial
4 Tears.  So that's the eye drops that they receive
5 over and over and over again every single day, is
6 Artificial Tears.  And then -- and then on
7 occasion it's documented when they get Prednisone
8 eye drops.  So that's all.
9        MS. HAWKS:  Can we just clarify when you
10 say "here," since there's no Bates number, can you
11 identify just the date?
12        THE WITNESS:  Well, every -- every time
13 it's an ED and circled, eye drops, that's --
14 they're giving them Artificial Tears.  That's the
15 brand.
16 BY MR. EARNHART:
17    Q   But what date is on that entry?
18    A   Oh, I see.  2015 April 23rd.  And I'll
19 --
20    Q   And do you know what Artificial Tears
21 are?
22    A   It's just an over-the-counter -- my

280

1 understanding is it's just an over-the-counter
2 regular eye drop, nonprescription eye drop, which
3 is obviously different than when they give the
4 Prednisone eye drops, so -- because that was never
5 clear before in any of the other records.  So it
6 was good to see that.
7        MR. EARNHART:  We can go off the record.
8        (Off the record.)
9 BY MR. EARNHART:
10    Q   Okay.  We've just gone through
11 Exhibit 10 and it's the rest of the 2015 records
12 that were discussed, those Bates numbers.
13        Again, you marked it with blue.  What
14 does blue signify on these records?
15    A   Blue signifies medication and also
16 rakes.
17    Q   Okay.  And you've marked things with
18 orange.  What does orange signify?
19    A   Orange signifies precursors to
20 aggression and also if there was an indicator that
21 she handled an LRS poorly or if she had an
22 aggressive precursor following an LRS.

281

1    Q   And there's no yellow marks?
2    A   Correct.  The -- the -- the eye drops
3 that are given daily, not the Prednisone eye
4 drops, but the ones that we believe are regular
5 over-the-counter eye drops that they give every
6 day could be sun related, but I chose not to mark
7 it as sun related.  I chose to just mark it as
8 blue for medication, treating the eye drops as
9 medication.
10    Q   Now, the Prednisone eye drops, what
11 would they be for versus the Artificial Tears?
12    A   Because I'm not a vet, I can't give a --
13 all I know is it is a steroid -- a steroidal eye
14 drop.  So it is a prescription type eye drop.
15    Q   Okay.  And the other ones are Artificial
16 Tears?
17    A   Exactly.
18    Q   To moisten the eye?
19    A   There was a -- there was a record
20 that -- that documented that that was what those
21 were, Artificial Tears; however I don't know --
22 they may -- if it's just Artificial Tears, they

Capital Reporting Company
Hargrove, John  02-16-2016

282

1 could switch back -- back and forth from common
2 over-the-counter eye drops because they're
3 basically the same that are over the counter.
4     Q   And did you ever use Artificial Tears
5 with any orcas you were involved with?
6     A   I've never used eye drops on any of the
7 20 orcas I've worked with.
8     Q   So you don't know what the eye drops are
9 for other than obviously something with the eye?
10     A   Exactly.
11     Q   A number of times you brought out a red
12 pen.
13         Now, you initialed some things where you
14 made a mistake, correct?
15     A   Yes.
16     Q   Were there other marks with the red pen?
17     A   Where I circled with the red pen is
18 either if I didn't understand something or -- or
19 they wrote that trainers were in the water because
20 it is my understanding that there is a federal
21 order that they cannot get in the water with
22 Lolita at all under any circumstances, sessions or

283

1 shows.
2         So if in the records they documented
3 they did waterwork with her, I circled it and I
4 just put trainer in the water question mark.
5     Q   And, you know, I think you testified
6 previously these are handwritten notes, correct?
7     A   Correct.
8     Q   They're sometimes hard to interpret?
9     A   Yes.
10     Q   They have abbreviations as well as just
11 messy handwriting, correct?
12     A   Correct.  Some are -- some are easy to
13 read and some are not easy to read at all.
14     Q   Who would be the best person to
15 interpret what each of these notes mean?
16     A   The ones that we're unsure of the
17 handwriting I would use someone at Miami
18 Seaquarium who can identify which trainer's
19 handwriting that is and ask that specific person
20 what you wrote here.
21     Q   So asking the trainer who wrote the note
22 would give you the --

284

1     A   Right.
2     Q   -- best answer as to what was meant?
3     A   Yes.
4     Q   One last question or two here.
5         Do you recall in your report you speak
6 about document 9304 indicates that Lolita's tongue
7 had been bit by the orcas, or at least one example
8 of it?
9     A   Yes.
10     Q   Unfortunately we don't have Bates
11 numbers on the documents, but I got the group of
12 documents and counted through them.  They're
13 two-sided, so I had to count by two.  So I did it
14 a couple of times and did it backwards.
15         This appears to be 9304.  And before we
16 mark it, just for the record, it is dated
17 2004.  Monday, May 17th is the first entry, last
18 entry is Thursday, 5/20, so May 20th.
19         MR. EARNHART:  And if we can just mark
20 this as Exhibit 11.
21         MS. HAWKS:  Counsel, if we are moving on
22 from the exhibit that we just went over --

285

1         MR. EARNHART:  Yes.
2         MS. HAWKS:  -- I just wanted to make
3 sure that I state again for the record that my
4 same caveat or objection that I stated before
5 applies, which is that Mr. Hargrove's review of
6 this record was just preliminary.  He was not able
7 to spend the time with it that he was able to
8 spend with the other years that he reviewed, so
9 there is some chance that he, in conducting the
10 review sitting here today, may have missed
11 something that he otherwise would have marked.
12         MR. EARNHART:  Understood.  I should say
13 objection understood.  I don't agree with it.
14         (Hargrove Exhibit Number 11 was
15         marked for identification.)
16         THE WITNESS:  I'm sorry, which date did
17 you ask me to look at?
18 BY MR. EARNHART:
19     Q   Well, that is the Bates numbered
20 document I believe that you indicated was -- in
21 your report you say, "According to the documents,
22 Pacific white-sided dolphins have bitten Lolita on

Capital Reporting Company
Hargrove, John  02-16-2016

286

1  her tongue more than 70 times, an injury I've
2  never seen in an orca, see e.g." -- see, for
3  example -- "MSQ0009304," and I believe that that's
4  what this document is.
5      A   Okay.
6      Q   Do you see the notation as to the
7  dolphins biting Lolita's tongue?
8      A   Yes, I do.
9      Q   And where is it located on that
10  document?
11     A   Well, let's see.  There may be more than
12  one, but right off the bat, Thursday, May 20th,
13  the bottom of the box, asterisks, "Bite marks on
14  tongue."  And then they go, "Scratch in back of
15  throat."  But, again, I -- I did not document that
16  because that could be from the mackerel being fed
17  to her.  So I did not include the scratches in the
18  back of the throat as anything potentially done by
19  the -- the dolphins, only the bites on the tongue
20  or cuts on the tongue.
21     Q   Okay.  And that page doesn't say
22  anything about the dolphins actually biting the

287

1  tongue, it just says there's cuts on the tongue,
2  correct?
3      A   No.  It says, "Bite marks on tongue."
4  So obviously the only -- the only animal that
5  could have bitten her tongue was -- were the two
6  lags -- the two Pacific white-sided dolphins.
7      Q   Lolita can't bite her own tongue?
8      A   I've never seen a killer whale -- 20 --
9  20 different killer whales -- I've never seen a
10  killer whale bite their own tongue where it caused
11  any type of mark or bleeding or puncture mark.
12     Q   They do bite their own tongues but not
13  to the point to bleeding; is that what you're
14  saying?
15     A   They don't bite their own tongue, but
16  they can stick their tongue out.  We teach it.
17  It's something -- a play thing.  They stick their
18  tongue out and then they can close their rostrum,
19  but that's not biting their own tongue.  That's
20  just sticking their own tongue out and their
21  rostrum is closed.  But that's not biting their
22  tongue with their teeth.

288

1      Q   Okay.  So you believe all entries to
2  cuts on the tongue would be related to the
3  dolphins?
4      A   Yes, because what -- they're coming in
5  and they're seeing -- not knowing what happened
6  and not seeing -- being able to observe
7  behaviorally what went on between Lolita and the
8  dolphins and she's opening her mouth and she has a
9  cut on her tongue when they've already, you know,
10  throughout all of these years documented that she
11  has bite marks on her tongue.  So one can
12  reasonably conclude that those cuts on the tongue
13  are bite marks because eating mackerel will
14  scratch the back of the throat, that's true, but
15  it will not cut the tongue.
16     Q   How many times have you seen an orca's
17  tongue be bitten by a dolphin?
18     A   I've never seen -- I've never worked
19  with a killer whale that was housed with a
20  dolphin.
21         MR. EARNHART:  I don't have any further
22  questions.

289

1          MS. HAWKS:  Okay.  I don't have any
2  redirect either.
3          THE WITNESS:  Did no one want to go over
4  how many times there are rakes in any of these?
5          MS. HAWKS:  You've marked that up on the
6  document?
7          THE WITNESS:  Yes.
8          MS. HAWKS:  Have you highlighted every
9  one in the document?
10         THE WITNESS:  Yes, everything that was
11  like -- it was part of the blue, which was
12  medication and rakes, and which shows how many
13  times that she was raked by the dolphins
14  throughout these records.
15         MS. HAWKS:  Okay.  I'm comfortable
16  relying on your highlighting of the documents.  So
17  we can look at that again later.  It's in the
18  record.
19         THE WITNESS:  Okay.
20         MS. HAWKS:  We would like to reserve
21  signature.
22         (Whereupon, at 5:20 p.m., the