UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| People for the Ethical Treatment of Animals, Inc.; Animal Legal Defense Fund; Howard Garrett; and Orca Network,<br><br>Plaintiffs,<br><br>v.<br><br>Miami Seaquarium; Festival Fun Parks, LLC, d/b/a Palace Entertainment,<br><br>Defendants. | Civ. No. 1:15-cv-22692-UU<br><br>**Plaintiffs' Statement of Material Facts in Support of Their Motion for Partial Summary Judgment** |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to S.D. Fla. L.R. 56.1, People for the Ethical Treatment of Animals, Inc., ("PETA"), Animal Legal Defense Fund ("ALDF"), Howard Garrett, and Orca Network (collectively, "Plaintiffs") hereby submit this statement of material facts as to which there does not exist any genuine issue.

**A.    Defendant Has Confined Lolita to a Small Tank for More Than 45 Years**

1.    Defendant, Festival Fun Parks, LLC, doing business as Palace Entertainment, owns and operates the Miami Seaquarium ("Seaquarium"), a marine animal park that confines and exhibits marine animals in Miami-Dade County, Florida. (See Docket Entry ("DE") 22, Defendant's Amended Answer ("Ans."), ¶¶ 23, 32.)

2.    The Seaquarium has confined an orca (*Orcinus orca*) named Lolita since 1970, after she was captured from the wild. (Ans. ¶¶ 32, 38.)

3.    Lolita is twenty-feet long and weighs approximately 7,500 pounds. (Id. ¶ 40.)

4.    Lolita is held in a tank that is, at its deepest point, only twenty-feet deep. (Id. ¶ 42.) The tank is eighty-feet across at its widest point. (See Ex. A, Def.'s Response and Objections to PETA's First Set of Requests for Admission ("Adm.") to Ex. 1, Goodman Decl. ¶¶ 8-9, Request No. 14.)[1]

---

[1] The exhibits to this Statement are attached and referred to as "Ex. ___."

5.      Lolita has not seen another orca since 1980, when her companion, an orca named Hugo, died. (Ans. ¶¶ 57, 63.)

6.      The tank's only shade comes from the surrounding stadium seating, leaving Lolita with no shade when the sun is at its highest. (Ans. ¶ 50.)

**B.     Lolita Is Protected Under the Endangered Species Act**

7.      In 2015, the National Marine Fisheries Service ("NMFS") promulgated a final rule granting Lolita protection under the Endangered Species Act ("ESA"). See 80 Fed. Reg. 7380 (Feb. 10, 2015). This rule, which became effective on May 11, 2015, recognizes Lolita as a member of the "L-pod" of the endangered Southern Resident Killer Whale ("SKRW") Distinct Population Segment ("DPS"). (Id.)

8.      Plaintiffs allege that the conditions of Lolita's confinement are unlawful because they harm and harass Lolita and thus amount to a "take" under the ESA. (See DE 1, Complaint ("Compl."), ¶¶ 41-46 (tank size), ¶¶ 47-56 (shade), ¶¶ 57-66 (companionship).)

9.      Defendant does not have a permit to "take" Lolita under the ESA. (See Adm. at 5-6 (Request No. 6).)

10.     The Seaquarium has made many statements to the public, asserting that the manner in which Lolita is held and exhibited is both lawful and humane and "Lolita is healthy and thriving." (See Goodman Decl. ¶ 7 & Ex. C.)

**C.     Facts Related to PETA's Diversion of Resources**

11.     Plaintiff PETA is a national non-profit organization headquartered in Norfolk, Virginia, that is dedicated to protecting animals from abuse, neglect, and cruelty. (Ex. 2, Kerr Decl. ¶ 3.)  PETA focuses its efforts on the areas in which the largest numbers of animals suffer the most intensely for the longest periods of time, including the entertainment industry. (Id. ¶ 3.) A central tenet of PETA's mission is to expose the inhumane treatment of animals trained and used for entertainment; to educate the public about such treatment; and, ultimately, to encourage people to choose alternative forms of entertainment. (Id. ¶ 3.)

12.     To achieve its mission, PETA uses public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and administrative comments and complaints to educate the public and enforce laws enacted to protect animals. (Kerr Decl. ¶ 3.) ]

13. PETA focuses these efforts on U.S.-based animal exhibitors and other entertainment. (Kerr Decl. ¶ 3.)

14. The Seaquarium's treatment of Lolita (which PETA alleges harms and harasses her under the law) frustrates PETA's mission by requiring it to focus its resources on litigation to ensure compliance with established laws rather than on other educational and investigatory efforts, or on administrative comments and legislation, to ensure that animals are afforded appropriate legal protection. (Kerr Decl. ¶ 4.)

15. The Seaquarium's treatment of Lolita also frustrates PETA's efforts to alleviate the suffering of other animals held in conditions like Lolita's. (Kerr Decl. ¶ 4.) The fact that that the Seaquarium continues to maintain Lolita in the conditions that it does without legal sanction suggests to the public that the conditions at the Seaquarium cannot actually be injuring her and significantly disrupting her normal behavioral patterns. (Id.)

16. The Seaquarium's representations that Lolita is being treated lawfully and humanely also make it harder for PETA to successfully convince the public of its contention that Lolita's living conditions violate the ESA. (Kerr Decl. ¶ 6.)

17. Since at least 2011, PETA has been, and will continue to be, required to expend substantial resources of money and staff time on efforts to prevent the Seaquarium from continuing to maintain Lolita in her current conditions (which PETA alleges constitute harm and harassment under the law). (Kerr Decl. ¶ 5.) These efforts include, but are not limited to, (a) monitoring Lolita's conditions; (b) organizing and promoting protests against Lolita's conditions; (c) suing the NMFS for excluding Lolita from the ESA listing for Southern Resident killer whales, and appealing the dismissal of that suit on a procedural technicality; (d) submitting an ESA-listing petition for Lolita to the NMFS; (e) submitting lengthy nonrenewal requests to the U.S. Department of Agriculture ("USDA") asking the agency not to renew the Seaquarium's Animal Welfare Act ("AWA") license on the basis of the Seaquarium's failure to provide Lolita adequate space, shade, and companionship; (f) suing the USDA for renewing the Seaquarium's AWA license, and appealing dismissal of that suit; and (g) publishing multiple action alerts on PETA's website and affiliated websites asking supporters either to urge the Seaquarium to retire Lolita to a coastal sanctuary, or to urge government agencies to act to prevent Lolita's harm and harassment. (Id.; see also Goodman Decl., ¶¶ 15-16, Exs. J-K.)

18.     Since at least 2011, PETA has also been, and will continue to be, required to expend substantial resources of money and staff time on efforts to educate the public about Lolita's current conditions (which PETA alleges constitute harm and harassment under the law). (Kerr Decl. ¶ 6.) These efforts include, but are not limited to, (a) organizing and promoting protests against Lolita's conditions; (b) drafting and distributing press releases; (c) conducting media interviews; and (e) publishing news stories on PETA's websites and affiliated websites. (Id.; see also Goodman Decl., ¶¶ 11, 14, 16-17, Ex. F, I, K-L.)

19.     To assist in these efforts, PETA has expended, and continues to expend, considerable staff time on (a) developing litigation and communications strategies; (b) drafting administrative complaints and petitions; (c) preparing and distributing press releases; (d) drafting and publishing website content; (e) organizing and promoting protests; (f) recruiting activists; (g) preparing materials for protests; (h) writing legal complaints, briefs, and motions; (i) creating and coordinating action alerts; and (j) monitoring Lolita's conditions. (Kerr Decl. ¶ 7; see also Goodman Decl., ¶¶ 10, 14-17, Exs. E, I-L.) This does not include staff time expended on the current litigation. (Kerr Decl. ¶ 7.)

20.     In addition to staff time, PETA has incurred, and continues to incur, numerous costs related to these efforts, including, but not limited to: (a) attorneys' fees; Westlaw and LexisNexis research expenses; (b) filing fees; (c) search fees for court records; (d) long-distance phone charges; (e) fees for shipping and printing services; and (f) travel expenses (including food, travel, lodging, and parking expenses). (Kerr Decl. ¶ 8) These do not include costs incurred in the current litigation. (Id.)

21.     PETA has been forced to divert these resources from other projects and campaigns. (Kerr Decl. ¶ 9.) PETA would no longer expend these resources if the Seaquarium no longer kept Lolita in conditions that PETA considers to constitute an unlawful "take" under the law. (Id. ¶ 10.)

**D.      Facts Relating to ALDF's Diversion of Resources**

22.     Plaintiff ALDF is a national non-profit organization involved in every aspect of animal law. (Ex. 3, Dillard Decl. ¶ 4.) ALDF is dedicated to preventing animal cruelty and to advancing the interests of animals through the legal system. (Id.)

23.     ALDF focuses its attention, in part, on the protection of animals who are used in entertainment, and who are subject to cruelty and intensive confinement. (Dillard Decl. ¶ 5.)

24. To achieve its mission, ALDF has worked to educate the public about the treatment and welfare of animals used in entertainment. (Dillard Decl. ¶ 6.) These efforts include, but are not limited to, the production of on-line features, the filing of administrative petitions and lawsuits, publishing a regular newsletter and other materials, and organizing press and public speaking engagements. (Id.)

25. The Seaquarium's possession of Lolita for more than four decades in her current conditions, coupled with the Seaquarium's representations that its treatment of Lolita is lawful and humane, suggests to the public that the conditions at the Seaquarium cannot actually be harming and harassing her, and this frustrates ALDF's efforts by making it harder for ALDF to persuade the public of its contention that Lolita's living conditions violate the ESA. (Dillard Decl. ¶ 7-9.)

26. Since 2011, ALDF has expended substantial resources on efforts to improve Lolita's welfare. (Dillard Decl. ¶ 10.)

27. ALDF has expended, and will continue to expend, substantial resources, including money and staff time, separate from the current litigation, to prevent the Seaquarium from maintaining Lolita in her current conditions (which ALDF alleges constitute harm and harassment under the law); to educate the public about the conditions in which Lolita has been kept at the Seaquarium; and to urge the Seaquarium to release Lolita from the conditions Plaintiffs allege harm and harass her. (Dillard Decl. ¶¶ 10-11.)

28. ALDF's efforts include, but are not limited to: (a) suing the NMFS for excluding Lolita from the ESA listing for the SRKW DPS; (b) submitting an ESA-listing petition for Lolita; (c) submitting lengthy nonrenewal requests to the USDA asking the agency not to renew the Seaquarium's AWA license on the basis of the Seaquarium's alleged failure to provide Lolita adequate space, shade, and companionship; (d) conducting media interviews; (e) publishing news stories about Lolita on ALDF's website and in ALDF's newsletter; (f) initiating a letter-writing campaign to support Lolita's protection under the ESA; and (g) filing a complaint with the Occupational Safety and Health Administration (OSHA) after documenting Seaquarium trainers in the water with Lolita after OSHA had determined this was a workplace safety hazard. (Dillard Decl. ¶¶ 11-16.)

29. ALDF has been forced to divert these resources from other projects and campaigns. (Id. ¶¶ 17-20.) ALDF would no longer expend these resources if the Seaquarium no

longer kept Lolita in conditions that ALDF considers to constitute an unlawful "take" under the law. (Id. ¶ 21.)

E.     **Facts Related to Orca Network's Diversion of Resources**

30.    Plaintiff Orca Network is a non-profit organization dedicated to raising awareness of the killer whales of the Pacific Northwest and the importance of providing them healthy and safe habitats. (Ex. 4, Garrett Decl. ¶ 4.)

31.    Orca Networks seeks to build a "community" that is "increasingly attuned to the orca population" and that "cares about and tries to understand the needs of the resident and transient orcas that inhabit the Salish Sea." (Garret Decl. ¶ 4.) Orca Network's activities include tracking and documenting the activities of the SRKW population—including the L- pod from which Lolita was captured. (Id.)

32.    To encourage shoreline observation of the SKRWs, to increase awareness and knowledge about them, to foster a stewardship ethic, and to motivate a diverse audience to take action to protect and restore the habitat, Orca Network created the Whale Sighting Network and Education Project, through which sightings and observations of the orca community are gathered and disseminated to researchers and volunteers. (Garret Decl. ¶ 4.) Every year, Orca Network holds a beachside commemoration of the day Lolita was captured in Puget Sound and separated from her family. (Id.)

33.    The Seaquarium's treatment of Lolita (which Orca Network alleges harms and harasses Lolita, in violation of the ESA) frustrates its mission of fostering a stewardship ethic toward orcas by perpetuating the message that it is acceptable to use orcas as entertainment in conditions that Orca Network asserts are harmful—for example, in Lolita's case, in an inadequate tank, without sufficient shelter, and without any companions of her own species. (Garrett Decl. ¶ 5.)

34.    The Seaquarium's treatment of Lolita also frustrates Orca Network's efforts to encourage people to care about and try to understand the needs of the resident and transient orcas that inhabit the Salish Sea, by presenting Lolita—an orca from L-pod—in conditions that Orca Network asserts are radically inconsistent with her needs. (Id.)

35.    In addition, the Seaquarium's representations that its treatment of Lolita is lawful and humane suggest to the public that the conditions at the Seaquarium cannot actually be harming and harassing her, and this frustrates Orca Network's efforts by making it harder for

6

Orca Network to persuade the public of its contention that Lolita's living conditions violate the ESA. (Id.)

36.     Since at least 2011, Orca Network has expended, and will continue to expend, substantial resources, separate from the current litigation, to prevent Seaquarium from maintaining Lolita in her current conditions (which Orca Network alleges constitute harm and harassment under the law); to educate the public about the conditions in which Lolita has been kept at Seaquarium; and to urge Seaquarium to release Lolita from the conditions that Plaintiffs allege harm and harass her. (Garrett Decl. ¶ 6.)

37.     Orca Network's efforts include, but are not limited to: (a) submitting numerous complaints and requests for enforcement to government agencies concerning the conditions of Lolita's confinement; (b) coordinating multiple public letter-writing campaigns to the USDA concerning the conditions of Lolita's confinement; (c) conducting media interviews; (d) delivering presentations about Lolita's living conditions and the feasibility of returning her to her natural habitat; (e) publishing content about the Seaquarium's treatment of Lolita on its website; (f) organizing protests and other events; (g) drafting a detailed proposal to retire Lolita to her native habitat; (h) submitting an ESA-listing petition for Lolita to the NMFS; (i) submitting lengthy nonrenewal requests to the USDA asking the agency not to renew the Seaquarium's AWA license on the basis of the Seaquarium's alleged failure to provide Lolita adequate space, shade, and companionship; (j) suing the USDA for renewing the Seaquarium's AWA license; and (k) appealing dismissal of that suit. (Garrett Decl. ¶ 6.) These expenses are separate from the current litigation. (Id.)

38.     Orca Network has been forced to divert these resources from other projects and campaigns. (Id. ¶ 7.) Orca Network would no longer expend these resources if the Seaquarium no longer kept Lolita in conditions that Orca Network considers to constitute an unlawful "take" under the law. (Id. ¶ 8.)

**F.     Facts Related to Howard Garrett's Aesthetic Injury**

39.     Plaintiff Howard Garrett lives in Washington State and is the co-founder, Director, and President of the Board of Plaintiff Orca Network. (Garrett Decl. ¶ 2.) He has worked for Orca Network since its founding in 2001. (Id. ¶ 4.)

40.     Mr. Garrett's interest in orcas began in 1981, when he became an assistant researcher with the Center for Whale Research (then called Orca Survey), where his duties

included observing the SRKWs population—the family from which Lolita was captured. (Garrett Decl. ¶ 3.) There he learned that orcas are a far-ranging, deep-diving species, constantly moving and interacting with their social group. (Id. ¶ 14.) Because of his familiarity with and admiration for orcas, Mr. Garrett enjoys observing, studying, and photographing them, and appreciating in person their beauty, intelligence, and complexity. (Id. ¶ 9.)

41. Mr. Garrett developed a personal bond with Lolita upon first seeing her in person in 1993. (Garrett Decl. ¶ 10.)

42. Mr. Garrett has visited Lolita at the Seaquarium on several occasions since: in March 1999, May 2001, and January 2002 (Garrett Decl. ¶ 13.) Each time, his ability to enjoy observing Lolita was impaired by seeing her held in what he believes to be inhumane and unlawful conditions—i.e., an extremely small and shallow tank with inadequate protection from the sun, and without any companions of her own species. (Id. ¶¶ 13-14.)

43. Mr. Garrett is forced to choose between experiencing distress when he visits Lolita at the Seaquarium, as well as contributing monetarily to the very facility that he believes is causing her suffering, or refraining from visiting her to avoid that distressing event. (Id. ¶ 16.)

44. In April 1995, Mr. Garrett founded the non-profit Tokitae Foundation, which was dedicated to raising public awareness about the feasibility of returning Lolita to the SRKW community. (Garrett Decl. ¶ 12.) Mr. Garrett moved cross-country to Miami from September 1997 to November 1999—unpaid—to raise awareness of the proposed retirement plan. (Id.)

45. After more than two decades, Mr. Garrett continues to devote a substantial percentage of his time to advocating for Lolita. (Garrett Decl. ¶ 15.) Mr. Garrett has submitted voluminous materials to both the Seaquarium and the federal government over the years, in an effort to convince them to improve the conditions in which Lolita lives. (Id.) Mr. Garrett has repeatedly written to the Seaquarium asking it to retire Lolita; submitted complaints to various agencies about Lolita's living conditions; filed a petition with the NMFS urging agency to protect Lolita under the ESA; and served as a named plaintiff in a case against the USDA for failing to enforce the AWA with respect to the same conditions at issue here, among many other advocacy activities on Lolita's behalf. (Id.)

46. If the Seaquarium no longer kept Lolita in conditions that he considers injurious to her, Mr. Garrett would visit Lolita as often as possible to enjoy observing, studying, and photographing her. (Garrett Decl. ¶ 17.)

Date:   March 11, 2016               Respectfully submitted,

/s/ Paul J. Schwiep_____
Paul J. Schwiep, Fla. Bar No. 823244
Coffey Burlington, P.L.
2601 South Bayshore Dr., PH
Miami, FL 33133
Phone: 305-858-2900
Fax: 305-858-5261
pschwiep@coffeyburlington.com


/s/ Jared Goodman_____
Jared Goodman (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2266
Fax: 213-484-1648
JaredG@petaf.org

/s/ Matthew Strugar_____
Matthew Strugar (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 213-484-1648
Matthew-S@petaf.org

/s/ Caitlin K. Hawks_____
Caitlin K. Hawks (admitted *pro hac vice*)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 206-858-8518
Fax: 213-484-1648
CaitlinH@petaf.org

*Attorneys for Plaintiffs*