**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:15-cv-22692-UU

PEOPLE FOR THE
ETHICAL TREATMENT OF
ANIMALS, INC., *et al*,

      Plaintiffs,

v.

MIAMI SEAQUARIUM and
FESTIVAL FUN PARKS, LLC,
d/b/a PALACE ENTRAINMENT,

      Defendant.

_____/

## ORDER

      THIS CAUSE is before the Court on cross-motions for summary judgment.  Plaintiffs

People for the Ethical Treatment of Animals ("PETA"), Animal Legal Defense Fund, The Orca

Network, and Howard Garrett move for entry of partial summary judgment on the threshold

issue of standing. D.E. 131. Defendant Miami Seaquarium and Festival Fun Parks, LLC, d/b/a

Palace Entertainment (the "Seaquarium") moves for entry of summary judgment on the grounds

that Plaintiffs lack standing to maintain their claims and on the merits. D.E. 126.

      THE COURT has reviewed the Motions, the pertinent portions of the record, and is

otherwise fully advised of the premises.

## I.   BACKGROUND

This case concerns the welfare and humane treatment of a captive killer whale named Lolita (a/k/a "Toki") that resides at the Seaquarium.[1]  Plaintiffs seek to redress injuries that Lolita is suffering due to the conditions under which she is confined at the Seaquarium, claiming that such injuries amount to a "take" in violation of section 9(a)(1)(B) of the Endangered Species Act (the "ESA"), 16 U.S.C. § 1538(a)(1)(B) (1988).

Lolita is a Southern Resident Killer Whale ("SRKW")[2] that was legally captured off the coast of Washington State in 1970 when she was approximately five years old. Compl. ¶ 33. Seaquarium purchased Lolita soon after her capture, and she has lived at the Seaquarium since September 24, 1970. D.E. 147 at 6.  She is now approximately 51 years of age. D.E. 147 at 8. Her current age exceeds the median life expectancy of SRKWs.[3]

Lolita weighs about 8,000 pounds and is twenty-five feet long. D.E. 147 at 8.  For as long as she has been housed by the Seaquarium, she has lived in an oblong tank that, at its widest

---

[1] Miami Seaquarium is the entity that operates the marine animal park under the same name where Lolita resides. Compl. ¶ 24. For readability purposes, this Order will use "Seaquarium" to refer to both the park and entity Defendant.

[2] In the northeastern Pacific Ocean, where Lolita was caught, there are three discrete ecotypes of killer whales:  "residents," "transients," and "offshores." *Listing Endangered or Threatened Species: Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct Population Segment,* 80 Fed. Reg. 7380 (Feb. 10, 2015) (codified at 50 C.F.R. pt 224). These three groups are distinguished by morphology, diet, and behavior. *See Endangered Status for Southern Resident Killer Whales,* 70 Fed. Reg. 69903, 69911 (Nov. 18, 2005) (codified at 50 C.F.R. pt. 224.101). Within the "resident" ecotype, there exist four distinct populations: Southern, Northern, and two Alaskan groups. 80 Fed. Reg. at 7381. The Southern Resident Killer Whales ("SRKW"), for example, consist of three pods (J, K, and L), who range during non-winter months in the waterways of the Puget Sound, Strait of Juan de Fuca, and the Southern Georgia Strait. *Id.*

[3] Female SRKWs have a median life expectancy in the wild of approximately 38 years, according to Seaquarium, D.E. 22-2 at 5, and 50 years according to Plaintiffs. D.E. 164, Ex. N at 22:1-9. The life expectancy of captive killer whales in United States facilities is twelve years. D.E. 164, Ex. CC at 11.

point, is eighty (80) feet across, and at its lowest point, is twenty (20) feet deep. D.E. 22 ¶ 42. Since the 1980s, the tank has been surrounded by stadium seating. D.E. 22 ¶ 47; D.E. 147-1. For a time, Lolita shared her tank with Hugo, another SRKW.  However, Hugo died in the 1980s. For the last twenty years, Lolita has shared her tank with pacific white-sided dolphins ("PWSDs"), who are of a biologically related species in that they are taxonomically members of the same family (i.e., the dolphin or "delphinidae" family). D.E. 22-4.

Until very recently, Lolita was not protected by the ESA.  Although the National Marine Fisheries Service (the "NMFS") (the agency charged with administering the ESA with respect to various marine mammals, discussed *infra*) recognized the SRKW as an endangered species in 2005, it excluded from the listing those members of the population held in captivity. 70 Fed. Reg. 69903, 69911 (Nov. 18, 2005).

In January 2013, PETA submitted to the NMFS a petition:  (1) to recognize Lolita as a protected SRKW; and, (2) to remove the captive member exclusion from the ESA.  PETA was successful, and in May 2015, the NMFS recognized Lolita as protected. Accordingly, Lolita, the only SKRW presently held in captivity, is now protected by the ESA.  *Listing Endangered or Threatened Species: Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct Population Segment,* 80 Fed. Reg. 7380 (Feb. 10, 2015) (codified at 50 C.F.R. pt 224).[4]

Shortly after the effective date of the rule recognizing Lolita as a member of an endangered species, Plaintiffs commenced this action.  In their Complaint, Plaintiffs seek declaratory and injunctive relief, claiming that the Seaquarium has committed an unlawful "take" of Lolita in violation of the ESA section 9(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B) ("section 9(a)(1)").  Compl. ¶¶ 73-76 (a)-(d). More specifically, Plaintiffs allege that a "take" has occurred

---

[4]  The effective date of the rule was May 11, 2015.

because Lolita is suffering "harm" and "harass[ment]" in violation of the ESA section 9(a)(1) (making it unlawful to "take" an endangered species, which is defined as, among other conduct, "to harass [or] harm") from the conditions under which she is confined.

In support, Plaintiffs allege that the conditions of Lolita's captivity do not meet the minimum standards for captive marine mammals applicable to exhibitors under the Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131, *et seq.*, and its implementing regulations, Title 9 of the Code of Federal Regulations, parts 1, 2 and 3. *See* Compl. ¶¶ 45, 56, 66. The alleged harmful conditions are that she is maintained in an undersized tank, is not provided with adequate protection from the sun, and the PWSDs with which she shares her tank are of an incompatible species. *Id*. These conditions harm Lolita, according to Plaintiffs, because they create physical and psychological stress, deprive her of the ability to engage in natural behaviors, expose her to excessive radiation from the sun, and cause physical injuries. Compl. ¶¶ 46, 55, 64.

While the NMFS is charged with administering the ESA with respect to marine mammals, the AWA is administered by the Animal Plant Health Inspection Services ("APHIS") under the jurisdiction of the U.S. Department of Agriculture ("USDA"). APHIS also is the agency that licenses the Seaquarium to hold and exhibit Lolita (D.E. 164, Ex. GG) subject to its compliance with APHIS, which establishes minimum standards for the humane handling, care, and treatment of captive marine mammals. In June 2011, the Administrative Investigations and Compliance Branch of APHIS responded to a telephone complaint and a letter writing campaign concerning the alleged injuries to Lolita at the Seaquarium. APHIS arrived at the following conclusions:

> In general, Seaquarium's inspection history shows Lolita and the other marine mammals at the facility to be healthy and receiving appropriate veterinary care. Animals may develop superficial ("rake") injuries as part of their normal behavior and activities: such lesions are promptly identified and treated.

Animal enclosures have adequate shade, protection from weather, and compliant perimeter fences. [S]hade and protection from weather is provided by the stadium seating around Lolita's pool, and based on the facility's inspection history, Lolita has none of the skin and eye lesions associated with inadequate shade.

Many people have expressed concern about the size of Lolita's pool. Therefore, our agency has re-evaluated the measurements. Based on this re-assessment, we have determined that the pool meets the AWA space requirements for marine mammals.

*See* D.E. 22-3 at 3.

In March 2012, APHIS again reviewed the conditions of Lolita's captivity in response to a letter from the Animal Legal Defense Fund and PETA concerning harms related to Lolita's tank dimensions and the sharing of her tank with the PWSDs. APHIS found the Seaquarium compliant with the AWA's space and social companionship regulations:

[W]e have determined that [Lolita's] pool meets the AWA space requirements for marine mammals . . . [and] exceeds the minimum requirements in all required dimensions.

Miami Seaquarium meets section 3.109 of the AWA regulations requiring that social marine mammals, such as orcas, be housed with at least one compatible animal of the same species or biologically related species. Lolita has shared her tank for many years with Pacific white-sided dolphins that are, like Lolita, cetacean mammals and therefore a biologically related species.

*See* D.E. 22-4.[5]

In their Notice of Intent to File Citizen Suit Pursuant to the Endangered Species Act, which served as a precondition to the initiation of this lawsuit, Plaintiffs acknowledged that " … generally accepted husbandry practices that meet the Animal Welfare Act (AWA) requirements are exempt from the regulatory definition of 'harass' under the ESA." D.E. 1-4 at 3. Nonetheless, Plaintiffs contest APHIS' findings herein and assert that Lolita is the subject of

---

[5] Plaintiffs do not challenge the authenticity of the APHIS documents. The documents are also filed as exhibits to a declaration in support of Defendant's motion for summary judgment. D.E. 130-1.

an unlawful "take" pursuant to the ESA section 9(a)(1). 16 U.S.C. § 1538(a)(1)(B).  On this basis, Plaintiffs request that this Court enter an order enjoining Seaquarium from continuing to violate the ESA, requiring Seaquarium to forfeit possession of Lolita, and requiring Seaquarium to transfer Lolita to a sea pen. D.E. 22-4 at 17.

In order to resolve the pending motions, the Court must determine as a threshold matter whether one or more Plaintiffs have standing to pursue the ESA claims as alleged in the Complaint.  Assuming standing, the Court next must construe and apply the relevant portions of two federal statutes, the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq*., and the Animal Welfare Act, 7 U.S.C. §§ 2131, *et seq*., and those Acts' implementing regulations, taking into consideration the interrelationship of these laws and their associated regulatory frameworks.

## II.   LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. When determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002). The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrell Catrett*, 477 U.S. 317, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981) (citation omitted).[6] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from those facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969) (citation omitted). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Elec. Techniques, v. Wackenhut Protective Sys.*, 669 F.2d 1026, 1031 (5th Cir. 1982) (citation omitted); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

---

[6] The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

### III.   DISCUSSION

#### A.   PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON STANDING

The ESA's citizen-suit provision permits "any person" to commence a civil suit to enjoin alleged violations of the ESA or regulations issued under its authority. 16 U.S.C. § 1540(g)(1). Described as "an authorization of remarkable breadth," the citizen-suit provision expands standing to the full extent permitted under Article III of the Constitution and eliminates any prudential standing requirements. *Bennett v. Spear,* 520 U.S. 154, 164–66, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). To establish standing, therefore, Plaintiffs need only satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). That is, they must show:  (1) an injury in fact that is concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision.  *Id.* at 560–61, 112 S.Ct. 2130 (internal quotation marks omitted).[7]

"[E]ach element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000) (internal citation and quotation omitted).  Because this action is at the summary judgment stage, Plaintiffs can no longer rely on mere allegations, "but must set forth by affidavit or other evidence specific facts." *Florida Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004) (internal citation omitted).

---

[7] Despite the Supreme Court's ruling in *Bennett*, Plaintiffs devoted a portion of their standing brief arguing they had satisfied prudential standing requirements. Because the Supreme Court has held the ESA citizen's suit provision negates the "zone-of-interest" test, the Court need not address this argument. *Bennett,* 520 U.S. at 164.

"[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Culverhouse v. Paulson & Co., Inc.*, 813 F.3d 991, 994 (11th Cir. 2016).

### i.  ORGANIZATIONAL STANDING UNDER *HAVENS*

In *Sierra Club v. Morton*, the Supreme Court held that organizations "who seek to do no more than vindicate their own value preferences through the judicial process" generally cannot establish standing.  405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed. 2d 636 (1972) (footnote omitted). Subsequently, in *Havens Realty Corp. v. Coleman,* the Supreme Court held that an organization can establish Article III standing if it can show that the defendant's actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

In *Havens,* a nonprofit seeking to promote equal opportunity in housing argued that it had standing to sue the owner of an apartment complex in its own right, because the owner's racial steering practices frustrated its efforts "'to assist equal access to housing through counseling and other referral services[,]'" and caused the organization to devote resources to counteracting the unlawful practices.  *Id.*  (quoting complaint). Taking these allegations as true, the Supreme Court held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests," *id.,* and distinguished the case from *Sierra Club,* where the organizational plaintiff had alleged nothing more than a "'mere interest in a problem.'" *Id.* (quoting *Sierra Club,* 405 U.S. at 739, 92 S.Ct. 1361).

Following *Havens*, the Eleventh Circuit held that an organization claiming standing to sue on its own behalf must show that "the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). To satisfy this requirement, an organization must demonstrate that the asserted illegal acts are in conflict with the organization's mission. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014); *see also Nat'l Treasury Emps. Union v. United States,* 101 F.3d 1423, 1430 (D.C. Cir.1996). And, at the summary judgment stage, the organization must provide evidence of an injury independent of the "expenditure of resources on that *very* suit," *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co*., 236 F.3d 629, 642 (11th Cir. 2000) (emphasis added), and independent of "the cost of detecting [the defendant's] illegal practices . . . ." *Browning*, 522 F.3d at 1166.

### a. PETA

#### i. INJURY-IN-FACT

In order to establish that PETA has suffered an actual injury for standing purposes, PETA has submitted an affidavit from its General Counsel, Jeffrey S. Kerr ("Kerr"), to show that PETA's mission is to protect animals from abuse, neglect, and cruelty, and documents demonstrating that it has been diverted from its mission by the conditions of Lolita's captivity. For the reasons explained below, the evidence is sufficient to satisfy the "injury in fact" element of the standing analysis.

First, in his affidavit, Mr. Kerr avers that PETA's mission is to protect animals from abuse, neglect, and cruelty. (D.E. 133, Kerr Dec. ¶ 3); and, as part of this mission, PETA seeks to

expose the inhumane treatment of animals trained and used in the entertainment industry, and to educate the public about such treatment. *Id*. He further explains that to achieve its mission, PETA uses public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and administrative comments and complaints to educate the public and enforce laws enacted to protect animals. *Id*. Accordingly, the asserted illegal act—the claimed unlawful "take" of Lolita under the ESA[8]—is in direct conflict with PETA's mission of protecting animals from abuse as described by Mr. Kerr.

Second, with respect to diversion of resources, the evidence supplied by PETA shows that since 2011 its staff: has organized and promoted protests against Lolita's conditions, (*id*. ¶ 5); has sued the NMFS for excluding Lolita from the ESA, (*id.*); has submitted an ESA-listing petition for Lolita to the NMFS, (*id*.); has submitted non-renewal requests under the AWA to the USDA regarding the Seaquarium's exhibitor license, (*id*.); has sued the USDA to deny renewal of the Seaquarium's exhibitor license under the AWA, (*id*.); has shared information with the public about Lolita's condition through various social media websites (D.E. 133, Exs. G, H); has conducted interviews with news outlets (*id*., Ex. F; Kerr Dec. ¶ 6); and, has published multiple action alerts on PETA's website and affiliated websites asking supporters either to urge Seaquarium to retire Lolita to a coastal sanctuary, or to urge government agencies to act to prevent Lolita's harm and harassment, (*id*., Ex. J).

This evidence, none of which is challenged, demonstrates that PETA's diversion of resources to address Lolita's captivity, apart from this lawsuit, has impaired its mission of protecting animals from abuse through legislative and educational efforts. And this showing is

---

[8] As noted above, under the ESA, "take" is defined in pertinent part as an act that "harm[s]" or "harass[es]" an endangered species. 16 U.S.C. § 1532(19). The Plaintiffs claim that Seaquarium is actively "harm[ing] and harass[ing]" Lolita based on her captive conditions in violation of section 9(a)(1), 16 U.S.C. § 1531(a)(1)(B).

sufficient, by comparison to other cases, to establish that it has incurred a concrete injury entitling it to maintain this action. *See Arcia,* 772 F.3d at 1341-42 (finding standing at summary judgment where the organizational plaintiffs, whose missions included voter registration and education, challenged the Florida Secretary of State's voter purging practices and an organizational plaintiff submitted an affidavit in which a representative stated, generally, that the defendant's conduct caused it "to divert resources to combat Defendant's unlawful practices."[9]); *see also Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1240 (11th Cir. 2012) (finding standing where the organizational plaintiff, Alabama Appleseed Law & Justice ("Appleseed"), whose mission was "to identify root causes of injustice and equality in Alabama and to develop and advocate for solutions,"[10] claimed injuries arising from an Alabama law, Ala. Code § 31-13-8, which prohibited an unlawfully present alien from "enroll[ing] in or attend[ing] any public postsecondary education institution"; the court found sufficient Appleseed's declarations, submitted through its Executive Director, which declared, *inter alia*, that in response to the passage of the law it "hosted presentations to convey information about the consequences of the law, including its education provision," and, expended time and money on the execution of those presentations that "diverted resources from other immigration policy work."). Therefore, by diverting resources to address specifically the conditions of Lolita's captivity to the detriment of its other organizational objectives—e.g., educational or legislative efforts directed at raising public awareness of animal cruelty—PETA's mission of protecting animals from abuse has been impaired. *Arcia,* 772 F.3d at 1341-42.

---

[9] The quoted language is available at: *Arcia v. Detzner*, 908 F. Supp.2d 1276 (S.D. Fla. Oct 29, 2012) (Case No. 1:12-cv-22282-WJZ) (D.E. 65-7 ¶ 4).

[10] The quoted language is available at: *Hispanic Interest Coal. of Ala. v. Bentley*, No. 5:11-CV-2484-SLB, 2011 WL 5516953, at *1 (N.D. Ala. Sept. 28, 2011), *aff'd in part, vacated in part, rev'd in part sub nom. Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236 (11th Cir. 2012)  (D.E. 37-6 ¶ 3).

Nonetheless, Seaquarium maintains PETA lacks standing on the following grounds:  (1) PETA's mission includes litigation and, as such, PETA is engaging in a regular activity in pursuing this action, which cannot constitute a diversion of resources; (2) PETA has not been "forced" or "required" to incur the expenses it claims as injuries; (3) and, PETA has not shown an actual injury because it has failed to demonstrate a net economic loss from its activities apart from this lawsuit on Lolita's behalf. The Court addresses each in turn.

With respect to the role of litigation in PETA's mission, Seaquarium cites an affidavit Mr. Kerr submitted in related litigation challenging the AWA license,[11] in which Mr. Kerr averred that PETA's activities *include* litigation to enforce animal protection laws. That PETA, at times, undertakes litigation to accomplish its mission, as sworn in the prior affidavit, is distinct from litigation itself being PETA's organizational goal.[12]  In *Havens*, standing was not foreclosed because the organization pursued its mission of promoting equal access to housing through counseling and referral services by also engaging in litigation to counteract discriminatory housing practices. *Havens*, 455 U.S. at 363. Subsequently, in *Hispanic Interest*, in reversing a district court's dismissal of a constitutional challenge to an Alabama law requiring schools to collect data about the immigration status of public school students, the Eleventh Circuit relied on a declaration from the executive director of an organization, wherein he attested that:  "[t]o fulfill our mission we undertake network/coalition organizing and development, research, education, advocacy . . . our staff and network of pro bono lawyers work in partnership with . . . the legal and judicial communities."  *See Hispanic Interest Coalition of Ala. v. Bentley*,

---

[11] *Animal Legal Def. Fund, et.al. v. U.S. Dept of Agric., et. al.*, Case No., 13-cv-20076-JAL, Southern District of Florida.

[12] The prior affidavit reads in pertinent part: "PETA is a national non-profit organization . . . dedicated to protecting animals from abuse . . . and undertakes these efforts through public education, cruelty investigations, research . . . and lawsuits to enforce laws enacted to protection [sic] animals." D.E. 161-1, ¶ 3.

case no. 5:11-cv-02484-SLB, 2011 WL 5516953 (N.D. Ala. Sep. 28, 2011) (D.E. 37-6 ¶ 3).  And in *Arcia*, in affirming the district court's finding of standing for three organizational plaintiffs whose missions included, *inter alia*, voter registration, the Eleventh Circuit cited three affidavits submitted by the plaintiffs, one of which declared that it was dedicated to "securing full equality for Puerto Ricans living in the U.S. through advocacy" and that the Florida chapters were "actively involved in safeguarding Puerto Rican voting rights." *Arcia*, 772 F.3d at 1341-42.[13] Thus, *Havens*, *Hispanic Interest*, and *Arcia* make clear that utilizing litigation to achieve organizational goals does not negate Article III standing.

As for Seaquarium's claim that PETA lacks standing because it voluntarily chose to divert its resources, there simply is no legal support.  An organization's *voluntary* decision to divert resources to counteract the asserted illegal acts, unrelated to the legal challenge itself, qualifies as an injury: the drain on resources, the Eleventh Circuit has observed, "is simply another manifestation of the injury to the organization's noneconomic goals." *Browning*, 522 F.3d at 1166 ("The Secretary attempts to draw a distinction between an act or law negating the efforts of an organization, which is admittedly an injury under *Havens,* and an act or law merely causing the organization to voluntarily divert resources in response to the law, which he claims is not an injury cognizable under Article III. This distinction finds no support in the law, and it misses the point.") (internal citation omitted).  Thus, PETA's choice to divert its resources to address the asserted illegal acts does not disqualify it from claiming injuries under *Havens*.

Seaquarium's final argument, that PETA and the other organizational plaintiffs have failed to establish injury-in-fact because they actually benefit from Lolita related activities by taking in substantial contributions that exceed their litigation costs, also fails for lack of legal

---

[13] The quoted language is available at: *Arcia v. Detzner*, 908 F.Supp.2d 1276 (S.D. Fla. Oct 29, 2012) (Case No. 1:12-cv-22282-WJZ) (D.E. 65-7).

support.  The showing of an actual, concrete injury is a modest requirement for Article III standing, which does not require quantification. *Browning*, 522 F.3d at 1165 (quoting *Crawford v. Marion Cty. Election Bd.,* 472 F.3d 949 (7th Cir.2007), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."); *accord Defs. of Wildlife,* 504 U.S., at 562–563, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."). And, in any event, Seaquarium concedes that PETA has suffered an economic loss attributable to its diversion of resources to address Lolita's predicament separate from the expenses incurred in this litigation. Seaquarium claims PETA took in $13,823 in donations primarily related to Lolita in the last three years and acknowledges that PETA expended over $27,000 in litigation and administrative expenses from its earlier efforts to challenge the Seaquarium's  exhibitor's license for Lolita under the Animal Welfare Act. *See Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1209 (11th Cir. 2015).[14] Consequently, PETA has incurred a net economic loss from its decision to challenge the conditions of Lolita's captivity.

Moreover, adopting Seaquarium's novel theory would lead to the bizarre outcome that an organization whose mission has been frustrated by certain conduct, which in turn generates a high level of donor largesse to counteract such conduct, would be forced to show a net loss in dollars to establish Article III standing.  Such an accounting is contrary to the express standard, which is "*diversion*" of resources, not a verifiable monetary loss.

---

[14] In the AWA litigation, Marine Exhibition Corporation d/b/a Miami Seaquarium was an intervening party. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213 (11th Cir. 2015).

### ii.        Causal Connection and Redressability

Having found PETA has suffered actual injuries, the Court is "easily satisfied that the

other two requirements of standing are met." *Ga. Latino All. for Human Rights v. Governor of*

*Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (holding organizational plaintiff satisfied *Havens*

standard). The diversion of resources and the conflict with PETA's mission is directly traceable

to the asserted unlawful "take" in violation of the ESA and would be redressed by enjoining

Seaquarium from violating the ESA section 9(a)(1). *Id.*; *see also Conservancy of Sw. Fla. v. U.S.*

*Fish & Wildlife Serv.*, No. 2:10-CV-106-FTM-SPC, 2011 WL 1326805, at *5 (M.D. Fla. Apr. 6,

2011), *aff'd sub nom. Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073 (11th

Cir. 2012) (assessing redressability in ESA action seeking declaratory and injunctive relief and

finding that declaratory judgment would be of value to the plaintiffs, and regarding injunctive

relief, that plaintiffs "need not obtain ultimate goal . . . so long as it relieves discrete injury to

plaintiff.").[15]

Finally, because PETA has standing to raise both claims, the Court need not decide

whether either of the remaining plaintiffs also has standing to do so. *Am. Civil Liberties Union of*

---

[15] Seaquarium argues that Plaintiffs have not established redressability because in their Complaint they seek an order that "Seaquarium . . . forfeit possession of Lolita." Under the citizen-suit provision of the ESA, Seaquarium claims Plaintiffs have no legal right to sue for forfeiture. Seaquarium additionally argues that Plaintiffs' lack-of-companionship injury is not redressable because this Court cannot "issue an order directing that another wild orca be captured for housing with Lolita." However, these are not Plaintiffs' exclusive requests for relief. Plaintiffs seek an order enjoining Seaquarium from continuing to violate the ESA, and they also seek declaratory relief. Compl. ¶¶ 76b.-d. "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355,* 618 F.3d 1279, 1290 (11th Cir. 2010) (internal quotation marks and alterations omitted). Here, redressability goes to PETA's diversion of resources and an order enjoining Seaquarium from violating the ESA—e.g., by removing the PWSDs from Lolita's tank or requiring it to provide Lolita more protection from UV exposure—would significantly reduce the likelihood that PETA would have to divert resources to challenge the asserted illegal acts.

*Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) (citing *Watt v.*

*Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981)).

## B. SEAQUARIUM'S MOTION FOR SUMMARY JUDGMENT

Having found PETA has standing to maintain the ESA claims, the Court next determines

whether Seaquarium is entitled to an order granting summary judgment on the merits.  As noted

above, in their Complaint, Plaintiffs seek declaratory and injunctive relief, claiming that the

conditions of Lolita's confinement at the Seaquarium and her alleged injuries constitute a "take"

in violation of the ESA section 9(a)(1), 16 U.S.C. § 1538(a)(1)(B); and, that the Seaquarium is in

possession of an animal that has been "taken" in violation of section 9(a)(1)(D), 16 U.S.C. §

1538(a)(1)(D).  Compl. ¶¶ 73-76.  More specifically, Plaintiffs argue that Seaquarium is

"actively 'harming' and 'harassing' [defined *infra*] Lolita by keeping her in an undersized tank,

without adequate shade, and with incompatible animals . . . ." (D.E. 163 at 11-12).  To that end,

Plaintiffs have proffered evidence, through expert testimony, of the following injuries:

1. Due to the size and configuration of the pool in which she is housed, Lolita cannot engage in normal swimming or diving behaviors, even as compared with other orcas in captivity, causing her physical and psychological injury. D.E. 164 ¶ 102, Ex. DD at 8.

2. The PWSDs are not socially compatible animals and do not provide an appropriate substitute for social contact. *Id*. ¶ 104, Ex. DD at 9.

3. The PWSDs cause Lolita frequent physical injury in the form of raking her skin with their teeth. *Id*. ¶ 105, Ex. F-A at 27-28, 32; DD at 11-12; Ex. F-D at 7-8. A rake is a skin abrasion occurring when one cetacean (which includes whales and dolphins) places its teeth on another cetacean swimming by.  These rakes can cause bleeding, which require treatment with antibiotics to avoid infection.  *Id.*[16]

4. Because Lolita has learned to anticipate certain aggressive behavior by the PWSDs, she shows physical signs of stress every time they approach. *Id*. ¶ 107, Ex. F-D at 5, 9.

---

[16] It is undisputed that cetaceans rake each other in the wild and in captivity. Plaintiffs' expert rated Lolita's marks as a 3 to 4 on a scale of 1 to 10, with 1 being the least raked killer whale observed in the wild and 10 being the most raked killer whale in the wild. Gallego Dep. 55:9-19.

5.  The PWSDs engage in "inappropriate" sexual behavior toward Lolita that would not happen in the wild. *Id.* ¶ 107, Ex. BB at 44:19-46:2; Ex. DD at 10-12. Ex. M at 36:22-37:8.

6.  Since the 1980s, Lolita has suffered from an irreversible condition known as "surfer's eye" as a result of "prolonged exposure to UV radiation" (D.E. 164-CC at 8) for which she is administered eye drops twice daily. D.E. 134 at 20 ¶¶ 24, 75. The condition leads to "discomfort." *Id.*, Ex. CC at 5.

7.  Lolita has exhibited blisters and wrinkles that might be caused by sun exposure. *Id.* ¶ 112, Ex. F-A at 32, 33.

8.  Unlike orcas in the wild, she is treated with "antibiotics, antifungals, pain medication, hormones" and antacids to treat ulcers. D.E. 164, Ex. CC at 8. These treatments might be necessary because of the stress of her tank dimensions and sun exposure, or stressful cohabitation with the PWSDs, or both. *Id.* at 8-9.

9.  Lolita is generally unhealthy as shown by the following: (a) she suffers from a mild, non-fatal kidney impairment, *id.* ¶ 117, Ex. CC at 7-8; Lolita has a higher number of bacteria, "more than has been described in literature," compared to orcas in the wild and captivity combined, *id.* ¶ 118, Ex. DD at 21-23; Lolita "appears to have had" treatments for infections to her respiratory tract, and, she might have a recurring lung condition, *id.* ¶ 117, Ex. CC at 8.[17]

10. Lolita engages in abnormal behavior known as "stereotypies," which includes listless floating, lying motionless near an inflow valve, bobbing, pattern swimming, and rubbing her body against her tank. *Id.* ¶ 113, Ex. F-A at 13, 30-31; Ex. DD at 6-7, 16-17; Ex. CC at 5-6; Ex. F-D at 11-12.

11. Lolita has significant wear in six of her teeth, which might result from a stereotypic behavior of biting the side of the tank or the gates within it. *Id.* ¶ 114, Ex. CC at 8.

12. Lolita has had at least one tooth drilled multiple times. *Id.* ¶ 115.

13. Lolita's captivity conditions "likely reduce the likelihood of realizing her potential lifespan than in the wild."[18] *Id.* ¶ 120, Ex. N, 22:1-9.

---

[17] Lung diseases, according to Plaintiffs' expert, are the most common illnesses for orcas in terms of "mortality" and "morbidity." D.E. 164, Ex. CC at 8.

[18] Plaintiffs' evidence regarding Lolita's injuries are contained in four expert reports, three of which Seaquarium has moved to exclude under F.R.E. 702. Because the Court finds that as a matter of the law the injuries Plaintiffs have proffered do not constitute a "take" under the ESA section 9(a)(1), *infra*, the Court need not address whether the proffered testimony satisfies the *Daubert* standard. However, the Court has reviewed the reports and notes the absence of disclosures showing that the experts employed reliable methodologies for all or most of their opinions, and that the experts' opinions regarding causation for many of the alleged injuries are speculative and unreliable.

Seaquarium largely does not dispute that Lolita has medical issues for which she receives treatment.[19]  Rather, Seaquarium maintains that, as a matter of statutory construction, the injuries Plaintiffs complain of do not amount to a "take" within the meaning of the ESA and therefore are not actionable.  Therefore, the Court must construe the term "take" as used in the ESA and apply the term, as construed, to the injuries identified by PETA.

### i. THE ENDANGERED SPECIES ACT

By way of background, the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 (1988 ed. and Supp. V), contains a variety of protections designed to save from extinction species designated as endangered or threatened.  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690, 115 S.Ct. 2407, 2409, 132 L.Ed. 2d 597 (1995).  The stated purposes of the ESA are twofold: (1) "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and (2) "to provide a program for the conservation of such . . . species." *See* 16 U.S.C. § 1531(b); *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995).

At the most basic level, these twin purposes are furthered by requiring that the Secretaries of Commerce and the Interior maintain a list of endangered and threatened species ("listed species") and designate their critical habitats. *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008) (citing 16 U.S.C. § 1533). The Fish and Wildlife Service ("FWS") administers the ESA with respect to terrestrial species under the jurisdiction of the Secretary of the Interior,

---

[19] Seaquarium acknowledges that Lolita receives treatment for "surfer's eye" and, in 2011 had a serious tooth infection, which occasionally recurs. D.E. 127 ¶ 24. Defendant disputes that Lolita's medical records suggest the possibility of a lung disease and that she has too many harmful bacteria in her body (D.E. 130-7; Renner Dec. ¶¶ 8-11). Defendant also disputes that Lolita displays "stereotypical behaviors," (*id.*-2; Keenan Dec. ¶ 13) and that any stomach ulcers, for which she receives treatment, would have bled "moderately or intermittently," (D.E. 164, Ex. CC at 10) as indicated in Plaintiffs' expert report. (D.E. 127 ¶ 21; Rodriquez Dec. ¶ 8)

and the NMFS, part of the National Oceanic and Atmospheric Administration, relevant here, administers the ESA with respect to marine mammals, which is under the jurisdiction of the Secretary of Commerce. *Id.* (citing *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 127 S.Ct. 2518, 2526, 168 L.Ed.2d 467 (2007); *id.* (citing 50 C.F.R. §§ 17.11, 222.101(a))).

The ESA protects listed species in several ways. For example, section 5, 16 U.S.C. § 1534, authorizes the Secretar[ies], in cooperation with the States, *see* § 1535, to acquire land to aid in preserving listed species. Section 7 mandates interagency cooperation, requiring all "federal agencies to ensure that none of their activities, including the granting of licenses and permits, will jeopardize the continued existence of endangered species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . unless such agency has been granted an exemption from the Secretary." *Babbitt*, 515 U.S. at 692 (citing 16 U.S.C. § 1536(a)(2)).

Section 9(a)(1) of the ESA makes it unlawful to:  import or export; deliver, receive, carry, transport, or ship in interstate or foreign commerce in the course of commercial activity; or sell or offer for sale in interstate or foreign commerce, any endangered or threatened species. *See* 16 U.S.C. § 1538(a)(1).

Pertinent to the controversy before the Court, section 9(a)(1) also prohibits the "tak[ing]" of any member of a listed species within the United States, the territorial sea of the United States, or on the high seas.  16 U.S.C. § 1538(a)(1)(B); *id.* (a)(1)(C). The ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

In implementing the ESA, the NMFS has defined "harm" in the definition of "take" as: "[A]n act which *actually kills or injures* fish or wildlife. Such an act may include significant

habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102 (emphasis added). The NMFS has not promulgated a definition of "harass."

### a. TEXTUAL CONSTRUCTION

In determining whether Congress intended the ESA to extend to the injuries Plaintiffs complain of, the starting point is to analyze the plain meaning of the text of the statute. *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (internal citation omitted). However, in answering this question, the Court does not "interpret the relevant words . . . in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 134 S.Ct. 2259, 2267, 189 L.Ed.2d 262 (2014) (quoting *Maracich v. Spears*, 570 U.S. ——, ——, 133 S.Ct. 2191, 2209, 186 L.Ed.2d 275 (2013)).

Section 9(a)(1) reads in pertinent part: "it is unlawful for any person subject to the jurisdiction of the United States to[] *take* any such species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B) (emphasis added). The statutory term "take" is defined in the ESA with ten (10) prohibited acts: "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

As recognized by the Supreme Court, the proscribed conduct overlaps in some respects. For example, there is no meaningful difference between the terms "trap"[20] and "capture"[21]; and,

---

[20] "Catch (an animal) in a trap." The New Oxford American Dictionary (2010).
[21] "Take into one's possession or control by force." *Id.*

there is only a pedantic distinction between "wound"[22] and "harm,"[23] the former and more narrow term involving the piercing or laceration of skin, and the latter, broader term involving a physical injury of some kind. *Babbitt*, 515 U.S. at 721 (Scalia, J., dissenting) ("[T]he word "trap" in the definition otherwise . . . adds nothing to the word "capture."); *see also Endangered and Threatened Wildlife and Plants; Final Redefinition of "Harm,"* 46 Fed. Reg. 54748 (Nov. 4, 1981) ("It is obvious that there is considerable overlap in many of these terms and it would be a fruitless and impractical exercise to attempt to define any one of these terms to the exclusion of the others so as to have no overlap of prohibited actions."). In analyzing "take" in section 9(a)(1) of the ESA, the Supreme Court observed "[t]o the extent the definition of 'harm' may have applications that overlap with other words in the definition reflects the broad purpose of the Act." *Babbitt*, 515 U.S. at 698 n.11.

While the ESA's purpose is "broad," *id.*, construing statutory language is not merely an exercise in ascertaining "the outer limits of [a word's] definitional possibilities," *Dolan v. Postal Service*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006). Rather, courts should interpret proximate statutory terms in light of one another. *Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). By construing a statutory term "by the company it keeps" courts avoid giving "unintended breadth to the acts of Congress," *id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961)), which becomes even more pertinent when the proscribed conduct, like the term "take" in the ESA section 9(a)(1), is defined with a list of overlapping words. *United States v. Costello*, 666 F.3d 1040, 1046 (7th Cir. 2012) ("[T]hat a clause is broadly worded to stop up loopholes doesn't

_____

[22] "Inflict an injury on (someone)" *id.*, when used as a verb, and "an injury to living tissue when caused by a cut, typically one in which the skin is cut or broken," when used as a noun. *Id.*

[23] "Physically injure." *Id.*

justify a literal interpretation that carries far beyond any purpose that can reasonably be imputed to the drafter. When a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to situations absurdly remote from the concerns of the statute's framers.") (internal citation omitted). In that regard, *noscitur a sociis* is the common sense principle that statutory terms, ambiguous when considered alone, should be given related meaning when grouped together. *E.g., S.D. Warren Co. v. Maine Bd. Of Env. Protection*, 547 U.S. 370, 378, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006) (citations omitted).

Here, the common denominators among the terms are conduct that: constitutes seizure ("trap," "capture," "collect"); is gravely threatening ("kill," "shoot"); or, has the potential to seize or gravely threaten the life of ("pursue," "hunt," "wound") a member of a listed species. The remaining terms "harm" and "harass" should, therefore, have the same essential character as the eight associated terms. Or put another way, as Seaquarium argues, "harm" and "harass" should be interpreted with the same level of "impact" to the listed species as the other eight terms denote. And, indeed, by *replicating* the word "*kill*" in the definition of "harm" the NMFS's interpretation emphasizes the degree of harm the Act requires: "[A]n act which *actually kills* or injures fish or wildlife." 50 C.F.R. § 222.102 (emphasis added).

An alternative statutory canon, *esjudem generis*, yields the same result. This canon holds "that general words or principles, when appearing in conjunction with particular classes of things, will not be considered broadly, but rather will be limited to the meaning of the more particular and specific words." *Doe v. Naval Air Station, Pensacola, Fla.*, 768 F.2d 1229, 1232 (11th Cir. 1985). As noted above, the more general word "harm" appears in relation to specific terms which denote grave harm: "cause the death of a (person, animal, or other living thing)" ("kill"), The New Oxford American Dictionary (2010); "pursue an animal in order to kill or for

sport" ("hunt"), (*id.*); "kill or wound (a person or animal) with a bullet . . . ." ("shoot"), (*id.*); and, "to follow someone or something in order to catch or attack them" ("pursue"), *id.*

In *United States v. Hayashi*, 22 F.3d 859 (9th Cir. 1993), the Ninth Circuit Court of Appeals engaged in a similar analysis of the term "harass" as used in the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361, *et seq.*[24] The word "harass," the Court explained, should have a symmetrical degree of harm when viewed with its associated terms:

> The statute groups "harass" with "hunt," "capture," and "kill" as forms of prohibited "taking." The latter three each involve direct and significant intrusions upon the normal, life-sustaining activities of a marine mammal; killing is a direct and permanent intrusion, while hunting and capturing cause significant disruptions of a marine mammal's natural state. Consistent with these other terms, "harassment," to constitute a "taking" under the MMPA, must entail a similar level of direct intrusion.
>
> Interpreting "harassment" under the MMPA to involve a direct and significant intrusion also comports with a common understanding of the term "take," of which "harass" is simply one form. To "take" a marine mammal strongly suggests a serious diversion of the mammal from its natural routine. Congressional concern in passing the MMPA about marine mammals "in danger of extinction or depletion as a result of man's activities" supports this conception of "take." MMPA § 2(1), Pub. L. No. 92–522, 86 Stat. 1027 (1972) (findings and declaration of policy). Killing, capturing, and hunting fit the common understanding of the term. "Harassment" under the MMPA, to constitute a "taking," must entail a similarly significant level of intrusiveness.

*Id.* at 864.

---

[24] The MMPA is directed to the protection of marine mammals in the wild and declares it unlawful for any person to "take" a marine mammal in United States waters. *See* 16 U.S.C. § 1372(a)(2)(A). The term "take" in the MMPA is defined with similar, albeit fewer, terms as the ESA, and is defined as: "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). Like the ESA, the MMPA prescribes both civil and criminal penalties, *see* 16 U.S.C. § 1375(b), is also administered by the NMFS, and advances a similar purpose:  the prevention of the extinction or depletion of marine mammals. 16 U.S.C. § 1361(1). As such, "take" within the meaning of the MMPA should be analyzed reasonably consistent with the ESA. *See, Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973) (stating the similarity of language in two statutes "is, of course, a strong indication that the two statutes should be interpreted pari passu.").

Accordingly, the Court's textual interpretation of "harm" and "harass" as used to describe "take" in the ESA section 9(a)(1) is human conduct that amounts to a seizure or is gravely threatening, or has the potential to seize or gravely threaten the life of a member of a protected species.

### b.  LEGISLATIVE HISTORY

In addition to the interpretation of "take" yielded by the rules of statutory construction, the legislative history accompanying the ESA provides strong evidence that use of the terms "harm" and "harass" to describe a "take" were intended to encompass only conduct amounting to a seizure, that is gravely threatening, or has the potential to seize or gravely threaten the life of an endangered species.

Importantly, the Senate Report to the ESA highlighted two causes of extinction the ESA was designed to reverse: "hunting" and "destruction of natural habitat." S. Rep. No. 93-307 (1973).  Senator Tunney, for instance, echoed these two concerns in discussing the need for providing a mechanism in the ESA through which the FWS could acquire land for endangered species' use, stating:

> Although most endangered species are threatened primarily by the *destruction of their natural habitats*, a significant portion of these animals *are subject to predation* by man for commercial, sport, consumption, or other purposes. The provisions in S. 1983 would prohibit the commerce in or the importation, exportation, or taking of endangered species....

*Babbitt*, 515 U.S. 687, 706 n.19 (citing 119 Cong.Rec. 25669) (1973) (emphasis added).

Representative Sullivan, the House floor manager in 1973, reflected the Senate's view of the two causes of species extinction:

> "[T]he principal threat to animals stems from *destruction of their habitat*....
>
> "Another hazard to endangered species arises from those who would *capture or kill them for pleasure or profit.* There is no way that the Congress can make it less

pleasurable for a person to take an animal, but we can certainly make it less profitable for them to do so."

*Babbitt*, 515 U.S. at 728 (1995) (citing 119 Cong.Rec. 25669) (1973) (emphasis added).

These two causes of species extinction—habitat destruction and predation—are also reflected in the cornerstone of the Act, section 4, which prescribes the actual designation of a species as endangered. 16 U.S.C. § 1533(a)(1).  Pursuant to the ESA and its implementing regulations, a species is threatened or endangered  based on any one or a combination of the following section 4(a)(1) factors:  "the present or threatened destruction, modification, or curtailment of its habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; [] inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting [the species'] existence." *Id.*[25]

Given the foregoing, analyzing the plain meaning of "take" and its attendant verbs— harm, harass, hunt, shoot, kill, wound, capture, trap, pursue, collect—relative to the ESA's purpose and the two causes of species extinction Congress sought to counteract, it is clear that in formulating the ESA, "harm" and "harass" within the definition of "take" were intended to proscribe acts that are gravely threatening, constitute the seizure of, or have the potential seize or gravely threaten a member of a listed species.

---

[25] The NFMS' decision to list Lolita as endangered did not cite any of the § 4(a)(1) factors. Rather, the acceptance of Lolita's petition was based on the biological information regarding her "genetic heritage and consideration of the applicability of the ESA to captive members of an endangered species." 80 Fed. Reg. 7380, 7382 (Feb. 10, 2015). In other words, Lolita's genealogy and the decision to remove the exclusion of captive Southern Resident Killer Whales from the ESA—rather than any extant manmade factors or disease or lack of regulatory mechanisms—were the exclusive factors in the listing.

### ii.   NMFS' AND FWS' INTERPRETATIONS OF "TAKE" UNDER SECTION 9

While the courts are the "final authorities on issues of statutory construction, " *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) (internal citations omitted), reviewing courts, when confronted with a statutory interpretation issue regarding the ESA, grant deference to the NMFS' and FWS' interpretations of the ESA. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ("When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration."); *Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1122 (11th Cir. 2013); *United States v. McKittrick*, 142 F.3d 1170, 1173 (9th Cir. 1998).

The reasoning behind this deferential review is that when Congress ambiguously expresses its intent, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("*Chevron*"). Deference to agency interpretation is also appropriate, as is the case here, where the subject being regulated is complex and requires an expertise exceeding the "normal province of Congress." *Babbitt*, 515 U.S. at 708 (holding deference owed to FWS' interpretation of "harm" in the ESA).

In situations where *Chevron* deference is not appropriate*,* some deference to administrative interpretation is nonetheless due pursuant to *Skidmore. See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (holding agency interpretations and opinions "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"). *Skidmore* holds that some deference is owed to "a non-

binding administrative interpretation . . . [based] upon the thoroughness evident in its

consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

and all those factors which give it power to persuade, if lacking power to control." *Quinchia v.*

*U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008) (citation omitted).  Whether the Court

affords the level of deference enunciated in *Chevron* or in *Skidmore,* or any level of deference in

between, a court must "first ask whether congressional intent is clear." *Wilderness Watch & Pub.*

*Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1091 (11th Cir. 2004) (citation

omitted). If Congress' intent is clear and unambiguous, "that is the end of the matter;" the Court

must apply the statute in accordance with the Congressional directive. *Id.*  As explained in

section III.B.(b)(i), *supra*, Congress' express intent in the ESA is to halt species extinction, but

the statute could be viewed as ambiguous on the question of the degree of "harm" or

"harass[ment]" necessary to constitute a "take," and how the ESA's "take" provision applies to

animals in captivity. Accordingly, the Court considers the guidance provided by the NMFS and

the FWS.

      In July 1994, the NFMS and the FWS issued a joint policy stating that, to the extent

known at the time a species is listed as endangered, the agencies would address specific activities

that will not be considered likely to result in a "take" in violation of the ESA section 9(a)(1).

*Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions*, 59

Fed. Reg. 34272 (July 1, 1994). Accordingly, with respect to Lolita's listing as an endangered

species, the NFMS made three relevant statements, each of which was in response to a number of

public comments:

      First, in responding to comments regarding the permissible captive care activities for

Lolita, the NMFS stated:  "depending on the circumstances, it would likely not find continued

possession, care, and maintenance of a captive animal to be a violation of ESA section 9." 80 Fed. Reg. 7380, 7385 (Feb 10, 2015). Though this statement was not linked to any factual findings, it reflects the "general" (*id*.) view of the agency charged with administering the ESA and aligns with the textual interpretation of section 9(a)(1) that appears *supra*. Second, also in responding to concerns regarding Lolita's care at the Seaquarium, the NMFS stated that Lolita's "captive care requirements" are regulated by APHIS, under the Animal Welfare Act, 7 U.S.C. §§ 2131, *et seq.*—and thus, are not within the jurisdiction of the NFMS. *Id*.  Finally, and relevant to Plaintiffs' proposed remedy in this case, the NMFS, in responding to many comments supporting Lolita's relocation to a sea pen or release into the wild, further interpreted section 9(a)(1) by stating that release of a captive animal into the wild could itself constitute a "take" under section 9(a)(1) of the Act. *Id*. The NMFS noted concerns arising from disease transmission between captive and wild stocks; the ability of released animals to adequately forage for themselves; and behavioral patterns developed in captivity impeding social integration and affecting the social behavior of wild animals. *Id*.

The FWS also has interpreted "take" under the ESA in relation to the captive status of a listed species.  In promulgating a definition of "harass" the FWS acknowledged that the ESA's prohibitions extend to captive-wildlife, but interpreted "harass" to have a different character when applied to an animal in captivity than when applied to animal in the wild. *See Captive-bred Wildlife Regulation*, 63 Fed. Reg. 48634, 48636 (Oct. 13, 1998). This interpretation was informed, the FWS found, by the purpose of the ESA as being "best served by conserving species in the wild along with their ecosystems"—captive animals, the FWS stated, are "removed from their natural ecosystems and have a role in survival of the species only to the extent that they maintain genetic integrity":

It is true that the Act applies to all specimens that comprise a "species" (as defined in the Act) that has been listed as endangered or threatened, and in general does not distinguish between wild and captive specimens thereof. However, the definition of "take" in the Act clearly applies to individual specimens or groups of specimens, and *the captive or non-captive status of a particular specimen is a significant factor* in determining whether particular actions would "harass" that specimen or whether such actions would "*enhance the propagation or survival*" of the species.

To decide otherwise would place those persons holding captive specimens of a listed species in an untenable position. If providing for the maintenance and veterinary care of a live animal were considered to be "harassment", those persons holding such specimens in captivity would be forced to obtain a permit or give up possession since any failure to provide proper care and maintenance would be an unlawful "taking". Since Congress chose not to prohibit the mere possession of lawfully-taken listed species in section 9(a)(1) of the Act, the Service believes that congressional intent supports the proposition that measures necessary for the proper care and maintenance of listed wildlife in captivity do not constitute "harassment" or "taking".

*Id.* (emphasis added).

Consistent with this view, the FWS promulgated a definition of "harass" as: "an intentional or negligent act or omission which creates the likelihood of injury to *wildlife* by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering"—and excluded from the definition, when applied to "captive wildlife[,] . . . generally accepted [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act." 50 C.F.R. § 17.3 (emphasis added).

While the NMFS' interpretations of the ESA section 9(a)(1) were outside the formal rule-making process and are not entitled to *Chevron* deference, *see Skidmore*, 323 U.S. at 140; *cf. U.S. v. Mead Corp.*, 533 U.S. 218, 232–234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995), and the FWS' statements and definition of "harass" are not binding with respect to the applicability of ESA section 9(a)(1) to

marine mammals, both agencies' statements are due some deference under *Skidmore* given the autonomy and interpretive power granted to them in implementing the ESA, *see Babbitt*, 515 U.S. at 728, the text and design of the ESA, and the validity of the statements in light of the policy objectives of the ESA.

The NMFS' and FWS' statements, thus, further confirm the ambit of the ESA discussed in the textual analysis section, *supra*. That the types of harm—more specifically, the acute nature of harm—the ESA was designed to safeguard against are, on the whole, distinct from concerns regarding the humane treatment and welfare of an animal in captivity, which are at the core of Plaintiffs' complaint. *See* Compl. ¶¶ 1, 7-9, 11-12, 15-17, 20-22, 64, 67.  As discussed *infra*, the humane treatment and welfare standards governing Lolita's captivity are provided for in a different federal law: the Animal Welfare Act, 7 U.S.C. §§ 2131 *et seq.*

### iii.   THE ANIMAL WELFARE ACT AND THE ENDANGERED SPECIES ACT

In arguing that it has not "tak[en]" Lolita in violation of the ESA, Seaquarium highlights the fact that Lolita is maintained under conditions that have been found by APHIS to comply with the AWA's implementing regulations.  Plaintiffs, on the other hand, dispute the relevance of the AWA as to the proper interpretation of "take" under the ESA. The parties' arguments thus require this Court to consider the relationship between the ESA and the AWA insofar as they both apply to animals held in captivity, particularly those trained and used for entertainment purposes. In doing so, the Court adheres to well-established statutory interpretation principles that "statutes relating to the same subject matter should be construed harmoniously," that in apparent conflicts between statutes, the more specific statute controls over the more general one, *Southern Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368, 1373 (11th Cir. 1999), and that "rules applicable under one statute should not be applied to a different statute without careful and critical examination." *See Gross v. FBL Fin. Serv.*, 557 U.S. 167, 174, 129 S.Ct. 2343 174

L.Ed.2d 119 (2009) (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393, 128 S.Ct. 1147, 1153, 170 L.Ed.2d 10 (2008)).

The Animal Welfare Act ("AWA"), first passed in 1966, Pub. L. No. 89-544, 80 Stat. 350, provides for the humane treatment of animals by persons who use them for exhibition and research purposes. 7 U.S.C. §§ 2131, *et seq.* In other words, unlike the ESA, it deals exclusively with captive animals, and specifically, animals that are exhibited in licensed facilities such as the Seaquarium. 7 U.S.C. §§ 2131, *et seq*. To this end, the AWA authorizes the Secretary of Agriculture to license exhibitors, *see* 7 U.S.C. § 2133,  and promulgate standards for the proper care and treatment of animals in their care, *see* 7 U.S.C. § 2146, which the Secretary has delegated to the Administrator of APHIS. *See 907 Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*, 701 F.3d 1345, 1347 (11th Cir. 2012).

"[T]he supervisory goals of the [AWA] . . . [are] realized through a regime of administrative enforcement, with a right of judicial review for an aggrieved facility." *Int'l Primate Prot. League v. Inst. for Behavioral Research, Inc.*, 799 F.2d 934, 940 (4th Cir. 1986) (citing 7 U.S.C. §2149(b)). However, in contrast to the ESA, the AWA's goals are not advanced through private causes of action.  *Id.*; *see also Moor–Jankowski v. The Board of Trustees of New York University*, 1998 WL 474084 *1, *8 (S.D.N.Y. 1998) ("Congress did not intend to extend beyond the administrative action by the Secretary of Agriculture to include a private cause of action; the main purpose of the Act is to confer authority to the Secretary of Agriculture to insure the proper care and treatment of animals and that the Secretary be the exclusive investigator and enforcer of the AWA.").

In implementing the policy considerations enacted in the AWA, APHIS first established detailed regulations for the humane handling, care, treatment, and transportation of marine

mammals used for exhibition purposes in 1979. *Animal Welfare; Marine Mammals*, 81 Fed. Reg. 5629 (Feb. 3, 2016). The regulations, which have been modified from time to time, are contained in Title 9 of the Code of Federal Regulations, parts 1, 2 and 3. The standards contained therein govern Lolita's captive care requirements at the Seaquarium, and, fundamentally, address many of the types of injuries identified by Plaintiffs in this case.

For example, section 9 C.F.R. § 3.103(b) contains the standards for providing shelter for marine mammals housed in outdoor facilities. It requires that natural or artificial shelter as appropriate for a particular species "be provided for . . . marine mammals kept outdoors to afford them protection from the weather *or from direct sunlight*." *Id*. (emphasis added). In a recent proposed rule, APHIS stated it intended to adjust the regulation regarding UV exposure, acknowledging that: "[b]ecause marine mammals are susceptible to overheating and sunburn and/or eye damage from direct and/or reflected sunlight, and UV light reflections can cause or exacerbate damage to marine mammal eyes, we are proposing to amend § 3.103(b) by adding that the shade must be accessible and must cover sufficient area to afford all the animals within the enclosure protection from direct sunlight while not limiting their ability to move or not be too close to another animal." *Animal Welfare; Marine Mammals*, 81 Fed. Reg. 5629 (Feb. 3, 2016).

Section 3.104 requires exhibitors to hold marine mammals in enclosures that satisfy minimum horizontal dimension, depth, and volume standards so that they are able to make normal postural and social adjustments. 9 C.F.R. § 3.104.

The regulations also establish minimum husbandry standards, and contain detailed requirements for feeding, water quality, sanitation, and veterinary care. *See* 9 C.F.R. Ch. 1, Subch. A, Pt. 3, Subprt. E. And, section 3.109 prescribes a companionship component under the AWA, requiring that marine mammals be "housed in their primary enclosure with at least one

compatible animal of the same or biologically related species . . .  unless it is not in the best interest of the marine mammal's health or well-being." 9 C.F.R. § 3.109.

Thus, from a wide angle, the AWA deals with a subject similar to that addressed by the ESA:  the protection of animals from people.  But the AWA is sharply focused on the "humane treatment" of captive animals used for exhibition and research, *see* 7 U.S.C. § 2131(1).  Indeed, the terminology "humane treatment" is employed repeatedly in no fewer than five different sections in the statutory scheme, and it is the overriding concern reflected in the implementing regulations. *See* 7 U.S.C. §§ 2131, *et seq*; 9 C.F.R. Ch. 1, Subch. A, Pt. 3, Subprt. E.  By contrast, the ESA promotes a different congressional objective—the protection of endangered species from habitat destruction and predation. *See* 16 U.S.C. § 1531.

Careful review of the legislative history of both statutes shows that in the forty-plus years since their respective enactments, Congress has not disturbed this balance. The 91st Congress first addressed the humane treatment of animals by exhibitors in 1970 when it amended the 1966 version of the AWA.  *See* H.R. Rep. No. 91-1651(1970) ("[T]his bill represents a continuing commitment by Congress to the ethic of kindness to … animals … [by] regulat[ing] more people who handle animals.  It will bring into the regulatory framework of the Act for the first time exhibitors …"); Animal Welfare Act of 1970, Pub. L. No. 91-579, section 2, 84 Stat.1560 (1970) ("[I]n order to … insure that certain animals intended for exhibition purposes … are provided humane care and treatment, it is essential to regulate the transportation, purchase, sale, housing, care, handling, and treatment of such animals by person or organizations engaged in using them for . . . exhibition purposes."). At the same time Congress was formulating the AWA, and the subsequent amendment in 1970, it was also developing endangered species legislation, the first comprehensive attempt of which was the Endangered Species Preservation Act of 1966. *Safari*

*Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 26 (D.D.C. 2013), *appeal docketed*, (Oct. 18, 2013) (citing S. Rep. No. 97-418, at 1(1982)). "The 1966 Act was an important step toward conserving endangered species, [but] it had serious drawbacks[,] including its failure to prohibit the taking of endangered species." *Id*. To address these problems, the 91st Congress—the same Congress which amended the AWA in 1970—enacted the Endangered Species Conservation Act of 1969 to "correct[ ] several of the weaknesses of the 1966 Act." *Id*.; *see also* Pub. L. No. 91-135.  That the same Congress addressed the humane treatment of animals by exhibitors and researchers while contemporaneously addressing shortcomings in the ESA's predecessor statute is strong evidence that the ESA was not intended to serve as a surrogate for the AWA. *Bryan v. Itasca Cty., Minnesota*, 426 U.S. 373, 389, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976) (interpreting scope of federal law conferring jurisdiction to federal courts over civil causes of action on Native American reservations and finding "congent proof" that that same Congress expressed its intent "directly" in other Native American legislation); *United States v. Kattan-Kassin*, 696 F.2d 893, 898 (11th Cir. 1983) (recognizing different language in the Bank Secrecy Act and the RICO statute passed by the same Congress indicated deliberate congressional intent); *see also Nat'l Ass'n for Advancement of Colored People v. Civiletti*, 609 F.2d 514, 525 n.15 (D.C. Cir. 1979) (stating the inference that an omission in a federal law is "deliberate and significant" is "more plausible if the same Congress draft[s] the two statutes").

Following the enactment of the Endangered Species Conservation Act of 1969, Congress still perceived deficiencies in the endangered species program, namely that "[t]here . . . were no prohibitions on the taking of endangered species, and the habitat protection provisions were limited."  S. Rep. No. 97–418, at 2 (1982). What followed in 1973 is the statutory scheme of the current ESA, which resolved the flaws in the prior two bills, and which has been described as

"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" in the world, *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), ultimately striking a proper balance between "economic growth and development with adequate conservation measures." H.R. Rep. No. 97–567, pt. 1, at 10 (1982). Notably, given the Congressional intent to provide for a "take" provision in the ESA, and the sheer sweep of the legislation, nowhere in the 1973 statutory scheme, it bears emphasizing, is there a reference to the humane treatment of captive animals. *See* Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884.

Subsequent amendments to the ESA in 1976, 1978, 1979, and 1982, for example, illustrate that a principal concern of Congress was habitat destruction from commercial activity, with each amendment primarily fashioned to "increase the flexibility in balancing species protection . . . with development projects." H.R. Rep. No. 97–567, pt. 1, at 10 (1982). Congress has amended section 9 three time since its passage—1978, Pub. L. No. 95-632, 1982, Pub. L. No.100-478, and 1988, Pub. L. No. 100-653—and on each occasion Congress elected not to prescribe captive care requirements in the ESA, or expand the definition of "take" to include the humane treatment of endangered species in captivity.[26]  Instead, it left such responsibility with the Secretary of Agriculture under the authority granted by the AWA and his delegee, APHIS. *See 907 Whitehead St.*, 701 F.3d at 1347.

Thus, it is clear that the AWA is intended for the specific purpose of protecting animals in captivity that are used by licensees for exhibition or research purposes. 7 U.S.C. § 2131(1).  It

---

[26] *See* S. Rep. No. 95-874 (stating 1978 amended section 9 to clarify breeding activities for captive produced raptors); S. Rep. No. 97-418 (stating 1982 amendment resolved statutory contradiction between section 7 and 9 by exempting permitees or other federal agencies from the "take" prohibition in section 9 following authorization of a project under section 7); S. Rep. No. 100-928 (stating 1988 amendment modified § 1538(a)(2)(B) regarding endangered plants and § 1538(d) regarding importing and exporting listed species).

is equally clear that APHIS has implemented the Congressional intent embodied in the AWA for the humane treatment and care of such animals by promulgating regulations concerning subjects such as the appropriate spatial dimensions for captive marine mammals' enclosures, social companionship, and veterinary care. *See* 9 C.F.R. Ch.1, Subch. A, Pt. 3, Subprt. E. Nonetheless, Plaintiffs argue that this Court should address the conditions of Lolita's captivity under the ESA section 9(a)(1) because the Seaquarium has independent obligations under the ESA not to "harm" or "harass" Lolita in the manner alleged (D.E. 163 at 15), and because APHIS, when issuing its findings, failed to consider "compliance issues" uncovered during discovery in this matter—i.e., that Lolita's rakes are not superficial, that the PWSDs exhibit "inappropriate" sexual behavior toward her, that she is not afforded adequate protection from the sun, and that her tank might not be compliant with AWA minimum horizontal dimension requirements. D.E. 164-13 (relying on March 22, 2016 Miami New Times article quoting an APHIS representative's statement regarding the minimal horizontal dimension calculation with respect to the work island in Lolita's pool, and indicating the APHIS' prior determination might be incorrect).

The flaw in Plaintiffs' position is that their expansive interpretation of the words "harm" and "harass" in the ESA section 9(a)(1), if adopted by this Court, would bring the ESA into conflict with the AWA. It would  displace a long established regulatory framework providing for licensing and oversight of exhibitors and researchers by APHIS, it would expose licensed exhibitors and researchers to liability to special interest groups despite their compliance with APHIS' captive care standards, and would substitute the judgment of a federal trial court judge for the technical expertise of the responsible agency. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 375-77, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); *see Tug Allie-B, Inc. v. United*

*States*, 273 F.3d 936, 941 (11th Cir. 2001) (holding courts should avoid a construction of two statutes that leads to a "dichomotous result").

## IV.    Conclusion

The Court recognizes that a person can "take" a listed species in captivity under the ESA section 9(a)(1). 16 U.S.C. § 1538(a)(1)(B). The Court also agrees with Plaintiffs that the Seaquarium must comply with both the ESA, 16 U.S.C. §§ 1531, *et seq*. and the AWA, 7 U.S.C. §§ 2131, *et seq*. However, the plain terms of the ESA, its legislative history, and its coexistence with the AWA and the MMPA persuade this Court that a licensed exhibitor "take[s]" a captive animal in violation of the ESA's section 9(a)(1) only when its conduct gravely threatens or has the potential to gravely threaten the animal's survival.

That being said, the Court has thoroughly considered the conditions and consequent injuries identified by Plaintiffs.  They fall into three categories: (a) physical and psychological injuries due to inadequate pool size and design; (b) physical and psychological injuries due to aggressive and inappropriate behavior by the PWSDs; and (c) inappropriate veterinary care. There is simply no evidence from the experts or otherwise that these conditions and concomitant injuries, individually or collectively, gravely threaten Lolita's existence.[27] Thus, while in a literal sense the conditions and injuries of which Plaintiffs complain are within the ambit of the ordinary meaning of "harm" and "harass," it cannot be said that they rise to the level of grave harm that is required to constitute a "take" by a licensed exhibitor under the ESA.

---

[27] The Court notes the speculative and unreliable quality of the experts' causation opinions: that Lolita's blisters and wrinkles *might* be caused by sun exposure (D.E. 164 ¶ 112, Ex. F-A at 32, 33); that her illnesses *might* be caused by, and her medications *might* be necessary, because of the stress of her tank design and cohabitation with the PWSDs (*id*., Ex., CC at 8-9); and she *might* have wear in her teeth due to stereotypic behavior, (*id*. ¶ 114, Ex. CC at 7-8).

The conditions in which Lolita is kept, and the injuries the Plaintiffs have presented to the Court, are largely addressed under a different federal law—the Animal Welfare Act. Under these facts, Plaintiffs remedy is not under the ESA, but rather with Congress, where their efforts to improve Lolita's less than ideal conditions can be addressed through legislation.  Accordingly, it is

ORDERED AND ADJUDGED that Plaintiffs' Motion (D.E. 131) is GRANTED.

ORDERED AND ADJUDGED that Defendant's Motion (D.E. 126) is GRANTED IN PART AND DENIED IN PART, as provided for in this Order. This case will be administratively closed in a separate order.

DONE AND ORDERED in Chambers, Miami, Florida, this _1st__ day of June, 2016.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record