# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

FILED BY ___AP___
Deputy Clerk

**Oct 18, 2018**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. MIAMI

David J. Smith
Clerk of Court

**_REISSUED WITH CORRECTED JUDGMENT_**

For rules and forms visit
www.ca11.uscourts.gov

October 18, 2018

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number: 16-14814-EE ; 16-15022 -EE
Case Style: People for the Ethical Treatme, et al v. Miami Seaquarium, et al
District Court Docket No: 1:15-cv-22692-UU

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Lois Tunstall
Phone #: (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

UNITED STATES COURT OF APPEALS
For the Eleventh Circuit

No. 16-14814

District Court Docket No.
1:15-cv-22692-UU

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,
ANIMAL LEGAL DEFENSE FUND,
HOWARD GARRETT,
ORCA NETWORK,

Plaintiffs - Appellants,

versus

MIAMI SEAQUARIUM,
FESTIVAL FUN PARKS, LLC,

Defendants - Appellees.

Appeal from the United States District Court for the
Southern District of Florida

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: January 12, 2018
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

**ISSUED AS MANDATE 10/18/2018**

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14814
_____

D.C. Docket No. 1:15-cv-22692-UU

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,
ANIMAL LEGAL DEFENSE FUND,
HOWARD GARRETT,
ORCA NETWORK,

                                          Plaintiffs - Appellants,

versus

MIAMI SEAQUARIUM,
FESTIVAL FUN PARKS, LLC,

                                          Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 12, 2018)

Before BLACK and HULL, Circuit Judges, and RESTANI,[*] Judge.

PER CURIAM:

This case concerns Lolita, an *Orcinus orca* living in captivity at Miami Seaquarium. People for the Ethical Treatment of Animals, Inc., Animal Legal Defense Fund, Orca Network, and Howard Garrett (collectively, PETA) sued Miami Seaquarium and Festival Fun Parks, LLC (collectively, Seaquarium), alleging Seaquarium is perpetrating an unlawful "take" by "harm[ing]" or "harass[ing]" Lolita in violation of section 9(a)(1)(B) of the Endangered Species Act of 1973, 16 U.S.C. § 1538(a)(1)(B).

The district court determined that "a licensed exhibitor 'take[s]' a captive animal . . . only when its conduct gravely threatens or has the potential to gravely threaten the animal's survival" and granted summary judgment for Seaquarium, citing PETA's failure to identify any conduct satisfying that standard. On appeal, PETA contends the district court imposed too high a standard and, alternatively, that the district court erred by concluding Seaquarium's conduct does not, as a matter of law, pose a grave threat to Lolita.[1]

---

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

[1] PETA also asserts the district court "imposed a novel 'grave threat' requirement only with respect to a 'take' of captive animals regulated under the [Animal Welfare Act], creating a drastic disparity between [Endangered Species Act] protections afforded to wild and captive endangered animals." Like this opinion, the district court's order pertains only to captive

2

We affirm the district court's determination that Seaquarium is entitled to summary judgment; however, we do not agree that actionable "harm" or "harass[ment]" includes only deadly or potentially deadly harm. Rather, Seaquarium is entitled to summary judgment because the evidence, construed in the light most favorable to PETA, does not support the conclusion that the conditions of her captivity pose a threat of serious harm to Lolita.

## I.  BACKGROUND

### A.  *Lolita*

A member of the Southern Resident L Pod of the Southern Resident Killer Whale (SRKW) Distinct Population Segment, Lolita was captured off the coast of Washington state when she was between three and six years old. Seaquarium purchased Lolita and she has lived at Seaquarium since September 24, 1970. Lolita is about twenty feet long and weighs around 8,000 pounds.

Lolita lives in an oblong tank that, at its widest and deepest points, is eighty feet wide and twenty feet deep.[2] A portion of the tank is occupied by a concrete

---

endangered animals because this case concerns only a captive endangered animal. The standard applicable to wild endangered animals is not decided in this case.

[2] In the district court, PETA sought an order enjoining Seaquarium from continuing to violate the Endangered Species Act (ESA), requiring Seaquarium to forfeit possession of Lolita, and requiring Seaquarium to transfer Lolita to a sea pen. At oral argument, counsel for PETA acknowledged the sea pen has not yet been built, but represented that PETA has funding for the project. We asked counsel for a submission directing us to the portion of the record discussing Lolita's proposed relocation. PETA's response acknowledges that the relocation plan is not itself in the record and, instead, cites a hyperlink included in an interrogatory response.

platform on which Lolita's trainers stand. Stadium seating surrounds the tank. Lolita has not lived with another orca since 1980, when Hugo, her former companion, passed away. Lolita now lives with Pacific white-sided dolphins (PWSDs). Like Lolita, the PWSDs are cetacean mammals.

*B. The Instant Case*

The Endangered Species Act of 1973 (ESA), 87 Stat. 884, 16 U.S.C. § 1531 *et seq.* (1988 ed. and Supp. V), protects species of fish and wildlife designated as endangered or threatened. Until recently, the ESA did not cover Lolita. The National Marine Fisheries Service (NMFS), the agency that administers the ESA with respect to marine mammals, recognized SRKWs as an endangered species in 2005; however, the listing excluded captive SRKWs. *Endangered and Threatened Wildlife and Plants: Endangered Status for Southern Resident Killer Whales*, 70 Fed. Reg. 69,903-01, 69,911 (Nov. 18, 2005) (codified at 50 C.F.R. § 17.11).

In January 2013, PETA successfully petitioned the NMFS to recognize Lolita as a protected SRKW and to remove the "captive member" exclusion from the ESA. Since May 11, 2015, NMFS has recognized Lolita as a SRKW covered by the ESA. *Listing Endangered or Threatened Species: Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct*

---

Although the hyperlinked document describes the relocation plan, it does not demonstrate that PETA has funded the sea pen's construction in whole or in part.

*Population Segment*, 80 Fed. Reg. 7380-01 (Feb. 10, 2015) (codified at 50 C.F.R. pt. 224).  On July 20, 2015, approximately two months after Lolita came within its coverage, PETA sued under section 9(a)(1)(B) of the ESA.

Section 9(a)(1) protects "any endangered species of fish or wildlife listed pursuant to section 1533."[3]  16 U.S.C. § 1538(a)(1).  Section 9(a)(1)(B) makes it unlawful to "take any such species within the United States or the territorial sea of the United States."  *Id.* § 1538(a)(1)(B).  "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  PETA specifically contends Seaquarium is subjecting Lolita to "harm" or "harass[ment]."  When PETA filed suit, Lolita was approximately fifty-one years old.  Wild female SRKWs have a median life expectancy of approximately 38 years according to Seaquarium and approximately 50 years according to PETA.  Lolita has exceeded the median life expectancy of wild female SRKWs by either measure.  In support of its claim that Seaquarium is subjecting Lolita to "harm" or "harass[ment]," PETA cites thirteen separate injuries to Lolita, alleging each is attributable to the configuration of Lolita's tank, the PWSDs with which Lolita shares her tank, sun exposure, or some combination

---

[3] 16 U.S.C. § 1533(a)(1)(A)–(E) sets forth several factors used "to determine whether any species is an endangered species or a threatened species."

5

thereof.[4]

The case came before the district court on cross-motions for summary judgment. PETA moved for partial summary judgment on the threshold issue of standing. Seaquarium moved for summary judgment on standing and the merits. Although the district court concluded PETA had standing to assert its ESA claims, the district court nevertheless entered summary judgment in Seaquarium's favor.[5] PETA appealed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). We will affirm if, construing the evidence in the light most favorable to the non-moving party, no genuine issue of material

---

[4] The injuries PETA cites are: (1) Physical and psychological injury caused by Lolita's inability to engage in normal swimming and diving behaviors in her tank; (2) Psychological injury attributable to the absence of a socially compatible companion; (3) Rakes inflicted when the PWSDs scrape Lolita with their teeth while swimming past her; (4) Stress caused by the PWSDs' aggressive behavior; (5) Stress caused by the PWSDs' inappropriate sexual behavior; (6) "Surfer's eye," a condition caused by exposure to UV radiation for which Lolita requires twice-daily eye drops; (7) Blisters and wrinkles potentially caused by sun exposure; (8) Treatment with antibiotics, antifungals, pain medication, hormones, and antacids not used on wild orca; (9) General unhealthiness illustrated by: a mild kidney impairment, a high number of bacteria, past treatment for respiratory infections, and a potential recurring lung condition; (10) Abnormal behavior like listless floating, lying motionless near her tank's inflow valve, pattern swimming, etc.; (11) Significant wear in six teeth; (12) A tooth that has been drilled multiple times; and (13) Captivity conditions likely to reduce Lolita's lifespan.

[5] Seaquarium filed a cross-appeal to preserve its argument that PETA lacks standing. This Court dismissed the cross-appeal, noting Seaquarium could argue the point in its response brief. Seaquarium did so. We conclude PETA has standing to bring its ESA claim.

fact exists and the moving party is entitled to judgment as a matter of law. *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1262–63 (11th Cir. 2003).

### III. ANALYSIS

Confronted with a question of statutory construction, we begin with the words of the statute. *See Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). "If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *United States v. Fisher*, 289 F.3d 1329, 1338 (11th Cir. 2002). Section 9(a)(1)(B) makes it unlawful to "take [any endangered species of fish or wildlife listed pursuant to section 1533] within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). PETA contends Lolita is being "harm[ed]" and "harass[ed]"; however, neither "harm" nor "harass" is defined in the ESA.

"In the absence of a statutory definition of a term, we look to the common usage of words for their meaning." *Consolidated Bank, N.A. v. U.S. Dep't of Treasury*, 118 F.3d 1461, 1464 (11th Cir. 1997). Dictionary definitions speak to common usage. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). "Harm" is defined as "to cause hurt or damage to: injure." Webster's Third New International Dictionary 1034 (1986). "Harass" means "to

7

vex, trouble, or annoy continually or chronically." *Id.* at 1031. Although both definitions clarify what acts constitute "harm" or "harass[ment]," they do not resolve the critical issue in this case: What degree of "harm" or "harass[ment]" is actionable? Accordingly, neither definition reveals a "plain and unambiguous meaning with regard to [this] particular dispute." *Fisher*, 289 F.3d at 1337–38 (quotation omitted).

But dictionary definitions are not the end of plain meaning analysis. As the Supreme Court has often reiterated, construing statutory language is not merely an exercise in ascertaining "the outer limits of [a word's] definitional possibilities." *See, e.g.*, *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S. Ct. 1252, 1257 (2006). "We [] have long recognized that our authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction." *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010).

We turn to the canons of statutory construction for assistance. The interpretive maxim *noscitur a sociis* counsels that "a word is known by the company it keeps." *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 378 126 S. Ct. 1843, 1849 (2006) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S. Ct. 1061, 1069 (1995)). It is frequently employed where, as here, "a string of statutory terms raises the implication that the words grouped in a list should be

8

given related meaning." *Id.* (quotation omitted). The terms "harm" and "harass" are listed alongside "pursue, hunt, shoot, wound, kill, trap, capture, [and] collect." 16 U.S.C. § 1532(19). Each of the terms accompanying "harm" and "harass" refers to conduct that poses a threat of serious harm to an endangered animal. "Hunt," "shoot," and "kill" each refer to deadly harm. "Trap," "capture," and "collect," which have limited relevance to animals already in captivity, all indicate a seizure. Seizures pose a threat of serious harm because efforts to gain bodily control over an animal come with a risk of considerable harm to the creature itself.[6] The two remaining terms, "pursue" and "wound," also concern seriously threatening conduct. The verb "wound" means "to inflict a wound upon." Webster's Third New International Dictionary at 2638. A "wound" is "an injury to the body consisting of a laceration or breaking of the skin or mucous membrane [usually] by a hard or sharp instrument forcefully driven or applied." *Id.* Similarly, "pursue" means "to follow [usually] determinedly in order to overtake, capture, kill, or defeat." *Id.* at 1848. "Harm" and "harass," which gather meaning from the surrounding terms, should be read as referring to conduct that poses a similarly serious threat.

---

[6] "Trap" means "to provide or set (a place) with traps." Webster's Third New International Dictionary at 2431. A "trap" is defined as "a device (as a pitfall, snare, or clamp that springs shut suddenly) for taking game or destructive animals." *Id.* "Collect" means "to bring together into a band . . . ." *Id.* at 444. "Capture" means "to take, seize, or catch [especially] as captive or prize by force, surprise, stratagem, craft or skill . . . ." *Id.* at 334.

9

PETA contends applying *noscitur a sociis* is inappropriate, citing *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 115 S. Ct. 2407 (1995).  But this case concerns an issue of statutory construction, whereas *Sweet Home* concerned a regulation entitled to deference.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782 (1984).  The regulation addressed in *Sweet Home* interpreted "'harm' to include indirectly injuring endangered animals through habitat modification . . . ." 515 U.S. at 702, 115 S. Ct. at 2415.  The D.C. Circuit Court of Appeals, relying heavily on *noscitur a sociis*, concluded the regulation was unreasonable because the other terms listed in the definition of "take" refer to direct applications of force.  *Id.* at 694, 115 S. Ct. at 2411.  The Supreme Court reversed, emphasizing the inappropriateness of "giv[ing] 'harm' essentially the same function as other words in the definition, thereby denying it independent meaning."  *Id.* at 702, 115 S. Ct. at 2415.

Contrary to PETA's position, *Sweet Home* does not counsel against applying *noscitur a sociis* in this case.  Using the canon to determine what degree of "harm" or "harass[ment]" is actionable does not deprive "harm" and "harass" of independent meaning.  "Harm" brings injury inflicted by means other than pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting within the ESA's ambit.  The same is true of "harass," which reaches annoying,

10

vexatious, and troubling conduct not covered by the other terms listed in the definition of "take." This application of *noscitur a sociis* is distinct from the D.C. Circuit's use of the canon, which removed a category of action (*i.e.* indirect action) from the ESA's purview.

No further inquiry is needed because common usage, as informed by the application of *noscitur a sociis*, reveals that "harm" and "harass" have a "plain and unambiguous meaning with regard to [this] particular dispute." *Fisher*, 289 F.3d at 1337–38 (quotation omitted). We will nevertheless discuss the ESA's purpose, as it is consistent with the conclusion that "harm" and "harass" should be read as referring to conduct that poses a threat of serious harm. The ESA's stated purpose is threefold: (1) providing "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," (2) providing "a program for the conservation of such endangered species and threatened species," and (3) taking appropriate steps to achieve the purposes of certain treaties and conventions set forth in the ESA. 16 U.S.C. § 1531(b). Those stated purposes, which focus on conservation, are broad; however, it is critical to keep in mind that conservation is a broad means aimed at preventing a specific end: extinction. *See, e.g.*, 16 U.S.C. § 1531(a)(1)–(2) (finding and declaring that "various species of fish, wildlife, and plants in the United States have been rendered extinct" while "other species . . . have been so depleted in numbers that

11

they are in danger of or threatened with extinction . . . ."); *see also* S. Rep. No. 93-307, at 2 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989, 2990 (noting "some sort of protective measures must be taken to prevent the further extinction of many of the world's animal species" and characterizing "hunting and destruction of natural habitat" as "[t]he two major causes of extinction").  Accounting only for the dictionary definitions of "harm" and "harass" would bring *de minimis* annoyances to endangered animals that bear no reasonable relationship to extinction within the ESA's coverage—a result inconsistent with its purpose.

PETA contends that reading "harm" and "harass" to include only conduct that poses a serious threat to an animal is inconsistent with the Supreme Court's characterization of the ESA's purpose as "broad."  *See Sweet Home*, 515 U.S. at 698, 115 S. Ct. at 2413.  But when the Supreme Court remarked on the ESA's broad purpose in *Sweet Home*, it did so in the context of a facial challenge to a regulation that interpreted "harm" as covering indirect action.  515 U.S. at 699, 115 S. Ct. at 2414.  Had the Supreme Court invalidated the regulation, no indirect action affecting an endangered animal could have been deemed covered "harm"—even habitat destruction that an actor knew would cause a particular endangered species to go extinct.  *Id.*  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184, 98 S. Ct. 2279, 2297 (1978).  Therefore,

the Court declined to exclude all indirect action from coverage, recognizing that activities like habitat destruction "cause the precise harms that Congress enacted the statute to avoid." *Sweet Home*, 515 U.S. at 698, 115 S. Ct. at 2413. Read in context, the Supreme Court's statements about the breadth of the ESA's purpose do not compel the reading PETA urges. Quite the opposite, interpreting "harm" and "harass" as covering any conduct that falls within those terms' dictionary definitions would be out of step with the ESA's purpose.

Agency interpretations also support the conclusion that only serious "harm" or "harass[ment]" is actionable under the ESA. The NMFS, which administers the ESA with respect to marine mammals, including Lolita, has defined "harm" as follows:

> Harm in the definition of "take" in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns including, breeding, spawning, rearing, migrating, feeding or sheltering.

General Endangered and Threatened Marine Species, 50 C.F.R. § 222.102 (2016). This definition is entitled to deference. *See Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. PETA contends the NMFS's use of the unadorned term "injures" conflicts with the "grave threat" standard the district court imposed. Several aspects of the definition, however, indicate a serious threat is required. First, "injure[]" is juxtaposed with "actually kill[]," an extremely serious alternative. 50 C.F.R.

§ 222.102. Second, the example provided is "*significant* habitat modification or degradation" that "actually kills or injures fish or wildlife by *significantly* impairing essential behavioral patterns including, breeding, spawning, rearing, migrating, feeding or sheltering." *Id.* (emphasis added). Although any impairment of essential behavioral patterns is "harm" in the literal sense, the NMFS cabined its example to significant impairment. This decision indicates not just any "harm" will do.

The NMFS has not defined "harass"; however, the Fish and Wildlife Service, which administers the ESA with respect to terrestrial species, interprets "harass" as follows:

> Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

Endangered and Threatened Wildlife and Plants, 50 C.F.R. § 17.3 (2016). This definition of "harass" only covers acts or omissions that create a likelihood of a sufficiently serious threat. Although even *de minimis* harassment creates some likelihood of injury, the definition specifically mentions acts or omissions that annoy wildlife "to such an extent as to significantly disrupt normal behavioral pattern" like breeding, feeding, and sheltering. *Id.* Therefore, like "harm," "harass[ment]" is only actionable under the ESA if its impact on an endangered

14

animal is sufficiently serious.

The relationship between the ESA and the Animal Welfare Act (AWA), 7 U.S.C. § 2131 *et seq.*, lends still more support for the conclusion that "harm" or "harass[ment]" is only actionable if it poses a threat of serious harm. The AWA aims to ensure the humane treatment of captive animals used for exhibition and research purposes. To that end, it authorizes the Secretary of Agriculture to license exhibitors, *see* 7 U.S.C. § 2133, and to promulgate standards for the treatment of animals under their care, *see* 7 U.S.C. § 2146. The Secretary delegated this authority to the Administrator of Animal and Plant Health Inspection Services (APHIS). Pursuant to that delegation APHIS has established, and occasionally amended, a set of detailed regulations governing the humane handling, care, treatment, and transportation of marine mammals used for exhibition purposes. *See* Animal Welfare; Marine Mammals, 81 Fed. Reg. 5629-01 (Feb. 3, 2016) (to be codified at 9 C.F.R. pts. 1, 3). As the district court recognized, the regulations promulgated under the AWA address many of the aspects of Lolita's activity PETA puts forward in this case as "harm[ing]" or "harass[ing]" Lolita in violation of the ESA, including natural and artificial shelter, 9 C.F.R. § 3.103(b), enclosure dimensions, *id.* at §3.104, and companionship, *id.* at § 3.109. APHIS has even announced its intention to revise its regulations relating to artificial shelter to account for concerns about UV exposure, stating: "Because marine mammals are

15

susceptible to overheating and sunburn and/or eye damage from direct and/or reflected sunlight, and UV light reflections can cause or exacerbate damage to marine mammal eyes, we are proposing to amend § 3.103(b) by adding that the shade must be accessible and must cover sufficient area to afford all the animals within the enclosure protection from direct sunlight while not limiting their ability to move or not be too close to another animal." Animal Welfare; Marine Mammals, 81 Fed. Reg. at 5635 (footnote omitted).

PETA's expansive reading of "harm" and "harass" would effectively nullify the AWA in the context of captive endangered animals. If given their dictionary definitions, "harm" and "harass" would sweep so broadly as to deprive AWA compliance of practical significance. Any continual annoyance, trouble, or vexation could, for example, be actionable "harass[ment]." It is not difficult to imagine that captivity, however humane, could often be challenged as continually annoying, troublesome, or vexatious. PETA urges that we ought not be concerned about interpreting the ESA aggressively because Congress intended the ESA to provide added protections for endangered animals. But the interpretation PETA presses could nullify the AWA's regime of administrative enforcement. Even after APHIS had approved a particular aspect of an endangered animal's conditions of captivity, plaintiffs could expose the exhibitor to ESA liability by framing that condition as an impermissible "take," no matter how *de minimis* the harm it

16

caused. For example, if APHIS had approved a captive endangered marine mammal's companions, plaintiffs could invite a federal court to substitute its judgment for APHIS's by bringing an ESA lawsuit characterizing the chosen companions as a "continual annoyance." Our conclusion that "harm" or "harass[ment]" is actionable if it poses a threat of serious harm provides captive endangered animals with an additional layer of protection from harmful conditions of captivity without abrogating the complex regulatory scheme crafted and administered by APHIS.

## IV.  CONCLUSION

Under the ESA, "harm" or "harass[ment]" is only actionable if it poses a threat of serious harm. None of the thirteen injuries PETA cites satisfies that standard. The judgment of the district court is

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 12, 2018

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 16-14814-BB
Case Style: People for the Ethical Treatme, et al v. Miami Seaquarium, et al
District Court Docket No: 1:15-cv-22692-UU

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1.

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Carol R. Lewis, BB at (404) 335-6179.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs